1  Michael W. Sobol (State Bar No. 194857)
   msobol@lchb.com
2  Melissa Gardner (State Bar No. 289096)
   mgardner@lchb.com
3  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA 94111-3339
   Telephone: 415.956.1000
5  Facsimile: 415.956.1008

6  Rachel Geman
   rgeman@lchb.com
7  Nicholas Diamand
   ndiamand@lchb.com
8  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   250 Hudson Street, 8th Floor
9  New York, NY 10013-1413
   Telephone: 212.355.9500
10 Facsimile: 212.355.9592

11 Hank Bates (State Bar No. 167688)
   hbates@cbplaw.com
12 Allen Carney
   acarney@cbplaw.com
13 David Slade
   dslade@cbplaw.com
14 CARNEY BATES & PULLIAM, PLLC
   11311 Arcade Drive
15 Little Rock, AR 72212
   Telephone: 501.312.8500
16 Facsimile: 501.312.8505

Jeremy A. Lieberman
Lesley F. Portnoy
info@pomlaw.com
POMERANTZ, LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212.661.1100
Facsimile: 212.661.8665

Patrick V. Dahlstrom
pdahlstrom@pomlaw.com
POMERANTZ, LLP
10 S. La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: 312.377.1181
Facsimile: 312.377.1184

17 *Attorneys for Plaintiffs and the Proposed Class*

18

UNITED STATES DISTRICT COURT

19

NORTHERN DISTRICT OF CALIFORNIA

20

21

22 MATTHEW CAMPBELL, MICHAEL
   HURLEY, and DAVID SHADPOUR, on
   behalf of themselves and all others
23 similarly situated,

24            Plaintiffs,

25 v.

26 FACEBOOK, INC.,

27            Defendant.

28

Case No. C 13-05996 PJH

**PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

**HEARING**
Date:  September 17, 2014
Time:  9:00 a.m.
Place: Courtroom 3, 3rd Floor
       The Honorable Phyllis J. Hamilton

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................ 1

II.  FACTUAL BACKGROUND ......................................................................... 3

    A.   Facebook's Private Message Service And Its Interceptions Of Content Within Those Messages.............................................................. 4

    B.   Facebook's Misleading Disclosures............................................................ 5

    C.   The Role of Intercepting User Content On Facebook's "Ordinary Course Of Business." ................................................................................. 5

III. LEGAL STANDARD ..................................................................................... 6

IV.  ARGUMENT ................................................................................................. 6

    A.   Facebook Violated The Electronic Communications Privacy Act. ........... 7

        1.   Intercepting And Using The Contents Of Private Correspondence Is Not Within Facebook's Ordinary Course Of Business. .................................................................................... 7

            a.   The Plain Meaning Of Section 2510(5)(a)(ii), ECPA's Statutory Scheme, And The Legislative History All Make Clear That The "Ordinary Course Of Business" Exception Is A Narrow One......................... 8

            b.   Virtually All Courts Addressing "Ordinary Course Of Business" Interpret The Exception Narrowly. .............. 9

            c.   Facebook's Cases Do Not Support Its Motion................ 11

            d.   Facebook's Reliance On An Opinion About Publicly-Disclosed Practices Is Particularly Misplaced. ........................................................................ 12

        2.   Plaintiffs Did Not Consent To Facebook's Interception And Use Of Their Private Messages.................................................. 14

            a.   Facebook Did Not Obtain Express Consent. ................... 15

            b.   Facebook Did Not Obtain Implied Consent..................... 18

        3.   Facebook "Intercepted" Communications "In Transmission." ............................................................................. 19

    B.   Facebook Violated California Penal Code § 631 ...................................... 19

    C.   Facebook Violated California Penal Code § 632........................................ 19

    D.   Plaintiffs' Unfair Competition Law Claims Are Adequately Pleaded. ................................................................................................... 20

        1.   Plaintiffs Have Standing Under the UCL. .................................. 20

        2.   Facebook Violated the Unfair Competition Law........................ 24

    E.   Plaintiffs Are Entitled To Seek Injunctive Relief. ................................... 25

    F.   Leave To Amend Should Be Granted If Any Of Facebook's Motion Is Granted. ............................................................................................... 25

V.   CONCLUSION ............................................................................................ 26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arias v. Mutual Cent. Alarm Serv.*,
202 F.3d 553 (2d Cir. 2000)................................................................................. 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................. 6, 19

*Berry v. Funk*,
146 F.3d 1003 (D.C. Cir. 1998)................................................................. 10, 18

*Brennan v. Concord EFS, Inc.*,
369 F.Supp.2d 1127 (N.D. Cal. 2005) ...................................................... 19

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................................. 25

*Claridge v. RockYou, Inc.*,
785 F. Supp. 2d 855 (N.D. Cal. 2011) ...................................................... 23

*Cohen v. Facebook, Inc.*,
798 F. Supp. 2d 1090 (N.D. Cal. 2011) .................................................... 15

*Deal v. Spears*,
980 F.2d 1153 (8th Cir. 1992)................................................................ 10, 18

*Deering v. CenturyTel, Inc.*,
No. 10-63, 2011 U.S. Dist. LEXIS 51930 (D. Mont. May 16, 2011)........................ 17

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989)................................................................................. 6

*Doe 1 v. AOL, LLC*,
719 F. Supp. 2d 1102 (N.D. Cal. 2010) .................................................... 23

*Downing v. Mun. Court*,
88 Cal. App. 2d 345 (Cal. App. 1948) ...................................................... 22

*Dukes v. ADS Alliance Data Sys.*,
2006 U.S. Dist. LEXIS 84311 (S.D. Ohio Nov. 20, 2006)................................. 15

*Dunbar v. Google, Inc.*,
No. 10-194, 2011 U.S. Dist. LEXIS 157932 (E.D. Tex. May 23, 2011)...................... 10

*Duncan v. Walker*,
533 U.S. 167 (2001)................................................................................. 8

*Edwards v. First Am. Corp.*,
610 F.3d 514 (9th Cir. 2010)...................................................................... 21

*Farmers Ins. Exch. v. Superior Court*,
2 Cal.4th 377 (Cal. 1992)........................................................................... 24

*Fisher v. United States*,
425 U.S. 391 (1976).................................................................................. 6

*FMC Corp. v. Capital Cities/ABC, Inc.*,
915 F.2d 300 (7th Cir. 1990)...................................................................... 23

*G.S. Rasmussen & Assocs. v. Kalitta Flying Serv.*,
958 F.2d 896 (9th Cir. 1992)...................................................................... 22

**TABLE OF AUTHORITIES**
(continued)

Page

*Gilligan v. Jamco Dev. Corp.*,
   108 F.3d 246 (9th Cir. 1997)..................................................................................... 6

*Griggs-Ryan v. Smith*,
   904 F.2d 112 (1st Cir. 1990) ..................................................................................... 18

*Hall v. EarthLink Network, Inc.*,
   396 F.3d 500 (2d Cir. 2005)................................................................................ 11, 12

*Haro v. Sebelius*,
   747 F.3d 1099 (9th Cir. 2014)................................................................................... 25

*Hernandez v. Path, Inc.*,
   2012 U.S. Dist. LEXIS 151035 (N.D. Cal. Oct. 17, 2012).......................................... 19

*In re Facebook Privacy Litig.*,
   791 F. Supp. 2d 705 (N.D. Cal. 2011) ....................................................................... 23

*In re Facebook Privacy Litig.*,
   No. 12-15619, 2014 U.S. App. LEXIS 8679 (9th Cir. May 8, 2014)............................. 23

*In re Google Inc. Gmail Litig. ("Gmail")*,
   No. 13-02430, 2013 U.S. Dist. LEXIS 172784
   (N.D. Cal. Sept. 26, 2013).................................................................................. passim

*In re Google Inc. Gmail Litig.*,
   No. 13-02430, 2014 U.S. Dist. LEXIS 36957 (N.D. Cal. Mar. 18, 2014)....................... 15

*In re Google, Inc. Privacy Policy Litig.*,
   No. 12-01382, 2013 U.S. Dist. LEXIS 171124 (N.D. Cal. Dec. 3, 2013)........................ 12

*In re iPhone Application Litig.*,
   No. 11-02250, 2011 U.S. Dist. LEXIS 106865
   (N.D. Cal. Sept. 20, 2011)........................................................................................ 23

*In re Pharmatrak, Inc. Privacy Litig*,
   329 F.3d 9 (1st Cir. 2003).............................................................................. 14, 15, 18

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (Cal. 2009)...................................................................................... 25

*In re VistaPrint Corp Mktg. & Sales Practices Litig.*,
   2009 U.S. Dist. LEXIS 77509 (S.D. Tex. Aug. 31, 2009)............................................. 17

*Johnson v. Trans Ag.*,
   770 F.2d 752 (9th Cir. 1984)....................................................................................... 7

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979)................................................................................................. 22

*Kight v. CashCall, Inc.*,
   200 Cal. App. 4th 1377 (Cal. App. 2011) .................................................................. 20

*Kirch v. Embarq Mgmt. Co.*,
   702 F.3d 1245 (10th Cir. 2012)........................................................................... 11, 12

*Klamath Water Users Protective Ass'n v. Patterson*,
   204 F.3d 1206 (9th Cir. 2000)................................................................................... 15

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (Cal. 2003)..................................................................................... 24

- iii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Kremen v. Cohen*,
337 F.3d 1024 (9th Cir. 2003)................................................................. 22

