GIBSON, DUNN & CRUTCHER LLP
JOSHUA A. JESSEN, SBN 222831
JJessen@gibsondunn.com
JEANA BISNAR MAUTE, SBN 290573
JBisnarMaute@gibsondunn.com
JESSICA S. OU, SBN 280534
JOu@gibsondunn.com
1881 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

GIBSON, DUNN & CRUTCHER LLP
GAIL E. LEES, SBN 90363
GLees@gibsondunn.com
CHRISTOPHER CHORBA, SBN 216692
CChorba@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Defendant
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MATTHEW CAMPBELL, MICHAEL HURLEY, and DAVID SHADPOUR,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. C 13-05996 PJH<br><br>**CONSOLIDATED CLASS ACTION**<br><br>**DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**<br><br>**HEARING:**<br>Date:  September 17, 2014<br>Time:  9:00 a.m.<br>Place:  Courtroom 3, 3rd Floor<br>       The Honorable Phyllis J. Hamilton |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ............................................................................................................. 1

II. ARGUMENT ................................................................................................................... 2

    A.  Plaintiffs Fail To State A Claim Under The Wiretap Act ....................................... 2

        1.  Facebook's Alleged Conduct Is Not An "Interception" Because It
            Occurred In The Ordinary Course Of Facebook's Business ......................... 2

        2.  Plaintiffs Consented To The Alleged Interceptions As A Matter
            Of Law .......................................................................................................... 8

        3.  The Alleged Conduct Does Not "Intercept" A Communication "In
            Transmission" .............................................................................................. 11

    B.  Plaintiffs Fail To State A Claim Under California Penal Code Section 631 ............. 12

    C.  Plaintiffs Fail To State A Claim Under California Penal Code Section 632 ............. 12

    D.  Because Plaintiffs Cannot Allege Any Economic Harm, They Lack Standing
        To Pursue Their UCL Claim .................................................................................. 13

    E.  The Court Should Strike Plaintiffs' Request for Injunctive Relief ............................ 15

III. CONCLUSION ................................................................................................................ 15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Battle Creek,*
250 F.3d 980 (6th Cir. 2001) ............................................................................................ 4

*Arias v. Mutual Cent. Alarm Servs., Inc.,*
182 F.R.D. 407 (S.D.N.Y. 1998) ................................................................................... 2, 5

*Arias v. Mutual Cent. Alarm Servs., Inc.,*
202 F.3d 553 (2d Cir. 2000) ......................................................................................... 2, 4

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................................ 12

*Berry v. Funk,*
146 F.3d 1003 (D.C. Cir. 1998) ...................................................................................... 4

*Briggs v. Amer. Air Filter Co., Inc.,*
630 F.2d 414 (5th Cir. 1980) .......................................................................................... 5

*Buckingham v. Gailor,*
No. 00-cv-1568, 2001 WL 34036325 (D. Md. Mar. 27, 2001) ..................................... 10

*Campiti v. Walonis,*
611 F.2d 387 (1st Cir. 1979) ........................................................................................... 4

*Claridge v. RockYou, Inc.,*
785 F. Supp. 2d 855 (N.D. Cal. 2011) ....................................................................... 8, 14

*Daniel v. Santa Rosa Junior College,*
No. C 13-02426 JSW, 2014 WL 806432 (N.D. Cal. Feb. 27, 2014).............................. 15

*Davis v. HSBC Bank Nevada, N.A.,*
691 F.3d 1152 (9th Cir. 2012) ........................................................................................ 15

*Deal v. Spears,*
980 F.2d 1153 (8th Cir. 1992) .......................................................................................... 5

*Doe 1 v. AOL, LLC,*
719 F. Supp. 2d 1102 (N.D. Cal. 2010) ......................................................................... 14

*Downing v. Mun. Ct.,*
88 Cal. App. 2d 345 (1948) ............................................................................................ 14

*Dunbar v. Google, Inc.,*
No. 10-194, 2011 U.S. Dist. LEXIS 157932 (E.D. Tex. May 23, 2011) ......................... 7

*Epps v. St. Mary's Hosp. of Athens, Inc.,*
802 F.2d 412 (11th Cir. 1986) .......................................................................................... 5

*First v. Stark Cnty. Bd. of Comm'rs,*
234 F.3d 1268 (6th Cir. 2000) .......................................................................................... 5

*G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.,*
958 F.2d 896 (9th Cir. 1992) .......................................................................................... 13

*Griggs-Ryan v. Smith,*
904 F.2d 112 (1st Cir. 1990) ........................................................................................... 11

*Hall v. EarthLink Network, Inc.,*
396 F.3d 500 (2d Cir. 2005) ......................................................................................... 5, 6

ii

Gibson, Dunn &
Crutcher LLP

*Heller v. Ralph's Grocery Co.*,
No. B249608, 2014 WL 2818671 (Cal. Ct. App. June 23, 2014) ............................................ 13

*In re DoubleClick Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ...................................................................................... 4

*In re Facebook Privacy Litig.*,
791 F. Supp. 2d 705 (N.D. Cal. 2011), *aff'd*, No. 12-15619, 2014 WL 1815489
(9th Cir. May 8, 2014) ...................................................................................................... 13, 14

*In re Google Inc. Gmail Litig.*,
No. 13-02430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........................................ 4, 7, 11

*In re Google, Inc. Privacy Policy Litig.*,
No. 12-01382 PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) ................................ 3, 4, 5, 6

*In re High Fructose Corn Syrup Antitrust Litig.*,
216 F.3d 621 (7th Cir. 2000) .................................................................................................. 10

*In re iPhone Application Litig.*,
No. 11-02250, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ................................................ 14

*In re Yahoo Mail Litig.*,
No. 5:13-CV-04980-LHK, Dkt. No. 49 (N.D. Cal. Aug. 12, 2013) ........................................ 10

*James v. Newspaper Agency Corp.*,
591 F.2d 579 (10th Cir. 1979) .................................................................................................. 5

*Johnson v. Trans Ag.*,
770 F.2d 752 (9th Cir. 1984) .................................................................................................... 2

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) ................................................................................................................ 14

*Kight v. CashCall, Inc.*,
200 Cal. App. 4th 1377 (2011) ................................................................................................ 12

*Kirch v. Embarq Mgmt. Co.*,
702 F.3d 1245 (10th Cir. 2012) ............................................................................................ 5, 6