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (Cal. 2011)................................................... 21, 23, 24

*MacDonald v. Ford Motor Co.*,
No. 13-02988, 2014 U.S. Dist. LEXIS 44858
(N.D. Cal. Mar. 31, 2014)..................................................................... 24

*Marquis v. Google, Inc.*,
No. 11-02808, Mass. Super. Ct. (Jan. 17, 2012)............................. 10

*Mohamed v. Jeppesen Dataplan, Inc.*,
579 F.3d 943 (9th Cir. 2009).................................................................. 6

*Moskal v. United States*,
498 U.S. 103 (1990)................................................................................ 7

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993).................................................................... 25

*Opperman v. Path, Inc.*,
No. 13-00453, 2014 U.S. Dist. LEXIS 67225
(N.D. Cal. May 14, 2014) ..................................................................... 23

*Ortega v. O'Connor*,
146 F.3d 1149 (9th Cir. 1998)................................................................ 6

*People v. Kwok*,
63 Cal. App. 4th 1236 (Cal. App. 1998)............................................. 22

*Petersen v. Boeing Co.*,
715 F.3d 276 (9th Cir. 2013).............................................................. 25

*Quon v. Arch Wireless Operating Co., Inc.*,
529 F.3d 892 (9th Cir. 2008)............................................................... 17

*Rogers v. Ulrich*,
52 Cal. App. 3d 894 (1975)................................................................. 20

*Shroyer v. New Cingular Wireless Servs., Inc.*,
606 F.3d 658 (9th Cir. 2010)................................................................. 6

*Shulman v. Group W Productions, Inc.*,
18 Cal. 4th 200 (Cal. 1998).......................................................... 3, 20

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009)............................................................... 6

*Thomasson v. GC Servs. Ltd. P'ship.*,
321 F. App'x 557 (9th Cir. 2008) ....................................................... 20

*United States v. Bass*,
404 U.S. 336 (1971)................................................................................ 7

*United States v. Murdock*,
63 F.3d 1391 (6th Cir. 1995)............................................................... 10

*United States v. Staves*,
383 F.3d 977 (9th Cir. 2004)............................................................... 18

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Szymuszkiewicz*,
   622 F.3d 701 (7th Cir. 2010)................................................................. 11

*Valentine v. Wideopen West Fin., LLC*,
   288 F.R.D. 407 (N.D. Ill. 2012)........................................................... 14

*Watkins v. L.M. Berry & Co.*,
   704 F.2d 577 (11th Cir. 1983)................................................. 10, 14, 18

*Whalen v. Roe*,
   429 U.S. 589 (1977)............................................................................... 6

**Statutes**

18 U.S.C. § 2510 *et seq.*................................................................. 1, 7, 8, 9

18 U.S.C. § 2511(1)(a).................................................................................. 7

Cal. Bus. & Prof. Code § 17200 *et seq.* .................................................... 1

Cal. Civ. Code § 654 .................................................................................. 22

Cal. Pen. Code § 631 *et seq.* ....................................................................... 1

Cal. Pen. Code § 632(a) ............................................................................. 20

**Rules**

Fed. R. Civ. P. 15(a)(2)............................................................................. 25

**Other Authorities**

CAL. CONST., Art. I, § 1 ............................................................................. 6

S. Rep. No. 99-541 (1986) .......................................................................... 9

1

## **ISSUES TO BE DECIDED**

2    1.   Does Plaintiffs' Consolidated Amended Complaint adequately set forth facts, which if

3    considered in a light most favorable to Plaintiffs and taken as true for purposes of this

4    motion, state claims upon which relief may be granted?

5    2.   Does Plaintiffs' Consolidated Amended Complaint adequately set forth facts, which if

6    considered in a light most favorable to Plaintiffs and taken as true for purposes of this

7    motion, demonstrate UCL standing in that they have suffered injury in fact, by

8    alleging violation of federally protected rights, and have lost property or money, by

9    alleging that Facebook has deprived them of exclusive use of their private

10   correspondence?

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.**      **INTRODUCTION**

2          Defendant Facebook, Inc.'s ("Facebook's") motion to dismiss should be denied because it

3    prematurely and improperly seeks to litigate questions of fact and misstates the relevant law.

4    Contrary to Facebook's incorrect argument that this is copycat litigation, Plaintiffs' detailed

5    Consolidated Amended Complaint ("CAC") centers on practices unique to Facebook.

6          Specifically, on October, 2012, security researchers published proof that Facebook was

7    scanning its users' private messages to learn the substance of those communications.  Facebook

8    employed devices to seek out URLs in private messages, and to include that information in

9    profiles of its users.  Facebook thus added code to its messaging process that was unnecessary for

10   any purpose other than to enable it to analyze the substance of its users' messages and determine

11   their meaning, as well as to tie that meaning back to the users.

12         Once these practices were brought to light, Facebook, by its own admission, ceased these

13   scanning practices without changing its disclosures, underscoring that it in no way needed to

14   access the content of messages in order to provide its messaging service, and that its scanning

15   practices were in no way disclosed to its users.

16         The acts articulated in the CAC violate the Electronic Communications Privacy Act,

17   18 U.S.C. §§ 2510 *et seq.* ("ECPA"), and the California Invasion of Privacy Act, Cal. Penal Code

18   §§ 631 *et seq.* ("CIPA") – which broadly prohibit the interception of private communications for

19   purposes of acquiring the substance of those communications – as well as California's Unfair

20   Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"), which prohibits unlawful,

21   unfair, and fraudulent business practices.

22         Plaintiffs' ECPA Claims – Facebook argues that *any* "systematic conduct . . . that

23   generates revenue for a company" is exempt from liability under ECPA's "ordinary course of

24   business" exception.  Defendant's Motion to Dismiss ("Mot.") at 15.  However, and

25   unsurprisingly, no court has ever held that *secretly* acquiring the *substance* of private

26   communications is within the ordinary course of a company's business, and the case law cited in

27   Facebook's motion is inapposite.  Facebook's circular logic that any conduct done by a business

28   is therefore within the ordinary course of business lacks textual, precedential, or logical support.

1       Facebook also submits that its loosely-worded terms of service mean that users have

2  granted explicit consent to these practices.  Yet, nothing in Facebook's disclosures remotely

3  suggests that it would analyze the content of users' messages – messages that Facebook in fact

4  repeatedly, publicly, characterizes as "private" – to scan them for their substance, and then

5  catalog the information contained in them in a data profile.  Facebook's implied consent argument

6  is equally infirm, and raises questions of fact outside the CAC by suggesting that Facebook's

7  separate practice of allegedly previewing URLs has anything to do with the issues here.

8       Finally, Facebook's argument that its interceptions of private messages did not occur "in

9  transmission" is another attempt to insert facts not pled in the CAC – indeed, facts in *conflict* with

10  those pled – and, thus, is wholly inappropriate to consider at this stage of the litigation.

11      <u>Plaintiffs' CIPA Claims</u> – Facebook's argument that Plaintiffs' communications were

12  "entirely contained" within Facebook's network has no basis in fact, and is expressly contradicted

13  by Plaintiffs' allegations.  To the extent that Facebook renews its argument regarding consent in

14  the context of CIPA, such an argument fails for the same reasons as it fails under ECPA.  Further,

15  the communications at issue are "confidential" within the meaning of CIPA, and Facebook's

16  activities amounted to "eavesdropping" under the statute.

17      <u>Plaintiffs' UCL Claims</u> –California law recognizes private communications as property

18  and Plaintiffs have pled facts sufficient to confer standing to assert a UCL claim.  Similarly, the

19  facts set forth in the CAC sufficiently articulate a violation of each prong of the UCL.  Facebook

20  unlawfully violated both ECPA and CIPA; it unfairly sacrificed the rights of consumers in pursuit

21  of its personal gain, and it fraudulently misled both Plaintiffs and the public that "private"

22  messages sent over Facebook would be just that – private.

23      <u>Plaintiffs' Request for Injunctive Relief</u> – Finally, Facebook's concession that it

24  abandoned its invasive practices once they were uncovered should not preclude injunctive relief

25  here, as there is no guarantee that Facebook will not resume its conduct at any point in the future.

26      While Facebook attempts to recast its conduct as innocuous routing protocol coupled with

27  "anonymized"[1] observation, in reality it has committed a breach of trust from which *every*

---

28  [1] Here, again, Facebook advances facts in not pled in the CAC.  Specifically, it claims that the

*Footnote continued on next page*

facilitator of communications is prohibited: it acquired the substance of its users' communications without their consent.  These acts are the twenty-first-century equivalent of AT&T eavesdropping on each of its customers' phone conversations, or of a common carrier taking information from private correspondence; acts which would uniformly be condemned as egregious and illegal invasions of privacy under any circumstance.  As the California Supreme Court has said:

> [A] measure of personal isolation and personal control over the conditions of its abandonment is of the very essence of personal freedom and dignity…. A [person]…whose conversations may be overheard at the will of another…is less of a [person], has less human dignity, on that account. He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant.

*Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 231 (Cal. 1998) (citation omitted).