*Klamath Water Users Prot. Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 2001) .................................................................................................. 9

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 878 (9th Cir. 2002) .................................................................................................. 11

*Kremen v. Cohen*,
337 F.3d 1024 (9th Cir. 2003) ................................................................................................ 13

*Kwikset v. Super. Ct.*,
51 Cal. 4th 310 (2011) ............................................................................................................ 13

*Marquis v. Google, Inc.*,
No. 11-02808 (Mass. Sup. Ct. Jan. 17, 2012) .......................................................................... 7

*Meghrig v. KFC Western, Inc.*,
516 U.S. 479 (1996) .................................................................................................................. 4

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) .................................................................................................... 3

*Opperman v. Path*,
No. 13-cv-00453-JST, 2014 WL 1973378 (N.D. Cal. May 14, 2014) .................................... 15

iii

Gibson, Dunn &
Crutcher LLP

*People v. Kwok,*
 63 Cal. App. 4th 1236 (1998) ............................................................................ 14

*Preston v. State Bd. of Equalization,*
 25 Cal. 4th 197 (2001) ....................................................................................... 14

*Prop. Reserve, Inc. v. Super. Ct.,*
 224 Cal. App. 4th 828 (2014), *review granted and superseded,* 326 P.3d 976 (June
 25, 2014) ............................................................................................................. 14

*Shulman v. Group W Prods., Inc.,*
 18 Cal. 4th 200, 235 (1998) ............................................................................... 13

*Smith & Hawken, Ltd. v. Gardendance, Inc.,*
 No. C04-1664 SBA, 2004 WL 2496163 (N.D. Cal. Nov. 5, 2004) .................... 14

*U.S. v. Granderson,*
 511 U.S. 39 (1994) ............................................................................................... 6

*Watkins v. L.M. Berry & Co.,*
 704 F.2d 577 (11th Cir. 1983) ................................................................... 5, 10, 11

*Weisbuch v. Cnty. of L.A.,*
 119 F.3d 778 (9th Cir.1997) ................................................................................. 3

**Statutes**

18 U.S.C. § 2510(14) ................................................................................................ 4

18 U.S.C. § 2510(4) ............................................................................................... 2, 3

18 U.S.C. § 2510(5) .................................................................................................. 2

18 U.S.C. § 2510(5)(a)(ii) ...................................................................................... 2, 3

18 U.S.C. § 2511(1)(a) .............................................................................................. 2

18 U.S.C. § 2511(1)(d) .............................................................................................. 3

18 U.S.C. § 2511(2)(a)(i) ........................................................................................ 6, 7

18 U.S.C. § 2511(2)(d) ............................................................................................ 10

Cal Civ. Code § 654 ................................................................................................ 14

Cal. Bus. & Prof. Code § 17204 ............................................................................. 13

FACEBOOK, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

# I. INTRODUCTION

Following in the footsteps of other complaints alleging that other technology companies "intercepted" their users' e-mails for the purpose of creating user profiles and serving targeted advertisements, Plaintiffs filed a copycat complaint with similar allegations against Facebook. Plaintiffs removed those allegations (with the exception of a few conclusory stragglers) in their Consolidated Amended Complaint ("CAC"). Now, faced with dismissal of their amended claims—which focus not on "creat[ing] user profiles for serving targeted advertis[ing]," but rather on the increase of an anonymous, aggregate number (*i.e.*, the "Like" count) on a webpage—Plaintiffs attempt to revive those inaccurate, abandoned claims in their Opposition. (Opp. at 4, n.2.) But abandoned, groundless, and conclusory allegations cannot save a complaint from dismissal. Moreover, even if the Court credited these bald allegations, Plaintiffs' claims fail as a matter of law.

***First***, the CAC makes crystal clear that the conduct Plaintiffs complain about is within the ordinary course of Facebook's business. And Plaintiffs' Opposition ***confirms*** that Plaintiffs' complaint is not that Facebook processes or receives their messages as part of its service, but rather that Facebook subsequently *uses* links (or URLs) in their messages in a manner to which they object. This conduct is not governed by the Wiretap Act.

***Second***, Plaintiffs cannot avoid their express consent to the conduct alleged in the CAC. They attempt to obfuscate Facebook's clear disclosure that it "receive[s] data about you whenever you use or are running Facebook, such as when you . . . send or receive a message"—a disclosure included in the initial complaint and conspicuously omitted from the CAC—but this disclosure speaks for itself. Plaintiffs' consent is independently dispositive of their Wiretap Act and CIPA claims. The Section 632 CIPA claim fails for the further reason that written electronic messages, which a recipient can re-share, are not covered communications under the statute.

***Finally***, Plaintiffs spill considerable ink trying to avoid the obvious requirement of ***economic injury*** to establish standing to pursue a UCL claim. But they have not cited a single case—and there is none—finding economic injury in these circumstances, nor do they (or can they) allege any economic injury of any kind. Facebook and its Messages product are free services. Plaintiffs have

not "lost" anything, much less the required "money or property." This claim must be dismissed.[1]

## II. ARGUMENT

### A. Plaintiffs Fail To State A Claim Under The Wiretap Act

#### 1. Facebook's Alleged Conduct Is Not An "Interception" Because It Occurred In The Ordinary Course Of Facebook's Business

##### a. Plaintiffs' Complaint Establishes That Facebook's Alleged Acquisition Of Plaintiffs' Messages Was "In The Ordinary Course Of Its Business"

To state a Wiretap Act claim, the onus is on Plaintiffs to plead an unlawful "intercept[ion]," 18 U.S.C. § 2511(1)(a)—that is, an impermissible "acquisition of the contents" of a communication through the use of a "device," *id.* § 2510(4), other than equipment "being used by a provider of wire or electronic communication service in the ordinary course of its business," *id.* § 2510(5)(a)(ii). *See Arias v. Mutual Cent. Alarm Servs., Inc.*, 182 F.R.D. 407, 413 n.42 (S.D.N.Y. 1998) (*Arias I*), *aff'd*, 202 F.3d 553 (2d Cir. 2000) (*Arias II*); *see* Mot. at 12-16.[2] Plaintiffs concede in the CAC and in their Opposition that Facebook acquires messages through a "device" in the ordinary course of its business—a business that includes hosting and displaying messages sent to and from its users. (*See, e.g.*, CAC ¶ 23; Opp. at 4.) Plaintiffs therefore have not pled an actionable interception.