## II.     **FACTUAL BACKGROUND**

Facebook systematically intercepted its users' private messages to acquire information concerning their content.  CAC¶¶ 25-58.  Specifically, when users employed Facebook's private message service, Facebook surreptitiously utilized devices to scan the contents of those messages, in order to determine whether users had included links to other websites within them.  *Id.* ¶¶ 17-24, 31, 34, 38-39, 47-48.  When the message contained a link to a third party website, Facebook's routing procedures and code would then notate that link, in that it would add it as a data point on user profiles it assembled for both the sender and recipient of the message.  It then used that information to inflate the "Like" counters on websites associated with Facebook.  *Id.*

Facebook in no way needed to engage in this practice to provide its private messaging service.  *Id.* ¶¶ 22-58.  In fact, actions that Facebook attempts to characterize as (1) minimal, technical steps incident to providing its most basic services and (2) procedures openly disclosed to its users were, in fact, so opaque and so far outside the norm that, when exposed, the story made national news in the Wall Street Journal.  *Id.* ¶¶ 35-39.  Within a month of being exposed in

---

*Footnote continued from previous page*
data points assembled from its message scans are "*anonymous and aggregate*" Mot. at 1 (emphasis original).  Plaintiffs have instead asserted that these data points are *precisely* what Facebook uses in assembling its *individualized* user profiles.  CAC ¶¶ 41-49.

the press, Facebook quietly ceased its practice of intercepting private messages' content. *Id.* ¶¶ 39, 59 n.3. This about-face had no impact on Facebook's ability to transmit private messages or protect the security of its services. *Id.* ¶ 39. Nor did it occasion a revision to any of Facebook's disclosures to its users, an implicit admission that the practice was never disclosed to users in the first place. *Id.*

**A.** **Facebook's Private Message Service And Its Interceptions Of Content Within Those Messages.**

Recognizing that users do not wish for every activity on Facebook to be part of a record, Facebook offers a "private message" service as a counterpoint to public or group posts. *Id.* ¶¶ 20-24. The service combines email, chat, text messaging, and in-service messaging, thereby enabling users to send and receive private messages within and outside of Facebook, and across different devices. *Id.* ¶ 22. Facebook tells users they have "unprecedented" control over privacy when operating this service, promising they are "*only sharing the information you want to, and you're only sharing it with the people you want to share it with.*" *Id.* ¶¶ 23-24. But Facebook's assurances of user control and privacy were directly contradicted by its actions. *Id.* ¶¶ 25-58.

At least until it was exposed by the press in October, 2012, Facebook took several steps in the private message routing process to intercept the substance of users' private messages. *Id.* When a user's private message included a link to a web page (a "URL"), Facebook employed devices called "web crawlers" to (1) scan the web page's contents, (2) determine whether there was a "Like" plugin[2] embedded in that page, (3) add a "Like" to the aggregate count on behalf of the sender and each recipient, and (4) associate "Liking" that web page with the secretly-assembled profiles of the sender and each recipient. *Id.* Facebook engaged in this conduct in order to compile data points for its ever-expanding user profiles. *Id.*

As discussed above, Facebook's conduct is an elemental invasion of privacy. *Id.* ¶¶ 53-55. By intercepting private message content Facebook gained significant, and completely

---

[2] Facebook uses a variety of mechanisms to record activity not just on its social network, but on the Internet, at large. CAC ¶¶ 26-34, 41-49. One such mechanism is the "Like" button; code that enables users to publicly "Like" third party websites – and alerts Facebook to the fact that those users have some affinity for the material on that web page. *Id.* Facebook relies heavily on what individual users "Like" to create user profiles for serving targeted advertising. *Id.*

personalized, intelligence on each user – information the user chose to share *privately* – without their knowledge or consent.  *Id.* ¶¶ 32-34, 41-52, 56-58.

**B.    Facebook's Misleading Disclosures.**

At all times relevant to this litigation, Facebook failed to notify users that it intercepted and catalogued the content of their private correspondence.  *Id.* ¶¶ 17-24, 31.  Indeed, Facebook affirmatively represented that users' messages would be "private," and provide "unprecedented" user control.  *Id.*  Facebook's Data Use Policy conspicuously failed to seek users' permission to access user-generated content and correspondence.  Ex. B[3]; Part IV-A-2, *infra*.  And in separate disclosures about technical data – which do not concern such content at all – Facebook stated only that it may collect "data about" users' messages.  *Id.*  In direct contradiction to its representations to users, Facebook scanned users' private messages to get information about their substance.  *Id.*  When Facebook purportedly discontinued that practice, it did not revise any of its disclosures, which had never disclosed the interceptions to begin with.  *Id.* ¶¶ 17-24, 31, 38-39.

**C.    The Role of Intercepting User Content On Facebook's "Ordinary Course Of Business."**

Similarly, while Facebook may have ceased intercepting, cataloging, and manipulating the content within its users' private messages following an exposé in the Wall Street Journal, this re-tooling of its routing processes and devices had *no impact* on Facebook's ability to transmit messages, ensure service safety, protect intellectual property, or to generally offer its product or services.  *Id.* ¶¶ 37-39.  Instead, Facebook simply (and quietly) ceased practices that were wholly extraneous to the services it purported to offer, and that were employed for the sole purpose of mining private communications for information that would benefit Facebook's bottom line.  *Id.*

On December 30, 2013, Plaintiffs brought this action for damages and injunctive relief against Facebook under ECPA, CIPA and the UCL, and declaratory relief and restitution under ECPA and the UCL.  The CAC was filed on April 25, 2014.  On June 17, 2014, Facebook filed the instant motion to dismiss.

---

[3] Unless otherwise stated, references to exhibits ("Ex.") are to the Declaration of Michael Sobol.

III.   **LEGAL STANDARD**

Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks "a cognizable legal theory" or "sufficient facts to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 606 F.3d 658, 664 (9th Cir. 2010). The issue is not whether the non-moving party will ultimately prevail but whether it is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). The Court must draw "all reasonable inferences from the complaint in [plaintiffs'] favor," *Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009), and "must accept as true all of the factual allegations contained in the complaint" and "construe them in the light most favorable to the plaintiffs." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009).

IV.   **ARGUMENT**

The right of privacy is a personal and fundamental right in California[4] and the United States.[5] "Personal letters," in particular, "constitute an integral aspect of a person's private enclave." *Fisher v. United States*, 425 U.S. 391, 427 (1976); *Ortega v. O'Connor*, 146 F.3d 1149, 1161 (9th Cir. 1998) (personal communications "lie at the heart of our sense of privacy.") (citation omitted). Federal law has long protected privacy rights in personal communications. ECPA was passed in 1986 with the express purpose of affording to electronic communications the same protections that attach to private letters sent via the U.S. Postal Service. In recommending that ECPA be adopted, the Senate Committee on the Judiciary stated:

> A letter sent by first class mail is afforded a high level of protection against unauthorized opening by a combination of constitutional provisions, case law, and U.S. Postal Service statutes and regulations. Voice communications transmitted via common carrier are protected by Title III of the Omnibus Crime Control and Safe

---

[4] CAL. CONST., Art. I, § 1, adopted as ballot measure in 1972 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.")

[5] *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("[B]oth common law and the literal understanding of privacy encompass the individual's control of information concerning his or her own person"); *Whalen v. Roe*, 429 U.S. 589, 605 (1977).

Streets Act of 1968. But there are no comparable Federal statutory standards to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer technology. This is so, even though American citizens and American businesses are using these new forms of technology in lieu of, or side-by-side with, first class mail and common carrier telephone services.

CAC ¶ 53.

### A.    **Facebook Violated The Electronic Communications Privacy Act.**

ECPA provides a civil cause of action against any person who "intentionally intercepts . . . any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Act further clarifies that intercepting a message's *content* is proscribed, and defines "intercept" as "the aural or other acquisition of the *contents* of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id*. at § 2510(4) (emphasis added). "Contents" are defined as "any information concerning the [communication's] substance, purport, or meaning." *Id*. at § 2510(8). Thus, ECPA prohibits Facebook's conduct alleged here: it prohibits any non-participant to an electronic communication from acquiring "*any* information concerning the substance, purport, or meaning" of the communication. *Id.* (emphasis added). [6]

### 1.    **Intercepting And Using The Contents Of Private Correspondence Is Not Within Facebook's Ordinary Course Of Business.**

ECPA provides a narrow exception to its blanket prohibition on message interception, exempting from its definition of "device" any equipment used by an electronic communications service in the "ordinary course of its business." *Id*. § 2510(5)(a)(ii). As with any affirmative defense, the burden to prove this exception falls upon the party asserting the defense – here, Facebook. *See Johnson v. Trans Ag.*, 770 F.2d 752, 762 (9th Cir. 1984). Facebook cannot meet

---

[6] Facebook argues that ECPA must be construed narrowly because it is a criminal statute. But that rule of lenity, if it is of any relevance in a civil context, applies only where a statute is ambiguous, and there is no ambiguity here. Accordingly, the rule cannot avail Facebook. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) (rule of lenity applies only where "a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute.") (citation omitted); *United States v. Bass*, 404 U.S. 336, 347 (1971) (court should rely on lenity only if, "after seizing every thing from which aid can be derived," it is "left with an ambiguous statute") (citations omitted).

1   its burden for multiple reasons.  First, the plain meaning of ECPA, its statutory scheme, and its

2   legislative history, all make plain that the ordinary course of business exception is a narrow one.