Unable to allege any specific facts to the contrary, Plaintiffs focus on alleged *uses* of message content—*e.g.*, "Facebook accessed, analyzed, and used," "mined," "catalogued," and "manipulated" messages, and "added code" to its service. (Opp. at 1, 5, 12, 24.) Even if these conclusory

---

[1] Plaintiffs' Opposition contains a lot of hyperbole. Plaintiffs absurdly proclaim that Facebook's automated processing of messages with URLs and incrementing an anonymous, aggregate number is "the twenty-first century equivalent of AT&T eavesdropping on each of its customers' phone conversations, or of a common carrier taking information from private correspondence[.]" (Opp. at 3.) Plaintiffs also contend that the practice of incrementing the "Like" count with URL message shares was "so opaque and so far outside the norm that, when exposed, the story made national news in the *Wall Street Journal*" in an "exposé." (*Id.* at 3, 5.) In reality, this alleged "exposé" was a short post on the *Journal*'s "Digits" blog that *acknowledged* that Facebook's publicly-available "guidance for developers . . . states that 'the number of inbox messages containing' a link to a page will count as 'Likes.'" (CAC ¶ 37.) In other words, the blog did not uncover or "expose" some secret, undisclosed practice; rather, it reported on a practice that Facebook itself had *disclosed* in a variety of contexts, including in the DUP. (*Id.*) The Court need not credit Plaintiffs' rhetoric in deciding the Motion.

[2] Plaintiffs are incorrect that this *exemption* is an affirmative defense that Facebook must establish. *See* Opp. at 7; *see also Arias I*, 182 F.R.D. at 413 n.42 ("The relevant portion of 18 U.S.C. § 2510(5) often has been referred to as the telephone extension/business use defense. That, however, is a misnomer. It is plaintiffs' burden to make out the elements on their claim[.]"). Plaintiffs' only "support" for their argument is a *dissenting* opinion in an employment discrimination case that did not involve the Wiretap Act. (Opp. at 7, citing *Johnson v. Trans Ag.*, 770 F.2d 752,762 (9th Cir. 1984).)

allegations were credited, they are irrelevant to the question of "interception," which the Act explicitly defines to mean only "acquisition." 18 U.S.C. § 2510(4). And there can be no liability under the "use" provision (*id*. § 2511(1)(d)) if the communications were not unlawfully intercepted. *See Noel v. Hall*, 568 F.3d 743, 751 (9th Cir. 2009) ("use" provision only covers communications "unlawfully intercepted"). Plaintiffs fail to meaningfully address this dispositive point.

### b. The Uses Alleged In Plaintiffs' Complaint Are Also In Facebook's "Ordinary Course Of Business"

Even if the Court considered the subsequent uses alleged by Plaintiffs in determining whether an "interception" occurred, they still fall within the ordinary course of business exemption. 18 U.S.C. § 2510(5)(a)(ii). That provision exempts conduct where "the provider is furthering its 'legitimate business purposes'—including advertising—and is not limited to only those acts that are technically necessary to processing email." *In re Google, Inc. Privacy Policy Litig.*, No. 12-01382 PSG, 2013 WL 6248499, at *11 (N.D. Cal. Dec. 3, 2013) ("*Google*"). The CAC establishes that Facebook is "the world's largest social-networking website," whose business is facilitating content sharing in an automatic and systematic fashion (CAC ¶¶ 1, 15), including hosting and displaying messages, previewing the content of URL links, detecting and protecting against malicious, harassing, or criminal conduct (*see id.* ¶¶ 20-24, 36; Compl., Dkt. 1, ¶ 58), and delivering advertising (CAC ¶ 3 (via the "fundamental" "Like" function)). Even if Plaintiffs' false claims that Facebook scans URLs in messages to create "user profiles" to target advertising (Opp. at 3 n.1, 4) were credited, the CAC *admits* that such conduct is within the ordinary course of Facebook's business. *See, e.g.*, CAC ¶¶ 3, 19, 25, 37, 41-42, 45, 57; *see also Google*, 2013 WL 6248499, at *10 ("Plaintiffs' own allegations make clear that the activities at issue here, concerning Google's core targeted advertising, [are] within its business' ordinary course."); *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir.1997) ("[A] plaintiff may plead herself out of court" if she "plead[s] facts which establish that [s]he cannot prevail on h[er] . . . claim.") (internal quotation marks/citation omitted).

### c. The "Ordinary Course Of Business" Exemption Is Not Limited To Conduct That Is "Incidental to Transmitting Communications"

To avoid application of the ordinary course of business exemption, Plaintiffs argue that it is limited to the use of technologies "incidental to transmitting communications." (Opp. at 9.)

3

Plaintiffs are incorrect.  While one court in this district did hold that the exemption applies only to interceptions that "facilitate[] the transmission of the communication at issue[,]" *In re Google Inc. Gmail Litig.* ("*Gmail*"), No. 13-02430, 2013 WL 5423918, at *8 (N.D. Cal. Sept. 26, 2013), another court in this district found that the exemption was not so limited (instead conferring "broad immunity") and that routine practices supporting Google's ordinary course of business, such as targeted advertising, were covered.  *Google*, 2013 WL 6248499, at *10.  Facebook respectfully submits that the *Google* opinion is legally correct for several reasons.

**First**, as *Google* noted, limiting the exemption "to only action taken to deliver the electronic communication[] does not square with the plain meaning of the statutory text at issue."  *Id.*  Indeed:

> Rather than narrowing the exemption to only the provision of electronic communications services itself, or some such narrower scope, Congress specifically chose the broader term "business" that covers more far[-]ranging activity.  For good measure, Congress also teamed the term "business" with the terms "ordinary course," suggesting an interest in protecting a provider's customary and routine business practices.

*Id.* at *10-11.[3]  This construction does not "write[] 'ordinary' completely out of the statute," as Plaintiffs contend.  (Opp. at 8.)  Instead, as the case law explains, the presence of the word "ordinary" means merely that acquisitions must be *regular* or *systematic*, as opposed to *ad hoc*.[4]  Similarly, the limitation to acquisitions in the course of "its business" means merely that acquisitions must relate to that entity's legitimate business purposes, not personal motives.[5]  Thus, even if Plaintiffs' baseless

---

[3]  In support of their argument, Plaintiffs cite ECPA's definition of "electronic communications system" as a facility used for the "***transmission*** of wire or electronic communications."  (Opp. at 8-9 (citing 18 U.S.C. § 2510(14) (emphasis added by Plaintiffs).)  But "electronic communications ***system***" does not appear in the "ordinary course of business" provision, demonstrating that Congress knew how to limit the provision to conduct necessary to "transmit communications," but chose not to do so.  *Cf. Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy.").