3   Second, every court considering the applicability of section 2510(5)(a)(ii) to the kind of conduct

4   at issue here – the undisclosed interception and mining of the ***content*** of private communications,

5   for an undisclosed commercial purpose, in a manner unrelated to the transmission of the messages

6   – has rejected Facebook's interpretation of the statute.  Indeed, the cases upon which Facebook

7   relies for its incorrect and broad reading of "ordinary course of business" do not directly address

8   allegations of invasion of privacy such as scanning messages to obtain their substance.  Further,

9   to the extent that Facebook interprets one lone holding to require a broad interpretation of section

10  2510(5)(a)(ii), Facebook's contorted interpretation of that holding is at odds with established

11  ECPA precedent.

12              **a.       The Plain Meaning Of Section 2510(5)(a)(ii),  ECPA's Statutory**
                          **Scheme, And The Legislative History All Make Clear That The**
13                        **"Ordinary Course Of Business" Exception Is A Narrow One.**

14          At the outset, it is critical to note that Congress circumscribed the term "course of

15  business" with the limiting modifier "ordinary."  *In re Google Inc. Gmail Litig*. *("Gmail")*, No.

16  13-02430, 2013 U.S. Dist. LEXIS 172784, at *29 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("The

17  presence of the modifier 'ordinary' must mean that not everything [a defendant] does in the

18  course of its business would fall within the exception.").  Ignoring this, Facebook posits that *any*

19  "systematic conduct . . . that generates revenue for a company" is entitled to an exemption.  Mot.

20  at 15.  This writes "ordinary" completely out of the statute, thus conflicting with bedrock rules of

21  statutory interpretation.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (in interpreting a statute,

22  courts should "give effect, if possible, to every clause and word[.]").

23          Beyond the plain meaning of section 2510(5)(a)(ii), ECPA's broader statutory scheme

24  indicates that the "ordinary course of business" exception is focused only on devices used for

25  transmitting communications.  ECPA defines an "electronic communication service" ("ECS") as

26  "any service which provides the users thereof the ability ***to send or receive*** wire or electronic

27  communications."  18 U.S.C. § 2510(15) (emphasis added).  Similarly, an "electronic

28  communications system" is a facility used for the "***transmission*** of wire or electronic

1   communications." 18 U.S.C. § 2510(14) (emphasis added).  These definitions evidence the

2   legislature's understanding of the "business" in which ECS providers are involved: *transmitting*

3   communications – not harvesting them for profitable tidbits about the authors.

4        A separate exception to the Wiretap Act related to ECS providers is also instructive; it

5   states that ECS providers may intercept communications "while engaged in any activity which is

6   a necessary incident to the rendition of his service or to the protection of the rights or property of

7   the provider of that service," but the provider *may not* "utilize service observing or random

8   monitoring *except for mechanical or service quality control checks*." *Gmail*, 2013 U.S. Dist.

9   LEXIS 172784, at *35 (quoting 18 U.S.C. § 2511(2)(a)(i)).  As *Gmail* held, because this language

10  "explicitly limits the use of service observing or random monitoring by [ECS] providers to

11  mechanical and service quality control checks . . . the statutory scheme suggests that Congress did

12  not intend to allow [ECS] providers unlimited leeway to engage in any interception that would

13  benefit their business models." *Id*. at *36.

14       Finally, legislative history supports a narrow reading of section 2510(5)(a)(ii).  A Senate

15  Report on ECPA states that, while ECS providers may have to "monitor a stream of transmissions

16  in order to properly route, terminate, and otherwise manage the individual messages they

17  contain," these acts do not violate ECPA *only* because "[t]hese monitoring functions . . . do not

18  involve humans listening in on voice conversations." Ex. C (S. Rep. No. 99-541, at 20 (1986)).

19  Analyzing this language, *Gmail* found that an ECS provider therefore "must show some link

20  between the alleged interceptions at issue and its ability to operate the communication system" to

21  be eligible for section 210(5)(a)(ii)'s protection.  2013 U.S. Dist. LEXIS 172784, at *37.

22       Congress created a narrow exception to ECPA under section 2510(5)(a)(ii), one that

23  applies only when an ECS provider employs technologies incidental to transmitting

24  communications, and not for undisclosed acquisition of the "substance, purport, or meaning" of

25  the content contained within those communications.

26       **b.    Virtually All Courts Addressing "Ordinary Course Of**
            **Business" Interpret The Exception Narrowly.**

27

28       To date, every court assessing the applicability of section 2510(5)(a)(ii) to a defendant's

1    undisclosed acts of intercepting and mining of private communications' content has found such

2    conduct to be outside of ECPA's narrow exception.  *See Gmail*, 2013 U.S. Dist. LEXIS 172784 at

3    *27-28 (section 2510(5)(a)(ii) applies only when interceptions are an "instrumental part of the

4    transmission;" scanning for user profiling or advertising is not "related to . . . transmission.")

5    (emphasis added); *Dunbar v. Google, Inc.*, No. 10-194, 2011 U.S. Dist. LEXIS 157932, at *11

6    (E.D. Tex. May 23, 2011) (when scanning was for purposes other than facilitating email

7    transmission, "[t]he applicability of the 'ordinary course of business' exception . . . cannot be

8    resolved at the pleading stage."); Ex. D (*Marquis v. Google, Inc.*, No. 11-02808,  Mass. Super.

9    Ct., at Suffolk at 8-9 (Jan. 17, 2012) (same, interpreting an analogous Massachusetts state law)).

10        A defendant does not enjoy section 2510(5)(a)(ii)'s protection when, as here, the

11   interception "is both physically and purposively unrelated to [the] provision of email services."

12   *Gmail*, 2013 U.S. Dist. LEXIS 172784 at *42.  *See also Watkins v. L.M. Berry & Co*., 704 F.2d

13   577, 582 (11th Cir. 1983) ("The phrase 'in the ordinary course of business' cannot be expanded to

14   mean anything that interests a company."); *Berry v. Funk*, 146 F.3d 1003, 1009 (D.C. Cir. 1998)

15   (actions are in the ordinary course of business only if they are "justified by a valid business

16   purpose" or "shown to be undertaken normally").

17        Moreover, as *Gmail* emphasized, a companion clause articulating an "ordinary course of

18   business" exception in the employment context, section 2510(5)(a)(i), is routinely – narrowly –

19   interpreted.  2013 U.S. Dist. LEXIS 172784 at *39-40; *see also United States v. Murdock*, 63

20   F.3d 1391, 1396-97 (6th Cir. 1995) (noting that a "substantial body of law has . . . narrowly

21   construed the phrase 'ordinary course of business,'" and that "indiscriminate recording of both

22   incoming and outgoing calls" does not constitute the ordinary course of business.); *Deal v.

23   Spears*, 980 F.2d 1153, 1158 (8th Cir. 1992) (stating that general practice of surreptitious

24   monitoring  "takes us well beyond the boundaries of the ordinary course of business.").

25        Finally, the Seventh Circuit's analysis in *United States v. Szymuszkiewicz* makes plain that

26   a "device" can be used in violation of ECPA even if it otherwise facilitates transmission:

27           [W]e don't see any need to search for a device that is different

28           from, or not integral to, the legitimate communication.  [Courts
             have] added this "different device" requirement to the statutory text

- 10 -

to avoid what those judges thought would otherwise be a rule that made ordinary usage of a telephone or computer criminal. . . . This fear just shows why it is a mistake to read snippets of a statute in isolation.  For another section of [ECPA] declares that 'it shall not be unlawful . . . for a person . . . to intercept a wire, oral or electronic communication where such person is a party to the communication or where one of the parties . . . has given prior consent.' [citation omitted]. . . . ***It is better to follow the statute than to make up limitations to avert imaginary problems***.

622 F.3d 701, 707 (7th Cir. 2010) (Easterbrook, J.) (emphasis added).[7]

### c.    Facebook's Cases Do Not Support Its Motion.

The cases relied upon by Facebook are distinguishable from this case, chiefly because none of them involved defendants intercepting message content without consent.  Indeed, while the cases discussed above analyzed the ordinary course of business exception in the relevant context: secretly acquiring the substance of intercepted communications, two of the three principal cases cited by Facebook involved defendants who had merely *transmitted* electronic communications, which they at no point scanned for "any information concerning the substance, purport, or meaning."  Further, these opinions addressed rulings at the summary judgment stage, and are thus scarcely relevant to this Court's analysis at the pleadings stage.  *See Hall v. EarthLink Network, Inc.*, 396 F.3d 500 (2d Cir. 2005) (affirming order granting summary judgment); *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245 (10th Cir. 2012) (same).  The remaining case, upon which Facebook principally relies, only addresses challenges to a defendant's *disclosed* practices, and is thus wholly inapposite.

For its expansive reading of section 2510(5)(a)(ii), Facebook misleadingly cites to *Hall v. EarthLink Network, Inc.*, a case about a disgruntled Earthlink email account-holder who, after his account was closed, sued Earthlink for failing to "bounce" emails subsequently sent to the account.  396 F.3d 500, 502 (2d Cir. 2005).  The Second Circuit held that Earthlink did not

---

[7] This reasoning applies with equal force to Facebook's argument.  Facebook explains away its ECPA violations on the premise that it "requires access to message information . . . for myriad features crucial to providing its services."  Mot. at 10.  However, at no point does Facebook explain – nor can it – how obtaining the content within those messages furthers those purposes, nor does it explain how protocols and portions of code that Facebook ceased utilizing almost two years ago remain critical to its "ordinary course of business" today, or indeed were ever critical.

1  violate ECPA given that (1) no evidence that receipt of emails – and nothing *more* than mere

2  receipt – was outside Earthlink's ordinary course of business; and (2) Earthlink did not have the

3  technical ability to bounce emails after closing an account.  396 F.3d at 505.  By contrast, beyond

4  "receiving" messages, here Facebook accessed, analyzed, and used the content within them.