[4]  *Compare Google*, 2013 WL 6248499, at *10 (exempting "customary and routine" acquisitions for advertising), *Arias II*, 202 F.3d at 559 (exempting 24-hour call recording), *with Adams v. Battle Creek*, 250 F.3d 980, 983-84 (6th Cir. 2001) (no exemption where defendants "did not routinely monitor officers' pagers"), *Berry v. Funk*, 146 F.3d 1003, 1009-10 (D.C. Cir. 1998) (no exemption for monitoring not "shown to be routine" and inconsistent with published guidelines), *Campiti v. Walonis*, 611 F.2d 387, 392 (1st Cir. 1979) (no exemption for "exceptional course of conduct").

[5]  The Act targets wiretapping "for criminal or tortious purposes," *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 526 (S.D.N.Y. 2001), not the systematic acquisition of communications by a business in the course of its ordinary operations.  *Compare Google*, 2013 WL 6248499, at *11 (advertising was legitimate business purpose), *Arias II*, 202 F.3d at 559 (recording calls furthered alarm company's business), *First v. Stark Cnty. Bd. of Comm'rs*, 234 F.3d 1268, 1268 (6th Cir. 2000)

[Footnote continued on next page]

4

Gibson, Dunn & Crutcher LLP

assertions about the systematic use of URL data in messages for "user profiles" and "targeted advertising" had a factual basis—and they do not—they still would be in service of the legitimate business purpose of serving targeted advertising. (*Id.* at 4 & n.2.) And contrary to Plaintiffs' repeated misquoting of the Motion, Facebook does not contend that "*any* 'systematic conduct . . . that generates revenue for a company' is entitled to an exemption." (*Id.* at 8 (using ellipses to misrepresent Facebook's argument).) Rather, Facebook contends that "systematic conduct *of the type alleged by Plaintiffs*" is the very essence of a company acting "in the ordinary course of its business." (Mot. at 15 (emphasis added).) The court in *Google* agreed.

**Second**, as *Google* noted, "[a]lthough the Ninth Circuit has yet to rule on the subject, other appellate courts [] agree[] that the 'ordinary course of business' exception is not limited to actions necessary to providing the electronic communication services ('ECS') at issue." 2013 WL 6248499, at *11 (citing *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 505 (2d Cir. 2005) (applying the exemption where "the plaintiff alleged that the ISP continued processing his emails after he terminated his account," even though "[n]othing in processing a closed account's emails [] was necessary to the provision of ECS, suggesting that the processing was performed for other business reasons") and *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1250 (10th Cir. 2012) (applying the exemption to test of advertising technology on user communications because defendant had "no more of its users' electronic communications than it had in the ordinary course of its business as an ISP")).

Plaintiffs attempt to distinguish *Hall* and *Kirch* by arguing that those cases involved only receipt of messages, whereas, "[b]y contrast, beyond 'receiving' messages, here Facebook [allegedly] accessed, analyzed, and used the content within them." (Opp. at 11-12.) This argument underscores

---

[Footnote continued from previous page]

(legitimate purpose for recording all calls to "911," "not to spy on a particular dispatcher"), *Epps v. St. Mary's Hosp. of Athens, Inc.*, 802 F.2d 412, 417 (11th Cir. 1986) (monitoring employee calls for disparaging remarks was "matter in which the employer has a legal interest"), *Briggs v. Amer. Air Filter Co., Inc.*, 630 F.2d 414, 420 (5th Cir. 1980) (monitoring employee calls exempted where employer had reason to suspect disclosure of confidential information), *James v. Newspaper Agency Corp.*, 591 F.2d 579, 581 (10th Cir. 1979) (recording abusive language by customers served employer interest), *with Deal v. Spears*, 980 F.2d 1153, 1155-58 (8th Cir. 1992) (listening to employee's sexually provocative exchanges for too long went beyond employer's legitimate interest), *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581-84 (11th Cir. 1983) (listening to employee's personal call after nature of call was known did not serve legitimate business interest). ECPA's focus on acquisitions "heard and understood by human ears" is telling. *Arias I*, 202 F.3d at 558.

that Plaintiffs' complaint is not about "interception" of messages, but rather about their *use*. Moreover, *Hall* and *Kirch* explicitly held—without drawing any distinction between "receipt" and "access" of messages—that acquisition of contents of communications by an ECS did not constitute an "interception" because they were acquired in the ordinary course of those companies' business, which was not limited to transmission of messages. *Kirch*, 702 F.3d at 1250; *Hall*, 396 F.3d at 505.

  **Third**, Plaintiffs' narrow interpretation of the exemption only begs the question of what conduct is "necessary" or "incidental" to the transmission of a communication. As *Google* explained:

> [I]n defining "ordinary course of business" as "necessary" it begs the question of what exactly it[] means for a given action to be "necessary" to the delivery of Gmail. For example, in delivering Gmail is it really "necessary" [to] do more than just [] comply with email protocols such as POP, IMAP and MAPI? What about spam-filtering or indexing? None of these activities have anything specifically to do with transmitting email. And yet not even Plaintiffs suggest that these activities are unnecessary and thus lie outside of the "ordinary course [of] business."

*Google*, 2013 WL 6248499, at *11. Here, Plaintiffs do not dispute that Facebook *must* process and analyze content shared on its service (including messages) for a host of reasons, including the operation of the service itself and for security reasons such as protecting users from spam, malicious links, and criminal conduct. (Mot. at 1, 10.) Yet Plaintiffs' proposed construction would ***exclude*** these standard processes from the "ordinary course of [Facebook's] business." This is an "absurd" construction that must be avoided. *See United States v. Granderson*, 511 U.S. 39, 47 n.5 (1994).