5  CAC ¶¶ 25-58.  Further, Plaintiffs allege – and Facebook concedes – that Facebook *did* have the

6  capacity to transmit private messages without intercepting their content, as evidenced by its

7  ceasing the practice following the Wall Street Journal exposé.  *Id.* ¶¶ 39, 59 n.3; Mot. at 25.

8        Far from supporting Facebook's defense, *Kirch v. Embarq Management Company* further

9  clarifies that the ordinary course of business exception cannot avail ECS providers that access

10  communications to learn information about their content. 702 F.3d 1245 (10th Cir. 2012).  *Kirch*

11  concerned an internet service provider, Embarq, that had given third party, NebuAd, access to

12  user data on its network.  Only NebuAd, not Embarq, had examined transmissions to discern their

13  content and meaning.  *Id.* at 1250.  The court held that Embarq had *not* violated ECPA where it

14  never examined "any of the raw data that NebuAd may have looked at."  *Id.*  Implicit in this

15  holding is that if Embarq had itself attempted to divine the contents of user transmissions, then it

16  would have violated ECPA just like NebuAd.[8]  2013 U.S. Dist. LEXIS 172784 at *32 ("Google is

17  more akin to NebuAd, which intercepted data for the purpose of . . . advertising – a purpose

18  separate and apart from . . . provision of internet service.").  Here, Plaintiffs allege that Facebook

19  acquired and examined the contents of Plaintiffs' messages in order to learn information about

20  their "substance, purport, or meaning."  CAC ¶¶ 25-58.  Thus *Kirch* is inapposite.

21            **d.**    **Facebook's Reliance On An Opinion About Publicly-Disclosed**

22                 **Practices Is Particularly Misplaced.**

23        Chiefly, Facebook cites *In re Google, Inc. Privacy Policy Litig.* *("Google")*, in support of

24  its far-reaching argument that "systematic conduct . . . that generates revenue for a company is the

25  very essence of a company acting 'in the ordinary course of it business.'"  Mot. at 15 (citing No.

26  12-01382, 2013 U.S. Dist. LEXIS 171124 (N.D. Cal. Dec. 3, 2013)).  Facebook's interpretation

27

28  [8] The *Kirch* plaintiffs settled their claims against NebuAd in a prior proceeding.  702 F.3d at 1248, n.2.

of *Google* leads to absurd results; creating blanket immunity for any ECS provider, so long as they acted in pursuit of profit.  Such a broad reading contradicts the principle evident throughout ECPA's text, legislative history, and interpretive case law, that ECS providers may not secretly monitor users' communications to learn about their substance.  Further, *Google* is distinguishable because it concerned a claim entirely different from that here – one based upon neither undisclosed scanning of message content *nor* the violation of internal policies, and to the extent that *Google* could support an expansive reading of section 2510(5)(a)(ii), the court's analysis did not substantively distinguish the more comprehensive analysis of the *Gmail* opinion.

The core of the plaintiffs' case in *Google* was profoundly different from this case.  There, users complained that Google had adopted a universal policy covering all of its services – *e.g.,* Gmail, YouTube, Google Maps – which enabled it to share user data across all of these services. *Id.* at *6.  Previously, such data was not comingled.  *Id.*  Thus, the plaintiffs did not plead that Google had done anything secretly, but rather had acted in accord with *announced* practices.  *Id.* This fact – absent here – was fatal to the ECPA claim.  *Id.* at *36 ("Plaintiffs' claim is not that Google did anything in secret . . . .").  Here, Facebook's monitoring was undertaken surreptitiously.  *See, e.g.* CAC ¶ 38.  This fact, alone, renders the *Google* holding inapposite.

To the extent that *Google* may support a broad reading of section 2510(5)(a)(ii), the court's analysis focused solely on the presence of the word "business," and neglected to account for the modifier "ordinary."  2013 U.S. Dist. LEXIS 171124 at *33.  For the reasons discussed in Part IV-A-1-a above, this inverts the critical inquiry – the limiting modifier "ordinary" must be reconciled with Congressional intent.  *Gmail*, 2013 U.S. Dist. LEXIS 172784 at *29. Additionally, although it referenced *Gmail*, *Google* did not controvert *Gmail's* analysis of ECPA's statutory scheme, case law, or legislative history.  2013 U.S. Dist. LEXIS 171124 at *37. Instead, *Google* distinguished *Gmail* on the grounds that "among other things, the court's thorough analysis addressed allegations that Google's practices violated its own internal policies, further establishing that its actions are outside the course of its business."  *Id.*  Here, too, *Google's* holding cannot be readily analogized in light of the CAC's factual allegations contrasting representations Facebook made to users with Facebook's surreptitious scans of private messages.

1   *See*, *e.g.*, CAC at ¶¶ 9-21, 23-25; 34; 47; 48; 57-58; Exs. A-B.

2          Ultimately, *Google* conflates the "ordinary course of business" analysis with whether or

3   not the practice was *disclosed*, *i.e.*, whether consent was obtained.  2013 U.S. Dist. LEXIS

4   171124 at *36 (emphasizing that practice was "publicly announced").[9]  In the court's view, if an

5   ECS announces a practice, it is presumptively in the ECS's "ordinary course of business."  *Id.* at

6   *36-37.  However, even assuming *arguendo* that such an analysis is proper under ECPA,

7   Plaintiffs still prevail here: Facebook did not disclose its practice of scanning private messages

8   for their content, and thus cannot presumptively have acted in the ordinary course of business.

9          Accordingly, the Court should reject Facebook's contention that intercepting the contents

10  of users' private messages is lawful under ECPA's narrow ordinary course of business exception.

11              **2.      Plaintiffs Did Not Consent To Facebook's Interception And Use Of
                          Their Private Messages.**
12

13         Facebook argues that Plaintiffs consented to its conduct – expressly, because Plaintiffs

14  viewed Facebook's disclosures, and impliedly, because when Plaintiffs pasted a URL link into

15  their messages, a "thumbnail preview" would appear, which showed a brief description of the

16  website at that link.  Mot. at 17-18.  As "the party seeking the benefit of the exception," Facebook

17  bears the burden of proving consent.  *In re Pharmatrak, Inc. Privacy Litig*, 329 F.3d 9, 19 (1st

18  Cir. 2003).  Consent is "an affirmative defense to an ECPA claim that need not be anticipated by

19  Plaintiffs in the pleadings."  *Valentine v. Wideopen West Fin., LLC*, 288 F.R.D. 407, 413 (N.D.

20  Ill. 2012).  Under ECPA, consent may be express or implied, but it "is not an all-or-nothing

21  proposition."  *Gmail*, 2013 U.S. Dist. LEXIS 172784, at *47.  A party "may consent to the

22  interception of only part of a communication or to the interception of only a subset of its

23  communications."  *Pharmatrak,* 329 F.3d at 21 (consent to collecting non-identifiable user data

24  not consent for identifiable data).[10]  "[A] reviewing court must inquire into the dimensions of the

25  ─────────────────────

26  [9] Under ECPA, consent and acting within the ordinary course of business are two, distinct
    inquiries. *See, e.g., Arias v. Mutual Cent. Alarm Serv.*, 202 F.3d 553, 559 (2d Cir. 2000)
    ("Given . . . this distinct consent exception, . . . it is a misreading of Title III to import wholesale a
27  consent requirement into the ordinary course of business analysis at issue here.").

    [10] *See also Gmail*, 2013 U.S. Dist. LEXIS 172784, at *50 (consent to process email for spam not
28  consent to process for profiling and advertising); *Watkins*, 704 F.2d 577 at 582 (consent to
                                                                  *Footnote continued on next page*

1    consent and then ascertain whether the interception exceeded those boundaries." *Id.* at 21.

2    Facebook presents its express consent argument by cobbling together out-of-context

3    snippets from its Data Use Policy. But read in context, Facebook's snippets give away the ruse.

4    *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000)

5    ("[A] written contract must be read as a whole . . . with preference given to reasonable

6    interpretations.") Even standing alone, these snippets do not notify users that Facebook would

7    intercept the substance of their messages. And Facebook fatally misunderstands what it must

8    show to establish implied consent. Accordingly, it cannot escape liability under ECPA.

9    **a.      Facebook Did Not Obtain Express Consent.**

10   Plaintiffs did not expressly consent to Facebook's interceptions. "[E]xpress consent is

11   usually a question of fact, where a fact-finder needs to interpret the express terms of any

12   agreements to determine whether these agreements adequately notify individuals regarding the

13   interceptions." *In re Google Inc. Gmail Litig.*, No. 13-02430, 2014 U.S. Dist. LEXIS 36957, at

14   *57 (N.D. Cal. Mar. 18, 2014). This analysis asks what the relevant disclosures would mean to a

15   reasonable person. *Id.* at *55; *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1095 (N.D. Cal.

16   2011) (holding that given a "natural" reading, disclosures by Facebook provided inadequate

17   notice of alleged privacy invasions to establish consent).

18   At least until this litigation, Facebook has unswervingly told users that "[y]ou own all of

19   the content and information you post on Facebook, and you can control how it is shared. . . ."