  **Fourth**, Plaintiffs are incorrect that the "broader statutory scheme" and "legislative history" support their narrow construction. (Opp. at 8-9.) The "necessary incident" exception they rely on, 18 U.S.C. § 2511(2)(a)(i), actually supports Facebook's reading of the statute because it illustrates the clear distinction between conduct that falls within an ECS's "ordinary course of business" and conduct that is a "necessary incident to the rendition of [the] service." *Google*, 2013 WL 6248499, at *10 n.86 (under this separate exception, "each Google agent enjoys broad immunity in his handling of communications 'in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service[]'"). Contrary to Plaintiffs' argument, the language that a provider "shall not utilize service observing or random monitoring *except for mechanical or service quality control checks*" expressly applies only to a "*wire communication service*," not an ECS like Facebook. 18 U.S.C. § 2511(2)(a)(i) (emphasis added). The legislative history explains why:

6

Gibson, Dunn & Crutcher LLP

In applying the second clause [of the necessary incident exception, which limits monitoring to mechanical or service quality control checks] *only to wire communications*, this provision reflects an important technical distinction between electronic communications services and traditional voice telephone service. *The provider of electronic communications services may have to monitor a stream of transmissions in order to properly route, terminate, and otherwise manage the individual messages they contain. These monitoring functions, which may be necessary to the provision of an electronic communication service, do not involve humans listening in on voice conversations. Accordingly, they are not prohibited.* In contrast, the traditional limits on service 'observing' and random 'monitoring' do refer to human aural interceptions and are retained with respect to voice or 'wire' communications.

Dkt. No. 30 at 23 (S. Rep. 99-541 at *20) (emphasis added). In short, the "necessary incident" exception—which focuses on activity that is a "*necessary incident to the* rendition of [the] service or to the protection of the rights or property of the provider of that service," 18 U.S.C. § 2511(2)(a)(i)— underscores the comparative breadth of the "ordinary course of business" exemption.

**Fifth**, Plaintiffs are wrong that "every court" assessing similar circumstances has declined to apply the ordinary course exemption. (Opp. at 9.) In support of this assertion, Plaintiffs rely on *Gmail*, 2013 WL 5423918.[6] But that decision is not binding on this Court, and, as detailed above and in the *Google* decision, the construction of the "ordinary course of business" exemption is much broader. (*Supra* pp. 3-6.) Indeed, virtually every case addressing the exemption has considered business practices that are in the specific company's ordinary course, including purposes that are not incidental to its primary service. (*See, e.g.*, *supra* nn. 4-5.) Moreover, in *Gmail*, the court found that Google's alleged practices violated its own internal policies; in contrast, the CAC shows that Facebook acted consistent with its stated policies and developer guidance. (Mot. at 16.)

**Sixth**, *Google* did not "conflate[] the 'ordinary course of business' analysis with whether or not the practice was *disclosed*, *i.e.*, whether consent was obtained." (Opp. at 14.) But disclosure of routine business processes—as in Facebook's DUP and developer guidance (CAC ¶ 37)—does confirm that conduct is in the ordinary course of an ECS's business.

**Finally**, while Facebook's construction of "ordinary course of business" is legally correct, if this Court were to find any ambiguity in this criminal statute, it should construe the language of the

---

[6] *Dunbar v. Google, Inc.*, No. 10-194, 2011 U.S. Dist. LEXIS 157932 (E.D. Tex. May 23, 2011), is an earlier decision in the same *Gmail* multi-district litigation, and *Marquis v. Google, Inc.*, No. 11-02808 (Mass. Sup. Ct. Jan. 17, 2012), involves a state statute with language that differs from ECPA.

Gibson, Dunn & Crutcher LLP

statute in Facebook's favor. *See, e.g.*, *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011) ("[A] penal statute[] is to be strictly construed . . . ."); Mot. at 12 (citing cases).

### 2. Plaintiffs Consented To The Alleged Interceptions As A Matter Of Law

Plaintiffs' ECPA claim fails for a second, independent reason: Plaintiffs consented to any "interceptions." Contrary to Plaintiffs' assertions, consent can be decided at the motion-to-dismiss stage where the defense is apparent from the face of the complaint. (Mot. at 18 (citing cases).)

**Express Consent**. Unable to effectively dispute that Facebook disclosed the relevant conduct in its DUP, Plaintiffs resort to grousing about the placement of the disclosure. Specifically, they contend that the first section of Facebook's DUP—a one-page section titled "**Information we receive about you,**" which all Plaintiffs admittedly read (CAC ¶¶ 69-71)—should have included the disclosure under the first subheading (titled "**Your information**") rather than under the third subheading (titled "**Other information we receive about you**"). (Opp. at 16.) But Plaintiffs cannot base a putative nationwide class action lawsuit on their disagreement about the DUP's subheadings, and their editorial second-guessing is meritless.

*First*, Plaintiffs do not deny that the "**Other information we receive about you**" subheading contains the relevant message disclosure, and they *admit* they read this disclosure. (*Id.*; CAC ¶¶ 69-71.) Thus, regardless of the subheading placement, Plaintiffs read and agreed to the disclosure.

*Second*, contrary to Plaintiffs' assertions, there is nothing confusing or misleading about the structure of the DUP's "**Information we receive about you**" section, which begins by stating, "We receive a number of different types of information about you, including: . . . " and then goes on to list several types of information under three subheadings. The "**Your information**" subheading includes, among other things, "information you choose to share on Facebook, such as when you post a status update, upload a photo, or comment on a friend's story" and "information you choose to share when you communicate with us" (Dkt. No. 29-1, Ex. D), but contrary to Plaintiffs' argument, this subsection does not "list[] *every type of communication* related to Facebook *except* private messages," thereby "implicitly exclud[ing] such messages from those that Facebook seeks permission to access and use." (Opp. at 16 (first emphasis added).) There are many ways to share on Facebook that are not mentioned in this non-exhaustive list, many of which are referenced in the CAC (*e.g.*,

8

creating a Facebook event, tagging a friend in a photo, posting a video, or sharing application content (CAC ¶¶ 15, 21)).  The DUP's use of "such as" makes clear that the list merely includes examples, and the CAC acknowledges that one way to "share" is through a "private message."  (*Id.* ¶ 21 (quoting Facebook Help Center)).  Thus, a reasonable user would not infer from the content of this sub-heading that Facebook is not receiving information about messages shared through its platform.

**Third**, even if a Facebook user were uncertain as to whether messages were included under the "**Your information**" subheading, the "**Other information we receive about you**" subheading removes all doubt that "**Information we receive about you**" includes message information:

> **Other information we receive about you**
> We also receive other types of information about you:
>
> We receive data about you whenever you use or are running Facebook, such as when you look at another person's timeline, send or receive a message, search for a friend or a Page, click on, view or otherwise interact with things, use a Facebook mobile app, or make purchases through Facebook.