20   Ex. A at 1.[11] Facebook's Data Use Policy thus seeks users' *permission* to process specific types

21   of user information for identified purposes. Ex. B at 4. Facebook therefore has encouraged users

22   to read its disclosures narrowly, as notice of specific exceptions to the general rule that users own

23   and control their data themselves. Facebook's disclosures of the "[i]nformation we receive about

24   you" is broken up into three discrete sections of the Data Use Policy. These sections identify

25   what Facebook calls "different types of information" that Facebook receives, namely: (1) "Your

26   *Footnote continued from previous page*
     monitoring sales calls not consent for personal calls); *Dukes v. ADS Alliance Data Sys.*, 2006 U.S.

27   Dist. LEXIS 84311, 44 (S.D. Ohio Nov. 20, 2006) (consent to monitoring calls for customer
     service not consent for listening in on private calls).

28   [11] *See also* Ex. B at 4 (Data Use Policy) ("[Y]ou always own all of your information.").

information"; (2) "Information others share about you"; and (3) "Other information we receive about you".  Ex. B at 2-3.

The "Your information" section is devoted to user-generated content and communications. It expressly encompasses the "Information you choose to share" such as "when you post a status update, upload a photo, or comment on a friend's story . . . [and] . . . when you communicate with [Facebook], such as when you contact [Facebook] using an email address . . . ."  Ex. B at 2.  A reasonable user would expect to find any disclosures about the content of private messages in the "Your information" section along with the disclosures about the content of other communications, but it is not there.  By listing every type of communication related to Facebook *except* private messages, the "Your information" disclosure implicitly excludes such messages from those that Facebook seeks permission to access and use.  In *Gmail*, the Court found that an analogous omission – stating that emails directly to Google would be monitored but failing to mention other communications – "could mislead users into believing that user communications to each other or to nonusers were not intercepted."  *Gmail*, 2013 U.S. Dist. LEXIS 172784, at *53 (denying motion to dismiss on express consent defense).

Indeed, Facebook's sole reference to when users "send or receive a message" is altogether independent of the disclosures under "Your information."  It appears in a separate section, applicable to a "different type[] of information" titled "Other information we receive about you." A reasonable user would not expect to find notice about the *content* of private communications in the "Other information" section because it concerns "data" of a technical nature.  First, it says that Facebook receives "*data about* you whenever you use or are running Facebook," including when you "send or receive a message."  Ex. B at 2-3.  The remaining categories of "data about you" that Facebook seeks permission to collect here are:

> [M]etadata such as the time, date, and place you took [photos or videos] . . . .[N]etwork and communication information, such as your IP address or mobile phone number . . . your internet service, operating system, location, the type (including identifiers) of the device or browser you use, or the pages you visit . . . .[T]he date and time you visit [a game, application, or certain websites] . . .; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use . . . .Data from .

. . third parties . . . [such as] how you responded to an ad on Facebook or on another site . . . .

*Id.* Facebook's self-serving interpretation of the reference within "Other information" to messages – *i.e.* that users should have understood "data about" their correspondence to include its substance – should be rejected. Nothing there told users that Facebook would open up their private messages and use the contents to profile users and boost "Like" counters. At most, users consented to interception of "data *about*" their private messages, such as when and to whom they were sent – the kind of data any common carrier might receive about a communication, without opening it up. *Cf. Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 905 (9th Cir. 2008) ("As with letters and e-mails, it is not reasonable to expect privacy in the information used to 'address' a text message . . . . However, users do have a reasonable expectation of privacy in the content of their text messages vis-à-vis the service provider.")

Facebook cannot show that Plaintiffs had specific notice of its interceptions and their purposes, as it must to prevail on its defense. For the same reason, the authority cited in support of Facebook's motion is inapposite here. *Deering v. CenturyTel, Inc.*, held that a defendant had obtained consent to give a third-party data about users' browsing habits because it notified users in advance that it would give that data to that third party for specified purposes, and gave users the choice to opt out. No. 10-63, 2011 U.S. Dist. LEXIS 51930, at *7 (D. Mont. May 16, 2011). Similarly, *In re VistaPrint Corp Mktg. & Sales Practices Litig.*, merely observed that the plaintiffs had authorized the defendant to transfer their "name[s], address[es] and credit/debit card information" to a specific third party by clicking "Yes" on the defendant's request for permission to transfer that information to that third party. 2009 U.S. Dist. LEXIS 77509, at *29 (S.D. Tex. Aug. 31, 2009).[12] In contrast to the specific notice provided in *Deering* and *VistaPrint*, Facebook's disclosures are vague and, in fact, suggest the opposite of what Facebook now asserts they mean. Facebook is not entitled to dismissal based upon express consent that it never obtained.

---

[12] *VistaPrint* did not analyze the *plaintiffs'* consent because the defendant was itself a consenting party to the relevant communications.

### b.     Facebook Did Not Obtain Implied Consent.

Nor did Plaintiffs impliedly consent.  "[I]mplied consent applies only in a narrow set of cases."  *Gmail*, 2013 U.S. Dist. LEXIS 172784, at *47 (citation omitted).  Implied consent "is not constructive consent.  Rather, [it] is 'consent in fact' which is inferred 'from surrounding circumstances indicating that the party knowingly agreed to the surveillance.'"  *Griggs-Ryan v. Smith*, 904 F.2d 112, 116-117 (1st Cir. 1990) (citations omitted).  Thus, like express consent, to impliedly consent, a party must have actual notice of the specific interception and its purpose.  *Pharmatrak*, 329 F.3d at 19-21.  Notice that interceptions are *possible* is not enough.  *United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004) ("[F]oreseeability of monitoring is insufficient to infer consent.  Rather, the circumstances must indicate that a party to the communication knew that interception was likely and agreed to the monitoring."); *Watkins*, 704 F.2d at 581 ("Knowledge of the capability of monitoring alone cannot be considered implied consent.").[13]

Facebook's argument for implied consent here is just a thinly disguised theory of constructive consent, and an implausible one at that.  Facebook argues users should have deduced from URL previews in their draft messages that hitting "send" would cause Facebook to intercept their message in transit, note any URLs therein, and use that information in unspecified ways.  Mot. at 18.  Beyond the fact that this is deeply improbable, notice that an interception is merely *possible* does not establish consent.  *Watkins*, 704 F.2d at 581.  "Actual" consent requires actual knowledge of the fact of interception, *and* its purpose.  *Pharmatrak,* 329 F.3d at 21; *Gmail*, 2013 U.S. Dist. LEXIS 172784, at *50; *Watkins*, 704 F.2d at 582.  Moreover, as discussed above, Facebook represented to users that their messages are "private," provide "unprecedented" control, and can be limited to "[s]haring with an individual."  Facebook omits private messages from its disclosure of information that it "receives" from users.  Therefore, even if a user did somehow suspect, based on a URL preview, that Facebook could monitor message content, Facebook's own representations about the messaging service would put a reasonable user's suspicions to rest.

Thus, Facebook's motion to dismiss based upon consent should be denied.

---

[13] *See also Deal v. Spears*, 980 F.2d 1153, 1156-57 (8th Cir. 1992) (consent could not be implied from notice that a business owner only *might* monitor company phones); *Berry*, 146 F.3d at 1011 (same, in law enforcement context).

### 3.    Facebook "Intercepted" Communications "In Transmission."

Facebook rearranges fragments of the CAC to pretend that Plaintiffs' real claim involves messages in electronic storage, and thus are unprotected here.  Mot. at 20.  In fact, the CAC consistently alleges that Facebook intercepted private messages in transmission.  *See, e.g.,* CAC ¶ 25 (describing scanning as "in transit, in transmission, and/or during transfer" of private messages."); *Id.* ¶ 36 (showing screen grabs of private message being sent, a scan occurring, and the implicated "Like" count increasing contemporaneously.).  Plaintiffs have amply established the "plausibility" of their claims, demonstrating that there is "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

### B.    Facebook Violated California Penal Code § 631

Again contorting the CAC's allegations, Facebook mistakenly suggests that describing its conduct as taking place "across its network" amounts to "concessions that messages were *entirely contained* within Facebook's network."  Mot. at 20.  In reality, according to a post by Facebook on its website, Facebook's private messaging service allowed users to exchange emails with non-Facebook email addresses.  CAC ¶ 24 (citing post); *Id.* ¶ 22 ("Facebook's private message function [includes] email.").  Facebook does not explain – nor can it – how a non-Facebook email can be sent to or received from a Facebook user's private messages inbox if the transmissions are "entirely contained within Facebook's network."  Such an assertion contradicts the CAC, and thus is inappropriate to consider at this stage of motion practice.  *See Brennan v. Concord EFS, Inc*., 369 F.Supp.2d 1127, 1133 (N.D. Cal. 2005) (Arguments "contrary to plaintiffs' pleading [are] inappropriate for resolution at the motion to dismiss stage.").[14]

### C.    Facebook Violated California Penal Code § 632

Facebook incorrectly claims it was not "eavesdropping" under Penal Code section 632.  Offering no further clarification, Facebook simply contends that, because it "stored Plaintiffs' messages in the course of providing the Messages product," it could not have been "secretly"

---

[14] Facebook mischaracterizes *Hernandez v. Path, Inc.*, which dismissed ECPA and CIPA claims on the ground that, as alleged, the interceptions were not *contemporaneous* with transmission. 2012 U.S. Dist. LEXIS 151035, at *9 (N.D. Cal. Oct. 17, 2012).  Here, Plaintiffs allege that the interceptions occurred contemporaneously with the transmission. CAC at ¶¶ 25, 36, 40.  Whether or not the transmissions occurred exclusively across Facebook's network is thus immaterial"

1    recording the contents of Plaintiffs' communications.[15]  Mot. at 23.  Nothing in CIPA supports

2    this proposition.[16]  Instead, the law is clear that whenever a non-party to a communication

3    acquires its content without obtaining the consent of the parties, section 632 has been violated.