(Dkt. No. 29-1, Ex. D (underlined emphases added).)  These disclosures are not confusing or misleading, and Plaintiffs acknowledge that a written instrument "must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000) (Opp. at 15).

**Fourth**, Plaintiffs contend that the "**Other information we receive about you**" subheading is limited to "'data' of a technical nature," and thus "[a]t most, users consented to interception of 'data *about*' their private messages, such as when and to whom they were sent . . . ."  (Opp. at 16-17.) Plaintiffs are incorrect.  They cannot point to *any* language in the DUP—because there is none—limiting message "data" to "'data' of a technical nature" and/or excluding URL "data" in a message.

Plaintiffs then attempt to bolster their argument by claiming to quote "[t]he remaining categories of 'data about you' that Facebook seeks permission to collect[.]"  (*Id.* at 16.)  However, Plaintiffs **remove** all of the language *directly surrounding* the message disclosure and then "cobbl[e] together out-of-context snippets" (*id.* at 15) from the remaining bullet points to manufacture an argument that this subsection of the DUP concerns only technical data.  Attached as Exhibit 1 is a redline showing the significant deletions Plaintiffs make.  Specifically, Plaintiffs omit a substantial amount of critical intervening text, using ellipses to jump to later-appearing, wholly unrelated

provisions detailing technical data that Facebook receives in other, unrelated circumstances. When this subsection is read as a whole, it refutes Plaintiffs' argument that Facebook only would have received "technical data" and not URLs in messages.[7]

**Finally**, Plaintiffs assert in an entirely conclusory manner that "Facebook cannot show that Plaintiffs had specific notice of its interceptions *and their purposes*, as it must to prevail on its defense." (Opp. at 17 (emphasis added).) This is incorrect. Plaintiffs do not even attempt to challenge the DUP's clear "use" disclosures, which unquestionably cover the conduct alleged here. (Mot. at 9-10, 17-18 (citing relevant provisions).) As explained in the Motion, all Facebook users acknowledge that they understand and agree that Facebook will receive and employ user data for a variety of routine business purposes, including "efforts to keep Facebook products, services and integrations safe and secure," "to measure or understand the effectiveness of ads [users] and others see, including to deliver relevant ads to [the user]," and "for internal operations" such as "data analysis" or "service improvement." (*Id.*) Users also acknowledge that Facebook may share information, including with "developers that build the . . . websites [users] use," where Facebook "has removed your name and any other personally identifying information from it." (*Id.*)

Moreover, once consent to the interception has been obtained, the "purpose" of the interception is irrelevant "unless [the] communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).[8] Facebook explained in its Motion that Plaintiffs had failed to allege

---

[7] Plaintiffs also selectively quote from other sections of Facebook's user agreements (Opp. at 15) that are not relevant. The cited SRR statement provides merely that "[y]ou own all of the content and information you post on Facebook, and you can control how it is shared *through your privacy and application settings*." (Dkt. No. 29-1, Ex. A (emphasis added).) Similarly, the cited DUP provision states merely: "While you are allowing us to use the information we receive about you, you always own all of your information." (*Id.*, Ex. D.) These provisions underscore that users agree that Facebook can use information it receives about its users, including message information.

[8] The Wiretap Act requires only "consent to [the] *interception*"—not consent to *the purpose of the interception*. 18 U.S.C. § 2511(2)(d) (emphasis added); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 216 F.3d 621, 624 (7th Cir. 2000) (if consent is obtained for an interception, there are "no . . . restrictions on its use"); *Buckingham v. Gailor*, No. 00-cv-1568, 2001 WL 34036325, at *6 (D. Md. Mar. 27, 2001) ("The use and disclosure of interceptions . . . will not be considered unlawful, if, as in this instance, the interceptions themselves are lawful."). To the extent that the court in *In re Yahoo Mail Litig.*, No. 5:13-CV-04980-LHK, Dkt. No. 49 (N.D. Cal Aug. 12, 2013) ("*Yahoo*") read *Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir. 1983) and other cases for the proposition that all *purposes* of an interception must be consented to, Facebook respectfully disagrees with that

[Footnote continued on next page]

1  plausibly that Facebook acquired Plaintiffs' messages for the purpose of committing a "criminal or

2  tortious act," and had in fact conceded that Facebook acquired their messages for legitimate business

3  purposes. (Mot. at 19 n.11 (citing cases).)  Plaintiffs do not contest the point in their Opposition.[9]

4      **Implied Consent**.  Plaintiffs also impliedly consented to the alleged interceptions.  Facebook

5  is not, as Plaintiffs contend, asserting a theory of "constructive consent." (Opp. at 18.)  Rather, the

6  CAC admits that users received *actual notice* before sending their messages*:* (i) when they typed a

7  URL into a message, Facebook returned a preview of the URL content in their message, which

8  Facebook could not have done without analyzing the URL; (ii) users who then proceeded to send the

9  message did so with *full recognition* that Facebook was acquiring their message content.  (Mot at 18-

10  19; CAC ¶ 36 (acknowledging URL preview functionality; cited article also notes message

11  processing to filter spam)).)  Accordingly, users had "adequate notice" of, and impliedly consented to,

12  the "interceptions."  *Gmail*, 2013 WL 5423918, at *12.  Plaintiffs' own cases support this conclusion,

13  finding implied consent when a party elects to continue using a communication method after

14  receiving *clear warning*.  *Griggs-Ryan v. Smith*, 904 F.2d 112, 117-18 (1st Cir. 1990) (Opp. at 18).