4    Cal. Pen. Code § 632(a) (prohibiting "eavesdrop[ing] upon or record[ing]" confidential

5    communications "intentionally and without the consent of all parties.).

6         Facebook acted without users' consent.  *See* Part A-2, *supra.*  Facebook's argument that

7    private messages are somehow not "confidential" because they are "Internet communications" – a

8    term Facebook does not define and a term not included in the CAC – is unavailing.  The act of re-

9    sharing by a conversation's participant simply does not factor into "confidential[ity]" under

10   section 632.  Instead, the analysis hinges upon whether (1) the monitoring was disclosed and

11   (2) whether all parties to the conversation agreed to its recording.  *Kight v. CashCall, Inc.*,

12   200 Cal. App. 4th 1377, 1389 (Cal. App. 2011) ("secret monitoring denies the speaker . . . the

13   right to control the nature and extent of the firsthand dissemination of his statements . . . . A new

14   audience – either electronic or human – has been introduced . . . [But], section 632 requires the

15   assent of all parties to a communication before another may listen."); *accord Shulman*, 18 Cal.

16   4th at 234-35.  The Supreme Court of California makes plain that the *only* inquiry is whether

17   there has been a "simultaneous dissemination [of the communication] to an unannounced second

18   auditor, whether that auditor be a person or a mechanical device."  *Id.*  This is precisely

19   Facebook's behavior.  CAC ¶¶ 25-58.

20        **D.      Plaintiffs' Unfair Competition Law Claims Are Adequately Pleaded.**

21             **1.      Plaintiffs Have Standing Under the UCL.**

22        Plaintiffs meet the UCL's standing requirements because they suffered (1) "injury in fact,"

23   and (2) "lost money or property."  *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322

24

25   [15] In support, Facebook cites to cases in which the defendant was a *party* to the conversation.
     *See, e.g., Thomasson v. GC Servs. Ltd. P'ship.*, 321 F. App'x 557, 559 (9th Cir. 2008) (no CIPA
26   violation when "[n]o third party listened in on the conversations between the Thomassons and GC
     Services.."); *Rogers v. Ulrich*, 52 Cal. App. 3d 894, 896 (1975) (Defendant recorded
27   conversations between himself and plaintiff).

28   [16] Indeed, "storing" a message does not give Facebook a legal right to inspect its contents any
     more than the Postal Service's act of "storing" a letter in a P.O. Box allows it to open that letter.

1  (Cal. 2011).  Facebook's challenges to both prongs of the standing requirement fail.

2          The UCL's standard for injury in fact expressly mirrors that of the U.S. Constitution (*id.*);

3  thus the requisite injury "can exist solely by virtue of statutes creating legal rights."  *Edwards v.*

4  *First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010) (citation omitted).  Here, because Plaintiffs

5  allege that Facebook violated their rights under ECPA, Facebook's argument based on injury in

6  fact is baseless and should be rejected.  CAC ¶¶ 72-94.[17]

7          Plaintiffs also adequately allege that they have "lost property" within the meaning of the

8  UCL.  As alleged in the CAC, Facebook itself acknowledges that Plaintiffs' electronic

9  correspondence belongs to them, as it expressly states to its users that they "own" the content of

10  their "private" messages.   (CAC ¶ 17 (incorporating Internet links to Facebook's online policies);

11  ¶ 23; Exs. A-B (copies of the documents referenced in CAC)).  Moreover, like any private

12  correspondence, private messages on Facebook satisfy California's three-prong test for a property

13  interest.  "First, there must be an interest capable of precise definition; second, it must be capable

14  of exclusive possession or control; and third, the putative owner must have established a

15  legitimate claim to exclusivity."  *Kremen,* 337 F.3d at 1030; Cal. Civ. Code § 654.  Here, the

16  CAC alleges "an interest capable of precise definition," the right to own and exclude non-parties

17  like Facebook from private communications is well-established (CAC ¶¶ 23-24; 47-48; 53-54;

18  100), and, as just stated, Facebook acknowledges that private messages legitimately belong

19  exclusively to the communicating parties.

20          Facebook makes little effort to argue that, as a matter of law, senders and recipients of

21  private messages do not have a property interest in them.  Instead, Facebook asserts that Plaintiffs

22  fail to allege they "lost" any property when Facebook used their messages.  Mot. at 24.

23  Facebook's argument fails because by interfering with users' exclusive right to use their own

24  property, Plaintiffs have, as a matter of well-settled California law, been deprived of their

25  property.  As the Ninth Circuit has recognized, "California defines property very broadly:  'The

26  ownership of a thing is the right of one or more persons to possess and use it to the exclusion of

27

28  [17] The spuriousness of Facebook's "injury in fact" argument is apparent in the fact that Facebook stopped short of even attempting to challenge Plaintiffs' standing under Article III directly.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
CASE NO. C 13-05996-PJH

others. . . .   The thing of which there may be ownership is called property.'"  *G.S. Rasmussen &*

*Assocs. v. Kalitta Flying Serv.*, 958 F.2d 896, 902 (9th Cir. 1992), quoting Cal. Civ. Code § 654.[18]

Therefore, as California's Supreme Court recently held, having "a present or future property

interest diminished" is one of "innumerable ways" to show "lost money or property—economic

injury" under the UCL.  *Kwikset*, 51 Cal. 4th at 323.

Plaintiffs adequately allege this loss of property.  Indeed, when Facebook explicitly

represented to users that private messages are their property, it also emphasized that users, not

Facebook, can control the sharing and use of those messages:  "You own all of the content and

information you post on Facebook . . . *you can control how it is shared*. . . ."  (Ex. A at 1,

referenced at CAC ¶ 17 (emphasis added); Ex. B.).  The control promised by Facebook

exemplifies the exclusivity inherent in a property interest.  However, Facebook treated Plaintiffs'

private messages as though they were *Facebook's* property to freely open up, inspect, and use for

any purpose that suited Facebook.  CAC ¶¶ 1-4.  Facebook's actions deprived Plaintiffs of their

exclusive right to their correspondence.  *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)

(exclusivity is "one of the most essential sticks in the bundle of rights that are commonly

characterized as property.").[19]

The exclusivity inherent in a property right extends to unauthorized copying and

subsequent use of property.  "[A]lthough the owner may retain possession of the original

property, there has been nevertheless a deprivation of property when a copy is made and retained

by another."  *People v. Kwok*, 63 Cal. App. 4th 1236, 1251 (Cal. App. 1998).  In *People v. Kwok*,

a California Court of Appeal held that making an unauthorized copy of a victim's house key

constituted theft even though the victim never lost possession of her own key.  The court reasoned

that "a homeowner's or tenant's property interest in his or her house key is not just the right to

maintain possession of a tangible object – the key – but also the right to control the intangible

---

[18] *See also Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003), quoting *Downing v. Mun. Court*, 88 Cal. App. 2d 345, 350 (Cal. App. 1948) ("Property . . . includes every intangible benefit and prerogative susceptible of possession or disposition.").

[19] *See also Prop. Reserve, Inc. v. Superior Court*, 224 Cal. App. 4th 828, 862-863 (Cal. App. 3d 2014); *Preston v. Bd. of Equalization*, 25 Cal. 4th 197, 208 (Cal. 2001) ("Intangible property . . . is generally defined as property that is a 'right' rather than a physical object.").

1    benefit conferred by ownership of the key, *i.e.*, the ability to control access to one's residence."

2    *Id.*  Here, even though Plaintiffs retained their original messages, Facebook's actions deprived

3    Plaintiffs of the fundamental right to exclude others, including Facebook, from using the

4    messages' content.  As the CAC alleges, "users have no control whatsoever over their own user

5    data collected or retained by Facebook"  CAC ¶ 52; *see Claridge v. RockYou, Inc.*, 785 F. Supp.

6    2d 855, 862 (N.D. Cal. 2011) (Hamilton, J.) (noting that one court has defined "lost" property as

7    property that has passed beyond the owner's control).[20]

8            The argument advanced, and cases cited by, Facebook to convince this Court to decline to

9    acknowledge a loss of a property interest here are flatly inapposite.  The private correspondence

10   at issue in this case, which carries with it an historically-recognized property interest, is in no way

11   analogous to "referrer headers" automatically generated by computers,[21] digital contacts lists,[22] or

12   other involuntary footprints of Internet use.[23]  To the contrary, this case is about Plaintiffs'

13   fundamental right to protect the exclusivity of private messages transmitted over Facebook.  By

14   [20] Facebook may argue in reply that another standard applies, *i.e.*, that "lost" property requires the
     owner be deprived of the property's "use and possession."  *Kwikset*, however, clarified that
15   conduct diminishing a "present or future property interest" creates economic injury under the
     UCL.  51 Cal. 4th at 323.  Depriving the owner of use and possession, an element of the common
16   law tort, conversion, need not be shown for UCL standing.  *See FMC Corp. v. Capital
     Cities/ABC, Inc.,* 915 F.2d 300, 303 (7th Cir. 1990) (noting that under California law, making
17   unauthorized copies of property ordinarily does not give rise to liability *for conversion*).