15      **3.     The Alleged Conduct Does Not "Intercept" A Communication "In Transmission"**

16      An "interception" occurs under the Wiretap Act only if a communication is "acquired during

17  transmission, not while it is in electronic storage."  *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 878,

18  878-79 (9th Cir. 2002).  Plaintiffs fail to offer any theory of how the definition of "in transmission"

19  could possibly encompass the events they allege.  Plaintiffs allege (i) acquisition of messages,

20

21  [Footnote continued from previous page]

22  holding and believes it is not supported by the case law.  Those cases merely acknowledge that a
   party may give consent to the interception of a subset of her communications—for example, consent
23  that her employer may listen in on her business calls but not her personal calls.  *See Watkins*, 704
   F.2d at 581-82.  This is the meaning of the observation that consent "is not necessarily an all or
24  nothing proposition."  *Id.*

25  [9]  Plaintiffs also argue that because Facebook did not revise its disclosures once it stopped including
   URL message shares in the anonymous, aggregate "Like" count in October 2012, this was "an
26  implicit admission that the practice was never disclosed to users in the first place."  (Opp. at 4.)  The
   argument makes no sense.  For the duration of the proposed class period, Facebook's DUP *always*
27  informed users that Facebook would receive information about them whenever they sent or received
   a message, as well as the many ways in which Facebook could use their information.  (*See* Mot. at 8-
28  9.)  The fact that Facebook ceased a practice in October 2012 to which all users had already
   consented would not require any revisions to Facebook's disclosures.

followed by (ii) scanning, (iii) URL analysis, (iv) crawling of third-party websites, (v) potential detection of a social plugin, and (vi) an increase in the "Like" count, all without ever addressing the scope of the transmission or how anything after acquisition occurs "in transmission." (CAC ¶ 2; Opp. at 3-4.) Instead, Plaintiffs merely cite the CAC's conclusory and legally insufficient allegations parroting the "in transmission" requirement. (Opp. at 19; CAC ¶¶ 25, 81.) The *Yahoo* decision cited in Plaintiffs' supplemental filing (Dkt. No. 34) is distinguishable because here the CAC itself reveals that the alleged processes, noted above, occurred in a sequence after the message content was acquired, and therefore did not occur "during transmission." (Mot. at 19-21.)

**B.** **Plaintiffs Fail To State A Claim Under California Penal Code Section 631**

Plaintiffs' Section 631 claim fails because, as explained in Facebook's Motion and above, Plaintiffs consented to the alleged interceptions. (Mot. at 17-21; *supra* pp. 8-11.) The claim also fails because Plaintiffs provide no more than conclusory allegations regarding how their messages were purportedly "in transit." CAC ¶ 108; *see, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In fact, the CAC alleges that Facebook "mined" "transmissions across its network," acknowledging that the alleged conduct did not occur while the messages were "in transit." (CAC ¶ 48.) In opposition, Plaintiffs argue that Facebook's assertions—quoting the CAC—somehow "contradict[] the CAC." (Opp. at 19.) But the CAC speaks for itself.

**C.** **Plaintiffs Fail To State A Claim Under California Penal Code Section 632**

Plaintiffs' Section 632 arguments are frivolous. Plaintiffs do not even mention—let alone attempt to distinguish—the four dispositive cases cited in Facebook's Motion for the well-settled proposition that written electronic communications (*e.g.*, chats and emails) do not qualify as "confidential communications" under Section 632 as a matter of law because they by definition are recorded and thus can be shared by the recipient with others. (Mot. at 22.) Nor do Plaintiffs contest that Facebook informed them of that fact in the DUP. (*Id.* at 22-23.)

Instead, Plaintiffs cite a case about phone conversations and ignore even that court's statement of the law. (Opp. at 20.) Contrary to Plaintiffs' formulation, *Kight v. CashCall, Inc.*, 200 Cal. App. 4th 1377, 1389-90 (2011), explicitly applied the same standard for "confidential communications" as other California cases: the party must have "an objectively reasonable

expectation that the conversation is not being overheard or recorded," which does not exist here as a matter of law.[10]  Moreover, Plaintiffs consented to the conduct at issue, as discussed above, and Facebook did not "eavesdrop[]" on their conversations.  (Opp. at 19-20.)  Unlike in the cases cited by Plaintiffs, there was no third party surreptitiously listening in on any confidential oral communications.  Instead, Facebook operates a service that involves automatic and systematic processing and storage of electronic messages, a fact conceded by Plaintiffs.  (*Id.* at 1, 3-4, 11.)

## D.  Because Plaintiffs Cannot Allege Any Economic Harm, They Lack Standing To Pursue Their UCL Claim

To establish standing under the UCL, Plaintiffs must show that they have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.  This language requires private plaintiffs to "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim."  *Kwikset v. Super. Ct.*, 51 Cal. 4th 310, 332 (2011) (emphasis in original).

Plaintiffs do not and cannot establish "lost money or property."  Facebook is a free service.  The CAC merely parrots the statutory elements without supporting factual allegations (CAC ¶ 129), and there is no way to cure this deficiency with further amendment of their pleading.  *See, e.g.*, *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 715 (N.D. Cal. 2011), *aff'd*, No. 12-15619, 2014 WL 1815489 (9th Cir. May 8, 2014); *Heller v. Ralph's Grocery Co.*, No. B249608, 2014 WL 2818671, at *4 (Cal. Ct. App. June 23, 2014) (no economic harm under *Kwikset* from use of free rewards card).

Plaintiffs raise a number of arguments in response (Opp. at 20-24), but they do not cite a single case, statute, or treatise that supports their expansive definition of "lost money or property."  Instead, they rely on inapposite cases that did not involve the UCL, including two Ninth Circuit decisions involving conversion and unjust enrichment law (*Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003); *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896 (9th Cir. 1992)), a dispute over whether beachside construction triggered the "navigational servitude" provisions of the

---

[10]  *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 235 (1998) (Opp. at 20), involved a claim for intrusion upon seclusion and applied the same test for confidential communications.

Rivers and Harbors Appropriation Act of 1899 (*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)), state decisions interpreting California Penal Code provisions regarding burglary and parking meters (*People v. Kwok*, 63 Cal. App. 4th 1236 (1998); *Downing v. Mun. Ct.*, 88 Cal. App. 2d 345 (1948)), a case involving a request for temporary easement to conduct environmental surveys (*Prop. Reserve, Inc. v. Super. Ct.*, 224 Cal. App. 4th 828 (2014), *review granted and superseded*, 173 Cal. Rptr. 3d 45 (June 25, 2014)), a decision regarding the application of the sales tax provisions of the California Revenue & Tax Code to copyright agreements (*Preston v. State Bd. of Equalization*, 25 Cal. 4th 197 (2001)), and a generic, unrelated statute (Cal Civ. Code § 654). (*See* Opp. at 21-22.)[11]