18   [21] In *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 715 (N.D. Cal. 2011) (Ware, J.), *aff'd*,
     No. 12-15619, 2014 U.S. App. LEXIS 8679, at *1 (9th Cir. May 8, 2014), the court expressly
19   drew the distinction between "personal information" such as the referring headers at issue, and
     personal financial records that a company has promised to safeguard.  There, the court
20   acknowledged that UCL standing may be established in the latter circumstance, albeit focusing on
     "lost money," given that it was describing a paid service.  *Id.*, *citing Doe 1 v. AOL, LLC*, 719 F.
21   Supp. 2d 1102, 1111-1113 (N.D. Cal. 2010) (finding UCL standing where defendant failed to
     safeguard the content of users' financial records).  Here, as with the financial records described in
22   *Facebook Privacy*, Facebook has promised its users that their private messages will remain theirs,
     subject to the users' control.  CAC ¶ 17; Ex. A and B.  Facebook's violation of users' exclusive
23   right to those private messages establishes the requisite "lost property" required to show standing
     under the UCL, akin to the violation that gave rise to plaintiffs' standing in *AOL*.

24   [22] *Opperman v. Path, Inc.*, No. 13-00453, 2014 U.S. Dist. LEXIS 67225, at *83 & n.22 (N.D.
     Cal. May 14, 2014) (Tigar, J.) (acknowledging that consumers may have a property interest in
25   personal information, but finding that plaintiffs lacked standing based solely on whether plaintiffs
     incurred economic loss, *i.e.*, lost "money.").

26   [23] *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 862 (N.D. Cal. 2011) (Hamilton, J.)
     (concerning users' login credentials stolen from the defendant by a third-party; finding that
27   plaintiffs failed to allege credentials had passed beyond their control); *In re iPhone Application
     Litig.*, No. 11-02250, 2011 U.S. Dist. LEXIS 106865, at *45 (N.D. Cal. Sept. 20, 2011) (Koh, J.)
28   (concerning user data such as cell phone numbers, geolocation, and sim card serial numbers).

1  abusing its ability as an ECS provider to monetize the *substance* of Plaintiffs' messages,

2  Facebook not only violated Plaintiffs' privacy, it diminished their property rights as well,

3  cementing Plaintiffs' standing under the UCL.  *Kwikset*, 51 Cal. 4th at 323.

4        Moreover, to deny Plaintiffs standing here would thwart the purpose of the UCL's "lost

5  money or property" requirement, which is "to eliminate standing for those who have not engaged

6  in any business dealings with would-be defendants . . . while ***preserving for actual victims of***

7  ***deception*** and other acts of unfair competition the ability to sue and enjoin such practices."

8  *Kwikset*, 51 Cal. 4th at 317 (emphasis added).  Facebook attracted users to its site by representing

9  that they owned their own content and that messages sent over Facebook would be "private."

10  CAC ¶¶ 21-25.  Then Facebook mined users' private messages for information without their

11  consent.  As the victims of Facebook's self-serving misrepresentations and deception, Plaintiffs

12  have standing to bring this action to enjoin Facebook's misconduct.[24]

13                    **2.      Facebook Violated the Unfair Competition Law.**

14        This Court should not credit Facebook's unsubstantiated assertion in a footnote that

15  Plaintiffs allege no "unlawful, unfair, or fraudulent" business acts or practices.  Mot. at 24 n.13.

16  All three prongs of Plaintiffs' UCL claim are well pled.  First, the UCL's "unlawful" prong is

17  satisfied because Facebook violated ECPA and CIPA.  CAC ¶ 126; *Farmers Ins. Exch. v.*

18  *Superior Court*, 2 Cal.4th 377, 383 (Cal. 1992) ("Unlawful" prong borrows violations of other

19  laws).  Second, extensive allegations show that Facebook deprived Plaintiffs ownership of their

20  private messages solely to benefit *Facebook*, and that no public utility derived from Facebook's

21  misconduct.  CAC ¶¶ 1-4;19; 23-51 (describing Facebook's deceptions and incentives to mislead

22  users).  Thus, the conduct was "unfair."  *MacDonald v. Ford Motor Co.*, No. 13-02988, 2014

23  U.S. Dist. LEXIS 44858, at *27 (N.D. Cal. Mar. 31, 2014) (Tigar, J.); *see also id.* (finding no

24  public benefit in company's failure to disclose vehicle safety problems).  Third, the CAC details

25  _____

26  [24] Facebook's reliance on *Korea Supply Co. v. Lockheed Martin Corp.* is misplaced.  *Korea Supply* held that restitution is unavailable to a plaintiff who never had a vested interest in the funds it sought to have "restored."  29 Cal. 4th 1134, 1148-49 (Cal. 2003). By contrast, Plaintiffs'

27  property interest in their messages is "vested."  Thus, any benefits Facebook derived from using their messages are "benefits in which [Plaintiffs have] an ownership interest," and for which

28  Plaintiffs may seek restitution under the UCL.  *Id.*

1    extensively Facebook's fraudulent concealment of the "who, what, when, where, and how" of

2    Facebook's intrusion upon Facebook's private messages.  CAC ¶¶ 21-25; 38; 47-48; 69-71;

3    127.[25]  Because Facebook's representations and omissions are likely to, and did, deceive both

4    Plaintiffs and the public, they are "fraudulent."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312

5    (Cal. 2009).  Accordingly, Plaintiffs' UCL claims should not be dismissed.

6         **E.     Plaintiffs Are Entitled To Seek Injunctive Relief.**

7         Facebook claims that because it may have stopped the alleged interceptions when the Wall

8    Street Journal exposed it, Plaintiffs therefore cannot seek injunctive relief.  Mot. at 25.  But

9    Plaintiffs are entitled to seek injunctive relief if there is "a sufficient likelihood that [they] will

10   again be wronged in a similar way."  *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014),

11   citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  Here, that standard is met.

12   Plaintiffs are still active Facebook users.  CAC ¶¶ 5-7.  If Facebook truly has ceased *all* of the

13   unlawful conduct alleged – and Facebook has not confirmed that it has – nothing in the CAC

14   supports finding that Facebook could not again intrude on Plaintiffs' private correspondence.  On

15   the contrary, Plaintiffs allege that Facebook, could surreptitiously repeat this, or similar,

16   misconduct in the future.  *Id.* ¶ 39.  Thus, an injunction would constitute appropriate relief.

17        **F.     Leave To Amend Should Be Granted If Any Of Facebook's Motion Is
18               Granted.**

19        "[D]ismissal without leave to amend is improper unless it is clear . . . that the complaint

20   could not be saved by any amendment."  *Petersen v. Boeing Co.*, 715 F.3d 276, 280 (9th Cir.

21   2013) (leave to amend "should be granted with extreme liberality.");  Fed. R. Civ. P. 15(a)(2).

22   Plaintiffs have articulated viable legal theories for each of their claims, and should be afforded an

23   opportunity to allege more facts should the Court require it, since in no instance would

24   amendment be futile.  Therefore, should the Court grant Facebook's motion in any part, it should

25   also grant Plaintiffs leave to amend.

26

27   [25]The CAC therefore meets the pleading requirements of Federal Rule 9(b).  Facebook could not
     credibly maintain, nor does it in its motion, that it lacks "notice of the particular misconduct . . .
28   alleged to constitute the fraud[.]"  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).

**V.      CONCLUSION**

      For the foregoing reasons, Facebook's motion should be denied in its entirety.

Dated: July 30, 2014             LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                By:   /s/ *Michael W. Sobol*
                                      Michael W. Sobol

                              Michael W. Sobol (State Bar No. 194857)
                              msobol@lchb.com
                              Melissa Gardner (State Bar No. 289096)
                              mgardner@lchb.com
                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                              275 Battery Street, 29th Floor
                              San Francisco, CA  94111-3339
                              Telephone:  415.956.1000
                              Facsimile:  415.956.1008

                              Rachel Geman
                              rgeman@lchb.com
                              Nicholas Diamand
                              ndiamand@lchb.com
                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                              250 Hudson Street, 8th Floor
                              New York, NY  10013-1413
                              Telephone:  212.355.9500
                              Facsimile:  212.355.9592

                              Hank Bates  (State Bar No. 167688)
                              hbates@cbplaw.com
                              Allen Carney
                              acarney@cbplaw.com
                              David Slade
                              dslade@cbplaw.com
                              CARNEY BATES & PULLIAM, PLLC
                              11311 Arcade Drive
                              Little Rock, AR 72212
                              Telephone:  501.312.8500
                              Facsimile:  501.312.8505

1                            Jeremy A. Lieberman
                                Lesley F. Portnoy

2                            info@pomlaw.com
                                POMERANTZ, LLP

3                            600 Third Avenue, 20th Floor
                                New York, NY 10016

4                            Telephone: 212.661.1100
                                Facsimile: 212.661.8665

5

6                            Patrick V. Dahlstrom
                                pdahlstrom@pomlaw.com

7                            POMERANTZ, LLP
                                10 S. La Salle Street, Suite 3505

8                            Chicago, IL 60603
                                Telephone: 312.377.1181

9                            Facsimile: 312.377.1184

10                          Jon Tostrud (State Bar No. 199502)
                              jtostrud@tostrudlaw.com

11                         TOSTRUD LAW GROUP, PC
                              1925 Century Park East, Suite 2125

12                         Los Angeles, CA 90067
                              Telephone: 310.278.2600

13                         Facsimile: 310.278.2640

14                         *Attorneys for Plaintiffs and the Proposed Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28