In other words, Plaintiffs could not find a single reported decision to support their position. That is because state and federal courts repeatedly have rejected Plaintiffs' broad construction of "lost money or property." The Ninth Circuit recently affirmed a district court's decision that dismissed a UCL claim with prejudice and held that "[a] plaintiff's 'personal information' does not constitute property under the UCL." *Facebook*, 791 F. Supp. 2d at 714, *aff'd* 2014 WL 1815489; *see also In re iPhone Application Litig.*, No. 11-02250, 2011 WL 4403963, at *14 (N.D. Cal. Sept. 20, 2011) (same). And this Court specifically rejected a claim that personally identifiable information qualifies as "lost money or property" under the UCL. *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 862-63 (N.D. Cal. 2011) (rejecting UCL standing for stolen account credentials).[12] Plaintiffs have failed to allege any harm of any kind, let alone the required "lost money or property."[13]

---

[11] Plaintiffs also suggest that because they "owned" their messages, Facebook had no right to use the messages. (Opp. at 22.) In fact, the DUP expressly provides: "***While you are allowing us to use the information we receive about you***, you always own all of your information." (Dkt. No. 29-1, Ex. D (emphasis added).) Plaintiffs agreed to the uses challenged here and cannot claim any "loss" (much less any *economic* loss) as a result.

[12] In a futile attempt to distinguish these decisions, Plaintiffs contend that the alleged loss of "control" of their messages is akin to the loss of financial records in *Doe 1 v. AOL, LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010) (Opp. at 23 n.21), but that case involved alleged economic losses in the form of fees paid for the services. Plaintiffs do not and cannot allege any such economic harm here. *See, e.g.*, *Facebook*, 791 F. Supp. 2d at 714-15 ("Because Plaintiffs allege that they received Defendant's services for free, as a matter of law, Plaintiffs cannot state a UCL claim . . . .").

[13] Plaintiffs also do not establish any violation of the UCL: (1) Because they cannot state an ECPA or CIPA claim (*supra* pp. 2-13), their derivative claim for "unlawful" business practices also fails; (2) Plaintiffs' scattershot citation to thirty-three paragraphs in the CAC fails to *identify any particularized "unfair" practices* (*see, e.g., Smith & Hawken, Ltd. v. Gardendance, Inc.*, No. C04-1664 SBA, 2004 WL 2496163, at *5 (N.D. Cal. Nov. 5, 2004)), and they also do not allege any conduct that "threatens or harms competition" or results in harm (which is non-existent) that

[Footnote continued on next page]

14

**E.    The Court Should Strike Plaintiffs' Request for Injunctive Relief**

As Facebook explained in its Motion, Plaintiffs may not obtain injunctive relief because—by their own admission—the challenged practice of incrementing the "Like" count by including URL shares in messages ceased nearly two years ago.  (Mot. at 25.)  While Plaintiffs contend they are entitled to seek injunctive relief "if there is 'a sufficient likelihood that [they] will again be wronged in a similar way'" (Opp. at 25) (citation omitted), Plaintiffs themselves acknowledge that is not the case here.  Mot. at 25; CAC ¶¶ 27, 59, 59 n.3; *cf. Opperman v. Path*, No. 13-cv-00453-JST, 2014 WL 1973378, at *23 (N.D. Cal. May 14, 2014) ("Here, Plaintiffs allege that the App Defendants all discontinued their practices when the practice of transmitting user address books was made public"; without "realistic threat of repetition, Plaintiffs [could not] establish standing through their prayer for injunctive relief").

Struggling to articulate some basis for their request, Plaintiffs remark that they "are still active Facebook users," that Facebook "has not confirmed that it has" "ceased *all* of the unlawful conduct alleged," and that Facebook "could surreptitiously repeat this, or similar, misconduct in the future." (Opp. at 25.)  This type of speculation does not warrant injunctive relief, as it simply relies on "[p]ast exposure to [alleged] illegal conduct" without any "continuing, present adverse effects."  *Daniel v. Santa Rosa Junior College*, No. C 13-02426 JSW, 2014 WL 806432, at *9 (N.D. Cal. Feb. 27, 2014) (citation omitted).

### III.    CONCLUSION

For the reasons set forth in its Motion and above, Facebook respectfully requests that the Court dismiss the CAC with prejudice.

---

[Footnote continued from previous page]

outweighs its utility (*see, e.g., Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169-70 (9th Cir. 2012)); and (3) Plaintiffs fail to allege any "fraudulent" business practices with sufficient particularity, because they do not identify any specific alleged misrepresentation that was false or deceptive and that Plaintiffs read and relied on.

Finally, as Facebook explained (Mot. at 24 n.13), the CAC fails to allege any facts to support an award of restitution.  In response, Plaintiffs make the incomprehensible argument that their "property interest" in their messages is "vested," and for this reason they may seek restitution of unidentified "benefits Facebook derived from using their messages."  (Opp. at 24 n.24.)  Plaintiffs do not and cannot identify any "money or gains" taken from Plaintiffs and held by Facebook that can be "restored" to them.  (Mot. at 24 n.13 (citing cases).)

Dated: August 28, 2014

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/_____
                Joshua A. Jessen

Attorneys for Defendant FACEBOOK, INC.

# Exhibit 1

**Plaintiffs' Deletions to "Other information we receive about you" (Facebook's Data Use Policy)**

**Other information we receive about you**

We also receive other types of information about you:

- We receive data about you whenever you use or are running Facebook, such as when you ~~look at another person's timeline,~~ send or receive a message, ~~search for a friend or a Page, click on, view or otherwise interact with things, use a Facebook mobile app, or make purchases through Facebook.~~

- ~~When you post things like photos or videos on Facebook, we may receive additional related data (or~~ metadata), such as the time, date, and place you took the photo or video.

- ~~We receive data from or about the computer, mobile phone, or other devices you use to install Facebook apps or to access Facebook, including when multiple users log in from the same device. This may include~~ network and communication information, such as your IP address or mobile phone number~~, and other information about things like~~ your internet service, operating system, location, the type (including identifiers) of the device or browser you use, or the pages you visit. ~~For example, we may get your GPS or other location information so we can tell you if any of your friends are nearby, or we could request device information to improve how our apps work on your device.~~

- ~~We receive data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin), sometimes through cookies. This may include~~ the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use~~; and, if you are logged in to Facebook, your User ID.~~

- ~~Sometimes we get~~ data from ~~our affiliates or our advertising partners, customers and other~~ third parties ~~that helps us (or them) deliver ads, understand online activity, and generally make Facebook better. For example, an advertiser may tell us information about you (like~~ how you responded to an ad on Facebook or on another site~~) in order to measure the effectiveness of - and improve the quality of - ads.~~