1  GIBSON, DUNN & CRUTCHER LLP
   JOSHUA A. JESSEN, SBN 222831
2  JJessen@gibsondunn.com
   JEANA BISNAR MAUTE, SBN 290573
3  JBisnarMaute@gibsondunn.com
   JESSICA S. OU, SBN 280534
4  JOu@gibsondunn.com
   1881 Page Mill Road
5  Palo Alto, California  94304
   Telephone:  (650) 849-5300
6  Facsimile:   (650) 849-5333

7  GIBSON, DUNN & CRUTCHER LLP
   GAIL E. LEES, SBN 90363
8  GLees@gibsondunn.com
   CHRISTOPHER CHORBA, SBN 216692
9  CChorba@gibsondunn.com
   333 South Grand Avenue
10 Los Angeles, California 90071
   Telephone:  (213) 229-7000
11 Facsimile:  (213) 229-7520

12 Attorneys for Defendant
   FACEBOOK, INC.

13

14               UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                    OAKLAND DIVISION

17 MATTHEW CAMPBELL, MICHAEL           Case No. C 13-05996 PJH
   HURLEY, and DAVID SHADPOUR,
18                                     **CONSOLIDATED CLASS ACTION**
                  Plaintiffs,
19                                     **JOINT STIPULATION REGARDING**
          v.                           **JUDICIALLY NOTICEABLE**
20                                     **DOCUMENTS**
   FACEBOOK, INC.,
21
                  Defendant.
22

23

24

25

26

27

28

1  WHEREAS, on April 25, 2014, Plaintiffs filed a Consolidated Amended Complaint ("CAC")

2  in this matter (Dkt. No. 25);

3  WHEREAS, on June 17, 2014, Defendant Facebook, Inc. ("Facebook") filed a Motion to

4  Dismiss the CAC (Dkt. No. 29);

5  WHEREAS, Plaintiffs have filed an Opposition to Facebook's Motion to Dismiss the CAC

6  (Dkt. No. 31), and Facebook has filed a Reply in support of its Motion to Dismiss the CAC (Dkt. No.

7  35);

8  WHEREAS, in support of their respective arguments regarding Facebook's Motion to

9  Dismiss, Plaintiffs and Facebook (the "Parties") have filed Requests for Judicial Notice (Dkt. Nos.

10 30, 32), Plaintiffs have filed an Opposition to Facebook's Request for Judicial notice (Dkt. No. 33),

11 and Facebook has filed a Reply in support of its Request for Judicial Notice (Dkt. No. 36);

12 WHEREAS, on October 1, 2014, the Court heard the Parties' arguments on Facebook's

13 Motion to Dismiss;

14 WHEREAS, at the Motion to Dismiss hearing, the Court requested that the Parties confer and

15 jointly stipulate as to the judicially noticeable nature of certain documents at issue; and

16 WHEREAS, the Court further requested that the Parties' joint stipulation attach the judicially

17 noticeable documents, including highlighting of the respective language relied upon by each of the

18 Parties in each of the documents.

19 THEREFORE, as instructed by the Court during the hearing on October 1, 2014, the parties

20 have conferred and respectfully submit the attached documents for which this Court may take judicial

21 notice in ruling on Facebook's Motion to Dismiss:

22    1. **Exhibit A**:  A true and correct copy of Facebook's current Statement of Rights and

23       Responsibilities, dated November 15, 2013;

24    2. **Exhibit B**:  A true and correct copy of Facebook's Statement of Rights and

25       Responsibilities, dated April 26, 2011;

26    3. **Exhibit C**:  A true and correct copy of Facebook's Statement of Rights and

27       Responsibilities, dated June 8, 2012;

28    4. **Exhibit D**:  A true and correct copy of Facebook's current Data Use Policy, dated

1      November 15, 2013;

2          5.  **Exhibit E:**  A true and correct copy of Facebook's Data Use Policy, dated September

3              7, 2011;

4          6.  **Exhibit F:**  A true and correct copy of Facebook's Data Use Policy, dated June 8,

5              2012; and

6          7.  **Exhibit G:**  A true and correct copy of Senate Report No. 99-541, dated October 17,

7              1986.

8          Facebook has highlighted, in yellow, the language in Exhibits A, B, C, D, E, F, and G, on

9   which it relies in support of its Motion to Dismiss.

10         As Plaintiffs contend that there is no disclosure of the practice in question, there is no discrete

11  text upon which to focus.  Accordingly, Plaintiffs have highlighted in pink the sections generally

12  relevant to the privacy of user-generated content, as it is Plaintiffs' position that the documents must

13  be read in their entirety.

14

15

16  Dated: October 9, 2014                    Respectfully submitted,

17                                            GIBSON, DUNN & CRUTCHER LLP

18                                            By:  /s/

19                                                 JOSHUA A. JESSEN

20                                            Attorneys for Defendant Facebook, Inc.

21

22                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

23                                            By: 

24                                                 MICHAEL W. SOBOL

25                                            Attorneys for Plaintiffs

26

27

28

Gibson, Dunn & Crutcher LLP

JOINT STIPULATION REGARDING JUDICIALLY NOTICEABLE DOCUMENTS
Case No. C 13-05996 PJH

1

## __ATTORNEY ATTESTATION__

2      Pursuant to Civil Local Rule 5-1, I, Joshua A. Jessen, hereby attest that concurrence in the

3   filing of this document has been obtained from Michael W. Sobol.

4

5   Dated: October 9, 2014                         Respectfully submitted,

6                                                  GIBSON, DUNN & CRUTCHER LLP

7                                                  By:  _____/s/_____

8                                                            JOSHUA A. JESSEN

9                                                  Attorneys for Defendant Facebook, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

JOINT STIPULATION REGARDING JUDICIALLY NOTICEABLE DOCUMENTS
Case No. C 13-05996 PJH

# Exhibit A

This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls.  Please note that Section 17 contains certain changes to the general terms for users outside the United States.

Date of Last Revision: November 15, 2013.

**Statement of Rights and Responsibilities**

This Statement of Rights and Responsibilities ("Statement," "Terms," or "SRR") derives from the Facebook Principles, and is our terms of service that governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement, as updated from time to time in accordance with Section 14 below. Additionally, you will find resources at the end of this document that help you understand how Facebook works.

1. **Privacy**

   Your privacy is very important to us. We designed our Data Use Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information.  We encourage you to read the Data Use Policy, and to use it to help you make informed decisions.

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:
   1. For content that is covered by intellectual property rights, like photos and videos (IP content), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).
   3. When you use an application, the application may ask for your permission to access your content and information as well as content and information that others have shared with you.  We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information.  (To learn more about Platform, including how you can control what information other people may share with applications, read our Data Use Policy and Platform Page.)
   4. When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture).
   5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use them without any obligation to compensate you for them (just as you have no obligation to offer them).

3. **Safety**

   We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to keep Facebook safe, which includes the following commitments by you:
   1. You will not post unauthorized commercial communications (such as spam) on Facebook.
   2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our prior permission.

1

3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.
4. You will not upload viruses or other malicious code.
5. You will not solicit login information or access an account belonging to someone else.
6. You will not bully, intimidate, or harass any user.
7. You will not post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.
8. You will not develop or operate a third-party application containing alcohol-related, dating or other mature content (including advertisements) without appropriate age-based restrictions.
9. You will follow our Promotions Guidelines and all applicable laws if you publicize or offer any contest, giveaway, or sweepstakes ("promotion") on Facebook.
10. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.
11. You will not do anything that could disable, overburden, or impair the proper working or appearance of Facebook, such as a denial of service attack or interference with page rendering or other Facebook functionality.
12. You will not facilitate or encourage any violations of this Statement or our policies.

## 4. Registration and Account Security

Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:

1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.
2. You will not create more than one personal account.
3. If we disable your account, you will not create another one without our permission.
4. You will not use your personal timeline primarily for your own commercial gain, and will use a Facebook Page for such purposes.
5. You will not use Facebook if you are under 13.
6. You will not use Facebook if you are a convicted sex offender.
7. You will keep your contact information accurate and up-to-date.
8. You will not share your password (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.
9. You will not transfer your account (including any Page or application you administer) to anyone without first getting our written permission.
10. If you select a username or similar identifier for your account or Page, we reserve the right to remove or reclaim it if we believe it is appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

## 5. Protecting Other People's Rights

We respect other people's rights, and expect you to do the same.

1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
2. We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies.
3. We provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.
4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.
5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.
6. You will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Book and Wall), or any confusingly similar marks, except as expressly permitted by our Brand

2

Usage Guidelines or with our prior written permission.

7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.

8. You will not post anyone's identification documents or sensitive financial information on Facebook.

9. You will not tag users or send email invitations to non-users without their consent. Facebook offers social reporting tools to enable users to provide feedback about tagging.

## 6. Mobile and Other Devices

1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging and data charges, will still apply.

2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are not sent to the person who acquires your old number.

3. You provide consent and all rights necessary to enable users to sync (including through an application) their devices with any information that is visible to them on Facebook.

## 7. Payments

If you make a payment on Facebook or use Facebook Credits, you agree to our Payments Terms.

## 8. Special Provisions Applicable to Social Plugins

If you include our Social Plugins, such as the Share or Like buttons on your website, the following additional terms apply to you:

1. We give you permission to use Facebook's Social Plugins so that users can post links or content from your website on Facebook.

2. You give us permission to use and allow others to use such links and content on Facebook.

3. You will not place a Social Plugin on any page containing content that would violate this Statement if posted on Facebook.

## 9. Special Provisions Applicable to Developers/Operators of Applications and Websites

If you are a developer or operator of a Platform application or website, the following additional terms apply to you:

1. You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Facebook Platform Policies and our Advertising Guidelines.

2. Your access to and use of data you receive from Facebook, will be limited as follows:

   1. You will only request data you need to operate your application.

   2. You will have a privacy policy that tells users what user data you are going to use and how you will use, display, share, or transfer that data and you will include your privacy policy URL in the Developer Application.

   3. You will not use, display, share, or transfer a user's data in a manner inconsistent with your privacy policy.

   4. You will delete all data you receive from us concerning a user if the user asks you to do so, and will provide a mechanism for users to make such a request.

   5. You will not include data you receive from us concerning a user in any advertising creative.

   6. You will not directly or indirectly transfer any data you receive from us to (or use such data in

3

connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use.

7. You will not sell user data.  If you are acquired by or merge with a third party, you can continue to use user data within your application, but you cannot transfer user data outside of your application.
8. We can require you to delete user data if you use it in a way that we determine is inconsistent with users' expectations.
9. We can limit your access to data.
10. You will comply with all other restrictions contained in our Facebook Platform Policies.

3. You will not give us information that you independently collect from a user or a user's content without that user's consent.
4. You will make it easy for users to remove or disconnect from your application.
5. You will make it easy for users to contact you. We can also share your email address with users and others claiming that you have infringed or otherwise violated their rights.
6. You will provide customer support for your application.
7. You will not show third party ads or web search boxes on www.facebook.com.
8. We give you all rights necessary to use the code, APIs, data, and tools you receive from us.
9. You will not sell, transfer, or sublicense our code, APIs, or tools to anyone.
10. You will not misrepresent your relationship with Facebook to others.
11. You may use the logos we make available to developers or issue a press release or other public statement so long as you follow our Facebook Platform Policies.
12. We can issue a press release describing our relationship with you.
13. You will comply with all applicable laws. In particular you will (if applicable):
    1. have a policy for removing infringing content and terminating repeat infringers that complies with the Digital Millennium Copyright Act.
    2. comply with the Video Privacy Protection Act (VPPA), and obtain any opt-in consent necessary from users so that user data subject to the VPPA may be shared on Facebook.  You represent that any disclosure to us will not be incidental to the ordinary course of your business.
14. We do not guarantee that Platform will always be free.
15. You give us all rights necessary to enable your application to work with Facebook, including the right to incorporate content and information you provide to us into streams, timelines, and user action stories.
16. You give us the right to link to or frame your application, and place content, including ads, around your application.
17. We can analyze your application, content, and data for any purpose, including commercial (such as for targeting the delivery of advertisements and indexing content for search).
18. To ensure your application is safe for users, we can audit it.
19. We can create applications that offer similar features and services to, or otherwise compete with, your application.

10. **About Advertisements and Other Commercial Content Served or Enhanced by Facebook**

Our goal is to deliver advertising and other commercial or sponsored content that is valuable to our users and advertisers. In order to help us do that, you agree to the following:

1. You give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information, without any compensation to you. If you have selected a specific audience for your content or information, we will respect your choice when we use it.

2. We do not give your content or information to advertisers without your consent.
3. You understand that we may not always identify paid services and communications as such.

4

11. **Special Provisions Applicable to Advertisers**

You can target your desired audience by buying ads on Facebook or our publisher network. The following additional terms apply to you if you place an order through our online advertising portal (Order):

1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target.
2. In instances where we believe doing so will enhance the effectiveness of your advertising campaign, we may broaden the targeting criteria you specify.
3. You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms.
4. Your ads will comply with our Advertising Guidelines.
5. We will determine the size, placement, and positioning of your ads.
6. We do not guarantee the activity that your ads will receive, such as the number of clicks your ads will get.
7. We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.
8. You can cancel your Order at any time through our online portal, but it may take up to 24 hours before the ad stops running. You are responsible for paying for all ads that run.
9. Our license to run your ad will end when we have completed your Order. You understand, however, that if users have interacted with your ad, your ad may remain until the users delete it.
10. We can use your ads and related content and information for marketing or promotional purposes.
11. You will not issue any press release or make public statements about your relationship with Facebook without our prior written permission.
12. We may reject or remove any ad for any reason.
13. If you are placing ads on someone else's behalf, you must have permission to place those ads, including the following:
    1. You warrant that you have the legal authority to bind the advertiser to this Statement.
    2. You agree that if the advertiser you represent violates this Statement, we may hold you responsible for that violation.

12. **Special Provisions Applicable to Pages**

If you create or administer a Page on Facebook, or run a promotion or an offer from your Page, you agree to our Pages Terms.

13. **Special Provisions Applicable to Software**

1. If you download or use our software, such as a stand-alone software product, an app, or a browser plugin, you agree that from time to time, the software may download and install upgrades, updates and additional features from us in order to improve, enhance, and further develop the software.
2. You will not modify, create derivative works of, decompile, or otherwise attempt to extract source code from us, unless you are expressly permitted to do so under an open source license, or we give you express written permission.

14. **Amendments**

1. Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will provide you with seven (7) days notice (for example, by posting the change on the Facebook Site Governance Page) and an opportunity to comment on changes to this Statement. You can also visit our

5

Facebook Site Governance Page and "like" the Page to get updates about changes to this Statement.

2. If we make changes to policies referenced in or incorporated by this Statement, we may provide notice on the Site Governance Page.

3. Your continued use of Facebook following changes to our terms constitutes your acceptance of our amended terms.

## 15. **Termination**

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15, 9.18, 10.3, 11.2, 11.5, 11.6, 11.9, 11.12, 11.13, and 15-19.

## 16. **Disputes**

1. You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions.

2. If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim. Although we provide rules for user conduct, we do not control or direct users' actions on Facebook and are not responsible for the content or information users transmit or share on Facebook. We are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content or information you may encounter on Facebook. We are not responsible for the conduct, whether online or offline, or any user of Facebook.

3. WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE SAFE, SECURE OR ERROR-FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN

6

SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

17. **Special Provisions Applicable to Users Outside the United States**

   We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users and non-users who interact with Facebook outside the United States:
   1. You consent to having your personal data transferred to and processed in the United States.
   2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website. You will not use Facebook if you are prohibited from receiving products, services, or software originating from the United States.
   3. Certain specific terms that apply only for German users are available here.

18. **Definitions**

   1. By "Facebook" we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the Like button, the Share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.
   2. By "Platform" we mean a set of APIs and services (such as content) that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.
   3. By "information" we mean facts and other information about you, including actions taken by users and non-users who interact with Facebook.
   4. By "content" we mean anything you or other users post on Facebook that would not be included in the definition of information.
   5. By "data" or "user data" or "user's data" we mean any data, including a user's content or information that you or third parties can retrieve from Facebook or provide to Facebook through Platform.
   6. By "post" we mean post on Facebook or otherwise make available by using Facebook.
   7. By "use" we mean use, run, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.
   8. By "active registered user" we mean a user who has logged into Facebook at least once in the previous 30 days.
   9. By "application" we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us.  If you no longer access Platform but have not deleted all data from us, the term application will apply until you delete the data.

19. **Other**

   1. If you are a resident of or have your principal place of business in the US or Canada, this Statement is an agreement between you and Facebook, Inc.  Otherwise, this Statement is an agreement between you and Facebook Ireland Limited.  References to "us," "we," and "our" mean either Facebook, Inc. or Facebook Ireland Limited, as appropriate.
   2. This Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements.
   3. If any portion of this Statement is found to be unenforceable, the remaining portion will remain in full force and effect.
   4. If we fail to enforce any of this Statement, it will not be considered a waiver.
   5. Any amendment to or waiver of this Statement must be made in writing and signed by us.
   6. You will not transfer any of your rights or obligations under this Statement to anyone else without our

7

consent.

7.  All of our rights and obligations under this Statement are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.
8.  Nothing in this Statement shall prevent us from complying with the law.
9.  This Statement does not confer any third party beneficiary rights.
10.  We reserve all rights not expressly granted to you.
11.  You will comply with all applicable laws when using or accessing Facebook.

**You may also want to review the following documents, which provide additional information about your use of Facebook:**

- Data Use Policy: The Data Use Policy contains information to help you understand how we collect and use information.
- Payment Terms: These additional terms apply to all payments made on or through Facebook.
- Platform Page: This page helps you better understand what happens when you add a third-party application or use Facebook Connect, including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies that apply to applications, including Connect sites.
- Advertising Guidelines: These guidelines outline the policies that apply to advertisements placed on Facebook.
- Promotions Guidelines: These guidelines outline the policies that apply if you offer contests, sweepstakes, and other types of promotions on Facebook.
- Facebook Brand Resources: These guidelines outline the policies that apply to use of Facebook trademarks, logos and screenshots.
- How to Report Claims of Intellectual Property Infringement
- Pages Terms: These guidelines apply to your use of Facebook Pages.
- Community Standards: These guidelines outline our expectations regarding the content you post to Facebook and your activity on Facebook.

To access the Statement of Rights and Responsibilities in several different languages, change the language setting for your Facebook session by clicking on the language link in the left corner of most pages.  If the Statement is not available in the language you select, we will default to the English version.

8

# Exhibit B

file:///Users/.../Desktop/untitled.html

This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls.  Please note that Section 16 contains certain changes to the general terms for users outside the United States.

Date of Last Revision: April 26, 2011.

**Statement of Rights and Responsibilities**

This Statement of Rights and Responsibilities (Statement) derives from the Facebook Principles, and governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement.

1. **Privacy**

   Your privacy is very important to us. We designed our Privacy Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information.  We encourage you to read the Privacy Policy, and to use it to help make informed decisions.

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:
   1. For content that is covered by intellectual property rights, like photos and videos (IP content), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).
   3. When you use an application, your content and information is shared with the application.  We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information.  (To learn more about Platform, read our Privacy Policy and Platform Page.)
   4. When you publish content or information using the everyone setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture).
   5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use them without any obligation to compensate you for them (just as you have no obligation to offer them).

file:///Users/fraas/Desktop/untitled.html

3. **Safety**

We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to do that, which includes the following commitments:

1. You will not send or otherwise post unauthorized commercial communications (such as spam) on Facebook.
2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our permission.
3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.
4. You will not upload viruses or other malicious code.
5. You will not solicit login information or access an account belonging to someone else.
6. You will not bully, intimidate, or harass any user.
7. You will not post content that: is hateful, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.
8. You will not develop or operate a third-party application containing alcohol-related or other mature content (including advertisements) without appropriate age-based restrictions.
9. You will follow our [Promotions Guidelines](#) and all applicable laws if you publicize or offer any contest, giveaway, or sweepstakes ("promotion") on Facebook.
10. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.
11. You will not do anything that could disable, overburden, or impair the proper working of Facebook, such as a denial of service attack.
12. You will not facilitate or encourage any violations of this Statement.

4. **Registration and Account Security**

Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:

1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.
2. You will not create more than one personal profile.
3. If we disable your account, you will not create another one without our permission.
4. You will not use your personal profile for your own commercial gain (such as selling your status update to an advertiser).
5. You will not use Facebook if you are under 13.
6. You will not use Facebook if you are a convicted sex offender.
7. You will keep your contact information accurate and up-to-date.
8. You will not share your password, (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.
9. You will not transfer your account (including any page or application you administer) to

anyone without first getting our written permission.
10. If you select a username for your account we reserve the right to remove or reclaim it if we believe appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

5. **Protecting Other People's Rights**

We respect other people's rights, and expect you to do the same.

1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
2. We can remove any content or information you post on Facebook if we believe that it violates this Statement.
3. We will provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.
4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.
5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.
6. You will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Wall and 32665), or any confusingly similar marks, without our written permission.
7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.
8. You will not post anyone's identification documents or sensitive financial information on Facebook.
9. You will not tag users or send email invitations to non-users without their consent.

6. **Mobile**

1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging fees, will still apply.
2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are not sent to the person who acquires your old number.
3. You provide all rights necessary to enable users to sync (including through an application) their contact lists with any basic information and contact information that is visible to them on Facebook, as well as your name and profile picture.

7. **Payments and Deals**

1. If you make a payment on Facebook or use Facebook Credits, you agree to our Payments Terms.
2. If you purchase a Deal, you agree to our Deals Terms.
3. If you provide a Deal or partner with us to provide a Deal, you agree to the Merchant Deal Terms in addition to any other agreements you may have with us.

8.  **Special Provisions Applicable to Share Links**

If you include our Share Link button on your website, the following additional terms apply to you:

1.  We give you permission to use Facebook's Share Link button so that users can post links or content from your website on Facebook.
2.  You give us permission to use and allow others to use such links and content on Facebook.
3.  You will not place a Share Link button on any page containing content that would violate this Statement if posted on Facebook.

9.  **Special Provisions Applicable to Developers/Operators of Applications and Websites**

If you are a developer or operator of a Platform application or website, the following additional terms apply to you:

1.  You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Facebook Platform Policies and our Advertising Guidelines.
2.  Your access to and use of data you receive from Facebook, will be limited as follows:
    1.  You will only request data you need to operate your application.
    2.  You will have a privacy policy that tells users what user data you are going to use and how you will use, display, share, or transfer that data and you will include your privacy policy URL in the Developer Application.
    3.  You will not use, display, share, or transfer a user's data in a manner inconsistent with your privacy policy.
    4.  You will delete all data you receive from us concerning a user if the user asks you to do so, and will provide a mechanism for users to make such a request.
    5.  You will not include data you receive from us concerning a user in any advertising creative.
    6.  You will not directly or indirectly transfer any data you receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use.
    7.  You will not sell user data.  If you are acquired by or merge with a third party, you can continue to use user data within your application, but you cannot transfer user data outside of your application.
    8.  We can require you to delete user data if you use it in a way that we determine is inconsistent with users' expectations.
    9.  We can limit your access to data.
    10. You will comply with all other restrictions contained in our Facebook Platform Policies.
3.  You will not give us information that you independently collect from a user or a user's content without that user's consent.
4.  You will make it easy for users to remove or disconnect from your application.
5.  You will make it easy for users to contact you. We can also share your email address with users and others claiming that you have infringed or otherwise violated their rights.

6.  You will provide customer support for your application.
7.  You will not show third party ads or web search boxes on Facebook.
8.  We give you all rights necessary to use the code, APIs, data, and tools you receive from us.
9.  You will not sell, transfer, or sublicense our code, APIs, or tools to anyone.
10. You will not misrepresent your relationship with Facebook to others.
11. You may use the logos we make available to developers or issue a press release or other public statement so long as you follow our Facebook Platform Policies.
12. We can issue a press release describing our relationship with you.
13. You will comply with all applicable laws. In particular you will (if applicable):
    1.  have a policy for removing infringing content and terminating repeat infringers that complies with the Digital Millennium Copyright Act.
    2.  comply with the Video Privacy Protection Act (VPPA), and obtain any opt-in consent necessary from users so that user data subject to the VPPA may be shared on Facebook.  You represent that any disclosure to us will not be incidental to the ordinary course of your business.
14. We do not guarantee that Platform will always be free.
15. You give us all rights necessary to enable your application to work with Facebook, including the right to incorporate content and information you provide to us into streams, profiles, and user action stories.
16. You give us the right to link to or frame your application, and place content, including ads, around your application.
17. We can analyze your application, content, and data for any purpose, including commercial (such as for targeting the delivery of advertisements and indexing content for search).
18. To ensure your application is safe for users, we can audit it.
19. We can create applications that offer similar features and services to, or otherwise compete with, your application.

10. **About Advertisements and Other Commercial Content Served or Enhanced by Facebook**

Our goal is to deliver ads that are not only valuable to advertisers, but also valuable to you. In order to do that, you agree to the following:
1.  You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.
2.  We do not give your content or information to advertisers without your consent.
3.  You understand that we may not always identify paid services and communications as such.

11. **Special Provisions Applicable to Advertisers**

You can target your specific audience by buying ads on Facebook or our publisher network. The following additional terms apply to you if you place an order through our online advertising

portal (Order):

1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target.
2. In instances where we believe doing so will enhance the effectiveness of your advertising campaign, we may broaden the targeting criteria you specify.
3. You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms.
4. Your ads will comply with our Advertising Guidelines.
5. We will determine the size, placement, and positioning of your ads.
6. We do not guarantee the activity that your ads will receive, such as the number of clicks you will get.
7. We cannot control how people interact with your ads, and are not responsible for click fraud or other improper actions that affect the cost of running ads. We do, however, have systems to detect and filter certain suspicious activity, learn more here.
8. You can cancel your Order at any time through our online portal, but it may take up to 24 hours before the ad stops running.  You are responsible for paying for those ads.
9. Our license to run your ad will end when we have completed your Order. You understand, however, that if users have interacted with your ad, your ad may remain until the users delete it.
10. We can use your ads and related content and information for marketing or promotional purposes.
11. You will not issue any press release or make public statements about your relationship with Facebook without written permission.
12. We may reject or remove any ad for any reason.
13. If you are placing ads on someone else's behalf, we need to make sure you have permission to place those ads, including the following:
    1. You warrant that you have the legal authority to bind the advertiser to this Statement.
    2. You agree that if the advertiser you represent violates this Statement, we may hold you responsible for that violation.

12. **Special Provisions Applicable to Pages**

   If you create or administer a Page on Facebook, you agree to our Pages Terms.

13. **Amendments**

1. We can change this Statement if we provide you notice (by posting the change on the Facebook Site Governance Page) and an opportunity to comment.  To get notice of any future changes to this Statement, visit our Facebook Site Governance Page and become a fan.
2. For changes to sections 7, 8, 9, and 11 (sections relating to payments, application developers, website operators, and advertisers), we will give you a minimum of three days notice. For all other changes we will give you a minimum of seven days notice. All

such comments must be made on the [Facebook Site Governance Page](#).

3. If more than 7,000 users comment on the proposed change, we will also give you the opportunity to participate in a vote in which you will be provided alternatives. The vote shall be binding on us if more than 30% of all active registered users as of the date of the notice vote.

4. We can make changes for legal or administrative reasons, or to correct an inaccurate statement, upon notice without opportunity to comment.

## 14. Termination

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15, 9.18, 10.3, 11.2, 11.5, 11.6, 11.9, 11.12, 11.13, and 14-18.

## 15. Disputes

1. You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

2. If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim.

3. WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL BE SAFE OR SECURE. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER

CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

16. **Special Provisions Applicable to Users Outside the United States**

We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users outside the United States:
   1. You consent to having your personal data transferred to and processed in the United States.
   2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website.
   3. Certain specific terms that apply only for German users are available here.

17. **Definitions**
   1. By Facebook we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the like button, the share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.
   2. By Platform we mean a set of APIs and services that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.
   3. By information we mean facts and other information about you, including actions you take.
   4. By content we mean anything you post on Facebook that would not be included in the definition of information.
   5. By data we mean content and information that third parties can retrieve from Facebook or provide to Facebook through Platform.
   6. By post we mean post on Facebook or otherwise make available to us (such as by using an application).
   7. By use we mean use, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.
   8. By active registered user we mean a user who has logged into Facebook at least once in the previous 30 days.

file:///Users/.../Desktop/untitled.html

9. By application we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us.  If you no longer access Platform but have not deleted all data from us, the term application will apply until you delete the data.

18. **Other**

   1. If you are a resident of or have your principal place of business in the US or Canada, this Statement is an agreement between you and Facebook, Inc.  Otherwise, this Statement is an agreement between you and Facebook Ireland Limited.  References to "us," "we," and "our" mean either Facebook, Inc. or Facebook Ireland Limited, as appropriate.
   2. This Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements.
   3. If any portion of this Statement is found to be unenforceable, the remaining portion will remain in full force and effect.
   4. If we fail to enforce any of this Statement, it will not be considered a waiver.
   5. Any amendment to or waiver of this Statement must be made in writing and signed by us.
   6. You will not transfer any of your rights or obligations under this Statement to anyone else without our consent.
   7. All of our rights and obligations under this Statement are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.
   8. Nothing in this Statement shall prevent us from complying with the law.
   9. This Statement does not confer any third party beneficiary rights.
   10. You will comply with all applicable laws when using or accessing Facebook.


**You may also want to review the following documents:**

- Privacy Policy: The Privacy Policy is designed to help you understand how we collect and use information.
- Payment Terms: These additional terms apply to all payments made on or through Facebook.
- Platform Page: This page helps you better understand what happens when you add a third-party application or use Facebook Connect, including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies that apply to applications, including Connect sites.
- Advertising Guidelines: These guidelines outline the policies that apply to advertisements placed on Facebook.
- Promotions Guidelines: These guidelines outline the policies that apply if you have obtained written pre-approval from us to offer contests, sweepstakes, and other types of promotions on Facebook.
- How to Report Claims of Intellectual Property Infringement
- How to Appeal Claims of Copyright Infringement
- Pages Terms


- **To access the Statement of Rights and Responsibilities in several different languages,**

change the language setting for your Facebook session by clicking on the language link in the left corner of most pages.  If the Statement is not available in the language you select, we will default to the English version.

# Exhibit C

This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls.  Please note that Section 17 contains certain changes to the general terms for users outside the United States.

==Date of Last Revision: June 8, 2012.==

**Statement of Rights and Responsibilities**

==This Statement of Rights and Responsibilities ("Statement," "Terms," or "SRR") derives from the Facebook Principles, and is our terms of service that governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement, as updated from time to time in accordance with Section 14 below. Additionally,== you will find resources at the end of this document that help you understand how Facebook works.

1. **Privacy**

   ==Your privacy is very important to us. We designed our Data Use Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information.  We encourage you to read the Data Use Policy, and to use it to help you make informed decisions.==

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:
   1. For content that is covered by intellectual property rights, like photos and videos (IP content), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).
   3. When you use an application, the application may ask for your permission to access your content and information as well as content and information that others have shared with you.  We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information.  (To learn more about Platform, including how you can control what information other people may share with applications, read our Data Use Policy and Platform Page.)

file:///Users/jfraden/Desktop/untitled.html

4. When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture).
5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use them without any obligation to compensate you for them (just as you have no obligation to offer them).

3. **Safety**

We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to keep Facebook safe, which includes the following commitments by you:

1. You will not post unauthorized commercial communications (such as spam) on Facebook.
2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our prior permission.
3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.
4. You will not upload viruses or other malicious code.
5. You will not solicit login information or access an account belonging to someone else.
6. You will not bully, intimidate, or harass any user.
7. You will not post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.
8. You will not develop or operate a third-party application containing alcohol-related, dating or other mature content (including advertisements) without appropriate age-based restrictions.
9. You will follow our Promotions Guidelines and all applicable laws if you publicize or offer any contest, giveaway, or sweepstakes ("promotion") on Facebook.
10. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.
11. You will not do anything that could disable, overburden, or impair the proper working or appearance of Facebook, such as a denial of service attack or interference with page rendering or other Facebook functionality.
12. You will not facilitate or encourage any violations of this Statement or our policies.

4. **Registration and Account Security**

Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:

1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.
2. You will not create more than one personal account.
3. If we disable your account, you will not create another one without our permission.
4. You will not use your personal timeline for your own commercial gain (such as selling

your status update to an advertiser).
5. You will not use Facebook if you are under 13.
6. You will not use Facebook if you are a convicted sex offender.
7. You will keep your contact information accurate and up-to-date.
8. You will not share your password (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.
9. You will not transfer your account (including any Page or application you administer) to anyone without first getting our written permission.
10. If you select a username or similar identifier for your account or Page, we reserve the right to remove or reclaim it if we believe it is appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

5. **Protecting Other People's Rights**

We respect other people's rights, and expect you to do the same.
1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
2. We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies.
3. We provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.
4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.
5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.
6. You will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Book and Wall), or any confusingly similar marks, except as expressly permitted by our Brand Usage Guidelines or with our prior written permission.
7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.
8. You will not post anyone's identification documents or sensitive financial information on Facebook.
9. You will not tag users or send email invitations to non-users without their consent. Facebook offers social reporting tools to enable users to provide feedback about tagging.

6. **Mobile and Other Devices**

1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging fees, will still apply.
2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are not sent to the person who acquires your old number.

file:///Users/.../Desktop/untitled.html

3.  You provide consent and all rights necessary to enable users to sync (including through an application) their devices with any information that is visible to them on Facebook.

7.  **Payments**

If you make a payment on Facebook or use Facebook Credits, you agree to our Payments Terms.

8.  **Special Provisions Applicable to Social Plugins**

If you include our Social Plugins, such as the Share or Like buttons on your website, the following additional terms apply to you:

1.  We give you permission to use Facebook's Social Plugins so that users can post links or content from your website on Facebook.
2.  You give us permission to use and allow others to use such links and content on Facebook.
3.  You will not place a Social Plugin on any page containing content that would violate this Statement if posted on Facebook.

9.  **Special Provisions Applicable to Developers/Operators of Applications and Websites**

If you are a developer or operator of a Platform application or website, the following additional terms apply to you:

1.  You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Facebook Platform Policies and our Advertising Guidelines.
2.  Your access to and use of data you receive from Facebook, will be limited as follows:

    1.  You will only request data you need to operate your application.
    2.  You will have a privacy policy that tells users what user data you are going to use and how you will use, display, share, or transfer that data and you will include your privacy policy URL in the Developer Application.
    3.  You will not use, display, share, or transfer a user's data in a manner inconsistent with your privacy policy.
    4.  You will delete all data you receive from us concerning a user if the user asks you to do so, and will provide a mechanism for users to make such a request.
    5.  You will not include data you receive from us concerning a user in any advertising creative.
    6.  You will not directly or indirectly transfer any data you receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use.
    7.  You will not sell user data.  If you are acquired by or merge with a third party, you can continue to use user data within your application, but you cannot transfer user data outside of your application.

8.  We can require you to delete user data if you use it in a way that we determine is inconsistent with users' expectations.
9.  We can limit your access to data.
10. You will comply with all other restrictions contained in our Facebook Platform Policies.

3.  You will not give us information that you independently collect from a user or a user's content without that user's consent.
4.  You will make it easy for users to remove or disconnect from your application.
5.  You will make it easy for users to contact you. We can also share your email address with users and others claiming that you have infringed or otherwise violated their rights.
6.  You will provide customer support for your application.
7.  You will not show third party ads or web search boxes on www.facebook.com.
8.  We give you all rights necessary to use the code, APIs, data, and tools you receive from us.
9.  You will not sell, transfer, or sublicense our code, APIs, or tools to anyone.
10. You will not misrepresent your relationship with Facebook to others.
11. You may use the logos we make available to developers or issue a press release or other public statement so long as you follow our Facebook Platform Policies.
12. We can issue a press release describing our relationship with you.
13. You will comply with all applicable laws. In particular you will (if applicable):
    1.  have a policy for removing infringing content and terminating repeat infringers that complies with the Digital Millennium Copyright Act.
    2.  comply with the Video Privacy Protection Act (VPPA), and obtain any opt-in consent necessary from users so that user data subject to the VPPA may be shared on Facebook.  You represent that any disclosure to us will not be incidental to the ordinary course of your business.
14. We do not guarantee that Platform will always be free.
15. You give us all rights necessary to enable your application to work with Facebook, including the right to incorporate content and information you provide to us into streams, timelines, and user action stories.
16. You give us the right to link to or frame your application, and place content, including ads, around your application.
17. We can analyze your application, content, and data for any purpose, including commercial (such as for targeting the delivery of advertisements and indexing content for search).
18. To ensure your application is safe for users, we can audit it.
19. We can create applications that offer similar features and services to, or otherwise compete with, your application.

10. **About Advertisements and Other Commercial Content Served or Enhanced by Facebook**

Our goal is to deliver ads and commercial content that are valuable to our users and advertisers. In order to help us do that, you agree to the following:

1.  You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like)

file:///Users/franklin/Desktop/untitled.html

served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.

2. We do not give your content or information to advertisers without your consent.
3. You understand that we may not always identify paid services and communications as such.

## 11. **Special Provisions Applicable to Advertisers**

You can target your desired audience by buying ads on Facebook or our publisher network. The following additional terms apply to you if you place an order through our online advertising portal (Order):

1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target.
2. In instances where we believe doing so will enhance the effectiveness of your advertising campaign, we may broaden the targeting criteria you specify.
3. You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms.
4. Your ads will comply with our Advertising Guidelines.
5. We will determine the size, placement, and positioning of your ads.
6. We do not guarantee the activity that your ads will receive, such as the number of clicks your ads will get.
7. We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.
8. You can cancel your Order at any time through our online portal, but it may take up to 24 hours before the ad stops running.  You are responsible for paying for all ads that run.
9. Our license to run your ad will end when we have completed your Order. You understand, however, that if users have interacted with your ad, your ad may remain until the users delete it.
10. We can use your ads and related content and information for marketing or promotional purposes.
11. You will not issue any press release or make public statements about your relationship with Facebook without our prior written permission.
12. We may reject or remove any ad for any reason.
13. If you are placing ads on someone else's behalf, you must have permission to place those ads, including the following:
    1. You warrant that you have the legal authority to bind the advertiser to this Statement.
    2. You agree that if the advertiser you represent violates this Statement, we may hold you responsible for that violation.

12. **Special Provisions Applicable to Pages**

If you create or administer a Page on Facebook, you agree to our Pages Terms.

13. **Special Provisions Applicable to Software**

1. If you download our software, such as a stand-alone software product or a browser plugin, you agree that from time to time, the software may download upgrades, updates and additional features from us in order to improve, enhance and further develop the software.
2. You will not modify, create derivative works of, decompile or otherwise attempt to extract source code from us, unless you are expressly permitted to do so under an open source license or we give you express written permission.

14. **Amendments**

1. We can change this Statement if we provide you notice (by posting the change on the Facebook Site Governance Page) and an opportunity to comment.  To get notice of any future changes to this Statement, visit our Facebook Site Governance Page and "like" the Page.
2. For changes to sections 7, 8, 9, and 11 (sections relating to payments, application developers, website operators, and advertisers), we will give you a minimum of three days notice. For all other changes we will give you a minimum of seven days notice. Comments to proposed changes will be made on the Facebook Site Governance Page.
3. If more than 7,000 users post a substantive comment on a particular proposed change, we will also give you the opportunity to participate in a vote in which you will be provided alternatives. The vote shall be binding on us if more than 30% of all active registered users as of the date of the notice vote.
4. If we make changes to policies referenced in or incorporated by this Statement, we may provide notice on the Site Governance Page.
5. We can make changes for legal or administrative reasons, or to correct an inaccurate statement, upon notice without opportunity to comment.
6. Your continued use of Facebook following changes to our terms constitutes your acceptance of our amended terms.

15. **Termination**

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15, 9.18, 10.3, 11.2, 11.5, 11.6, 11.9, 11.12, 11.13, and 15-19.

16. **Disputes**

1. You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

2. If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim. Although we provide rules for user conduct, we do not control or direct users' actions on Facebook and are not responsible for the content or information users transmit or share on Facebook. We are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content or information you may encounter on Facebook. We are not responsible for the conduct, whether online or offline, or any user of Facebook.

3. WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE SAFE, SECURE OR ERROR-FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION

MAY NOT APPLY TO YOU. IN SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

17. **Special Provisions Applicable to Users Outside the United States**

We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users and non-users who interact with Facebook outside the United States:

1. You consent to having your personal data transferred to and processed in the United States.
2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website.
3. Certain specific terms that apply only for German users are available here.

18. **Definitions**

1. By "Facebook" we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the Like button, the Share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.
2. By "Platform" we mean a set of APIs and services (such as content) that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.
3. By "information" we mean facts and other information about you, including actions taken by users and non-users who interact with Facebook.
4. By "content" we mean anything you or other users post on Facebook that would not be included in the definition of information.
5. By "data" or "user data" or "user's data" we mean any data, including a user's content or information that you or third parties can retrieve from Facebook or provide to Facebook through Platform.
6. By "post" we mean post on Facebook or otherwise make available by using Facebook.
7. By "use" we mean use, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.
8. By "active registered user" we mean a user who has logged into Facebook at least once in the previous 30 days.
9. By "application" we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us.  If you no longer access Platform but have not deleted all data from us, the term application will apply until you delete the data.

19. **Other**

1. If you are a resident of or have your principal place of business in the US or Canada, this Statement is an agreement between you and Facebook, Inc. Otherwise, this Statement is an agreement between you and Facebook Ireland Limited. References to "us," "we," and "our" mean either Facebook, Inc. or Facebook Ireland Limited, as appropriate.
2. This Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements.
3. If any portion of this Statement is found to be unenforceable, the remaining portion will remain in full force and effect.
4. If we fail to enforce any of this Statement, it will not be considered a waiver.
5. Any amendment to or waiver of this Statement must be made in writing and signed by us.
6. You will not transfer any of your rights or obligations under this Statement to anyone else without our consent.
7. All of our rights and obligations under this Statement are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.
8. Nothing in this Statement shall prevent us from complying with the law.
9. This Statement does not confer any third party beneficiary rights.
10. We reserve all rights not expressly granted to you.
11. You will comply with all applicable laws when using or accessing Facebook.

**You may also want to review the following documents, which provide additional information about your use of Facebook:**

- Data Use Policy: The Data Use Policy contains information to help you understand how we collect and use information.
- Payment Terms: These additional terms apply to all payments made on or through Facebook.
- Platform Page: This page helps you better understand what happens when you add a third-party application or use Facebook Connect, including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies that apply to applications, including Connect sites.
- Advertising Guidelines: These guidelines outline the policies that apply to advertisements placed on Facebook.
- Promotions Guidelines: These guidelines outline the policies that apply if you offer contests, sweepstakes, and other types of promotions on Facebook.
- Brand Permissions Center: These guidelines outline the policies that apply to use of Facebook trademarks, logos and screenshots.
- How to Report Claims of Intellectual Property Infringement
- Pages Terms: These guidelines apply to your use of Facebook Pages.
- Community Standards: These guidelines outline our expectations regarding the content you post to Facebook and your activity on Facebook.

To access the Statement of Rights and Responsibilities in several different languages, change the

file:///Users/jfraser/Desktop/untitled.html

language setting for your Facebook session by clicking on the language link in the left corner of most pages.  If the Statement is not available in the language you select, we will default to the English version.

# Exhibit D

**Data Use Policy**

Date of Last Revision: November 15, 2013]

[Information we receive and how it is used](#)

- [Information we receive about you](#)

- [Public information](#)

- [Usernames and User IDs](#)

- [How we use the information we receive](#)

- [Deleting and deactivating your account](#)

[Sharing and finding you on Facebook](#)

- [Control each time you post](#)

- [Control over your timeline](#)

- [Finding you on Facebook](#)

- [Access on phones and other devices](#)

- [Activity log](#)

- [What your friends and others share about you](#)

- [Groups](#)

- [Pages](#)

[Other websites and applications](#)

- [About Facebook Platform](#)

- [Controlling what information you share with applications](#)

- [Controlling what is shared when the people you share with use applications](#)

- [Logging in to another site using Facebook](#)

- [About social plugins](#)

- [About instant personalization](#)

- [Public search engines](#)

[Advertising and Facebook content](#)

- [Advertising](#)

- [Facebook content](#)

[Cookies, pixels and other similar technologies](#)

Some other things you need to know

## I. Information we receive and how it is used

### Information we receive about you

We receive a number of different types of information about you, including:

**Your information**
Your information is the information that's required when you sign up for the site, as well as the information you choose to share.

- **Registration information**: When you sign up for Facebook, you are required to provide information such as your name, email address, birthday, and gender. In some cases, you may be able to register using other information, like your telephone number.

- **Information you choose to share**: Your information also includes the information you choose to share on Facebook, such as when you post a status update, upload a photo, or comment on a friend's story.

It also includes the information you choose to share when you communicate with us, such as when you contact us using an email address, or when you take an action, such as when you add a friend, like a Page or a website, add a place to your story, use our contact importers, or indicate you are in a relationship.

Your name, profile pictures, cover photos, gender, networks, username and User ID are treated just like information you choose to make public.
Your birthday allows us to do things like show you age-appropriate content and advertisements.

**Information others share about you**
We receive information about you from your friends and others, such as when they upload your contact information, post a photo of you, tag you in a photo or status update, or at a location, or add you to a group.

When people use Facebook, they may store and share information about you and others that they have, such as when they upload and manage their invites and contacts.

**Other information we receive about you**
We also receive other types of information about you:

- We receive data about you whenever you use or are running Facebook, such as when you look at another person's timeline, send or receive a message, search for a friend or a Page, click on, view or otherwise interact with things, use a Facebook mobile app, or make purchases through Facebook.
- When you post things like photos or videos on Facebook, we may receive additional related data (or metadata), such as the time, date, and place you took the photo or video.
- We receive data from or about the computer, mobile phone, or other devices you use to install Facebook apps or to access Facebook, including when multiple users log in from the same device. This may include network and communication information, such as your IP address or mobile phone number, and other information about things like your internet service, operating system, location, the type (including identifiers) of the device or browser you use, or the pages you visit. For example, we may get your GPS or other location information so we can tell you if any of your friends are nearby, or we could request device information to improve how our apps work on your device.
- We receive data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin), sometimes through cookies. This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use; and, if you are logged in to Facebook, your User ID.
- Sometimes we get data from our affiliates or our advertising partners, customers and other third parties that helps us (or them) deliver ads, understand online activity, and generally make Facebook better. For example, an

2

advertiser may tell us information about you (like how you responded to an ad on Facebook or on another site) in order to measure the effectiveness of - and improve the quality of - ads.

As described in "How we use the information we receive" we also put together data from the information we already have about you, your friends, and others, so we can offer and suggest a variety of services and features. For example, we may make friend suggestions, pick stories for your News Feed, or suggest people to tag in photos. We may put together your current city with GPS and other location information we have about you, to, for example, tell you and your friends about people or events nearby, or offer deals to you in which you might be interested. We may also put together data about you to serve you ads or other content that might be more relevant to you.

When we get your GPS location, we put it together with other location information we have about you (like your current city). But we only keep it until it is no longer useful to provide you services, like keeping your last GPS coordinates to send you relevant notifications.

We only provide data to our advertising partners or customers after we have removed your name and any other personally identifying information from it, or have combined it with other people's data in a way that it no longer personally identifies you.

## Public information

When we use the phrase "public information" (which we sometimes refer to as "Everyone information"), we mean the information you choose to make public, as well as information that is always publicly available.

### Information you choose to make public

Choosing to make your information public is exactly what it sounds like: **anyone**, including people off Facebook, will be able to see it. Learn more.

Choosing to make your information public also means that this information:

- can be associated with you (i.e., your name, profile pictures, cover photos, timeline, User ID, username, etc.) even off Facebook;
- can show up when someone does a search on Facebook or on a public search engine;
- will be accessible to the Facebook-integrated games, applications, and websites you and your friends use; and
- will be accessible to anyone who uses our APIs such as our Graph API.

Sometimes you will not be able to select an audience when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

When others share information about you, they can also choose to make it public.

### Information that is always publicly available

The types of information listed below are always publicly available, and they are treated just like information you decided to make public:

- **Name**: This helps your friends and family find you. If you are uncomfortable sharing your real name, you can always delete your account.

- **Profile Pictures and Cover Photos**: These help your friends and family recognize you. If you are uncomfortable making any of these photos public, you can always delete them. Unless you delete them, when you add a new profile picture or cover photo, the previous photo will remain public in your profile picture or cover photo album.

- **Networks**: This helps you see who you will be sharing information with before you choose "Friends and Networks" as a custom audience. If you are uncomfortable making your network public, you can leave the network.

- **Gender**: This allows us to refer to you properly.

- **Username and User ID**: These allow you to give out a custom link to your timeline or Page, receive email at your Facebook email address, and help make Facebook Platform possible.

## Usernames and User IDs

Usernames and User IDs are the same thing – a way to identify you on Facebook. A User ID is a string of numbers and a username generally is some variation of your name. With your username, you get a custom link (a Facebook URL, such as www.facebook.com/username) to your timeline that you can give out to people or post on external websites.

If someone has your Username or User ID, they can use it to access information about you through the facebook.com website. For example, if someone has your Username, they can type facebook.com/Username into their browser and see your public information as well as anything else you've let them see. Similarly, someone with your Username or User ID can access information about you through our APIs, such as our Graph API. Specifically, they can access your public information, along with your age range, language and country.

If you do not want your information to be accessible to Platform applications, you can turn off all Platform applications from your Privacy Settings. If you turn off Platform you will no longer be able to use any games or other applications until you turn Platform back on. For more information about the information that apps receive when you visit them, see Other websites and applications.

If you want to see information available about you through our Graph API, just type
**https://graph.facebook.com/[User ID or Username]?metadata=1** into your browser.
Your Facebook email address includes your public username like so: username@facebook.com. People can use your Facebook email address to send you messages and anyone in a message conversation can reply to it.

## How we use the information we receive

We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, our partners, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use. For example, in addition to helping people see and find things that you do and share, we may use the information we receive about you:

- as part of our efforts to keep Facebook products, services and integrations safe and secure;
- to protect Facebook's or others' rights or property;
- to provide you with location features and services, like telling you and your friends when something is going on nearby;
- to measure or understand the effectiveness of ads you and others see, including to deliver relevant ads to you;
- to make suggestions to you and other users on Facebook, such as: suggesting that your friend use our contact importer because you found friends using it, suggesting that another user add you as a friend because the user imported the same email address as you did, or suggesting that your friend tag you in a picture they have uploaded with you in it; and
- for internal operations, including troubleshooting, data analysis, testing, research and service improvement.

Granting us permission to use your information not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways.

While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:

- received your permission;
- given you notice, such as by telling you about it in this policy; or
- removed your name and any other personally identifying information from it.

4

Of course, for information others share about you, they control how it is shared.

We store data for as long as it is necessary to provide products and services to you and others, including those described above. Typically, information associated with your account will be kept until your account is deleted. For certain categories of data, we may also tell you about specific data retention practices.

We may enable access to public information that has been shared through our services.

We may allow service providers to access information so they can help us provide services.

We are able to suggest that your friend tag you in a picture by scanning and comparing your friend's pictures to information we've put together from your profile pictures and the other photos in which you've been tagged. If this feature is enabled for you, you can control whether we suggest that another user tag you in a photo using the "Timeline and Tagging" settings. Learn more at: https://www.facebook.com/help/tag-suggestions

## Deleting and deactivating your account

If you want to stop using your account, you can either **deactivate** or **delete** it.

### Deactivate

Deactivating your account puts your account on hold. Other users will no longer see your timeline, but we do not delete any of your information. Deactivating an account is the same as you telling us not to delete any information because you might want to reactivate your account at some point in the future. You can deactivate your account at: https://www.facebook.com/settings?tab=security
Your friends will still see you listed in their list of friends while your account is deactivated.

### Deletion

When you delete your account, it is permanently deleted from Facebook. It typically takes about one month to delete an account, but some information may remain in backup copies and logs for up to 90 days. You should only delete your account if you are sure you never want to reactivate it. You can delete your account at: https://www.facebook.com/help/contact.php?show_form=delete_account
Learn more at: https://www.facebook.com/help/?faq=356107851084108

Certain information is needed to provide you with services, so we only delete this information after you delete your account. Some of the things you do on Facebook aren't stored in your account, like posting to a group or sending someone a message (where your friend may still have a message you sent, even after you delete your account). That information remains after you delete your account.

## II. Sharing and finding you on Facebook

### Control each time you post

Whenever you post content (like a status update, photo or check-in), you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off Facebook, will be able to see or access it.
Choose this icon if you want to share with your Facebook **Friends**.
Choose this icon if you want to **Customize** your audience. You can also use this to hide your story from specific people.

If you tag someone, that person and their friends can see your story no matter what audience you selected. The same is true when you approve a tag someone else adds to your story.

Always think before you post. Just like anything else you post on the web or send in an email, information you share on

Facebook can be copied or re-shared by anyone who can see it.

Although you choose with whom you share, there may be ways for others to determine information about you. For example, if you hide your birthday so no one can see it on your timeline, but friends post "happy birthday!" on your timeline, people may determine your birthday.

When you comment on or "like" someone else's story, or write on their timeline, that person gets to select the audience. For example, if a friend posts a Public story and you comment on it, your comment will be Public. Often, you can see the audience someone selected for their story before you post a comment; however, the person who posted the story may later change their audience. So, if you comment on a story, and the story's audience changes, the new audience can see your comment.

You can control who can see the Facebook Pages you've "liked" by visiting your timeline, clicking on the Likes box on your timeline, and then clicking "Edit."

Sometimes you will not see a sharing icon when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

## Control over your timeline

Whenever you add things to your timeline you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off Facebook, will be able to see or access it.

Choose this icon if you want to share with your Facebook **Friends**.

Choose this icon if you want to **Customize** your audience. You can also use this to hide the item on your timeline from specific people.

When you select an audience for your friend list, you are only controlling who can see the entire list of your friends on your timeline. We call this a timeline visibility control. This is because your friend list is always available to the games, applications and websites you use, and your friendships may be visible elsewhere (such as on your friends' timelines or in searches). For example, if you select "Only Me" as the audience for your friend list, but your friend sets her friend list to "Public," anyone will be able to see your connection on your friend's timeline.

Similarly, if you choose to hide your gender, it only hides it on your timeline. This is because we, just like the applications you and your friends use, need to use your gender to refer to you properly on the site.

When someone tags you in a story (such as a photo, status update or check-in), you can choose whether you want that story to appear on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can remove it from your timeline.

When you hide things on your timeline, like posts or connections, it means those things will not appear on your timeline. But, remember, anyone in the audience of those posts or who can see a connection may still see it elsewhere, like on someone else's timeline or in search results. You can also delete your posts or change the audience of content you post, which means you can remove people from or add people to the audience of the content.

People on Facebook may be able to see mutual friends, even if they cannot see your entire list of friends.

Some things (like your name, profile pictures and cover photos) do not have sharing icons because they are always publicly available. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

## Finding you on Facebook

To make it easier for your friends to find you, we allow anyone with your contact information (such as email address or telephone number) to find you through the Facebook search bar at the top of most pages, as well as other tools we provide, such as contact importers - even if you have not shared your contact information with them on Facebook.

6

You can choose who can look up your timeline using the email address or telephone number you added to your timeline through your Privacy Settings. But remember that people can still find you or a link to your timeline on Facebook through other people and the things they share about you or through other posts, like if you are tagged in a friend's photo or post something to a public page.

Your settings do not control whether people can find you or a link to your timeline when they search for content they have permission to see, like a photo or other story in which you've been tagged.

## Access on phones and other devices

Once you share information with your friends and others, they may be able to sync it with or access it via their mobile phones and other devices. For example, if you share a photo on Facebook, someone viewing that photo could save it using Facebook tools or by other methods offered by their device or browser. Similarly, if you share your contact information with someone or invite someone to an event, they may be able to use Facebook or third party applications or devices to sync that information. Or, if one of your friends has a Facebook application on one of their devices, your information (such as the things you post or photos you share) may be stored on or accessed by their device.

You should only share information with people you trust because they will be able to save it or re-share it with others, including when they sync the information to a device.

## Activity log

Your activity log is a place where you can go to view most of your information on Facebook, including things you've hidden from your timeline. You can use this log to manage your content. For example, you can do things like delete stories, change the audience of your stories or stop an application from publishing to your timeline on your behalf.

When you hide something from your timeline, you are not deleting it. This means that the story may be visible elsewhere, like in your friends' News Feed. If you want to delete a story you posted, choose the delete option.

## What your friends and others share about you

### Links and Tags

Anyone can add a link to a story. Links are references to something on the Internet; anything from a website to a Page or timeline on Facebook. For example, if you are writing a story, you might include a link to a blog you are referencing or a link to the blogger's Facebook timeline. If someone clicks on a link to another person's timeline, they'll only see the things that they are allowed to see.

A tag is a special type of link to someone's timeline that suggests that the tagged person add your story to their timeline. In cases where the tagged person isn't included in the audience of the story, it will add them so they can see it. Anyone can tag you in anything. Once you are tagged, you and your friends will be able to see it (such as in News Feed or in search).

You can choose whether a story you've been tagged in appears on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can always remove it from your timeline.

If you do not want someone to tag you, we encourage you to reach out to them and give them that feedback. If that does not work, you can block them. This will prevent them from tagging you going forward.

Social reporting is a way for people to quickly and easily ask for help from someone they trust. Learn more at: https://www.facebook.com/note.php?note_id=196124227075034&__adt=3&__att=iframe

If you are linked to in a private space (such as a message or a group) only the people who can see the private space can see the link. Similarly, if you are linked to a comment, only the people who can see the comment can see the link.

7

**Other information**

As described in the "what your friends and others share about you" section of this policy, your friends and others may share information about you. They may share photos or other information about you and tag you in their posts. If you do not like a particular post, tell them or report the post.

## Groups

Once you are in a Group, anyone in that Group can add you to a subgroup. When someone adds you to a Group, you will be listed as "invited" until you visit the Group. You can always leave a Group, which will prevent others from adding you to it again.

## Pages

Facebook Pages are public pages. Companies use Pages to share information about their products. Celebrities use Pages to talk about their latest projects. And communities use Pages to discuss topics of interest, everything from baseball to the opera.

Because Pages are public, information you share with a Page is public information. This means, for example, that if you post a comment on a Page, that comment may be used by the Page owner off Facebook, and anyone can see it.

When you "like" a Page, you create a connection to that Page. The connection is added to your timeline and your friends may see it in their News Feeds. You may be contacted by or receive updates from the Page, such as in your News Feed and your messages. You can remove the Pages you've "liked" through your timeline or on the Page.

Some Pages contain content that comes directly from the Page owner. Page owners can do this through online plugins, such as an iframe, and it works just like the games and other applications you use through Facebook. Because this content comes directly from the Page owner, that Page may be able to collect information about you, just like any website.

Page administrators may have access to insights data, which will tell them generally about the people that visit their Page (as opposed to information about specific people). They may also know when you've made a connection to their Page because you've liked their Page or posted a comment.

To control who can see the Facebook Pages you've liked, visit our Help Center.

## III. Other websites and applications

### About Facebook Platform

Facebook Platform (or simply Platform) refers to the way we help you share your information with the games, applications, and websites you and your friends use. Facebook Platform also lets you bring your friends with you, so you can connect with them off Facebook. In these two ways, Facebook Platform helps you make your experiences on the web more personalized and social.

Remember that these games, applications and websites are created and maintained by other businesses and developers who are not part of, or controlled by, Facebook, so you should always make sure to read their terms of service and privacy policies to understand how they treat your data.

### Controlling what information you share with applications

When you connect with a game, application or website - such as by going to a game, logging in to a website using your Facebook account, or adding an app to your timeline - we give the game, application, or website (sometimes referred to as just "applications" or "apps") your basic info (we sometimes call this your "public profile"), which includes your User ID and your public information. We also give them your friends' User IDs (also called your friend list) as part of your basic info.

8

Your friend list helps the application make your experience more social because it lets you find your friends on that application. Your User ID helps the application personalize your experience because it can connect your account on that application with your Facebook account, and it can access your basic info, which includes your public information and friend list. This includes the information you choose to make public, as well as information that is always publicly available. If the application needs additional information, such as your stories, photos or likes, it will have to ask you for specific permission.

The "Apps" setting lets you control the applications you use. You can see the permissions you have given these applications, the last time an application accessed your information, and the audience on Facebook for timeline stories and activity the application posts on your behalf. You can also remove applications you no longer want, or turn off all Platform applications. When you turn all Platform applications off, your User ID is no longer given to applications, even when your friends use those applications. But you will no longer be able to use any games, applications or websites through Facebook.

When you first visit an app, Facebook lets the app know your language, your country, and whether you are in an age group, for instance, under 18, between 18-20, or 21 and over. Age range lets apps provide you with age-appropriate content. If you install the app, it can access, store and update the information you've shared. Apps you've installed can update their records of your basic info, age range, language and country. If you haven't used an app in a while, you should consider removing it. Once you remove an app, it won't be able to continue to update the additional information you've given them permission to access, but it may still hold the information you have already shared. You always can contact the app directly and request that they delete your data. Learn more at: https://www.facebook.com/help/how-apps-work

Sometimes a game console, mobile phone, or other device might ask for permission to share specific information with the games and applications you use on that device. If you say okay, those applications will not be able to access any other information about you without asking specific permission from you or your friends.

Sites and apps that use Instant Personalization receive your User ID and friend list when you visit them.

You always can remove apps you've installed by using your app settings at: https://www.facebook.com/settings/?tab=applications. But remember, apps may still be able to access your information when the people you share with use them. And, if you've removed an application and want it to delete the information you've already shared with it, you should contact the application. Visit the application's page on Facebook or its own website to learn more about the app. For example, Apps may have reasons (e.g. legal obligations) to retain some data that you share with them.

**Controlling what is shared when the people you share with use applications**

==Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared. This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use.==

Your friends and the other people you share information with often want to share your information with applications to make their experiences on those applications more personalized and social. For example, one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it. Your friend might also want to share the music you "like" on Facebook. If you have made that information public, then the application can access it just like anyone else. But if you've shared your likes with just your friends, the application could ask your friend for permission to share them.

You can control most of the information other people can share with applications they use from the "App" settings page. But these controls do not let you limit access to your public information and friend list.

If you want to completely block applications from getting your information when your friends and others use them, you will need to turn off all Platform applications. This means that you will no longer be able to use any third-party Facebook-integrated games, applications or websites.

If an application asks permission from someone else to access your information, the application will be allowed to use

9

that information only in connection with the person that gave the permission, and no one else.

For example, some apps use information such as your friends list, to personalize your experience or show you which of your friends use that particular app.

## Logging in to another site using Facebook

Facebook Platform lets you log into other applications and websites using your Facebook account. When you log in using Facebook, we give the site your User ID (just like when you connect with any other application), but we do not share your email address or password with that website through this process without your permission.

If you already have an account on that website, the site may also be able to connect that account with your Facebook account. Sometimes it does this using what is called an "email hash", which is similar to searching for someone on Facebook using an email address. Only the email addresses in this case are hashed so no email addresses are actually shared between Facebook and the website.

### How it works

The website sends over a hashed version of your email address, and we match it with a database of email addresses that we have also hashed. If there is a match, then we tell the website the User ID associated with the email address. This way, when you log into the website using Facebook, the website can link your Facebook account to your account on that website.

## About social plugins

Social plugins are buttons, boxes, and stories (such as the Like button) that other websites can use to present Facebook content to you and create more social and personal experiences for you. While you view these buttons, boxes, and stories on other sites, the content comes directly from Facebook.

Sometimes plugins act just like applications. You can spot one of these plugins because it will ask you for permission to access your information or to publish information back to Facebook. For example, if you use a registration plugin on a website, the plugin will ask your permission to share your basic info with the website to make it easier for you to register for the website. Similarly, if you use an "Add To Timeline" plugin, the plugin will ask for your permission to publish stories about your activities on that website to Facebook.

If you make something public using a plugin, such as posting a public comment on a newspaper's website, then that website can access your comment (along with your User ID) just like everyone else.

If you post something using a social plugin and you do not see a sharing icon, you should assume that story is Public. For example, if you post a comment through a Facebook comment plugin on a site, your story is Public and everyone, including the website, can see your story.
Websites that use social plugins can sometimes tell that you have engaged with the social plugin. For example, they may know that you clicked on a Like button in a social plugin.
We receive data when you visit a site with a social plugin. We keep this data for a maximum of 90 days. After that, we remove your name and any other personally identifying information from the data, or combine it with other people's data in a way that it is no longer associated with you. Learn more at: https://www.facebook.com/help/social-plugins

## About instant personalization

Instant personalization (sometimes also referred to as "Start now") is a way for Facebook to help partners (such as Bing and Rotten Tomatoes) on and off Facebook to create a more personalized and social experience for logged in users than a social plugin can offer. When you visit a site or app using instant personalization, it will know some information about you and your friends the moment you arrive. This is because sites and apps using instant personalization can access your User ID, your friend list, and your public information.

The first time you visit a site or app using instant personalization, you will see a notification letting you know that the

10

site or app has partnered with Facebook to provide a personalized experience.

The notification will give you the ability to disable or turn off instant personalization for that site or app. If you do that, that site or app is required to delete all of the information about you it received from Facebook as part of the instant personalization program. In addition, we will prevent that site from accessing your information in the future, even when your friends use that site.

If you decide that you do not want to experience instant personalization for all partner sites and apps, you can disable instant personalization from the "Apps" settings page.

If you turn off instant personalization, these partner third party sites and apps will not be able to access your public information, even when your friends visit those sites.

If you turn off an instant personalization site or app after you have been using it or visited it a few times (or after you have given it specific permission to access your data), it will not automatically delete information about you it received through Facebook. Like all other apps, the site is required by our policies to delete information about you if you ask it to do so.

**How it works**

To join the instant personalization program, a potential partner must enter into an agreement with us designed to protect your privacy. For example, this agreement requires that the partner delete information about you if you turn off instant personalization when you first visit the site or app. It also prevents the partner from accessing any information about you until you or your friends visit its site.

Instant personalization partners sometimes use an email hash process to see if any of their users are on Facebook and get those users' User IDs. This process is similar to searching for someone on Facebook using an email address, except in this case, the email addresses are hashed so no actual email addresses are exchanged. The partner is also contractually required not to use your User ID for any purpose (other than associating it with your account) until you or your friends visit the site.

When you visit a site or app using instant personalization, we provide the site or app with your User ID and your friend list (as well as your age range, locale, and gender). The site or app can then connect your account with your friends' accounts to make the site or app instantly social. The site can also access public information associated with any of the User IDs it receives, which it can use to make them instantly personalized. For example, if the site is a music site, it can access your music interests to suggest songs you may like, and access your friends' music interests to let you know what they are listening to. Of course it can only access your or your friends' music interests if they are public. If the site or app wants any additional information, it will have to get your specific permission.

**Public search engines**

Your public search setting controls whether people who enter your name on a public search engine may see your public timeline (including in sponsored results). You can find your public search setting on the "Privacy Settings and Tools" settings page.

This setting does not apply to search engines that access your information as an application using Facebook Platform. If you turn your public search setting off and then search for yourself on a public search engine, you may still see a preview of your timeline. This is because some search engines cache information for a period of time. You can learn more about how to request a search engine to remove you from cached information at:
 https://www.facebook.com/help/?faq=13323

**IV. Advertising and Facebook content**

**Advertising**

Facebook offers a range of products that allow advertisers to reach people on and off Facebook. In addition to the

information we provide in this section, you can also learn more about advertising products, how they work, our partnerships, and the controls you have, by visiting our "Advertising on Facebook" page.

When we deliver ads, we do not share your information (information that personally identifies you, such as your name or contact information) with advertisers unless you give us permission. We may provide advertisers with information when we have removed your name and other personally identifying information from it, or combined it with other information so that it no longer personally identifies you. For example, we may tell an advertiser how its ads perform or how many people viewed or clicked on their ads or install an app after seeing an ad.

So we can show you content that you may find interesting, we may use all of the information we receive about you to serve ads that are more relevant to you. For example, this includes:

- information you provide at registration or add to your account or timeline,
- things you share and do on Facebook, such as what you like, and your interactions with advertisements, partners, or apps,
- keywords from your stories, and
- things we infer from your use of Facebook.

For many ads we serve, advertisers may choose their audience by location, demographics, likes, keywords, and any other information we receive or infer about users. Here are some of the ways advertisers may target relevant ads:

- demographics and interests: for example, 18 to 35 year-old women who live in the United States and like basketball;
- topics or keywords: for example, "music" or people who like a particular song or artist;
- Page likes (including topics such as products, brands, religion, health status, or political views): for example, if you like a Page about gluten-free food, you may receive ads about relevant food products; or
- categories (including things like "moviegoer" or a "sci-fi fan"): for example, if a person "likes" the "Star Trek" Page and mentions "Star Wars" when they check into a movie theater, we may infer that this person is likely to be a sci-fi fan and advertisers of sci-fi movies could ask us to target that category.

In addition to delivering relevant ads, Facebook sometimes pairs ads with social context, meaning stories about social actions that you or your friends have taken. For example, an ad for a sushi restaurant's Facebook Page may be paired with a News Feed story that one of your friends likes that Page.

We also sometimes serve these same types of ads on other sites or may serve just the social context (such as with ads served by others), so that the ads are more relevant to you. Just like any other content you share on Facebook, only people who you're already sharing with on Facebook would see it when it is paired with an ad. We also allow advertisers to reach people on Facebook using the information they already have about you (such as email addresses or whether you have visited their websites previously). You can learn more about ads, social context, and our partnerships, including the relevant settings and controls available to you, by visiting the Advertising on Facebook page.

If an advertiser chooses to run ads, we serve the ads to people who meet criteria the advertiser selects. So, if someone views or otherwise interacts with the ad, the advertiser might assume that the person meets the criteria they selected (for example, that the person is an 18-to-35-year-old woman who lives in the U.S. and likes basketball). We require advertisers to comply with our Advertising Guidelines, including provisions relating to the use of sensitive data.

Advertisers and their partners sometimes use cookies or other similar technologies in order to serve and measure ads and to make their ads more effective. Learn more about cookies, pixels and similar technologies.

When you post a story on Facebook and an advertiser sponsors it, nothing changes about the audience of the post. Only the people who could originally see the post (the people you shared it with) are eligible to see it.

## Facebook content

We like to tell you about some of the features and tools your friends and others use on Facebook, to help you have a

12

better experience. For example, if your friend uses our friend finder tool to find more friends on Facebook, we may tell you about it to encourage you to use it as well. This of course means your friend may similarly see suggestions based on the things you do. But we will try to only show it to friends that could benefit from your experience.

## V. Cookies, pixels and other similar technologies

Cookies are small pieces of data that are stored on your computer, mobile phone or other device. Pixels are small blocks of code on webpages that do things like allow another server to measure viewing of a webpage and often are used in connection with cookies.

We use technologies like cookies, pixels, and local storage (like on your browser or device, which is similar to a cookie but holds more information) to provide and understand a range of products and services. Learn more at: https://www.facebook.com/help/cookies

We use these technologies to do things like:

- make Facebook easier or faster to use;
- enable features and store information about you (including on your device or in your browser cache) and your use of Facebook;
- deliver, understand and improve advertising;
- monitor and understand the use of our products and services; and
- protect you, others and Facebook.

For example, we may use these tools to know you are logged in to Facebook, to help you use social plugins and share buttons, or to know when you are interacting with our advertising or Platform partners.

We may ask advertisers or other partners to serve ads or services to computers, mobile phones or other devices, which may use a cookie, pixel or other similar technology placed by Facebook or the third party (although we would not share information that personally identifies you with an advertiser).

Most companies on the web use cookies (or other similar technological tools), including our advertising and Platform partners. For example, our Platform partners, advertisers or Page administrators may use cookies or similar technologies when you access their apps, ads, Pages or other content.

Cookies and things like local storage help make Facebook work, like allowing pages to load faster because certain content is stored on your browser or by helping us authenticate you to deliver personalized content.
To learn more about how advertisers generally use cookies and the choices advertisers provide, visit the Network Advertising Initiative at http://www.networkadvertising.org/managing/opt_out.asp, the Digital Advertising Alliance at http://www.aboutads.info/, the Internet Advertising Bureau (US) at http://www.iab.net or the Internet Advertising Bureau (EU) at http://youronlinechoices.eu/.
Refer to your browser or device's help material to learn what controls you can often use to remove or block cookies or other similar technologies or block or remove other data stored on your computer or device (such as by using the various settings in your browser). If you do this, it may affect your ability to use Facebook or other websites and apps.

## VI. Some other things you need to know

### Safe harbor
Facebook complies with the U.S.-EU and U.S.-Swiss Safe Harbor frameworks as set forth by the Department of Commerce regarding the collection, use, and retention of data from the European Union. To view our certification, visit the U.S. Department of Commerce's Safe Harbor website at: https://safeharbor.export.gov/list.aspx. As part of our participation in the Safe Harbor program, we agree to resolve disputes you have with us in connection with our policies and practices through TRUSTe. If you would like to contact TRUSTe, visit:https://feedback-form.truste.com/watchdog/request

### Contact us with questions or disputes

If you have questions or complaints regarding our Data Use Policy or practices, please contact us by mail at 1601 Willow Road, Menlo Park, CA 94025 if you reside in the U.S. or Canada, or at Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland if you live outside the U.S. or Canada. Anyone may also contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

**Responding to legal requests and preventing harm**
We may access, preserve and share your information in response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States where we have a good faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards. We may also access, preserve and share information when we have a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect ourselves, you and others, including as part of investigations; or to prevent death or imminent bodily harm.

Information we receive about you, including financial transaction data related to purchases made with Facebook, may be accessed, processed and retained for an extended period of time when it is the subject of a legal request or obligation, governmental investigation, or investigations concerning possible violations of our terms or policies, or otherwise to prevent harm. We also may retain information from accounts disabled for violations of our terms for at least a year to prevent repeat abuse or other violations of our terms.

**Access requests**
You can access and correct most of your personal data stored by Facebook by logging into your account and viewing your timeline and activity log. You can also download a copy of your personal data by visiting your "Settings" (General Account Settings page), clicking on "Download a copy of your Facebook data" and then clicking on the link for your expanded archive. Learn more at: https://www.facebook.com/help/?faq=226281544049399

**Notifications and Other Messages**
We may send you notifications and other messages using the contact information we have for you, like your email address. You can control most of the notifications you receive, including ones from Pages you like and applications you use, using controls we provide, such as a control included in the email you receive or in your "Notifications" settings.

**Friend Finder**
We offer tools to help you upload your friends' contact information so that you and others can find friends on Facebook, and invite friends who do not use Facebook to join, and so we can offer you and others better experiences on Facebook through suggestions and other customized experiences. If you do not want us to store this information, visit this help page at: https://www.facebook.com/contact_importer/remove_uploads.php.

If you give us your password, we will delete it after you upload your friends' contact information.

**Invitations**
When you invite a friend to join Facebook, we send a message on your behalf using your name, and we may also include names and pictures of other people your friend might know on Facebook. We'll also send a few reminders to those you invite, but the invitation will also give your friend the opportunity to opt out of receiving other invitations to join Facebook.

**Memorializing accounts**
We may memorialize the account of a deceased person. When we memorialize an account, we keep the timeline on Facebook, but limit access and some features. You can report a deceased person's timeline at:
https://www.facebook.com/help/contact.php?show_form=deceased

We also may close an account if we receive a formal request that satisfies certain criteria.

**Affiliates**
We may share information we receive with businesses that are legally part of the same group of companies that Facebook is part of, or that become part of that group (often these companies are called affiliates). Likewise, our

14

affiliates may share information with us as well. This sharing is done in compliance with applicable laws including where such applicable laws require consent. We and our affiliates may use shared information to help provide, understand, and improve our services and their own services.

### Service Providers

We give your information to the people and companies that help us provide, understand and improve the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, conduct and publish research, measure the effectiveness of ads, or provide search results. In some cases we provide the service jointly with another company, such as the Facebook Marketplace. In all of these cases our partners must agree to only use your information consistent with the agreement we enter into with them, as well as this Data Use Policy.

### Security and bugs

We do our best to keep your information secure, but we need your help. For more detailed information about staying safe on Facebook, visit the Facebook Security Page. We try to keep Facebook up, bug-free and safe, but can't make guarantees about any part of our services or products.

### Change of Control

If the ownership of our business changes, we may transfer your information to the new owner so they can continue to operate the service. But they will still have to honor the commitments we have made in this Data Use Policy.

### Notice of Changes

If we make changes to this Data Use Policy we will notify you (for example, by publication here and on the Facebook Site Governance Page). If the changes are material, we will provide you additional, prominent notice as appropriate under the circumstances. You can make sure that you receive notice directly by liking the Facebook Site Governance Page.

### Opportunity to comment

Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will give you seven (7) days to provide us with comments on the change. After the comment period, if we adopt any changes, we will provide notice (for example, on the Facebook Site Governance Page or in this policy) of the effective date.

### Information for users outside of the United States and Canada

Company Information: The website under www.facebook.com and the services on these pages are being offered to users outside of the U.S. and Canada by Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland. The company Facebook Ireland Ltd. has been established and registered in Ireland as a private limited company, Company Number: 462932, and is the data controller responsible for your personal information.
Directors: Sonia Flynn (Irish), Shane Crehan (Irish).

### Your California privacy rights

California law permits residents of California to request certain details about what personal information a company shares with third parties for the third parties' direct marketing purposes. Facebook does not share your information with third parties for the third parties' own and independent direct marketing purposes unless we receive your permission. Learn more about the information we receive and how it is used and other websites and applications. If you have questions about our sharing practices or your rights under California law, please write us at 1601 Willow Road, Menlo Park,

# Exhibit E

Search

**Data Use Policy**

Date of Last Revision: September 7, 2011

Information we receive and how it is used
- Information we receive about you
- Public information
- Usernames and User IDs
- How we use the information we receive
- Deleting and deactivating your account

Sharing and finding you on Facebook
- Control each time you post
- Control over your profile
- What your friends share about you
- About Pages

Sharing with other websites and applications
- About Facebook Platform
- Controlling what information you share with applications
- Controlling what is shared when the people you share with use applications
- Logging in to another site using Facebook
- About social plugins
- About instant personalization
- Public search engines

How advertising works
- Personalized ads
- Ads + social context
- Sponsored stories
- Featured content

Minors and Safety
Some other things you need to know

**I. Information we receive and how it is used**

**Information we receive about you**

We receive a number of different types of information about you, including:

**Your information**
Your information is the information that's required when you sign up for the site, as well as the information you choose to share.

- **Registration information**: When you sign up for Facebook, you are required to provide your name, email address, birthday, and gender.

- **Information you choose to share**: Your information also includes the information you choose to share on Facebook, such as when you post a status update, upload a photo, or comment on a friend's post.

It also includes the information you choose to share when you take an action, such as when you add a friend, like a Page or a website, tag a place in your post, find friends using our contact importers, or indicate you are in a relationship.

💡 Your name, profile picture, networks, username and User ID are treated just like information you choose to make public.

💡 Your birthday allows us to do things like show you age-appropriate content and advertisements.

**Information others share about you**
We receive information about you from your friends, such as when they tag you in a photo or at a location, or add you to a group.

We may also receive information about you from the games, applications, and websites you use, but only when you have given them permission. If you have given a game, application, or website permission to post information on your Wall, you can remove it from your "Apps you use" setting.

**Other information we receive about you**
We also receive other types of information about you:

- We receive data about you whenever you interact with Facebook, such as when you look at another person's profile, send someone a message, search for a friend or a Page, click on an ad, or purchase Facebook Credits.
- When you post things like photos or videos on Facebook, we may receive additional related data (or metadata), such as the time, date, and place you took the photo or video.
- We receive data from the computer, mobile phone or other device you use to access Facebook. This may include your IP address, location, the type of browser you use, or the pages you visit. For example, we may get your GPS location so we can tell you if any of your friends are nearby.
- We receive data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin). This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use; and, if you are logged in to Facebook, your User ID.
- Sometimes we get data from our advertising partners, customers and other third parties that helps us (or them) deliver ads, understand online activity, and generally make Facebook better. For example, an advertiser may tell us how you responded to an ad on Facebook or on another site in order to measure the effectiveness of – and improve the quality of – those ads.

We also put together data from the information we already have about you and your friends. For example, we may put together data about you to determine which friends we should show you in your News Feed or suggest you tag in the photos you post. We may put together your current city with GPS and other location information we have about you to, for example, tell you and your friends about people or events nearby, or offer deals to you that you might be interested in. We may also put together data about you to serve you ads that might be more relevant to you.

💡 When we get your GPS location, we put it together with other location information we have about you (like your current city). But we only keep it until it is no longer useful to provide you services.

💡 We only provide data to our advertising partners or customers after we have removed your name or any other personally identifying information from it, or have combined it with other people's data in a way that it is no longer associated with you. Similarly, when we receive data about you from our advertising partners or customers, we keep the data for 180 days. After that, we combine the data with other people's data in a way that is no longer associated with you.

**Public information**

1

When we use the phrase "public information" (which we sometimes refer to as "Everyone information"), we mean the information you choose to make public, as well as information that is always publicly available.

**Information you choose to make public**
Choosing to make your information public is exactly what it sounds like: **anyone**, including people off of Facebook, will be able to see it.

Choosing to make your information public also means that this information:
▪ can be associated with you (i.e., your name, profile picture, Facebook profile, User ID, etc.) even off Facebook
▪ can show up when someone does a search on Facebook or on a public search engine
▪ will be accessible to the games, applications, and websites you and your friends use
▪ will be accessible to anyone who uses our APIs such as our Graph API.

💡 Sometimes you will not be able to select an audience when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of posts are always public posts. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

💡 When others share information about you, they can also choose to make it public.

**Information that is always publicly available**
The types of information listed below are always publicly available, and are treated just like information you decided to make public.

▪ **Name**: This helps your friends and family find you. If you are uncomfortable sharing your real name, you can always deactivate or delete your account.

▪ **Profile Pictures**: This helps your friends and family recognize you. If you are uncomfortable making your profile picture public, you can always delete it by hovering over your photo and clicking "Change Picture."

▪ **Network**: This helps you see whom you will be sharing information with before you choose "Friends and Networks" as a custom audience. If you are uncomfortable making your network public, you can leave the network.

▪ **Username and User ID**: These allow you to give out a custom link to your profile or Page, receive email at your Facebook email address, and help make Facebook Platform possible.

**Usernames and User IDs**

A Username (or Facebook URL) is a custom link to your profile that you can give out to people or post on external websites. If you have selected a username, it will always appear in the URL on your profile page. If you have not selected a username, then the URL on your profile page will contain your User ID, which is what we use to identify your Facebook account.

If someone has your Username or User ID, they can use it to access information about you through the facebook.com website. For example, if someone has your Username, they can type facebook.com/Username into their browser and see your public information as well as anything else you've let them see. Similarly, someone with your Username or User ID can access information about you through our APIs, such as our Graph API. Specifically, they can access your public information, along with your age range, locale (or language) and gender.

If you do not want your information to be accessible through our APIs, you can turn off all Platform applications from your Privacy Settings. If you turn off Platform you will no longer be able to use any games or other applications.

💡 If you want to see information available about you through our Graph API, just type **https://graph.facebook.com/[User ID or Username?metadata=1** into your browser.

💡 When you sign up for a Facebook email address, you will first have to select a public username. Your email address will include your public username like so: username@facebook.com. You can control who can send you messages using your "How You Connect" settings.

**How we use the information we receive**

We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use. For example, we may use the information we receive about you:
▪ as part of our efforts to keep Facebook safe and secure;
▪ to provide you with location features and services, like telling you and your friends when something is going on nearby;
▪ to measure or understand the effectiveness of ads you and others see;
▪ to make suggestions to you and other users on Facebook, such as: suggesting that your friend use our contact importer because you found friends using it, suggesting that another user add you as a friend because the user imported the same email address as you did, or suggesting that your friend tag you in a picture they have uploaded with you in it.

Granting us this permission not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways.

While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:
▪ received your permission;
▪ given you notice, such as by telling you about it in this policy; or
▪ removed your name or any other personally identifying information from it.

💡 We are able to suggest that your friend tag you in a picture by comparing your friend's pictures to information we've put together from the photos you've been tagged in. You can control whether we suggest that another user tag you in a photo using the "How Tags work" settings.

**Deleting and deactivating your account**

If you want to stop using your account, you can either deactivate or delete it.

**Deactivate**
Deactivating your account puts your account on hold. Other users will no longer see your profile, but we do not delete any of your information. Deactivating an account is the same as you telling us not to delete any information because you might want to reactivate your account at some point in the future. You can deactivate your account at:
https://www.facebook.com/editaccount.php

**Deletion**
When you delete an account, it is permanently deleted from Facebook. It typically takes about one month to delete an account, but some information may remain in backup copies and logs for up to 90 days. You should only delete your account if you are sure you never want to reactivate it. You can delete your account at:
https://www.facebook.com/help/contact.php?show_form=delete_account

**II. Sharing and finding you on Facebook**

**Control each time you post**

Whenever you post content (like a status update, photo or check-in), you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

👥 Choose this icon if you want to share with your Facebook **Friends**.

⚙ Choose this icon if you want to **Customize** your audience. You can also use this to hide your post from specific people.

If you do not make a selection, your information will be shared with the last audience you selected. If you want to change your selection later you can do that too on your profile.

If you tag someone, that person and their friends can see your post no matter what audience you selected. The same is true when you approve a tag someone else adds to your post.

Always think before you post. Just like anything else you post on the web or send in an email, information you share on Facebook can be copied or re-shared by anyone who can see it.

📍 When you comment on or "like" someone else's post, or write on their Wall, that person gets to select the audience.

📍 You can control who can see the Facebook Pages you've "liked" by visiting your profile and clicking "Edit Profile."

📍 Sometimes you will not see a sharing icon when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of posts are always public posts. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

### Control over your profile

Whenever you adding things to your profile you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

👥 Choose this icon if you want to share with your Facebook **Friends**.

⚙ Choose this icon if you want to **Customize** your audience. You can also use this to hide the item on your profile from specific people.

When you select an audience for your friend list, you are only controlling who can see it on your profile. We call this a profile visibility control. This is because your friend list is always available to the games, applications and websites you use, and your friendships may be visible elsewhere (such as on your friends' profiles or in searches). For example, if you select "Only Me" as the audience for your friend list, but your friend sets her friend list to "Public," anyone will be able to see your connection on your friend's profile.

Similarly, if you choose to hide your gender, it only hides it on your profile. This is because we, just like the applications you and your friends use, need to use your gender to refer to you properly on the site.

When someone tags you in a post (such as a photo, status update or check-in), you can choose whether you want that post to appear on your profile. You can either approve each post individually or approve all posts by your friends. If you approve a post and later change your mind, you can remove it from your profile.

📍 To make it easier for your friends to find you, we allow anyone with your contact information (such as your email address or mobile number), to find you through Facebook search, as well as other tools we provide, such as contact importers.

📍 If you share your contact information (such as your email address or mobile number) with your friends, they may be able to use third party applications to sync that information with other address books, including ones on their mobile phones.

📍 Some things (like your name and profile picture) do not have sharing icons because they are always publicly available. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

### What your friends share about you

#### Tags

A tag is a link to your profile. For example, if you are tagged in a post (such as a photo or a status update), that post will contain a link to your profile. If someone clicks on the link, they will see your public information and anything else you let them see.

Anyone can tag you in anything. Once you are tagged in a post, you and your friends will be able to see it. For example, your friends may be able to see the post in their News Feed or when they search for you. It may also appear on your profile.

You can choose whether a post you've been tagged in appears on your profile. You can either approve each post individually or approve all posts by your friends. If you approve a post and later change your mind, you can always remove it from your profile.

If you do not want someone to tag you in their posts, we encourage you to reach out to them and give them that feedback. If that does not work, you can block them. This will prevent them from tagging you going forward.

📍 If you are tagged in a private space (such as a message or a group) only the people who can see the private space can see the tag. Similarly, it you are tagged in a comment, only the people who can see the comment can see the tag.

#### Groups

Your friends can add you to the Groups they are in. You can always leave a Group, which will prevent others from adding you to it again.

### About Pages

Facebook Pages are public pages. Companies use Pages to share information about their products. Celebrities use Pages to talk about their latest projects. And communities use pages to discuss topics of interest, everything from baseball to the opera.

Because Pages are public, information you share with a Page is public information. This means, for example, that if you post a comment on a Page, that comment can be used by the Page owner off of Facebook, and anyone can see it.

When you "like" a Page, you create a connection to that Page. That connection is added to your profile and your friends may see it in their News Feeds. You may also receive updates from the Page in your News Feed and your messages. You can remove the Pages you've "liked" from your profile.

Some Pages contain content that comes directly from the Page owner. Page owners can do this through online plugins, such as an iframe, and it works just like the games and other applications you use through Facebook. Because this content comes directly from the Page owner, that Page may be able to collect information about you, just like any website.

### III. Sharing with other websites and applications

### About Facebook Platform

Facebook Platform (or simply Platform) refers to the way we help you share your information with the games, applications, and websites you and your friends use. Facebook Platform also lets you bring your friends with you, so you can connect with them off of Facebook. In these two ways, Facebook Platform helps you make your experiences on the web more personalized and social.

Remember that these games, applications and websites are created and maintained by other businesses and developers who are not part of Facebook, so you should always make sure

to read their terms of service and privacy policies.

**Controlling what information you share with applications**

When you go to a game or application, or connect with a website using Facebook Platform, we give the game, application, or website (sometimes referred to as just "Applications" or "Apps") your User ID, as well your friends' User IDs (or your friend list).

Your friend list helps the application make your experience more social because it lets you find your friends on that application. Your User ID helps the application personalize your experience because it can connect your account on that application with your Facebook account, and it can access your public information. This includes the information you choose to make public, as well as information that is always publicly available. If the application needs additional information, it will have to ask you for specific permission.

The "Apps you use" setting lets you control the applications you use. You can see the permissions you have given these applications, as well as the last time an application accessed your information. You can also remove applications you no longer want, or turn off all Platform applications. When you turn all Platform applications off, your User ID is no longer given to applications, even when your friends use those applications. But you will no longer be able to use any games, applications or websites through Facebook.

📍 Applications also get your age range, locale, and gender when you and your friends visit them. Age range (e.g., 18–21) lets applications provide you with age-appropriate content. Locale (e.g., en–US) lets applications know what language you speak. Gender lets applications refer to you correctly. If you do not want applications to receive this information about you, you can turn off all Facebook applications using your Privacy Settings.

📍 Sometimes a game console, mobile phone, or other device might ask for permission to share specific information with the games and applications you use on that device (such as your public information). If you say okay, those applications will not be able to access any other information about you without asking specific permission from you or your friends.

📍 Instant Personalization sites receive your User ID and friend list when you visit them.

**Controlling what is shared when the people you share with use applications**

Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared. This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use.

Your friends and the other people you share information with often want to share your information with applications to make their experiences on those application more personalized and social. For example, one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list - which includes your User ID - so the application knows which of her friends is also using it. Your friend might also want to share the music you "like" on Facebook. If you have made that information public, then the application can access it just like anyone else. But if you've shared your likes with just your friends, the application could ask your friend for permission to share them.

You can control most of the information other people can share with applications from the "Apps and Websites" settings page. But these controls do not let you limit access to your public information and friend list.

If you want to completely block applications from getting your information, you will need to turn off all Platform applications. This means that you will no longer be able to use any games, applications or websites.

📍 If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else.

**Logging in to another site using Facebook**

Facebook Platform also lets you log into other applications and websites using your Facebook account. When you log in using Facebook, we give the site your User ID, but we do not share your email address or password with that website.

If you already have an account on that website, the site may also be able to connect that account with your Facebook account. Sometimes it does this using what is called an "email hash," which is similar to searching for someone on Facebook using an email address. Only the email addresses in this case are encrypted so no email addresses are actually shared between Facebook and the website.

**How it works**
The website sends over an encrypted version of your email address, and we match it with a database of email addresses that we have also encrypted. If there is a match, then we tell the website the User ID associated with the email address. This way, when you log into the website using Facebook, the website can link your Facebook account to your account on that website.

**About social plugins**

Social plugins are buttons, boxes, and stories (such as the Like button) that other websites can use to present Facebook content to you and create more social and personal experiences for you. While you view these buttons, boxes, and stories on other sites, the content comes directly from Facebook.

If you make something public using a plugin, such as posting a public comment on a newspaper's website, then that website can access your comment (along with your User ID) just like everyone else.

📍 Websites that use social plugins can sometimes tell that you have engaged with the social plugin. For example, they may know that you clicked on a Like button in a social plugin.
📍 We receive data when you visit a site with a social plugin. We keep this data for 90 days. After that, we remove your name or any other personally identifying information from the data, or combine it with other people's data in a way that it is no longer associated with you.

**About instant personalization**

Instant personalization is a way for Facebook to help partner sites (such as Bing and Rotten Tomatoes) create a more personalized and social experience than a social plugin can offer. When you visit a site using instant personalization, it will know some information about you and your friends the moment you arrive. This is because instant personalization sites can access your User ID, your friend list, and your public information.

The first time you visit an instant personalization site, you will see a notification letting you know that the site has partnered with Facebook to provide a personalized experience.

The notification will give you the ability to disable or turn off instant personalization for that site. If you do that, that site is required to delete all of the information about you it received from Facebook. In addition, we will prevent that site from accessing your information in the future, even when your friends use that site.

If you decide that you do not want to experience instant personalization for all partner sites, you can disable instant personalization from the "Apps and Websites" settings page.

If you turn off instant personalization, partner sites will not be able to access your public information, even when your friends visit those sites.

📍 If you turn off an instant personalization site after you have been using it or visited it a few times (or after you have given it specific permission to access your data), it will not automatically delete your data. But the site is contractually required to delete your data if you ask it to.

**How it works**
To join the instant personalization program, a potential partner must enter into an agreement with us designed to protect your privacy. For example, this agreement requires that the partner delete your data if you turn off instant personalization when you first visit the site. It also prevents the partner from accessing any information about you until you or your

friends visit its site.

Instant personalization partners sometimes use an email hash process to see if any of their users are on Facebook and get those users' User IDs. This process is similar to searching for someone on Facebook using an email address, except in this case the email addresses are encrypted so no actual email addresses are exchanged. The partner is also contractually required not to use your User ID for any purpose (other than associating it with your account) until you or your friends visit the site.

When you visit an instant personalization site, we provide the site with your User ID and your friend list (as well as your age range, locale, and gender). The site can then connect your account on that site with your friends' accounts to make the site instantly social. The site can also access public information associated with any of the User IDs it receives, which it can use to make the site instantly personalized. For example, if the site is a music site, it can access your music interests to suggest songs you may like, and access your friends' music interests to let you know what they are listening to. Of course it can only access you or your friends' music interests if they are public. If the site wants any additional information, it will have to get your specific permission.

### Public search engines

Your Public Search setting controls whether people who enter your name on a public search engine may see your public profile (including in sponsored results). You can find your Public Search setting on the "Apps and Websites" settings page. You can preview your public profile at: **http://www.facebook.com/[Your Username or UserID]?p**

💡 This setting does not apply to search engines that access your information as an application using Facebook Platform.

💡 If you turn your public search setting off and then search for yourself on a public search engine, you may still see a preview of your profile. This is because some search engines cache information for a period of time. You can learn more about how to request a search engine to remove you from cached information at: https://www.facebook.com/help/?faq=13323

### IV. How Advertising Works

### Personalized ads

We do not share any of your information with advertisers (unless, of course, you give us permission).

When an advertiser creates an ad on Facebook, they are given the opportunity to choose their audience by location, demographics, likes, keywords, and any other information we receive or can tell about you and other users. For example, an advertiser can choose to target 18 to 35 year-old women who live in the United States and like basketball.

Try this tool yourself to see one of the ways advertisers target ads and what information they see at: https://www.facebook.com/ads/create/

If the advertiser chooses to run the ad (also known as placing the order), we serve the ad to people who meet the criteria the advertiser selected, but we do not tell the advertiser who any of those people are. So, for example, if a person clicks on the ad, the advertiser might infer that the person is an 18-to-35-year-old woman who lives in the US and likes basketball. But we would not tell the advertiser who that person is.

After the ad runs, we provide advertisers with reports on how their ads performed. For example we give advertisers reports telling them how many users saw or clicked on their ads. But these reports are anonymous. We do not tell advertisers who saw or clicked on their ads.

💡 Advertisers sometimes place cookies on your computer in order to make their ads more effective. Learn more at: http://www.networkadvertising.org/managing/opt_out.asp

💡 Sometimes we allow advertisers to target a category of user, like a "moviegoer" or a "sci-fi fan." We do this by bundling characteristics that we believe are related to the category. For example, if a person "likes" the "Star Trek" Page and mentions "Star Wars" when they check into a movie theater, we may conclude that this person is likely to be a sci-fi fan.

### Ads + social context

Facebook Ads are sometimes paired with social actions your friends have taken. For example, an ad for a sushi restaurant may be paired with a news story that one of your friends likes that restaurant's Facebook page.

This is the same type of news story that could show up in your News Feed, only we place it next to a paid advertisement to make that ad more relevant and interesting.

When you show up in one of these news stories, we will only pair it with ads shown to your friends. If you do not want to appear in stories paired with Facebook Ads, you can opt out using your "Edit social ads" setting.

💡 Learn what happens when you click "Like" on an advertisement or an advertiser's Facebook Page at: https://www.facebook.com/help/?faq=19399

💡 We may serve ads with social context (or serve just social context) on other sites. These work just like the ads we serve on Facebook – the advertisers do not receive any of your information.

💡 We sometimes allow businesses or anyone else to sponsor stories like the ones that show up in your News Feed, subject to the audience set for that story. While these are sponsored, they are different from ads because they don't contain a message from the person that sponsored them. Your friends will see these stories even if you have opted out of the "Show my social actions in Facebook Ads" setting.

💡 Your "Show my social actions in Facebook Ads" setting does not control ads about Facebook's services and features.

💡 Games, applications and websites can serve ads directly to you if they have your User ID.

### Sponsored stories

Many of the things you do on Facebook (like "liking" a Page) are posted to your Wall and shared in News Feed. But there's a lot to read in News Feed. That's why we allow people to "sponsor" your stories to make sure your friends see them. For example, if you RSVP to an event hosted by a local restaurant, that restaurant may want to make sure your friends see it so they can come too. If they do sponsor a story, that story will appear in the same place ads usually do under the heading "Sponsored Stories" or something similar. Only people that could originally see the story can see the sponsored story, and no personal information about you (or your friends) is shared with the sponsor.

### Featured content

We like to tell you about some of the features your friends use on Facebook to help you have a better experience. For example, if your friend uses our friend finder tool to find more friends on Facebook, we may tell you about it to encourage you to use it as well. This of course means your friend may similarly see suggestions based on the things you do. But we will try to only show it to friends that could benefit from your experience.

### V. Minors and safety

We take safety issues very seriously, especially with children, and we encourage parents to teach their children about safe internet practices. To learn more, visit our Safety Center.

To protect minors, we may put special safeguards in place (such as placing restrictions on the ability of adults to share and connect with them), recognizing this may provide minors a more limited experience on Facebook.

### VI. Some other things you need to know

### Safe harbor

Facebook complies with the EU Safe Harbor framework as set forth by the Department of Commerce regarding the collection, use, and retention of data from the European Union. As part of our participation in the Safe Harbor, we agree to resolve all disputes you have with us in connection with our policies and practices through TRUSTe. To view our certification,

visit the U.S. Department of Commerce's Safe Harbor website at: https://safeharbor.export.gov/list.aspx

**Responding to legal requests and preventing harm**

We may share your information in response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States where we have a good faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards. We may also share information when we have a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect ourselves and you from violations of our Statement of Rights and Responsibilities; and to prevent death or imminent bodily harm.

**Access requests**

We provide initial responses to access requests within a reasonable period of time, typically within thirty days. You can also download a copy of everything you've put into Facebook by visiting your "Account Settings" and clicking on "Download a copy of your Facebook data".

**Notifications and Other Messages**

We may send you notifications and other messages using the contact information we have for you, like your email address. You can control most of the notifications you receive, including ones from Pages you like and applications you use, using your "Notifications" settings.

**Friend finder**

We offer tools to help you upload your friends' contact information so that you can find your friends on Facebook, and invite friends who do not use Facebook to join. If you do not want us to store this information, visit this help page at: https://www.facebook.com/contact_importer/remove_uploads.php

If you give us your password, we will delete it after you upload your friends' contact information.

**Invitations**

When you invite a friend to join Facebook, we send a message on your behalf using your name, and up to two reminders. We may also include names and pictures of other people your friend might know on Facebook. The invitation will also give your friend the opportunity to opt out of receiving other invitations to join Facebook.

**Memorializing accounts**

We may memorialize the account of a deceased person. When we memorialize an account we keep the profile on Facebook, but only let friends and family look at pictures or write on the user's Wall in remembrance. You can report a deceased person's profile at: https://www.facebook.com/help/contact.php?show_form=deceased

We also may close an account if we receive a formal request from the person's next of kin.

**Cookies**

Cookies are small pieces of data that we store on your computer, mobile phone or other device to make Facebook easier to use, make our advertising better, and to protect you (and Facebook). For example, we may use them to know you are logged in to Facebook, to help you use social plugins and share buttons, or to know when you are interacting with our advertising or Platform partners. We may also use advertisers to serve ads to computers, mobile phones or other devices with a cookie placed by Facebook (although we would not share any other information with that advertiser). Most companies on the web use cookies (or similar technological methods), including our advertising and Platform partners. You can always remove or block cookies (such as by using the settings in your browser), but it may affect your ability to use Facebook. Learn more at: https://www.facebook.com/help/?page=176591669064814

**Service Providers**

We give your information to the people and companies that help us provide the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, or provide search results. In some cases we provide the service jointly with another company, such as the Facebook Marketplace. In all of these cases our partners must agree to only use your information consistent with the agreement we enter into with them, as well as this privacy policy.

**Security**

We do our best to keep your information secure, but we need your help. For more detailed information about staying safe on Facebook, visit the Facebook Security Page.

**Change of Control**

If the ownership of our business changes, we may transfer your information to the new owner so they can continue to operate the service. But they will still have to honor the commitments we have made in this privacy policy.

**Notice of Changes**

If we make changes to this Privacy Policy we will notify you by publication here and on the Facebook Site Governance Page. If the changes are material, we will provide you additional, prominent notice as appropriate under the circumstances. You can make sure that you receive notice directly by liking the Facebook Site Governance Page.

**Opportunity to comment and vote**

Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will give you seven (7) days to provide us with comments on the change. If we receive more than 7000 comments concerning a particular change, we will put the change up for a vote. The vote will be binding on us if more than 30% of all active registered users as of the date of the notice vote.

433 ms

Chat (Offline)

# Exhibit F

**Data Use Policy**

Date of Last Revision: June 8, 2012

Information we receive and how it is used

- Information we receive about you

- Public information

- Usernames and User IDs

- How we use the information we receive

- Deleting and deactivating your account

Sharing and finding you on Facebook

- Control each time you post

- Control over your timeline

- Finding you on Facebook

- Access on phones and other devices

- Activity log

- What your friends share about you

- About Pages

Other websites and applications

- About Facebook Platform

- Controlling what information you share with applications

- Controlling what is shared when the people you share with use applications

- Logging in to another site using Facebook

- About social plugins

- About instant personalization

- Public search engines

How advertising and Sponsored Stories work

- Personalized ads

- Ads + social context

- Sponsored stories

- Facebook content

1

Cookies, pixels and other similar technologies
Some other things you need to know

**I. Information we receive and how it is used**

**Information we receive about you**

We receive a number of different types of information about you, including:

**Your information**
Your information is the information that's required when you sign up for the site, as well as the information you choose to share.

- **Registration information**: When you sign up for Facebook, you are required to provide your name, email address, birthday, and gender.

- **Information you choose to share**: Your information also includes the information you choose to share on Facebook, such as when you post a status update, upload a photo, or comment on a friend's story.

It also includes the information you choose to share when you take an action, such as when you add a friend, like a Page or a website, add a place to your story, find friends using our contact importers, or indicate you are in a relationship.

Your name, profile pictures, cover photos, gender, networks, username and User ID are treated just like information you choose to make public.
Your birthday allows us to do things like show you age-appropriate content and advertisements.

**Information others share about you**
We receive information about you from your friends and others, such as when they upload your contact information, post a photo of you, tag you in a photo or status update, or at a location, or add you to a group.

When people use Facebook, they may store and share information about you and others that they have, such as when they upload and manage their invites and contacts.

**Other information we receive about you**
We also receive other types of information about you:

- We receive data about you whenever you interact with Facebook, such as when you look at another person's timeline, send or receive a message, search for a friend or a Page, click on, view or otherwise interact with things, use a Facebook mobile app, or purchase Facebook Credits or make other purchases through Facebook.
- When you post things like photos or videos on Facebook, we may receive additional related data (or metadata), such as the time, date, and place you took the photo or video.
- We receive data from the computer, mobile phone or other device you use to access Facebook, including when multiple users log in from the same device. This may include your IP address and other information about things like your internet service, location, the type (including identifiers) of browser you use, or the pages you visit. For example, we may get your GPS or other location information so we can tell you if any of your friends are nearby.
- We receive data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin), sometimes through cookies. This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use; and, if you are logged in to Facebook, your User ID.
- Sometimes we get data from our advertising partners, customers and other third parties that helps us (or them) deliver ads, understand online activity, and generally make Facebook better. For example, an advertiser may tell us information about you (like how you responded to an ad on Facebook or on another site) in order to measure the effectiveness of - and improve the quality of - ads.

2

We also put together data from the information we already have about you and your friends. For example, we may put together data about you to determine which friends we should show you in your News Feed or suggest you tag in the photos you post. We may put together your current city with GPS and other location information we have about you to, for example, tell you and your friends about people or events nearby, or offer deals to you that you might be interested in. We may also put together data about you to serve you ads that might be more relevant to you.

When we get your GPS location, we put it together with other location information we have about you (like your current city). But we only keep it until it is no longer useful to provide you services, like keeping your last GPS coordinates to send you relevant notifications.

We only provide data to our advertising partners or customers after we have removed your name or any other personally identifying information from it, or have combined it with other people's data in a way that it is no longer associated with you.

## **Public information**

When we use the phrase "public information" (which we sometimes refer to as "Everyone information"), we mean the information you choose to make public, as well as information that is always publicly available.

### **Information you choose to make public**

Choosing to make your information public is exactly what it sounds like: **anyone**, including people off of Facebook, will be able to see it.

Choosing to make your information public also means that this information:

- can be associated with you (i.e., your name, profile pictures, cover photos, timeline, User ID, username, etc.) even off Facebook;
- can show up when someone does a search on Facebook or on a public search engine;
- will be accessible to the Facebook-integrated games, applications, and websites you and your friends use; and
- will be accessible to anyone who uses our APIs such as our Graph API.

Sometimes you will not be able to select an audience when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

When others share information about you, they can also choose to make it public.

### **Information that is always publicly available**

The types of information listed below are always publicly available, and are treated just like information you decided to make public.

- **Name**: This helps your friends and family find you. If you are uncomfortable sharing your real name, you can always delete your account.

- **Profile Pictures and Cover Photos**: These help your friends and family recognize you. If you are uncomfortable making any of these photos public, you can always delete it. Unless you delete them, when you add a new profile picture or cover photo, the previous photo will remain public in your profile picture or cover photo album.

- **Network**: This helps you see whom you will be sharing information with before you choose "Friends and Networks" as a custom audience. If you are uncomfortable making your network public, you can leave the network.

- **Gender**: This allows us to refer to you properly.

- **Username and User ID**: These allow you to give out a custom link to your timeline or Page, receive email at your Facebook email address, and help make Facebook Platform possible.

3

**Usernames and User IDs**

A Username (or Facebook URL) is a custom link to your timeline that you can give out to people or post on external websites. Usernames appear in the URL on your timeline. We also use your User ID to identify your Facebook account.

If someone has your Username or User ID, they can use it to access information about you through the facebook.com website. For example, if someone has your Username, they can type facebook.com/Username into their browser and see your public information as well as anything else you've let them see. Similarly, someone with your Username or User ID can access information about you through our APIs, such as our Graph API. Specifically, they can access your public information, along with your age range, language and country.

If you do not want your information to be accessible to Platform applications, you can turn off all Platform applications from your Privacy Settings. If you turn off Platform you will no longer be able to use any games or other applications until you turn Platform back on. For more information about the information that apps receive when you visit them, see Other websites and applications.

If you want to see information available about you through our Graph API, just type **https://graph.facebook.com/[User ID or Username]?metadata=1** into your browser.
Your Facebook email address includes your public username like so: username@facebook.com. You can control who can start a message thread with you using your "How You Connect" settings. If they include others on that message, the others can reply too.

**How we use the information we receive**

We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, our partners, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use. For example, we may use the information we receive about you:

- as part of our efforts to keep Facebook products, services and integrations safe and secure;
- to protect Facebook's or others' rights or property;
- to provide you with location features and services, like telling you and your friends when something is going on nearby;
- to measure or understand the effectiveness of ads you and others see, including to deliver relevant ads to you;
- to make suggestions to you and other users on Facebook, such as: suggesting that your friend use our contact importer because you found friends using it, suggesting that another user add you as a friend because the user imported the same email address as you did, or suggesting that your friend tag you in a picture they have uploaded with you in it; and
- for internal operations, including troubleshooting, data analysis, testing, research and service improvement.

Granting us this permission not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways.

While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:

- received your permission;
- given you notice, such as by telling you about it in this policy; or
- removed your name or any other personally identifying information from it.

Of course, for information others share about you, they control how it is shared.

We store data for as long as it is necessary to provide products and services to you and others, including those described above. Typically, information associated with your account will be kept until your account is deleted. For certain categories of data, we may also tell you about specific data retention practices.

4

We are able to suggest that your friend tag you in a picture by scanning and comparing your friend's pictures to information we've put together from the other photos you've been tagged in. This allows us to make these suggestions. You can control whether we suggest that another user tag you in a photo using the "How Tags work" settings. Learn more at: https://www.facebook.com/help/tag-suggestions

## Deleting and deactivating your account

If you want to stop using your account, you can either **deactivate** or **delete** it.

### Deactivate
Deactivating your account puts your account on hold. Other users will no longer see your timeline, but we do not delete any of your information. Deactivating an account is the same as you telling us not to delete any information because you might want to reactivate your account at some point in the future. You can deactivate your account at: https://www.facebook.com/editaccount.php
Your friends will still see you listed in their list of friends while your account is deactivated.

### Deletion
When you delete an account, it is permanently deleted from Facebook. It typically takes about one month to delete an account, but some information may remain in backup copies and logs for up to 90 days. You should only delete your account if you are sure you never want to reactivate it. You can delete your account at: https://www.facebook.com/help/contact.php?show_form=delete_account
Learn more at: https://www.facebook.com/help/?faq=356107851084108

Certain information is needed to provide you with services, so we only delete this information after you delete your account. Some of the things you do on Facebook aren't stored in your account, like posting to a group or sending someone a message (where your friend may still have a message you sent, even after you delete your account). That information remains after you delete your account.

## II. Sharing and finding you on Facebook

### Control each time you post

Whenever you post content (like a status update, photo or check-in), you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.
Choose this icon if you want to share with your Facebook **Friends**.
Choose this icon if you want to **Customize** your audience. You can also use this to hide your story from specific people.

If you tag someone, that person and their friends can see your story no matter what audience you selected. The same is true when you approve a tag someone else adds to your story.

Always think before you post. Just like anything else you post on the web or send in an email, information you share on Facebook can be copied or re-shared by anyone who can see it.

Although you choose with whom you share, there may be ways for others to determine information about you. For example, if you hide your birthday so no one can see it on your timeline, but friends post "happy birthday!" on your timeline, people may determine your birthday.
When you comment on or "like" someone else's story, or write on their timeline, that person gets to select the audience. For example, if a friend posts a Public story and you comment on it, your comment will be Public. Often, you can see the audience someone selected for their story before you post a comment; however, the person who posted the story may later change their audience.

5

You can control who can see the Facebook Pages you've "liked" by visiting your timeline, clicking on the Likes box on your timeline, and then clicking "Edit."

Sometimes you will not see a sharing icon when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

## Control over your timeline

Whenever you add things to your timeline you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

Choose this icon if you want to share with your Facebook **Friends**.

Choose this icon if you want to **Customize** your audience. You can also use this to hide the item on your timeline from specific people.

When you select an audience for your friend list, you are only controlling who can see the entire list of your friends on your timeline. We call this a timeline visibility control. This is because your friend list is always available to the games, applications and websites you use, and your friendships may be visible elsewhere (such as on your friends' timelines or in searches). For example, if you select "Only Me" as the audience for your friend list, but your friend sets her friend list to "Public," anyone will be able to see your connection on your friend's timeline.

Similarly, if you choose to hide your gender, it only hides it on your timeline. This is because we, just like the applications you and your friends use, need to use your gender to refer to you properly on the site.

When someone tags you in a story (such as a photo, status update or check-in), you can choose whether you want that story to appear on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can remove it from your timeline.

People on Facebook may be able to see mutual friends, even if they cannot see your entire list of friends.

Some things (like your name, profile pictures and cover photos) do not have sharing icons because they are always publicly available. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

## Finding you on Facebook

To make it easier for your friends to find you, we allow anyone with your contact information (such as email address or telephone number) to find you through the Facebook search bar at the top of most pages, as well as other tools we provide, such as contact importers - even if you have not shared your contact information with them on Facebook.

You can choose who can look up your timeline using the email address or telephone number you added to your timeline through your privacy settings. But remember, if you choose Friends, only your current Facebook friends will be able to find you this way.

Your "How You Connect" settings do not control whether people can find you or a link to your timeline when they search for content they have permission to see, like a photo or other story you've been tagged in.

## Access on phones and other devices

Once you share information with your friends and others, they may be able to sync it with or access it via their mobile phones and other devices. For example, if you share a photo on Facebook, someone viewing that photo could save it using Facebook tools or by other methods offered by their device or browser. Similarly, if you share your contact information with someone or invite someone to an event, they may be able to use Facebook or third party applications or devices to sync that information. Or, if one of your friends has a Facebook application on one of their devices, your

6

information (such as the things you post or photos you share) may be stored on or accessed by their device.

You should only share information with people you trust because they will be able to save it or re-share it with others, including when they sync the information to a device.

## Activity log

Your activity log is a place where you can go to view most of your information on Facebook, including things you've hidden from your timeline. You can use this log to manage your content. For example, you can do things like delete stories, change the audience of your stories or stop an application from publishing to your timeline on your behalf.

When you hide something from your timeline, you are not deleting it. This means that the story may be visible elsewhere, like in your friends' News Feed. If you want to delete a story you posted, choose the delete option.

## What your friends share about you

### Links and Tags

Anyone can add a link to a story. Links are references to something on the Internet; anything from a website to a Page or timeline on Facebook. For example, if you are writing a story, you might include a link to a blog you are referencing or a link to the blogger's Facebook timeline. If someone clicks on a link to another person's timeline, they'll only see the things that they are allowed to see.

A tag is a special type of link to someone's timeline that suggests that the tagged person add your story to their timeline. In cases where the tagged person isn't included in the audience of the story, it will add them so they can see it. Anyone can tag you in anything. Once you are tagged, you and your friends will be able to see it (such as in News Feed or in search).

You can choose whether a story you've been tagged in appears on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can always remove it from your timeline.

If you do not want someone to tag you, we encourage you to reach out to them and give them that feedback. If that does not work, you can block them. This will prevent them from tagging you going forward.

If you are tagged in a private space (such as a message or a group) only the people who can see the private space can see the tag. Similarly, it you are tagged in a comment, only the people who can see the comment can see the tag.

### Groups

Once you are in a Group, anyone in that Group can add you to a subgroup. When someone adds you to a Group, you will be listed as "invited" until you visit the Group. You can always leave a Group, which will prevent others from adding you to it again.

## About Pages

Facebook Pages are public pages. Companies use Pages to share information about their products. Celebrities use Pages to talk about their latest projects. And communities use pages to discuss topics of interest, everything from baseball to the opera.

Because Pages are public, information you share with a Page is public information. This means, for example, that if you post a comment on a Page, that comment may be used by the Page owner off Facebook, and anyone can see it.

When you "like" a Page, you create a connection to that Page. The connection is added to your timeline and your friends may see it in their News Feeds. You may be contacted by or receive updates from the Page, such as in your News Feed and your messages. You can remove the Pages you've "liked" through your timeline or on the Page.

7

Some Pages contain content that comes directly from the Page owner. Page owners can do this through online plugins, such as an iframe, and it works just like the games and other applications you use through Facebook. Because this content comes directly from the Page owner, that Page may be able to collect information about you, just like any website.

Page administrators may have access to insights data, which will tell them generally about the people that visit their Page (as opposed to information about specific people). They may also know when you've made a connection to their Page because you've liked their Page or posted a comment.

## III. Other websites and applications

### About Facebook Platform

Facebook Platform (or simply Platform) refers to the way we help you share your information with the games, applications, and websites you and your friends use. Facebook Platform also lets you bring your friends with you, so you can connect with them off of Facebook. In these two ways, Facebook Platform helps you make your experiences on the web more personalized and social.

Remember that these games, applications and websites are created and maintained by other businesses and developers who are not part of Facebook, so you should always make sure to read their terms of service and privacy policies.

### Controlling what information you share with applications

When you connect with a game, application or website - such as by going to a game, logging in to a website using your Facebook account, or adding an app to your timeline - we give the game, application, or website (sometimes referred to as just "Applications" or "Apps") your basic info, which includes your User ID, as well your friends' User IDs (or your friend list) and your public information.

Your friend list helps the application make your experience more social because it lets you find your friends on that application. Your User ID helps the application personalize your experience because it can connect your account on that application with your Facebook account, and it can access your basic info, which includes your public information and friend list. This includes the information you choose to make public, as well as information that is always publicly available. If the application needs additional information, such as your stories, photos or likes, it will have to ask you for specific permission.

The "Apps you use" setting lets you control the applications you use. You can see the permissions you have given these applications, the last time an application accessed your information, and the audience on Facebook for your timeline stories and activity the application posts on your behalf. You can also remove applications you no longer want, or turn off all Platform applications. When you turn all Platform applications off, your User ID is no longer given to applications, even when your friends use those applications. But you will no longer be able to use any games, applications or websites through Facebook.

When you first visit an app, Facebook lets the app know your language, your country, and whether you are under 18, between 18-20, or 21 and over. Age range lets apps provide you with age-appropriate content. If you install the app, it can access, store and update the information you've shared. Apps you've installed can update their records of your basic info, age range, language and country. If you haven't used an app in a while, it won't be able to continue to update the additional information you've given them permission to access. Learn more at: https://www.facebook.com/help/how-apps-work
Sometimes a game console, mobile phone, or other device might ask for permission to share specific information with the games and applications you use on that device. If you say okay, those applications will not be able to access any other information about you without asking specific permission from you or your friends.
Sites and apps that use Instant Personalization receive your User ID and friend list when you visit them.
You always can remove apps you've installed by using your app settings at: https://www.facebook.com/settings/?tab=applications. But remember, apps may still be able to access your information when the people you share with use them. And, if you've removed an application and want them to delete the information you've already shared with them,

8

you should contact the application and ask them to delete it. Visit the application's page on Facebook or their own website to learn more about the app.

**Controlling what is shared when the people you share with use applications**

Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared. This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use.

Your friends and the other people you share information with often want to share your information with applications to make their experiences on those applications more personalized and social. For example, one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it. Your friend might also want to share the music you "like" on Facebook. If you have made that information public, then the application can access it just like anyone else. But if you've shared your likes with just your friends, the application could ask your friend for permission to share them.

You can control most of the information other people can share with applications they use from the "Ads, Apps and Websites" settings page. But these controls do not let you limit access to your public information and friend list.

If you want to completely block applications from getting your information when your friends and others use them, you will need to turn off all Platform applications. This means that you will no longer be able to use any third-party Facebook-integrated games, applications or websites.

If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else.

**Logging in to another site using Facebook**

Facebook Platform lets you log into other applications and websites using your Facebook account. When you log in using Facebook, we give the site your User ID (just like when you connect with any other application), but we do not share your email address or password with that website through this process.

If you already have an account on that website, the site may also be able to connect that account with your Facebook account. Sometimes it does this using what is called an "email hash", which is similar to searching for someone on Facebook using an email address. Only the email addresses in this case are hashed so no email addresses are actually shared between Facebook and the website.

**How it works**
The website sends over a hashed version of your email address, and we match it with a database of email addresses that we have also hashed. If there is a match, then we tell the website the User ID associated with the email address. This way, when you log into the website using Facebook, the website can link your Facebook account to your account on that website.

**About social plugins**

Social plugins are buttons, boxes, and stories (such as the Like button) that other websites can use to present Facebook content to you and create more social and personal experiences for you. While you view these buttons, boxes, and stories on other sites, the content comes directly from Facebook.

Sometimes plugins act just like applications. You can spot one of these plugins because it will ask you for permission to access your information or to publish information back to Facebook. For example, if you use a registration plugin on a website, the plugin will ask your permission to share your basic info with the website to make it easier for you to register for the website. Similarly, if you use an Add To Timeline plugin, the plugin will ask your permission to publish stories about your activities on that website to Facebook.

9

If you make something public using a plugin, such as posting a public comment on a newspaper's website, then that website can access your comment (along with your User ID) just like everyone else.

If you post something using a social plugin and you do not see a sharing icon, you should assume that story is Public. For example, if you post a comment through a Facebook comment plugin on a site, your story is Public and everyone, including the website, can see your story.
Websites that use social plugins can sometimes tell that you have engaged with the social plugin. For example, they may know that you clicked on a Like button in a social plugin.
We receive data when you visit a site with a social plugin. We keep this data for a maximum of 90 days. After that, we remove your name or any other personally identifying information from the data, or combine it with other people's data in a way that it is no longer associated with you. Learn more at: https://www.facebook.com/help/social-plugins

## About instant personalization

Instant personalization is a way for Facebook to help partners (such as Bing and Rotten Tomatoes) on and off Facebook create a more personalized and social experience for logged in users than a social plugin can offer. When you visit a site or app using instant personalization, it will know some information about you and your friends the moment you arrive. This is because sites and apps using instant personalization can access your User ID, your friend list, and your public information.

The first time you visit a site or app using instant personalization, you will see a notification letting you know that the site or app has partnered with Facebook to provide a personalized experience.

The notification will give you the ability to disable or turn off instant personalization for that site or app. If you do that, that site or app is required to delete all of the information about you it received from Facebook as part of the instant personalization program. In addition, we will prevent that site from accessing your information in the future, even when your friends use that site.

If you decide that you do not want to experience instant personalization for all partner sites and apps, you can disable instant personalization from the "Ads, Apps and Websites" settings page.

If you turn off instant personalization, partner third party sites and apps will not be able to access your public information, even when your friends visit those sites.

If you turn off an instant personalization site or app after you have been using it or visited it a few times (or after you have given it specific permission to access your data), it will not automatically delete your data received through Facebook. But the site is contractually required to delete your data if you ask it to.

## How it works
To join the instant personalization program, a potential partner must enter into an agreement with us designed to protect your privacy. For example, this agreement requires that the partner delete your data if you turn off instant personalization when you first visit the site or app. It also prevents the partner from accessing any information about you until you or your friends visit its site.

Instant personalization partners sometimes use an email hash process to see if any of their users are on Facebook and get those users' User IDs. This process is similar to searching for someone on Facebook using an email address, except in this case the email addresses are hashed so no actual email addresses are exchanged. The partner is also contractually required not to use your User ID for any purpose (other than associating it with your account) until you or your friends visit the site.

When you visit a site or app using instant personalization, we provide the site or app with your User ID and your friend list (as well as your age range, locale, and gender). The site or app can then connect your account with that partner with your friends' accounts to make the site or app instantly social. The site can also access public information associated with any of the User IDs it receives, which it can use to make them instantly personalized. For example, if the site is a

10

music site, it can access your music interests to suggest songs you may like, and access your friends' music interests to let you know what they are listening to. Of course it can only access your or your friends' music interests if they are public. If the site or app wants any additional information, it will have to get your specific permission.

## Public search engines

Your public search setting controls whether people who enter your name on a public search engine may see your public timeline (including in sponsored results). You can find your public search setting on the "Ads, Apps and Websites" settings page.

This setting does not apply to search engines that access your information as an application using Facebook Platform. If you turn your public search setting off and then search for yourself on a public search engine, you may still see a preview of your timeline. This is because some search engines cache information for a period of time. You can learn more about how to request a search engine to remove you from cached information at:
 https://www.facebook.com/help/?faq=13323

## IV. How advertising and Sponsored Stories work

## Personalized ads

We do not share any of your information with advertisers (unless, of course, you give us permission). As described in this policy, we may share your information when we have removed from it anything that personally identifies you or combined it with other information so that it no longer personally identifies you.

We use the information we receive to deliver ads and to make them more relevant to you. This includes all of the things you share and do on Facebook, such as the Pages you like or key words from your stories, and the things we infer from your use of Facebook. Learn more at: https://www.facebook.com/help/?page=226611954016283

When an advertiser creates an ad, they are given the opportunity to choose their audience by location, demographics, likes, keywords, and any other information we receive or can tell about you and other users. For example, an advertiser can choose to target 18 to 35 year-old women who live in the United States and like basketball. An advertiser could also choose to target certain topics or keywords, like "music" or even people who like a particular song or artist.

Try this tool yourself to see one of the ways advertisers target ads and what information they see at:
 https://www.facebook.com/ads/create/

If the advertiser chooses to run the ad (also known as placing the order), we serve the ad to people who meet the criteria the advertiser selected, but we do not tell the advertiser who any of those people are. So, for example, if a person views or otherwise interacts with the ad, the advertiser might infer that the person is an 18-to-35-year-old woman who lives in the U.S. and likes basketball. But we would not tell the advertiser who that person is.

After the ad runs, we provide advertisers with reports on how their ads performed. For example we give advertisers reports telling them how many users saw or clicked on their ads. But these reports are anonymous. We do not tell advertisers who saw or clicked on their ads.

Advertisers sometimes place cookies on your computer in order to make their ads more effective. Learn more about cookies, pixels and other system technologies.
Sometimes we allow advertisers to target a category of user, like a "moviegoer" or a "sci-fi fan." We do this by bundling characteristics that we believe are related to the category. For example, if a person "likes" the "Star Trek" Page and mentions "Star Wars" when they check into a movie theater, we may conclude that this person is likely to be a sci-fi fan. Advertisers of sci-fi movies, for example, could ask us to target "sci-fi fans" and we would target that group, which may include you. Or if you "like" Pages that are car-related and mention a particular car brand in a post, we might put you in the "potential car buyer" category and let a car brand target to that group, which would include you.

## Ads + social context

11

Facebook Ads are sometimes paired with social actions your friends have taken. For example, an ad for a sushi restaurant may be paired with a news story that one of your friends likes that restaurant's Facebook page.

This is the same type of news story that could show up in your News Feed, only we place it next to a paid advertisement to make that ad more relevant and interesting.

When you show up in one of these news stories, we will only pair it with ads shown to your friends. If you do not want to appear in stories paired with Facebook Ads, you can opt out using your "Edit social ads" setting.

Learn what happens when you click "Like" on an advertisement or an advertiser's Facebook Page at: https://www.facebook.com/help/?faq=19399
We may serve ads, including those with social context (or serve just social context), on other sites. These work just like the ads we serve on Facebook - the advertisers do not receive any of your information. Only people that could see the Facebook action (like on your timeline) would see it paired in this way.
Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.
Games, applications and websites can serve ads directly to you or help us serve ads to you or others if they have information like your User ID or email address.

## Sponsored stories

Many of the things you do on Facebook (like "liking" a Page) are posted to your timeline and shared in News Feed. But there's a lot to read in News Feed. That's why we allow people to "sponsor" your stories to make sure your friends see them. For example, if you RSVP to an event hosted by a local restaurant, that restaurant may want to make sure your friends see it so they can come too.

If they do sponsor a story, that story will appear in the same place ads usually do or in your News Feed under the heading "Sponsored" or something similar. Only people that could originally see the story can see the sponsored story, and no personal information about you (or your friends) is shared with the sponsor.

Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

## Facebook content

We like to tell you about some of the features and tools your friends and others use on Facebook, to help you have a better experience. For example, if your friend uses our friend finder tool to find more friends on Facebook, we may tell you about it to encourage you to use it as well. This of course means your friend may similarly see suggestions based on the things you do. But we will try to only show it to friends that could benefit from your experience.

Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

## V. Cookies, pixels and other similar technologies

Cookies are small pieces of data that are stored on your computer, mobile phone or other device. Pixels are small blocks of code on webpages that do things like allow another server to measure viewing of a webpage and often are used in connection with cookies.

We use technologies like cookies, pixels, and local storage (like on your browser or device, which is similar to a cookie but holds more information) to provide and understand a range of products and services. Learn more at: https://www.facebook.com/help/cookies

We use these technologies to do things like:

- make Facebook easier or faster to use;
- enable features and store information about you (including on your device or in your browser cache) and your use of Facebook;
- deliver, understand and improve advertising;
- monitor and understand the use of our products and services; and
- to protect you, others and Facebook.

For example, we may use them to know you are logged in to Facebook, to help you use social plugins and share buttons, or to know when you are interacting with our advertising or Platform partners.

We may ask advertisers or other partners to serve ads or services to computers, mobile phones or other devices, which may use a cookie, pixel or other similar technology placed by Facebook or the third party (although we would not share any other information that identifies you with an advertiser).

Most companies on the web use cookies (or other similar technological tools), including our advertising and Platform partners. For example, our Platform partners, advertisers or Page administrators may use cookies or similar technologies when you access their apps, ads, Pages or other content.

Cookies and things like local storage help make Facebook work, like allowing pages to load faster because certain content is stored on your browser or by helping us authenticate you to deliver personalized content.
To learn more about how advertisers generally use cookies and the choices advertisers provide, visit the Network Advertising Initiative at http://www.networkadvertising.org/managing/opt_out.asp, the Digital Advertising Alliance at http://www.aboutads.info/, the Internet Advertising Bureau (US) at http://www.iab.net or the Internet Advertising Bureau (EU) at http://youronlinechoices.eu/.
You can remove or block cookies or other similar technologies or block or remove other data stored on your computer or device (such as by using the various settings in your browser), but it may affect your ability to use Facebook or other websites and apps.

## VI. Some other things you need to know

### Safe harbor
Facebook complies with the EU Safe Harbor framework as set forth by the Department of Commerce regarding the collection, use, and retention of data from the European Union. To view our certification, visit the U.S. Department of Commerce's Safe Harbor website at: https://safeharbor.export.gov/list.aspx. As part of our participation in the Safe Harbor program, we agree to resolve disputes you have with us in connection with our policies and practices through TRUSTe. If you would like to contact TRUSTe, visit:https://feedback-form.truste.com/watchdog/request

### Contact us with questions or disputes
If you have questions or complaints regarding our Data Use Policy or practices, please contact us by mail at 1601 Willow Road, Menlo Park, CA 94025 if you reside in the U.S. or Canada, or at Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland if you live outside the U.S. or Canada. Anyone may also contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

### Responding to legal requests and preventing harm
We may access, preserve and share your information in response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States where we have a good faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards. We may also access, preserve and share information when we have a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect ourselves, you and others, including as part of investigations; and to prevent death or imminent bodily harm. Information we receive about you, including financial transaction data related to purchases made with Facebook Credits, may be accessed, processed and retained for an extended period of time when it is the subject of a legal request or obligation, governmental investigation, or investigations concerning possible violations of our terms or policies, or otherwise to prevent harm.

13

**Access requests**

You can access and correct most of your personal data stored by Facebook by logging into your account and viewing your timeline and activity log. You can also download a copy of your personal data by visiting your "Account Settings", clicking on "Download a copy of your Facebook data" and then clicking on the link for your expanded archive. Learn more at: https://www.facebook.com/help/?faq=226281544049399

**Notifications and Other Messages**

We may send you notifications and other messages using the contact information we have for you, like your email address. You can control most of the notifications you receive, including ones from Pages you like and applications you use, using your "Notifications" settings.

**Friend finder**

We offer tools to help you upload your friends' contact information so that you and others can find friends on Facebook, and invite friends who do not use Facebook to join. If you do not want us to store this information, visit this help page at: https://www.facebook.com/contact_importer/remove_uploads.php

If you give us your password, we will delete it after you upload your friends' contact information.

**Invitations**

When you invite a friend to join Facebook, we send a message on your behalf using your name, and up to two reminders. We may also include names and pictures of other people your friend might know on Facebook. The invitation will also give your friend the opportunity to opt out of receiving other invitations to join Facebook.

**Memorializing accounts**

We may memorialize the account of a deceased person. When we memorialize an account, we keep the timeline on Facebook, but limit access and some features. You can report a deceased person's timeline at: https://www.facebook.com/help/contact.php?show_form=deceased

We also may close an account if we receive a formal request that satisfies certain criteria.

**Service Providers**

We give your information to the people and companies that help us provide, understand and improve the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results. In some cases we provide the service jointly with another company, such as the Facebook Marketplace. In all of these cases our partners must agree to only use your information consistent with the agreement we enter into with them, as well as this Data Use Policy.

**Security and bugs**

We do our best to keep your information secure, but we need your help. For more detailed information about staying safe on Facebook, visit the Facebook Security Page. We try to keep Facebook up, bug-free and safe, but can't make guarantees about any part of our services or products.

**Change of Control**

If the ownership of our business changes, we may transfer your information to the new owner so they can continue to operate the service. But they will still have to honor the commitments we have made in this Data Use Policy.

**Notice of Changes**

If we make changes to this Data Use Policy we will notify you by publication here and on the Facebook Site Governance Page. If the changes are material, we will provide you additional, prominent notice as appropriate under the circumstances. You can make sure that you receive notice directly by liking the Facebook Site Governance Page.

**Opportunity to comment and vote**

Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will give you seven (7) days to provide us with comments on the change. If we receive more than 7000 comments concerning a particular change, we will put the change up for a vote. The vote will be binding on us if more than 30% of all active

14

registered users as of the date of the notice vote.

**Information for users outside of the United States and Canada**
Company Information: The website under www.facebook.com and the services on these pages are being offered to users outside of the U.S. and Canada by Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland. The company Facebook Ireland Ltd. has been established and registered in Ireland as a private limited company, Company Number: 462932, and is the data controller responsible for your personal information.
Directors: Cipora Herman (American), Theodore Ullyot (American).

**Your California privacy rights**
California law permits residents of California to request certain details about what personal information a company shares with third parties for the third parties' direct marketing purposes. Facebook does not share your information with third parties for the third parties' own and independent direct marketing purposes unless we receive your permission. Learn more about the information we receive and how it is used and other websites and applications. If you have questions about our sharing practices or your rights under California law, please write us at 1601 Willow Road, Menlo Park, CA 94025 or contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

15

# Exhibit G



S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 3555, 1986 WL 31929, S. REP. 99-541 (Leg.Hist.)

P.L. 99–508, **3555 ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986

DATES OF CONSIDERATION AND PASSAGE

House June 23, October 2, 1986

Senate October 1, 1986

House Report (Judiciary Committee) No. 99–647,

June 19, 1986 [To accompany H.R. 4952]

Senate Report (Judiciary Committee) No. 99–541,

Oct. 17, 1986 [To accompany S. 2575]

Cong. Record Vol. 132 (1986)

The House bill was passed in lieu of the Senate bill after amending its language to contain much of the text of the Senate bill. The Senate Report is set out below.

SENATE REPORT NO. 99–541

October 17, 1986

*1 The Committee on the Judiciary, to which was referred the bill (S. 2575) having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill, as amended, do pass.

I. PURPOSE

The Electronic Communications Privacy Act amends title III of the Omnibus Crime Control and Safe Streets Act of 1968—the Federal wiretap law—to protect against the unauthorized interception of electronic communications. The bill amends the 1968 law to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies.

When the Framers of the Constitution acted to guard against the arbitrary use of Government power to maintain surveillance over citizens, there were limited methods of intrusion into the 'houses, *2 papers, and effects' protected by the fourth amendment. During the intervening 200 years, development of new methods of communication and devices for surveillance has expanded dramatically the opportunity for such intrusions.

The telephone is the most obvious example. Its widespread use made it technologically possible to intercept the communications of **3556 citizens without entering homes or other private places. When the issue of Government wiretapping first came before the Supreme Court in Olmstead v. United States, 277 U.S. 438 (1928), the Court held that wiretapping did not violate the fourth amendment, since there was no searching, no seizure of anything tangible, and no physical trespass.

Today, the Olmstead case is often remembered more for Justice Brandeis' prescient dissent than for its holding. Justice Brandeis predicted:

Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home . . . Can it be that the Constitution affords no protection against such invasions of individual security?

Forty years later, the Supreme Court accepted Justice Brandeis' logic in *Katz* v. *United States*, 389 U.S. 347 (1967), holding that the fourth amendment applies to Government interception of a telephone conversation. At the same time, the Court extended fourth amendment protection to electronic eavesdropping on oral conversations in *Berger* v. *New York*, 388 U.S. 41 (1967).

Congress responded in a comprehensive fashion by authorizing Government interception, under carefully subscribed circumstances in title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510 et seq. Title III is the primary law protecting the security and privacy of business and personal communications in the United States today. Its regimen for protecting the privacy of voice communications is expressly limited to the unauthorized aural interception of wire or oral communications. It only applies where the contents of a communication can be overheard and understood by the human ear. See *United States* v. *New York Telephone Company*, 434 U.S. 159, 167[1] (1977). Furthermore, existing title III applies only to interceptions of communications sent via common carriers. 18 U.S.C. 2510(10).

As Senator Leahy said when he introduced S. 2575 with Senator Mathias, the existing law is 'hopelessly out of date.' Congressional Record, June 19, 1986. It has not kept pace with the development of communications and computer technology. Nor has it kept pace with changes in the structure of the telecommunications industry.

Today we have large-scale electronic mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing.[2] A phone call can be carried by wire, by microwave or fiber optics. It can be transmitted in the form of digitized voice, data or video. Since the divestiture of **3 AT&T and deregulation, many different companies, not just common carriers, offer a wide variety of telephone and other communications services. It does not make sense that a phone call transmitted via common carrier is protected by the current federal **3557 wiretap statute, while the same phone call transmitted via a private telephone network such as those used by many major U.S. corporations today, would not be covered by the statute.

These tremendous advances in telecommunications and computer technologies have carried with them comparable technological advances in surveillance devices and techniques. Electronic hardware making it possible for over-zealous law enforcement agencies, industrial spies and private parties to intercept the personal or proprietary communications of others are readily available in the American market today.

Title I of the Electronic Communications Privacy Act addresses the interception of wire, oral and electronic communications. It amends existing chapter 119 of title 18 to bring it in line with technological developments and changes in the structure of the telecommunications industry.

The Committee also recognizes that computers are used extensively today for the storage and processing of information. With the advent of computerized recordkeeping systems, Americans have lost the ability to lock away a great deal of personal and business information. For example, physicians and hospitals maintain medical files in offsite data banks, businesses of all sizes transmit their records to remote computers to obtain sophisticated data processing services. These services as well as the providers of electronic mail create electronic copies of private correspondence for later reference. This information is processed for the benefit of the user but often it is maintained for approximately 3 months to ensure system integrity. For the person or business whose records are involved, the privacy or proprietary interest in that information should not change. Nevertheless, because it is subject to control by a third party computer operator, the information may be subject to no constitutional privacy protection. See *United States* v. *Miller*, 425 U.S. 435[3] (1976) (customer has no standing to contest disclosure of his bank records). Thus, the information may be open to possible wrongful use and public disclosure by law enforcement authorities as well as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

unauthorized private parties. The provider of these services can do little under current law to resist unauthorized access to communications.

Title II of S. 2575 addresses access to stored wire and electronic communications and transactional records. It is modeled after the Right to Financial Privacy Act, 12 U.S.C. 3401 et seq. to protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs.

Title III of the bill addresses pen registers and trap and trace devices.

## II. HISTORY

In 1984, Senator Leahy asked the Attorney General whether he believed interceptions of electronic mail and computer-to-computer communications were covered by the Federal wiretap law. The **3558 *4 Criminal Division of the Justice Department responded that Federal law protects electronic communications against unauthorized acquisition only where a reasonable expectation of privacy exists. Underscoring the need for this legislation, the Department concluded:

In this rapidly developing area of communications which range from cellular non-wire telephone connections to microwave-fed computer terminals, distinctions such as [whether there does or does not exist a reasonable expectation of privacy] are not always clear or obvious.

Senator Leahy's letter and the Justice Department's response mark the beginning of this legislation. The Subcommittee on Patents, Copyrights and Trademarks chaired by Senator Mathias, held hearings in the 98th Congress. See, Hearings before the Subcommittee on Patents, Copyrights and Trademarks of the Committee on the Judiciary on Privacy and Electronic Communications, September 12, 1984, S. Hrg. 98–1266.

The product of that hearing and subsequent discussions with the Department of Justice and private groups interested in promoting communications privacy, while protecting legitimate law enforcement needs and promoting technological innovation, was S. 1667, the Electronic Communications Privacy Act of 1985. Senators Leahy and Mathias introduced that bill on September 19, 1985. On the same day, Congressmen Kastenmeier and Moorhead, the Chairman and Ranking Minority Member of the House Judiciary Subcommittee on Courts, Civil Liberties and the Administration of Justice introduced an identical bill, H.R. 3378.

In October 1985, the Office of Technology Assessment issued a report entitled 'Electronic Surveillance and Civil Liberties.' That study concluded that current legal protections for electronic mail are 'weak, ambiguous, or non-existent,' and that 'electronic mail remains legally as well as technically vulnerable to unauthorized surveillance.' 'Federal Government Information Technology: Electronic Surveillance and Civil Liberties' (Washington, D.C.: U.S. Congress, Office of Technology Assessment, OTA-CIT–293, October 1985).

The Subcommittee on Patents, Copyrights and Trademarks held a hearing on S. 1667 on November 13, 1985. Testimony was received from interested individuals and groups, including representatives of the telephone industry, the electronic mail industry, and the software and service industries. Representatives of the Department of Justice presented their views, and the subcommittee also received testimony from the American Civil Liberties Union and elicited technical information from the Institute of Electrical and Electronics Engineers.

As a result of those hearings, S. 1667 was superseded by a new bill to reflect the concerns raised by some of these groups, particularly the Department of Justice and radio hobbyists. On June 19, 1986, Senator Leahy, joined by Senator Mathias, introduced S. 2575.

On August 12, 1986, the Judiciary Committee Subcommittee on Patents, Copyrights and Trademarks favorably reported S. 2575, as amended, to the full Committee by voice vote.

**3559 *5 On September 19, 1986, Senators Leahy and Mathias and Chairman Thurmond offered an amendment in

the nature of a substitute to S. 2575. The Committee voted unanimously to favorably report the Electronic Communications Privacy Act of 1986, as amended, to the full Senate.

## III. STATEMENT

A letter sent by first class mail is afforded a high level of protection against unauthorized opening by a combination of constitutional provisions, case law, and U.S. Postal Service statutes and regulations. Voice communications transmitted via common carrier are protected by title III of the Omnibus Crime Control and Safe Streets Act of 1968.

But there are no comparable Federal statutory standards to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer technology. The is so, even though American citizens and American businesses are using these new forms of technology in lieu of, or side-by-side with, first class mail and common carrier telephone services.

This gap results in legal uncertainty. It may unnecessarily discourage potential customers from using innovative communications systems. It probably encourages unauthorized users to obtain access to communications to which they are not a party. It may discourage American businesses from developing new innovative forms of telecommunications and computer technology. The lack of clear standards may expose law enforcement officers to liability and may endanger the admissibility of evidence.

Most importantly, the law must advance with the technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances. Congress must act to protect the privacy of our citizens. If we do not, we will promote the gradual erosion of this precious right.

The Committee believes that S. 2575, te Electronic Communications Privacy Act of 1986, represents a fair balance between the privacy expectations of American citizens and the legitimate needs of law enforcement agencies.

The Justice Department strongly supports S. 2575 because it strengthens the current wiretap law from a law enforcement perspective. Specifically, it expands the the list of felonies for which a voice wiretap order may be issued and the list of Justice Department officials who may apply for a court order to place a wiretap. The bill also includes provisions making it easier for law enforcement officials to deal with a target who repeatedly changes telephones to thwart interception of his communications and creates criminal penalties for those who notify a target of a wiretap in order to obstruct it. These provisions will be particularly helpful to the Justice Department in its fight against drug trafficking.

The organizations and individual corporations named below also support the principles embodied in the legislation.

Organizations: Electronic Mail Assoc.; ADAPSO; Telocator Network of America; Cellular Telecommunications Industry Assoc.; **3560 *6 ACLU; National Association of Manufacturers (NAM); U.S. Chamber of Commerce; National Association of Broadcasters (NAB); National Cable Television Assoc. (NCTA); National Association of Business & Educational Radio (NABER); CBEMA; U.S. Telephone Assoc.; Videotext Industry Assoc.; Information Industry Assoc.; Electronic Funds Transfer Assoc.; Radio and Television News Directors Assoc.; Association of American Railroads; Institute of Electrical and Electronics Engineers (IEEE); Direct Marketing Association; Utilities Telecommunications Council; and Associated Credit Bureaus, Inc.

Corporations: AT&T; General Electric; IBM; GTE; EDS; ITT; MCI; CBS; ABC; NBC; Tandy Corp. (Radio Shack); Trintex; Equifax; TRW; Source Telecomputing Corporation; Chase Manhattan Bank; Motorola; Ameritech; Bell Atlantic; Bell South; Southwestern Bell; NYNEX; Pacific Telesis; US West; and Associated Credit Services, Inc.

A few points in the development of the Electronic Communications Privacy Act of 1986 should be noted here. After Senators Leahy and Mathias introduced the bill in June 1986, S. 2575 was referred to the Subcommittee on Patents,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Copyrights and Trademarks. During the subcommittee markup session held on August 12, 1986, the bill was further amended to clarify certain provisions.

At the request of the FCC, in response to the recent Captain Midnight incident, in which an individual in Florida interfered with the transmission of an HBO program being relayed by satellite, the subcommittee included in the bill language to address deliberate or malicious interference with satellite transmissions. It also added to title III of the bill related to installation and use of pen registers, procedural requirements for orders to use 'trap and trace' devices.

In order to underscore that the inadvertent reception of a protected communication is not a crime, the subcommittee changed the state of mind requirement under title III of the Omnibus Crime Control and Safe Streets Act of 1968 from 'willful' to 'intentional.' This change in the law addresses the concerns of radio scanners that in the course of scanning radio frequencies in order to receive public communications, one could inadvertently tune through a protected communication like a cellular telephone call. This provision makes clear that the inadvertent interception of a protected communication is not unlawful under this Act.

During subcommittee consideration, Senators Laxalt, Grassley, DeConcini and Simpson expressed concerns about the bill's penalty structure for the interception of certain satellite transmissions by home viewers. Senators Leahy and Mathias agreed that those concerns would be addressed during Committee consideration of the Electronic Communications Privacy Act.

The Leahy-Mathias-Thurmond substitute for S. 2575, which was offered when the full Committee considered this legislation, incorporated an amendment offered by Senator Grassley. Senators Laxalt, McConnell, Simpson and Denton cosponsored Senator Grassley's amendment.

Senator Grassley's amendment modifies the criminal penalties and civil liability provisions of chapter 119 of title 18 of the United States Code so that there is a two-track, tiered penalty structure for home viewing of private satellite transmissions when the conduct**3561 *7 is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain.

In a public action, under the Grassley amendment, a first offender would be subject to a suit by the Government for injunctive relief. If injunctive relief is granted, one who violates the injunction would be subject to the full panoply of enforcement mechanisms within the court's existing authority, including criminal and civil contempt. Second and subsequent offenses carry a mandatory $50 civil fine for each violation. The term 'violation' in this context refers to each viewing of a private video communication.

In a private civil action, a person harmed by the private viewing of such a satellite communication may sue for damages. If the defendant has not previously been enjoined in a government action as described above, and has not previously been found liable in a civil suit, the plaintiff may recover the greater of his actual damages or statutory damages of $50 to $500. A second offender (one who has been found liable in a prior private civil action or one who has been enjoined in a government suit) is subject to liability for the greater of actual damages or statutory damages of $100 to $1,000. Third and subsequent offenders are subject to the bill's full civil penalties.

The Grassley amendment also takes outside the penalty provisions of the Electronic Communications Privacy Act, the interception of a satellite transmission via audio subcarrier if the transmission is intended for redistribution to facilities open to the public, provided that the conduct is not for the purpose of direct or indirect commercial advantage or private financial gain. Audio subcarriers intended for redistribution to the public include those for redistribution by broadcast stations and cable and like facilities. They also include those for redistributions to buildings open to the public like hospitals and office buildings that pump in music which has been transmitted via subcarrier. As specified in the substitute, this audio subcarrier exclusion does not apply to data transmissions or telephone calls.

The substitute amendment also incorporated Senator Simon's amendment. Senator Simon had expressed concern that the Electronic Communications Privacy Act's penalties were too severe for the first offender, who without an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

unlawful or financial purpose, intercepts a cellular telephone call or certain radio communications related to news-gathering.

Senator Simon's amendment reduces the penalty for such an interception of an unencrypted, unscrambled cellular telephone call to a $500 criminal fine. Unencrypted, unscrambled radio communications transmitted on frequencies allocated under subpart D of part 74 of the FCC rules are treated like private satellite video communications are under Senator Grassley's amendment.

Scanning enthusiasts have argued to the Committee that the mere monitoring of cellular telephone calls should not be illegal. That argument ignores three important realities. First, Congress, in passing the 1968 wiretap law already made willful monitoring of such telephone calls illegal when at least part of the conversation is carried by wire. Second, unlike many signals which are more commonly scanned, the design of the cellular telephone system makes the intentional monitoring of specific calls more difficult because**3562 *8** they are handed off among cells. The Committee is not convinced that these arguments overcome the need for protection of privacy interests.

It has been suggested that the Federal Communications Commission consider labeling requirements on cellular telephones, radio scanning equipment and private satellite video communications. The Commission might consider the feasibility of requiring that cellular telephones be labeled to indicate that cellular calls are radio-based communications, and as such, portions of the communication may be intercepted by available scanning equipment and of requiring that scanning equipment be labeled to indicate that the intentional interception of protected communications could be a Federal criminal violation. Finally, the Commission might consider the feasibility of requiring those who transmit private satellite video communications to periodically transmit a crawl across the bottom of the screen indicating that such communications are protected.

## IV. GLOSSARY

For reference, some of the new telecommunications and computer technologies referred to in the Electronic Communications Privacy Act of 1986 and this report are described briefly below. Treatment of these and other technologies under current law is discussed in the House Report to its companion measure, H.R. 4952. *See* House Report 99–647.

## ELECTRONIC MAIL

Electronic mail is a form of communication by which private correspondence is transmitted over public and private telephone lines. In its most common form, messages are typed into a computer terminal, and then transmitted over telephone lines to a recipient computer operated by an electronic mail company. If the intended addressee subscribes to the service, the message is stored by the company's computer 'mail box' until the subscriber calls the company to retrieve its mail, which is then routed over the telephone system to the recipient's computer. If the addressee is not a subscriber to the service, the electronic mail company can put the message onto paper and then deposit it in the normal postal system.

Electronic mail systems may be available for public use or may be proprietary, such as systems operated by private companies for internal correspondence.

## COMPUTER-TO-COMPUTER COMMUNICATIONS

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Common computer-to-computer communications include the transmission of financial records or funds transfers among financial institutions, medical records between hospitals and/or physicians' offices, and the transmission of proprietary data among the various offices of a company.

## ELECTRONIC BULLETIN BOARDS

Electronic 'bulletin boards' are communications networks created by computer users for the transfer of information among computers.**3563 *9 These may take the form of proprietary systems or they may be noncommercial systems operating among computer users who share special interests. These noncommercial systems may involve fees covering operating costs and may require special 'passwords' which restrict entry to the system. These bulletin boards may be public or semi-public in nature, depending on the degree of privacy sought by users, operators or organizers of such systems.

## MICROWAVE

Microwave consists of extremely high frequency radio waves transmitted point-to-point on line-of-sight paths between antennas located on towers or building tops (in terrestrial microwave systems) and between satellites and earth station 'dish' antennas (in satellite-based systems).

## CELLULAR TELEPHONES

In 1981 the Federal Communications Commission approved the use of cellular telephone services. This technology uses both radio transmission and wire to make 'portable' telephone service available in a car, a briefcase, or in rural areas not reached by telephone wire.

In a cellular radiotelephone system, large service areas are divided into honeycomb-shaped segments or 'cells'—each of which is equipped with a low-power transmitter or base station which can receive and radiate messages within its parameters. When a caller dials a number on a cellular telephone, a transceiver sends signals over the air on a radio frequency to a cell site. From there the signal travels over phone lines or a microwave to a computerized mobile telephone switching office ('MTSO') or station. The MTSO automatically and inaudibly switches the conversation from one base station and one frequency to another as the portable telephone, typically in a motor vehicle, moves from cell to cell.

Cellular technology, because it is more complex, is more difficult to intercept than traditional mobile telephones; it is, however, more accessible than microwave transmissions. Cellular telephone calls can be intercepted by either sophisticated scanners designed for that purpose, or by regular radio scanners modified to intercept cellular calls.

## CORDLESS TELEPHONES

A cordless telephone consists of a handset and a base unit wired to a landline and a household/business electrical current. A communication is transmitted from the handset to the base unit by AM or FM radio signals. From the base unit the communication is transmitted over wire, the same as a regular telephone call. The radio portions of these telephone calls can be intercepted with relative ease using standard AM radios.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ELECTRONIC PAGERS

Electronic pagers are radio activated devises through which a user is notified of another's attempt to contact the carrier of the portable paging unit. These are in wide use among persons who are away from their homes or offices—or, more precisely, away from **3564 *10 telephones or two-way radios—yet still need to be reachable by others.

Pagers take on one of three basic forms: 'tone only,' 'display' and 'tone and voice pagers.' The 'tone only' device emits a 'beep' or other signal to inform the user that a message is waiting, and where that message can be retrieved by the user's making a phone call to a predetermined number (usually an office or answering service). 'Display' pagers are equipped with screens that can display visual messages, usually the telephone number of the person seeking to reach the person being paged. The party seeking to make contact with the user is instructed to provide a message, usually by pushing the buttons of a touch-tone telephone; this message is stored by the paging company's computer until it can be transmitted to the user's pager, where the message can then be read directly by the user, obviating the need for the user to make a telephone call to retrieve the message. The most sophisticated type of pager is the 'tone and voice' model. It can receive a spoken message that the paging company's computer has taken from the party seeking to contact the unit's user. After the beep tone is made, the device 'repeats' the recorded message. This requires that a radio signal containing voice communications be sent from the paging company's base to the mobile unit.

PEN REGISTERS/TRAP AND TRACE DEVICES

Pen registers are devices that record the telephone numbers to which calls have been placed from a particular telephone. These capture no part of an actual telephone conversation, but merely the electronic switching signals that connect two telephones. The same holds true for trap and trace devices, which record the numbers of telephones from which calls have been placed to a particular telephone.

ELECTRONIC TRACKING DEVICES (TRANSPONDERS)

These are one-way radio communication devices that emit a signal on a specific radio frequency. This signal can be received by special tracking equipment, and allows the user to trace the geographical location of the transponder. Such 'homing' devices are used by law enforcement personnel to keep track of the physical whereabouts of the sending unit, which might be placed in an automobile, on a person, or in some other item.

REMOVE COMPUTER SERVICES

In the age of rapid computerization, a basic choice has faced the users of computer technology. That is, whether to process data inhouse on the user's own computer or on someone else's equipment. Over the years, remote computer service companies have developed to provide sophisticated and convenient computing services to subscribers and customers from remote facilities. Today businesses of all sizes—hospitals, banks and many others—use remote computing services for computer processing. This processing can be done with the customer or subscriber using the facilities of the remote computing service in essentially a time-sharing arrangement, or it can be accomplished by the service provider on the basis of information **3565 *11 supplied by the subscriber or customer. Data is most often transmitted between these services and their customers by means of electronic communications.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

V. SECTION-BY-SECTION ANALYSIS

*Section 1* provides that the short title of the bill is the 'Electronic Communications Privacy Act of 1986.'

TITLE I—INTERCEPTION OF COMMUNICATIONS AND RELATED MATTERS

Under current law, the interception of wire and oral communications are governed by chapter 119 of title 18 (18 U.S.C. 2510 et seq.). Title I of the Electronic Communications Privacy Act expands chapter 119 to take into account modern advances in electronic telecommunications and computer technology.

*Section 101—Federal penalties for the interception of communications*

Definitions for terms used in chapter 119 and new chapter 121 of title 18 are set out in section 101 of the bill. This section also describes conduct which is not unlawful under this Act and modifies the penalties set out in existing section 2511 of title 18. It provides that the remedies in chapter 119 are the exclusive statutory remedies for violations of this chapter. Technical amendments to chapter 119 are also included in Section 101 of the bill.

*Subsection 101(a)—Definitions*

Subsection 101(a) of the Electronic Communications Privacy Act sets out the definitions and amendments to definitions used in chapter 119 and new chapter 121 of title 18. Paragraph 101(a)(1) amends the definition of the term 'wire communication' in subsection 2510(1) of title 18.

Subparagraph (A) amends that definition to include aural transfers. As defined in proposed subsection 2510(18) of title 18, 'aural transfers' are those which include the human voice at any point between and including the points of origin and reception.

Subparagraph (B) specifies that the use of wire, cable or other similar connections for the transmission of communications includes the use of such connections in a switching station. This subparagraph makes clear that cellular communications—whether they are between two cellular telephones or between a cellular telephone and a 'land line' telephone—are included in the definition of 'wire communications' and are covered by the statute. As noted below, the bill distinguishes between cordless and cellular telephones.

Recognizing that since deregulation and the divestiture of AT&T, many different companies, not just common carriers, offer and use telephone and other communications services, subparagraph (C) deletes from the definition of 'wire communication' the requirement that communications must be transmitted via common carrier to be covered by the federal wiretap statute.

Subparagraph (D) specifies that wire, cable or similar connections furnished or operated by any person engaged in providing or operating such facilities for the transmission of 'communications **3566 *12 affecting interstate or foreign commerce,' are within the definition of a 'wire communication.' This language recognizes that private networks and intra-company communications systems are common today and brings them within the protection of the statute. However, that language is not meant to suggest that the Electronic Communications Privacy Act applies to interceptions made outside the territorial United States. Like the Omnibus Crime Control and Safe Streets Act of 1968 which it revises, the Electronic Communications Privacy Act regulates only those interceptions conducted within the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

territorial United States.

The Senate Judiciary Committee's Subcommittee on Patents, Copyrights and Trademarks amended subparagraph (D) to specify that wire communications in storage like voice mail, remain wire communications, and are protected accordingly.

The combined effect of subparagraphs (A) through (D) is to clarify that the term 'wire communication' means the transfer of a communication which includes the human voice at some point. The transfer must be made in whole or in part through the use of communication transmission facilities by the aid of wire, cable, or other like connection, including fiber optics. The facilities may be furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or he may provide or operate those facilities for the transmission of communications affecting interstate or foreign commerce.

Thus, a wire communication encompasses the whole of a voice telephone transmission even if part of the transmission is carried by fiber optic cable or by radio—as in the case of cellular telephones and long distance satellite or micowave facilities. The conversion of a voice signal to digital form for purposes of transmission does not render the communication non-wire. The term 'wire communication' includes existing telephone service, and digitized communications to the extent that they contain the human voice at the point of origin, reception, or some point in between. A private telephone system established by a company whose activities affect interstate commerce, would also be covered.

It should be noted that an improperly mechanical reading of the phrase 'in whole or in part * * * by the aid of wire * * *' could sweep in virtually all voice communications made with the aid of any electronic equipment, inasmuch as virtually all such equipment includes in its assembly some length of wire or the equivalent. The quoted is intended to refer to wire that carries the communication to a significant extent from the point of origin to the point of reception, even in the same building. It does not refer to wire that is found inside the terminal equipment at either end of the communication.

Subparagraph (D) specifies that the term 'wire communication' does not include the radio portion of a cordless telephone communication transmitted between the cordless handset and the base unit. Because communications made on some cordless telephones can be intercepted easily with readily available technologies, such as an AM radio, it would be inappropriate to make the interception of such a communication a criminal offense. The wire portion of a cordless communication remains fully covered, however.

**\*\*3567 \*13** Section 101(a)(2) of the Electronic Communications Privacy Act amends the definition of 'oral communication' in current section 2510(2) of title 18 to exclude electronic communications. There have been cases involving radio communications in which the court having determined that the radio communication was not a wire communication then analyzes it in privacy terms to determine if it is an oral communication. The bill rejects that analysis by excluding electronic communications from the definition of oral communications.

An oral communication is an utterance by a person under circumstances exhibiting an expectation that the communication is not subject to interception, under circumstances justifying such an expectation. In essence, an oral communication is one carried by sound waves, not by an electronic medium.

Section 101(a)(3) of the Electronic Communications Privacy Act amends the definition of the term 'intercept' in current section 2510(4) of title 18 to cover electronic communications. The definition of 'intercept' under current law is retained with respect to wire and oral communications except that the term 'or other' is inserted after 'aural.' This amendment clarifies that it is illegal to intercept the non-voice portion of a wire communication. For example, it is illegal to intercept the data or digitized portion of a voice communication.

Subsection 101(a)(4) of the Electronic Communications Privacy Act amends existing section 2510(5) of title 18 to clarify that telephone equipment provided by the user and connected to the facilities of a service provider is not an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

'electronic, mechanical or other device,' provided that it is used in the ordinary course of the user's business.

The Committee notes that proposed section 2510's definition of an 'electronic, mechanical or other device' includes any combination of parts designed or intended for use in converting those parts into such a device or apparatus and from which such a device or apparatus may be readily assembled. The Committee also notes that section 2512, as amended by the Electronic Communications Privacy Act, prohibits the manufacture, distribution, possession, and advertising only of devices primarily useful for surreptitious interception.

Subsection 101(a)(5) of the Electronic Communications Privacy Act amends current section 2510(8) of title 18 to exclude from the definition of the term 'contents,' the identity of the parties or the existence of the communication. It thus distinguishes between the substance, purport or meaning of the communication and the existence of the communication or transactional records about it.

The Supreme Court has clearly indicated that the use of pen registers does not violate either chapter 119 of title 18 or the fourth amendment. Subsection 101(a)(5) of this legislation makes that policy clear. It should be read in conjunction with Title III of the Electronic Communications Privacy Act which adds new chapter 206 on pen registers and trap and trace devices to title 18. Subsection 101(a)(5) of the bill does not affect the installation or use of pen registers under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. 1801 et. seq. Similarly, the omission of a conforming amendment to the definition of 'contents' in section 705 of **3568 *14 title 47 is not intended to affect the current law under that section with respect to pen registers. The use of pen registers has been found not to violate section 705. See *Hodge* v. *Mountains Tel. & Telegraph Co.*, 555 F.2d 254 (9th Cir. 1977).

Subsection 101(a)(6) of the Electronic Communications Privacy Act adds to section 2510 of title 18 definitions for the terms 'electronic communication,' 'electronic communications system,' 'electronic communication service,' 'readily accessible to the general public,' 'electronic storage,' and 'aural transfer.'

An 'electronic communication' is defined in proposed subsection 2510(12) of title 18 as 'any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or a photooptical system that affects foreign or interstate commerce.' The following are explicitly excluded from the definition: (A) the radio portion of a cordless telephone communication transmitted between the cordless phone handset and the base unit; (B) any wire or oral communication; (C) any communication made through a tone-only paging device; (D) any communication from a tracking device.

As a general rule, a communication is an electronic communication protected by the federal wiretap law if it is not carried by sound waves and cannot fairly be characterized as containing the human voice. Communications consisting solely of data, for example, and all communications transmitted only by radio are electronic communications. This term also includes electronic mail, digitized transmissions, and video teleconferences. Although radio communications are within the scope of the Act, the provisions of the Electronic Communications Privacy Act directed specifically to radio do not affect the applicability of section 705 of the Communications Act of 1934, as amended, to actions by members of the public.

Under proposed subsection 2510(13), the term 'user' is defined as any person or entity who (A) uses an electronic communication service and (B) is duly authorized by the service provider to do so.

An 'electronic communication system' is defined in proposed subsection 2510(14). Such a system encompasses any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of electronic communications as well as any computer facilities or related electronic equipment for the electronic storage of such communications.

An 'electronic communication service' is defined in proposed subsection 2510(15) of title 18 as a service which provides its users the ability to send or to receive wire or electronic communications. Such services can be provided through the same facilities. Existing telephone companies and electronic mail companies are providers of electronic

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

communication services. Other services like remote computing services may also provide electronic communication services.

Radio communications 'readily accessible to the general public' are defined in proposed subsection 2510(16). Radio communications are considered readily accessible to the general public unless they fit into one of five specified categories.

**3569 *15 As described below, subsection 101(b) of the Electronic Communications Privacy Act provides an exception to the general prohibitions on interception for electronic communications which are configured to be readily accessible to the general public. Thus, the radio communications specified in proposed subsection 2510(16) are afforded privacy protections under this legislation unless another exception applies.

As specified in paragraph (A) of proposed subsection 2510(16), scrambled or encrypted radio communications are not readily accessible to the general public. The terms are used in their technical sense. To 'encrypt' or to 'scramble' means to convert the signal into unintelligible form by means intended to protect the contents of a communication from unintended recipients. Methods which merely change the form of a plaintext message, e.g., a device which converts an analog signal to a digital stream, does not provide 'encryption' within the meaning of this bill. Nor does the use of a word code, no matter how sophisticated, amount to scrambling or encryption. Examples of scrambling techniques which are currently available include the data encryption standard (DES).

As specified in paragraph (B) radio communications transmitted through modulation techniques whose essential parameters have been withheld from the public in order to preserve the privacy of the communication are not readily accessible to the general public. This paragraph (B) refers to spread spectrum radio communications. Spread spectrum technology usually involves the transmission of a signal on different frequencies where the receiving station must possess the necessary algorithm in order to reassemble the signal.

As specified in paragraph (C) of proposed subsection 2510(16) of title 18, radio communications carried on a subcarrier or other signal subsidiary to a radio transmission are protected by the Electronic Communications Privacy Act. This category includes, for example, data and background music services carried on FM subcarriers. It also includes data carried on the Vertical Blanking Interval (VBI) of a television signal.

Radio communications transmitted over a system provided by a common carrier are not readily accessible to the general public with one exception. That exception is for tone-only paging systems. As a result of that exception, the interception of tone-only paging system transmissions will not be prohibited by this law. However, the unauthorized interception of a display paging system, which involves the transmission of alphanumeric characters over the radio, carried by a common carrier, is illegal.

As specified in proposed paragraph (E), radio communications transmitted on frequencies allocated under parts 25 and 94 and subparts D, E, an F of part 74 of the FCC rules are protected by the Electronic Communications Privacy Act. These communications include satellite communications, auxiliary broadcast services and private microwave services, each of which routinely carries private business or personal communications. Two-way voice radio communications made on frequencies shared with services outside part 74 are expressly excluded from this category of protected communications.

**3570 *16 The liability incurred under chapter 119 for the interception of the communications described in proposed paragraph 2510(16(E) may be limited. Section 101(b) of the Electronic Communications Privacy Act sets out exceptions from liability under this Act with respect to electronic communications and section 101(d) establishes the penalty structure for violations of this Act.

The term 'electronic storage' is defined in proposed subsection 2510(7) of title 18. Electronic storage means (A) the temporary, intermediate storage of a wire or electronic communication incidental to its transmission as well as (B) the storage of such communication by an electronic communications service for backup protection. The term covers

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

storage within the random access memory of a computer as well as storage in any other form including storage of magnetic tapes, disks or other media. Thus, for example, section 2701's prohibitions against unauthorized access to wire or electronic communications while they are in electronic storage would prohibit unauthorized access to such a communication while it is stored on magnetic tape or disk. The section 2701 prohibitions similarly would apply to information held on magnetic tape or disk pursuant to an agreement to provide remote computing services.

The last new definition in subsection 101(a)(6) of the Electronic Communications Privacy Act is the definition of an 'aural transfer' in proposed subsection 2510(18). An aural transfer means any transfer containing the human voice at any point between and including the points of origin and reception. Under this definition, voice messages transferred over a paging system are protected. It is intended that computer-generated or otherwise artificial voices are not included in this definition and thus will not be part of a 'wire communication.' They would, however, be part of an 'electronic communication.'

It is important to recognize that a transaction may consist, in part, of both electronic communications and wire or oral communications as those terms are defined in section 2510 of title 18, as amended by the Electronic Communications Privacy Act. Accordingly, different aspects of the same communication might be characterized differently. For example, the transmission of data over the telephone is an electronic communication. If the parties use the line to speak to one another between data transmissions, those communications would be wire communications. At the same time, for a person overhearing one end of the telephone conversation by listening in on the oral utterances of one of the parties, those utterances are oral communications.

Although this bill does not address questions of the application of title III standards to video surveillance and only deals with the interception of closed circuit television communications to a limited extent, closed circuit television communications do provide another example of the importance of, and the interrelationship between, the definitions contained in this legislation. If a person or entity transmits a closed circuit television picture of a meeting using wires, microwaves or another method of transmission, the transmission itself would be an electronic communication. Interception of the picture at any point without either consent or a court order would be a violation of the statute. By contrast, if law enforcement officials were to install their own cameras and create their own **3571 *17 closed circuit television picture of a meeting, the capturing of the video images would not be an interception under the statute because there would be no interception of the contents of an electronic communication. Intercepting the audio portion of the meeting would be an interception of an oral communication, and the statute would apply to that portion.

*Section 101(b)—Exceptions with respect to electronic communications*

Subsection 2511(1) of title 18 of the United States Code sets out prohibitions against the interception, disclosure and use of wire or oral communications. Subsection 2511(2) specifies conduct which is not unlawful under chapter 119 of title 18.

Subsection 101(b) of the Electronic Communications Privacy Act amends Subsection 2511(2). Paragraph 101(b), consistent with other provisions of this legislation, deletes references to common carriers. It thus clarifies that any service provider who discloses the existence of an interception or surveillance or the device used to accomplish the interception or surveillance would be liable for civil damages under Section 2520 of title 18.

Paragraph 101(b)(2) of the Electronic Communications Privacy Act amends section 2511(2)(d) of title 18 by striking out 'or for the purpose of committing any other injurious act'. Under current Federal law it is permissible for one party to consent to the interception of a conversation unless that interception is for illegal, tortious or other injurious purposes such as blackmail. In numerous court cases the term 'other injurious purposes' has been misconstrued. Most troubling of these cases have been attempts by parties to chill the exercise of first amendment rights through the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

use of civil remedies under this chapter. For example, in *Boddie* v. *American Broadcasting Co.*, 731 F.2d 333 (6th Cir. 1984), the plaintiff, whose conversations were recorded by a journalist, sued. Despite the consent of the reporter who was a party to the conversation, the plaintiff claimed that the recording of the conversation was illegal because it was done for an improper purpose, to embarrass her. While the appeals court decision in *Boddie* merely sent the case back for further factual development, it is clear from the facts of the case that the term 'improper purpose' is overly broad and vague. The court's opinion suggests that if the network intended to cause 'insult and injury' to plaintiff Boddie, she might be entitled to recover. This interpretation of the statute places a stumbling block in the path of even the most scrupulous journalist. Many news stories have been brought to light by recording a conversation with the consent of only one of the parties involved—often the journalist himself. Many news stories are embarrassing to someone. The present wording of section 2511(2)(d) not only provides such a person with a right to bring suit, but it also makes the actions of the journalist a potential criminal offense under section 2511, even if the interception was made in the ordinary course of responsible news-gathering activities and not for the purpose of committing a criminal act or a tort. Such a threat is inconsistent with the guarantees of the first amendment. Inasmuch as chapter 119 as amended by the Electronic Communications Privacy Act continues to prohibit interceptions made for the purpose of committing either a **3572 *18 crime or a tort (including defamation), the public will be afforded ample portection against improper or unscrupulous interception.

Subsection 101(b)(3) of the Electronic Communications Privacy Act amends section 2511(2)(f) of title 18 to clarify that nothing in chapter 119 as amended or in proposed chapter 121 affects existing legal authority for U.S. Government foreign intelligence activities involving foreign electronic communications systems. The provision neither enhances nor diminishes existing authority for such activities; it simply preserves the status quo. It does not provide authority for the conduct of any intelligence activity.

Further the Senate expects that the practice of providing to the House and Senate Intelligence Committees proposed changes in relevant executive branch procedures and regulations governing the conduct of intelligence activities, including those involving electronic surveillance, physical searches, and the minimization of information collected concerning U.S. persons will be continued. As in the past, the Senate expects that any relevant changes in these procedures and regulations will be provided to the Senate and House Intelligence Committees prior to their taking effect.

Finally, since Congress last addressed the issue of privacy communications in a comprehensive fashion, the technologies of communication and interception have changed dramatically, and are expected to continue to do so. These factors have raised serious issues about the protection of the privacy interests of U.S. citizens, which are of great concern to the Senate and to the American people. For this reason, the Senate wishes to emphasize the obligation of the heads of intelligence agencies to continue to keep the Select Committee on Intelligence fully and currently informed of all intelligence activities pursuant to title V of the National Security Act of 1947.

Subsection 101(b)(4) of the Electronic Communications Privacy Act amends section 2511(2)(g) of title 18 of the United States Code. It sets out new exemptions from criminal liability applicable to the technologies which this legislation adds to the privacy protections of the federal wiretap law. Proposed section 2511(2)(g) provides that it shall not be unlawful under chapters 119 or 121 of title 18 for any person to engage in the conduct described in its five subparagraphs.

Under proposed section 2311(2)(g)(i), it is permissible to intercept electronic communications made through an electronic communication system configured so that the communication is 'readily accessible to the general public.' That term is defined with respect to radio communications in proposed section 210(16) of title 18. The term 'configure' is intended to establish an objective standard of design configuration for determining whether a system receives privacy protection.

Under this provision, it would not be unlawful to intercept subcarrier and UBI communications that are transmitted

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

for the use of the general public. Such 'public' communications would include the stereo subcarrier used in FM broadcasting or data carried on the VBI to provide closed-captioning of TV programming for the hearing-impaired.

Under proposed section 2511(g)(ii) it is permissible to intercept any radio communication which is transmitted (I) by any station **3573 *19 for the use of the general public, or that relate to ships, aircraft, vehicles or persons in distress; (II) by any government, law enforcement, civil defense, private land mobile or public safety communications system (including police and fire), that is readily accessible to the general public; (III) by a station operating on an authorized frequency within the bands allocated to amateur, citizens band or general mobile radio services; or (IV) by any marine or aeronautical communications system.

Traditionally, these radio communications have been free from prohibitions on mere interception. Amateur radio communications, including those utilizing telephone interconnect or amateur radio computer linked message systems are certainly not those to which this legislation is aimed. All amateur radio communications conducted on radio frequencies allocated to the Amateur Radio Services are exempt from this bill's prohibitions against the interception of electronic communications.

Radio services readily accessible to the general public are exempt from this act's prohibitions against interception by the generic exception contained in proposed paragraph 2511(2)(g)(i).

Proposed section 1511(2)(g)(iii) addresses conduct which is either prohibited or permitted by the Communications Act of 1934, as amended. Under clause (I) of subparagraph (iii) it is not unlawful under chapter 119 or 121 of title 18 for any person to engage in conduct prohibited by section 633 of the Communications Act of 1934 relating to cable piracy. If an individual violates the criminal prohibitions in section 633 of the Communications Act, he cannot also be charged under chapters 119 or 121 of title 18.

Clause (II) exempts from the prohibitions on interception contained in this Act conduct which is excepted from section 705(a) of the Communications Act by virtue of section 705(b) of that Act. Thus, if conduct is permitted under section 705(b) of the Communications Act, engaging in that conduct would not be a crime under chapters 119 or 121 of title 18, as amended by the Electronic Communications Privacy Act. Determination of whether conduct is permitted under section 705(b) must, of course, be the result of an examination of the statute, relevant legislative history, existing court interpretations and constructions given the statute by appropriate federal regulatory entities.

Proposed section 2511(2)(g)(iv) of title 18 exempts from the criminal prohibition contained in chapters 119 and 121 of that title, the interception of any wire or electronic communication the transmission of which is causing harmful interference to any lawfully operating station, to the extent necessary to identify the source of such interference.

Finally, proposed section 2511(2)(g)(v) exempts interceptions of radio communication by other users of the same frequency when such communication is made through a system that utilizes frequencies monitored by individuals engaged in the provision or use of such a system. This exemption clarifies that it is not unlawful for users of the same frequency, who must listen to be sure a channel is clear before using it, to do so. The exception applies to users of common and non-common carrier systems, but does not apply if the communication is scrambled or encrypted.

**3574 *20 Subsection 101(b)(4) of the Electronic Communications Privacy Act amends subsection 2511(2) of title 18 to add a new paragraph (h) to that subsection. Proposed subparagraph (i) of paragraph (h) clarifies that the use of pen registers and trap and trace devices are not regulated by chapter 119 of title 18. The use of those devices will be regulated by new chapter 206 of title 18 as amended by the Electronic Communications Privacy Act.

Subparagraph (ii) of paragraph (h) states that no violation of this chapter occurs if a provider of wire or electronic communication service records the fact that a communication was initiated or completed in order to protect such provider, another provider furnishing service toward the completion of the wire or electronic communication or a user of that service, from fraudulent, unlawful or abusive use of such a service. This provision permits the electronic and wire communication providers to protect themselves and their customers.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Subsection 101(c)—Technical and conforming amendments*

Subsection (c) sets out technical and conforming amendments to chapter 119 of title 18. Paragraph (c)(1) adds 'electronic communication' in appropriate places throughout the chapter. Paragraph (c)(2) amends the heading of the chapter. Paragraph (c)(3) amends the table of chapters to add electronic communications to the table. Paragraphs (4), (5), (6), (7), and (8) of subsection 101(c) of the Electronic Communications Privacy Act make appropriate technical amendments to delete the term 'common carrier' and substitute in its place 'provider of wire or electronic communication.'

Section 2511(2)(a)(i), as amended, specifies that it is not unlawful for the employees of providers of wire or electronic communication services to intercept, disclose or use customer communications in the normal course of employment while engaged in any activity which is a necessary incident to the rendition of the service or to the protection of the rights or property of the provider, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality checks.

In applying the second clause only to wire communications, this provision reflects an important technical distinction between electronic communications and traditional voice telephone service. The provider of electronic communications services may have to monitor a stream of transmissions in order to properly route, terminate, and otherwise manage the individual messages they contain. These monitoring functions, which may be necessary to the provision of an electronic communication service, do not involve humans listening in on voice conversations. Accordingly, they are not prohibited. In contrast, the traditional limits on service 'observing' and random 'monitoring' do refer to human aural interceptions and are retained with respect to voice or 'wire' communications.

*Subsection 101(d)—Penalties modification*

Subsection 101(d) of the Electronic Communications Privacy Act modifies the general penalty structure for violations of this chapter. It sets out proposed subsections (4) and (5) of section 2511 of title 18. Subsection (4) sets out the criminal penalties for violations **\*3575 \*21** of subsection 2511(1). Subsection (5) outlines the injunctive relief available to the federal government in the case of specified conduct related to private satellite video communications that are not scrambled or encrypted and to communications transmitted on frequencies allocated under subpart D of part 74 of the FCC rules that are not scrambled or encrypted.

The general rule as set out in proposed paragraph 2511(4)(a) is that a violation is punishable as a 5-year felony. Unless one of the exceptions in proposed subsection 2511(4)(b) or subsection 2511(5) applies, a person violating section 2511(1) will be liable for a fine under this chapter, imprisonment up to 5 years, or both. The fines under the chapter are set by section 3623 of title 18. That section provides for a different maximum fine level for felonies or misdemeanors resulting in death. Individual defendants can be fined up to $250,000 and organizations can be fined up to $500,000.

As stated in proposed paragraph 2511(14)(b), the first exception to the general rule that violations are 5-year felonies, applies to unscrambled, unencrypted radio communications provided that the conduct is a first offense and is not for a tortious or illegal purpose or purposes of direct or indirect commercial advantage or private financial gain. If the radio communication is scrambled or encrypted, if the person violating the statute has been found guilty of a prior offense, or if his conduct was for one of the enumerated bad purposes, the conduct remains punishable as a 5-year felony.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

As stated in subparagraph (ii) of proposed paragraph 2511(4)(b), for first offenders whose conduct was not for one of the enumerated bad purposes, if the communication is not scrambled or encrypted and it is the radio portion of a cellular telephone, public land mobile radio service or paging service communication, then the violator will be subject to a $500 criminal fine. Otherwise, as stated in clause (i) of proposed paragraph 2511(4)(b), the conduct is punishable as a one-year misdemeanor with fines of up to $100,000, 18 U.S.C. 3623, unless the conduct is that described in subsection (5).

It should be noted that the exceptions set out in proposed paragraph 2511(4)(b) apply only to radio communications. The interception of 'wire' communications remain punishable as five-year felonies. The interception of the wire portion of a cellular telephone call, for example, is a five-year felony.

Proposed paragraph 2511(4)(c) decriminalizes certain conduct unless it is for the purposes of direct or indirect commercial advantage or private financial gain. The terms 'direct or indirect commercial advantage or private financial gain' are intended to have the same meaning as those terms have when they are used in 47 U.S.C. 705(b).

This exception from the criminal provisions of the Electronic Communications Privacy Act applies to the interception of an unencrypted, unscrambled satellite transmission that is transmitted (i) to a broadcasting station for purposes of retransmission to the general public; or (ii) as an audio subcarrier intended for redistribution to facilities open to the public, but not including data transmissions or telephone calls. The conduct described in subparagraphs (i) and (ii) is not an offense under this chapter and is not subject to civil liability under this chapter.

**3576 *22 Subparagraph (i) descriminalizes the interception of 'network feeds' under title 18. Such conduct will be governed exclusively by section 705 of the Communications Act (47 U.S.C. 705).

Subparagraph (ii) descriminalizes the interception of material transmitted as an audio subcarrier provided that the information is intended for redistribution to facilities open to the public. Audio subcarriers intended for redistribution to facilities open to the public include those for redistribution by broadcast stations, cable TV systems and like facilities. They also include those for redistribution to buildings open to the public, and thus, it would not be unlawful to intercept music transmitted via an audio subcarrier if it is intended for redistribution to buildings like hospitals and office buildings which pump music into their lobbies and other public areas.

Subparagraph (ii) does not apply to data transmissions or telephone calls. The interception of those transmissions, like the interception of transmissions made for the enumerated bad purposes, would be punishable as 5-year felonies.

The private viewing of satellite cable programming, network feeds and certain audio subcarriers will continue to be governed exclusively by section 705 of the Communications Act of 1934, as amended, and not by chapter 119 of title 18 of the United States Code.

A new government action for injunctive relief is set out in proposed subsection 2511(5) of title 18. This new subsection was created to underscore that this public injunctive action is distinct from the criminal penalties set out in subsection (4).

Its exceptions apply only if the communication is not scrambled or encrypted and the conduct is not for one of the enumerated bad purposes. Clause (A) refers to the private or home viewing of a private satellite video communication. With regard to the home viewing of private satellite video communications, for purposes of this provision and proposed section 2520, the Committee views as scrambling that type of multiplexing[4] in which the audio and video portions of a communication are split, requiring special equipment to reassemble the whole communication (generally a videoteleconference) before it can be received in intelligible form. Clause (B) refers to radio communications transmitted on frequencies allocated under subpart D of part 74 of the FCC rules.

Under proposed clause 2511(5)(a)(ii)(A), if the violation is a first offense and the person has not previously been found liable in a private civil action under section 2520 of title 18, the government may sue for appropriate injunctive relief. Under proposed clause (B) if the violation is a second or subsequent offense or the person has previously been

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

found liable under section 2520, he shall be subject to a mandatory $500 civil fine.

Proposed paragraph (b) of subsection 2511(5) clarifies that the court may use any means within its existing authority, including civil or criminal contempt, to enforce an injunction issued to an individual under this subsection. Paragraph (b) also requires that the court impose a civil fine of $500 or more for each violation of such **3577 *23 an injunction. The term 'violation' in this context refers to each viewing of a private video communication and to each reception of a part 74 D radio communication.

*Subsection 101(e)—Exclusivity of remedies with respect to electronic communications*

Subsection 101(e) of the Electronic Communications Privacy Act amends subsection 2518(10) of title 18 to add a paragraph (c) which provides that with respect to the interception of electronic communications, the remedies and sanctions described in this chapter are the only judicial remedies and sanctions available for nonconstitutional violations of this chapter involving such communications. In the event that there is a violation of law of a constitutional magnitude, the court involved in a subsequent trial will apply the existing Constitutional law with respect to the exclusionary rule.

The purpose of this provision is to underscore that, as a result of discussions with the Justice Department, the Electronic Communications Privacy Act does not apply the statutory exclusionary rule contained in title III of the Omnibus Crime Control and Safe Streets Act of 1968 to the interception of electronic communications.

Similarly, the Electronic Communications Privacy Act does not amend the Communications Act of 1934. Conduct in violation of that statute, will continue to be governed by that statute.

*Subsection 101(f)—State of mind*

Subsection 101(f) of the Electronic Communications Privacy Act changes the state of mind required to violate section 2511 or section 2512 of title 18 of the United States Code from 'willful' to 'intentional.' The purpose of this amendment is to underscore that inadvertent interceptions are not crimes under the Electronic Communications Privacy Act.

As used in the Electronic Communications Privacy Act, the term 'intentional' is narrower than the dictionary definition of 'intentional.' 'Intentional' means more than that one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective. An 'intentional' state of mind means that one's state of mind is intentional as to one's conduct or the result of one's conduct if such conduct or result is one's conscious objective. The intentional state of mind is applicable only to conduct and results. Since one has no control over the existence of circumstances, one cannot 'intend' them.

As indicated in the Judiciary Committee's report to accompany the Criminal Code Reform Act of 1981 (S. 1630):

The highest degree of culpability is present if a person engages in conduct (or causes a result) *intentionally*, that is, 'if it is his conscious objective or desire to engage in the conduct (or cause the result).' A common means to describe conduct as intentional, or to say that one causes the result intentionally, is to state that it is done or accomplished 'on purpose.'

**3578 *24 The term 'intentional' is not meant to connote the existence of a motive. Liability for intentionally engaging in prohibited conduct is not dependent on an assessment of the merit of the motive that led the person to disregard the law. (Emphasis in original; citation omitted.) Report of the Committee on the Judiciary, United States Senate, to accompany S. 1630, Criminal Code Reform Act of 1981, Report 97–307 at 67.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Committee went on to point out that people who steal because they like to or to get more money or to feed the poor, like Robin Hood, all commit the same crime. Id. The word 'intentional' describes the mental attitude associated with an act that is being done on purpose. It does not suggest that the act was committed for a particular evil purpose.

At this point, it is important to note that the crime of interception under the Electronic Communications Privacy Act consists of the intentional acquisition of the contents of a wire, electronic or oral, communication through the use of any electronic, mechanical, or other device. Some groups which engage in testing were concerned that the picking up of the contents of a communication incident to those tests might be considered a crime under title III as amended by the Electronic Communications Privacy Act.

They then sought exemptions from liability under proposed paragraph 2511(2)(g). The Subcommittee on Patents, Copyrights and Trademarks rejected this approach solely because it feared application of the principle of statutory construction of 'expressio unius, est exclusio alterius' would encourage courts to treat similar tests as unlawful.

For example, since the early 1960s, motor vehicle manufacturers and others have been committed to voluntary actions to make their products 'good citizens' in the electromagnetic environment. That commitment has fostered the development of test procedures and programs resulting in systems to help ensure that the electromagnetic energy radiated from equipment such as motor vehicles, agricultural and construction machinery, engines for transportation, marine, industrial and consumer applications, electronic equipment and components of the foregoing do not interfere with signals carrying video, voice or data transmissions. Personal, business and entertainment radio, television, digital data communications, and radio navigation services are examples of services benefited by such test procedures and programs.

The equipment for measuring the test procedures and technical specifications by which electromagnetic radiation from motor vehicles typically includes an antenna for picking up electromagnetic energy radiated from the vehicle, and a radio receiver for scanning the frequency range from 20 or 30 to 1,000 MHz to determine the field strength of all emissions in that range which the antenna picks up.

The antenna picks up not only the electromagnetic emissions from the equipment being tested, but also any other signals present at the antenna location. Indeed, to be able to quantify the strength of the emissions to be measured, even though additional signals are present at the frequency on which the measurement is being made, **3579 *25 the procedures and programs specify initial measurement of these additional signals. Of course, any radio service operating in the scanned frequency range will be picked up and its field strength measured during both the baseline and the vehicle tests. Although occasionally a speaker will be used to verify that a radio service is indeed producing a high field strength reading, in virtually all of the testing there is not attempt to ascertain the substance, purport or meaning of the signal.

Similar equipment and procedures are used to measure electromagnetic radiation emitted by computing devices. In addition, the operation of electronic equipment, and devices equipped with electronic controls, may be susceptible to disruption by electromagnetic radiation impinging on such equipment or devices. For example, the operation of electronic engine controls, electronic speed controls, and anti-lock brake systems employing electronic controls, and even the operation of heart pacemakers, are potentially susceptible to disruption by strong electromagnetic radiation.

To help design equipment and devices which are resistant to such disruption, such equipment and devices customarily are irradiated during their development with electromagnetic engery at a variety of radio frequencies, and the effects, if any, of such irradiation on their operation are observed. To avoid interference with ongoing radio services, it is essential that the test engineer, before turning on the radio transmitter used for such irradiation, listen on the transmitter frequency to ascertain that there is no other signal on that frequency with which the test transmission might interfere.

In addition, both the EPA and the FCC have pointed out that Federal agencies and state and local governments are

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

currently addressing the problem of potentially excessive public exposure to radio frequency (RF) radiation emitted by various kinds of equipment. Testing solely to determine the source of, or to measure, RF emissions in order to comply with or to establish or enforce applicable federal, state or local standards limiting human exposure to RF radiation is not prohibited by the Electronic Communications Privacy Act.

This legislation was never intended to outlaw such testing, conducted in the ordinary course of the tester's business or regulatory activities. However, if one who obtained information in the course of such a test went beyond the procedures of the test to use any information obtained through the testing process, he could violate this statute.

*Section 102—Requirements for certain disclosures*

Section 102 of this legislation amends section 2511 of title 18 of the United States Code to add a new criminal prohibition on disclosure of electronic communications. It adds a new subsection (3) to section 2511. This amendment includes the term 'to the public.' The Government is included as part of the public. Thus, FTS services are covered.

The language in paragraph (a) of proposed subsection 2511(3) of title 18 provides that a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person **3580 *26 or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or the agent of such addressee or intended recipient.

Proposed paragraph (b) of new subsection 2511(3) of title 18 sets out exceptions to paragraph (a)'s criminal prohibition on disclosure. Providers of electronic communication services to the public are permitted to divulge the contents of any such communication (i) as otherwise authorized in section 2511(2)(a) or 2517 or title 18; (ii) with the lawful consent of the originator or any addressee or intended recipient; (iii) to any person employed or authorized, or whose facilities are used, to forward such communication to its destination, or (iv) which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime if such divulgence is made to a law enforcement agency.

The exceptions to the divulgence bar are relatively straightforward. Providers should be permitted to divulge under other provisions of the chapter. To be consistent with the one party consent exception found in the chapter, a similar exception is appropriate here. It is also logical to provide an exception with respect to activities necessary and intrinsic to the communication activity. Therefore, it is necessary to exempt communication intermediaries.

Finally, if an electronic communications service provider inadvertently obtains the contents of a communication during transmission and the communication appears to relate to the commission of a crime, divulgence is permitted when such divulgence is made to a law enforcement agency. If the provider purposefully sets out to monitor conversations to ascertain whether criminal activity has occurred, this exception would not apply.

*Section 103—Recovery of civil damages*

Section 103 of the Electronic Communications Privacy Act amends existing section 2520 of title 18 of the United States Code to incorporate violations involving interception, disclosure or intentional use of wire, oral, or electronic communications.

Proposed subsection 2520(a) of title 18 authorizes the commencement of a civil suit. There is one exception. A civil action will not lie where the requirements of section 2511(2)(a)(ii) of title 18 are met. With regard to that exception, the Committee intends that the following procedural standards will apply:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) The complaint must allege that a wire or electronic communications service provider (or one of its employees): (a) disclosed the existence of a wiretap; (b) acted without a facially valid court order or certification; (c) acted beyond the scope of a court order or certification or (d) acted on bad faith. Acting in bad faith would include failing to read the order or collusion. If the complaint fails to make any of these allegations, the defendant can move to dismiss the complaint for failure to state a claim upon which relief can be granted.

(2) If during the course of pretrial discovery the plaintiff's claim provides baseless, the defendant can move for summary judgment.

(3) If the court denies the summary judgment motion, the case goes to trial. At the close of the plaintiff's case, the defendant **3581 *27 again can move for dismissal. If that motion is denied, the defendant then has the opportunity to present to the jury its section 2520 good faith defense.

The plaintiff may bring a civil action under section 2520 whether or not the defendant has been subject to a criminal prosecution for the acts complained of, but in the absence of such prosecution and conviction, it is the plaintiff's burden to establish that the requirements of this section are met.

Proposed subsection 2520(b) indicates that appropriate relief in a civil action can include: (1) preliminary and other equitable or declaratory relief as may be appropriate; (2) damages under subsection (c) and punitive damages in appropriate cases; and (3) a reasonable attorney's fee and other reasonable litigation costs.

Proposed subsection 2520(c) provides a method for the computation of damages. The general rule is set out in paragraph (2) of subsection (c). The court may assess damages consisting of whichever is the greater of (A) the sum of the plaintiff's actual damages and any profits the violator made as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day or $10,000.

An exception from that general rule is set out in proposed paragraph (1) of subsection 2520(c). This exception applies if the violation consists of the private or home viewing of an unencrypted or unscrambled private satellite video communication or if the communication is an unencrypted or unscrambled radio communication that is transmitted on frequencies allocated under subpart D of part 74 of the FCC rules, and the conduct is not for one of the enumerated bad purposes.

Under subparagraph (A), if the violator has not previously been enjoined in a government action under subsection 2511(5) and has not been found liable in a prior civil action, the court shall assess the greater of the sum of the plaintiff's actual damages or statutory damages of $50 to $500. Under subparagraph (B), if the violator is a second offender (one who has been found liable in a prior private civil action under section 2520 or one who has been enjoined in a government suit), the court shall assess the greater of the sum of the plaintiff's actual damages or statutory damages of $100 to $1000. Third and subsequent offenders are subject to the bill's full civil penalties as described in the general rule set out in proposed paragraph 2520(c)(2).

Subsection 2520(d) provides a good faith defense for those who comply with court orders or warrants, grand jury subpoenas, legislative or statutory authorizations, or a request of an investigative or law enforcement officer under section 2518(7) of title 17 concerning emergency situations. As used in this subsection, the term 'good faith' includes the receipt of a facially valid court order. The fact that the provider of a wire or electronic communication service received a facially valid court order means that the provider would be entitled to a dismissal of a civil action upon a showing that he acted within the scope of that order.

Proposed subsection 2520(e) sets out the statute of limitations for actions brought under this section. Actions may not be commenced more than 2 years after the date on which the claimant first has a reasonable opportunity to discover the violation.

**3582 *28 *Section 104—Certain approvals by justice department officials*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 104 of the Electronic Communications Privacy Act amends section 2516(1) of title 18 of the United States Code to add to the list of Federal officials who may make applications for court orders under chapter 119. Under this amendment, the list of officials who may be specially designated by the Attorney General to authorize applications will include any acting Assistant Attorney General, or any Deputy Assistant Attorney General in the Criminal Division. The addition of an acting Assistant Attorney General is not meant to imply rejection in any other context of the well-established principle that an acting official ordinarily possesses all the legal powers of the official for whom he is acting, but to clarify the law under this statute.

As indicated in proposed subsection 111(c) of the Electronic Comunications Privacy Act, this section 104 shall take effect on the date of enactment.

*Section 105—Addition of offenses to crimes for which interception is authorized*

Section 105 of the Electronic Communications Privacy Act amends existing section 2516 of title 18 to add to the list of felonies for which a wiretap or bugging order may be obtained under chapter 119. It also adds a new subsection (3) to section 2516 which addresses applications and orders for interceptions of electronic communications.

*Subsection 105(a)—Offenses for which wire and oral interceptions are authorized*

Subsection 105(a) of the legislation amends subsection 2516(1) of title 18 by adding to the list of predicate felonies for which an application for a wiretapping or bugging order may be made. Those crimes are set out in the bill.

*Subsection 105(b)—Offenses for which interception of electronic communication are authorized*

Subsection 105(b) of the Electronic Communications Privacy Act amends section 2516 to authorize the Government to apply for a court order authorizing or approving the interception of an electronic communication by an investigative or law enforcement officer when an interception may provide or has provided evidence of a Federal felony. Thus, for non-wire, non-oral electronic communications, a different and less restrictive list of crimes can be used to justify an application for interception.

The Department of Justice has advised the Committee on the Judiciary that for the three years which follow the date of enactment of this legislation, this authority will only be exercised pursuant to the approval of the same level of officials as those involved in the approval of applications for wire interceptions. In addition to this voluntary regulatory limitation, the Department of Justice has committed itself to submitting to the relevant congressional committees any proposed changes in these regulations at least 90 days in advance of any change.

**3583 *29** *Section 106—Applications, orders, and implementation of orders*

Section 106 of the Electronic Communications Privacy Act amends section 2518 of title 18 of the United States Code. This section addresses the implementation of interception orders, reimbursement for providers who assist law enforcement agencies in carrying out an interception order and minimization requirements. Subsection 106(d) of the legislation permits law enforcement agencies to request an order for a 'roving tap' under certain limited circum-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

stances.

Telephone companies have, as a matter of practice, provided information and technical assistance to law enforcement officials in connection with lawfully authorized wiretaps. They have steadfastly maintained, however, an important distinction between such technical assistance and any active participation in the wiretap itself.

Section 2518(4) of title 18 is a codification of the cooperative working relationship that exists between telephone companies and law enforcement officials. This section anticipates that these government officials will, and should, seek the cooperation of telephone companies in accomplishing telephone line interceptions.

Nevertheless, telephone company customers have a reasonable expectation, traditionally enhanced by telephone company practices and policies, that their company will not become in effect, a branch of Government law enforcement. Accordingly, while technical assistance is provided and paid for, the Committee wishes to make clear that Section 2518(4) is not intended to authorize and should not be construed as authorizing, issuance of an order for land line telephone company assistance which either requires a company to actually accomplish or perform a wiretap or requires that law enforcement wiretap activity take place on land line telephone company premises.

The Committee understands that some cellular service providers may have cooperated with law enforcement officials to establish wiretap connections on the cellular service provider's premises. The Committee does not intend to alter this specific form of assistance.

The Committee understands that the practice followed with regard to land line telephones is that telephone company employees do not perform the wiretap itself, and that telephone company premises are not used for wiretap activity. This procedure is accepted by both company and law enforcement officials. The Committee does not expect any departure from current practice.

To ensure that the practice does not change, absent a compelling need appropriately addressed to Congress, the Committee expects the Justice Department to include in its United States Attorneys Manual a statement that no enforcement agency or official shall attempt to compel any telephone company employee to perform any wiretap, or attempt to compel any such company to make its premises available for wiretap activity. Any proposed amendment to that language should be reported to the Committee well in advance of dissemination so that the Committee has sufficient opportunity to assess both the extent of which such proposed language comports with its view of the scope of section 2518(4) as expressed **3584 *30 above and the extent to which any amendment of section 2518(4) to permit a change in prevailing practice may be warranted by subsequent and compelling changes in technology or other circumstances.

*Subsection 106(a)—Place of authorized interception*

Subsection 106(a) of the Electronic Communications Privacy Act amends subsection 2518(3) of title 18. It provides, that in the case of a mobile interception device, a court can authorize an order within its jurisdiction and outside its jurisdiction but within the United States. This provision applies to both a listening device installed in a vehicle and to a tap placed on a cellular or other telephone instrument installed in a vehicle.

In most cases, courts will authorize the installation of a device and the device will be installed within the court's jurisdiction, but the suspect will subsequently move outside that jurisdiction. In certain cases, however, a device authorized for installation in an automobile may be authorized in one district and the vehicle might be moved to another district prior to installation. Subsection 106(a) of the bill permits installation in the district to which the vehicle has been moved.

Nothing in this subsection affects the current law with regard to the use of such devices outside the United States.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Subsection 106(b)—Reimbursement*

Subsection 106(b) of the Electronic Communications Privacy Act establishes that service providers that provide assistance to the agency carrying out an interception order may be compensated for reasonable expenses incurred in providing such facilities or assistance. This is designed to permit reimbursement at an amount appropriate to the work required. In most cases, a flat or general rate will be appropriate, but this change in the existing law will permit flexibility by authorizing reimbursement at a higher level in unusual cases.

*Subsection 106(c)—Minimization*

This subsection makes two changes in section 2518(5) of title 18. Under existing law, no section 2518 interception order may extend longer than 30 days. Paragraph (1) of subsection 106(c) provides a rule for establishing when the 30 days to install a tap or a bug begins to run. Under this rule, the 30-day time period commences on the earlier of the day on which the officer first begins to conduct the interception, or 10 days after the order is entered.

Paragraph (2) of this subsection of the Electronic Communications Privacy Act provides a special minimization rule for intercepted communications that are in code or in a foreign language. If an expert in that foreign language or code is not reasonably available during that interception period, minimization may be accomplished as soon as practicable after the interception. In this regard, it is contemplated that the translator or decoder will listen to the tapes of an interception and make available to the investigators the minimized portions preserving the rest for possible court perusal later.

**3585 *31 Paragraph (2) also provides that the monitoring of interceptions under this chapter may be conducted in whole or in part by Government personnel, or by individuals operating under contract with the Government, as long as such personnel are acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception. This change, which was sought by the Federal Bureau of Investigation, is designed to free field agents from the relatively routine activity of monitoring interceptions so that they can engage in other law enforcement activities.

The Committee recognizes that although the statutory standards for minimizing wire, oral, and electronic communications are the same under proposed subsection 2518(5), the technology used to either transmit or intercept an electronic message such as electronic mail or a computer data transmission ordinarily will not make it possible to shut down the interception and taping or recording equipment simultaneously in order to minimize in the same manner as with a wire interception. It is impossible to 'listen' to a computer and determine when to stop listening and minimize as it is possible to do in listening to a telephone conversation. For instance, a page displayed on a screen during a computer transmission might have five paragraphs of which the second and third are relevant to the investigation and the others are not. The printing technology is such that the whole page including the irrelevant paragraphs, would have to be printed and read, before anything can be done about minimization.

Thus, minimization for computer transmissions would require a somewhat different procedure than that used to minimize a telephone call. Common sense would dictate, and it is the Committee's intention, that the minimization should be conducted by the initial law enforcement officials who review the transcript. Those officials would delete all non-relevant materials and disseminate to other officials only that information which is relevant to the investigation.

*Subsection 106(d)—Roving taps*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

This subsection of the Electronic Communications Privacy Act adds a new subsection (11) to section 2518 of title 18. Under current law, the application and the order for a bug or tap must indicate the 'particular' facility or place in which the interception is to occur. Subsection 106(d) of this legislation sets out new rules for the specificity required in the description of the place where the interceptions of wire and oral communications are to occur. The Committee finds such a provision necessary to cover circumstances under which law enforcement officials may not know, until shortly before the communication, which telephone line will be used by the person under surveillance. Telephone companies assist law enforcement officials by providing cable and pair information, or leased line facilities when requested and feasible: this is the information which will be provided to law enforcement for roving taps.

In the case of both oral and wire communications, only a limited list of Federal officials can apply for a special order seeking relief under this provision.

With regard to 'oral' communications, as set out in paragraph (a) of proposal subsection 2518(11), an application for a special **3586 *32 order must contain a full and complete statement as to why the ordinary specification requirements are not practical. The application must also identify the person committing the offense and whose communications are to be intercepted. The judge must find that the ordinary specification rules are not practical. Situations where ordinary specification rules would not be practical would include those where a suspect moves from room to room in a hotel to avoid a bug or where a suspect sets up a meeting with another suspect on a beach or a field. In such situations, the order would indicate authority to follow the suspect and engage in the interception once the targeted conversation occurs.

The rule with respect to 'wire communications' is somewhat similar. As indicated in paragraph (b), the application must show that the person committing the offense has a purpose to thwart interception by changing facilities. In these cases, the court must find that the applicant has shown that such a purpose has been evidenced by the suspect. An example of a situation which would meet this test would be an alleged terrorist who went from phone booth to phone booth numerous times to avoid interception. A person whose telephone calls were intercepted who said that he or she was planning on moving from phone to phone or to pay phones to avoid detection also would have demonstrated that purpose.

Proposed subsection 2518(12) of title 18 provides, with respect to both 'wire' and 'oral' communications, that where the federal government has been successful in obtaining a relaxed specificity order, it cannot begin the interception until the facilities or place from which the communication is to be intercepted is ascertained by the person implementing the interception order. In other words, the actual interception could not begin until the suspect begins or evidences an intention to begin a conversation.

It would be improper to use this expanded specificity order to tap a series of telephones, intercept all conversations over such phones and then minimize the conversations collected as a result. This provision puts the burden on the investigation agency to ascertain when the interception is to take place.

The Subcommittee on Patents, Copyrights and Trademarks added a provision to proposed subsection 2518(12) allowing a service provider to move the court to modify or quash the order on the grounds that it cannot provide assistance in a timely or reasonable manner. As indicated, on notice to the Government, the court must decide such a motion expeditiously.

This provision recognizes that a telephone company may not be able to respond instantaneously to an eleventh hour target line designation. It is designed to account for the practicalities of telephone company response time, the number of phones that may be covered by the order, and the geographic area of the target lines that may be used by the person under surveillance.

The Committee intends that the court look to several factors in considering whether to issue an order pursuant to proposed paragraph (11)(b). The request for the order, and the order itself, should specify a reasonably limited geo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

graphic area, the number of phones (and phone numbers) if known, to be intercepted—so as not to render telephone company cooperation technically infeasible—and the time within which the interception is to be accomplished. The **3587 *33 failure to make such specifications in the request and/or in the order may be considered evidence of unreasonableness or untimeliness by a court acting upon a telephone company motion made pursuant to proposed subsection (12).

The Committee also expects law enforcement officials to continue the current practice of consulting with telephone company employees regarding the details of implementation (such as phone numbers and the specific locations of the telephones) in advance of the time any order for interception is sought.

Finally, subsection 106(d) of the Electronic Communications Privacy Act provides that reports to the Administrative Office of the United States Courts under current section 2519 of title 18 on the kind of order or extension applied for include whether or not the order was one applied for under the relaxed specifity provisions of subsection 2518(11).

*Section 107—Intelligence activities*

Subsection (a) of this section of the bill clarifies that the amendments made in subsection 102(b) of the bill do not provide any new authority for intelligence activities but only represent an exemption from the coverage of this chapter and chapter 121 of title 18 for activities that are otherwise lawful.

Subsection (b) of this section of the bill exempts communications security monitoring activities of the Federal Government otherwise in accordance with U.S. law and undertaken in accordance with procedures approved by the Attorney General from coverage under chapter 119 or 121 of title 18. This subsection provides no new authority for such activities.

Specifically this subsection exempts from the coverage of this act the lawful activities of Federal agencies intended to intercept encrypted or other official communications for communications security purposes. Communications security measures are protective measures taken to deny unauthorized persons information derived from U.S. Government telecommunications and to ensure the authenticity of such communications. Communications security protection is the application of security measures to electrical systems generating, handling, proceeding, or using information the loss of which could adversely affect the national interest. Monitoring of security measures and security protection includes the intentional interception of executive branch official communications, including the communications of certain Government contractors, to provide technical material for analysis to determine the degree of security being provided to these transmissions. In addition, the interception, by authorized Federal agencies, of radio communications between foreign powers or agents as defined by the Foreign Intelligence Surveillance Act of 1978, and the accessing of electronic communications systems used exclusively by a foreign power as defined by the Foreign Intelligence Surveillance Act of 1978, are exempted from coverage of this act by this subsection of the bill.

*Section 108—Mobile tracking devices*

Subsection (a) of this section of the bill adds a new section to chapter 205 of title 18. This new code section provides that if a court is empowered a to issue a warrant or other order for the installation**3588 *34 of a mobile tracking device, and the tracking of the object or person on which the device is installed, such warrant remains valid even if the device is moved outside the jurisdiction of the court, even outside the jurisdiction of the United States, provided that the device was installed within the jurisdiction of the court, in conformity with the court order. This clarification does not effect current legal standards for the issuance of such an order.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

A tracking device is defined as an electronic or mechanical device which permits the tracking of the movement of a person or object.

Subsection (b) adds a new section 3117, 'Mobile tracking devices' to the table of contents of chapter 205.

*Section 109—Warning subject of surveillance*

The section amends section 2232 of title 18 by adding at the end a new subsection. Proposed subsection 2232(c) adds two new offenses to title 18. First, it makes it a criminal act punishable by a fine under this title and/or imprisonment for not more than 5 years to warn any person that a Federal agency or law enforcement officer has been authorized or has sought authorization under chapter 119 of title 18 to intercept a wire, oral, or electronic communication. Second, the proposed subsection provides the same penalties for warning anyone that a Federal officer has been authorized or has applied for authorization to conduct electronic surveillance under the provisions of the Foreign Intelligence Surveillance Act.

The elements of both new crimes are the same. It is required that the defendant have knowledge that the Federal law enforcement or investigative officer has been authorized or has applied for an interception order. The defendant need not know that such an application was made under a particular chapter of federal law, rather, only that such application or order was made under federal law. The defendant must engage in conduct of giving notice of the possible interception to any person who was or is the target of the interception. Finally, the defendants action must have been undertaken with the specific intent to obstruct, impede or prevent the interception. The offense also includes an attempt to engage in the offense.

*Section 110—Injunctive remedy*

This section of the act sets out a proposed section 2521 of title 18. Section 2521 adds to the existing criminal and civil remedies available for violations of this chapter by authorizing the Attorney General to seek an injunction to prevent felony level violations of this chapter. Section 2521 also provides that preliminary relief can be granted to prevent a continuing and substantial injury to the United States or to any person for whose protection the action is brought. Actions under section 2521 are governed by the Federal Rules of Civil Procedure, except that when an indication has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

**\*\*3589 \*35** *Section 111—Effective date*

Subsection (a) provides that in general the amendments made by this act are effective 90 days after enactment, and that the act applies only with respect to court orders or extensions made after the effective date. Thus existing court orders would not be affected by these changes and on-going investigations would not be hindered, but any extension of an existing court order made 90 days after passage would be governed by these new provision.

Subsection (b) provides a special rule for the effective date in the case of state authorizations of interceptions. This special effective date rule is necessary because the provisions of chapter 119 of title 18 supersede state laws with respect to electronic communications. Under chapter 119, the states must enact statutes which are at least as restrictive as the provisions of chapter 119 before they can authorize their state courts to issue interception orders. Because of the substantial changes made by this act it is appropriate to grant the states sufficient time to modify their laws. This special effective date rule gives the states two years to amend their laws to meet the new requirements of chapter 119.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subsection (c) provides that section 104 of the act is effective upon enactment. Section 104 modifies Justice Department procedures for approval of requests under this chapter, since section 104 is designed to alleviate management difficulties at the Department of Justice there is no reason to delay implementation of these changes.

TITLE II—STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS

*Section 201—Title 18 amendment*

This section amends title 18 by adding at the end thereof a new chapter 121 consisting of ten new sections. These sections are discussed below.

*New section 2701—Unlawful access to stored communications*

Subsection (a) of this new section creates a criminal offense for either intentionally accessing, without authorization, a facility through which an electronic communication service is provided, or for intentionally exceeding the authorization for accessing that facility. Subsection 2701, also provides that the offender must obtain, alter, or prevent authorized access to a wire or electronic communication while it is in electronic storage in such an electronic storage system in order to commit a violation under the subsection. The term 'electronic storage' is defined in section 2510(17) of title 18 and includes both temporary, intermediate storage of a wire or electronic communication incidental to the transmission of the message, and any storage of such a communication by the electronic communication service for purposes of backup protection of the communication.

This provision addresses the growing problem of unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public.

**\*\*3590 \*36** This subsection does not prevent broad authorizations to the general public to access such a facility. The bill does not for example hinder the development or use of 'electronic bulletin boards' or other similar services where the availability of information about the service, and the readily accessible nature of the service are widely known and the service does not require any special access code or warning to indicate that the information is private. To access a communication in such a public system is not a violation of the Act, since the general public has been 'authorized' to do so by the facility provider.

However, the offense of intentionally exceeding an authorization to access a computer facility would apply both to public and private aspects of a system. For example, a computer mail facility authorizes a subscriber to access information in their portion of the facilities storage. Accessing the storage of other subscribers without specific authorization to do so would be a violation of this provision. Similarly, a member of the general public authorized to access the public portion of a computer facility would violate this section by intentionally exceeding that authorization and accessing the private portions of the facility.

Subsection (b) of this new section provides punishment for violation of subsection (a). A distinction is drawn between offenses committed for purposes of commercial advantage, malicious destruction or damage, or for private commercial gain and all other types of violation. If the offense is committed for private or commercial gain or for malicious destruction the subsection provides a fine of not more than $250,000 or imprisonment for not more than one year, or both, for a first offender. Second and subsequent offenders are subject to the same fine provision but a jail term up to two years can be imposed for such violations. In all other cases the fine is limited to not more than $5,000 and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

imprisonment for not more than 6 months or both.

Subsection (c) of this new section provides exceptions to the violations contained in subsection (a). It is not a violation of subsection (a) if the conduct was authorized by the person or entity providing the wire or communications service, or if the conduct was authorized by the user of that service with respect to communications of or intended for that user or if the conduct is authorized by new sections 2703, 2704, or 2518 or title 18.

*New section 2702—Disclosure of contents*

Proposed section 2702 is divided between electronic communication services and remote computing services. The restrictions on the service provider are the same in each instance. However, as described below, there is different treatment for electronic communication service providers and remote computing services with regard to government access.

Subsection (a) of this new section prohibits the provider of an electronic communications service or the provider of a remote computing service from knowingly divulging the contents of any communication. The 'contents' of a communication has the same meaning in this section as it has in subsection 2510(8) of title 18 or the United States Code as amended by section 101(a)(5) of this Act. The requirement that a violator must 'knowingly' divulge the contents**3591 *37 is intended to make clear that 'reckless' or 'negligent' conduct is not sufficient to constitute a violation of this section. Subsection (b) of this section provides exceptions to this general rule of non-disclosure.

The application of new code section 2702(a) generally prohibits the provider of a wire or electronic communication service to the public from knowingly divulging the contents of any communication while in electronic storage by that service to any person other than the addressee or intended recipient. Similarly, section 2511(3) of title 18, as amended by this Act, prohibits such a provider from divulging the contents of a communication while it is in transmission. Neither provision, however, nor any other provision in the Act, is intended to affect any other provision of federal law that prohibits the disclosure of information on the basis of the content of the information, such as the Fair Credit Reporting Act.

The application of sections 2701(a) and 2511(3) is limited to providers of wire or electronic communications services. There are instances, however, in which a person or entity both acts as a provider of such services and also offers other services to the public. In some such situations, the bill may allow disclosure while another federal requirement, applicable to the person or entity in another of its roles, prohibits disclosure. The Committee intends that such instances be analyzed as though the communication services and the other services were provided by distinct entities. Where a combined entity in its non-provider role would not be allowed to disclose, the appropriate outcome would be non-disclosure.

Subsection (b) of this new section provides exceptions to the general rule of nondisclosure provided in subsection (a). These exceptions permit disclosure: (1) to the addressee or intended recipient of the communication or the authorized agent of such addressee or intended recipient; (2) in conformity with a court order issued pursuant to the procedures in section 2516 of title 18; or in the course of normal business practice as defined in section 2511(2)(a) of this title; or to the government under procedures of new section 2703; (3) with the lawful consent of the sender or the addressee or an intended recipient of such communication or with the consent of the subscriber in the case of a remote computing service; (4) to a person employed or authorized or whose facilities are used to forward the communication to its ultimate destination; (5) as necessary in order to render the service or to protect the rights or property of the provider of the service: of (6) to a law enforcement agency, if the contents were inadvertently obtained by the service provider and appear to pertain to the commission of a crime.

The exceptions to the general rule of nondisclosure provided in subsection (b) fall into three categories. The first

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

category are those disclosures which are authorized by either the sender or receiver of the message. Either the sender or the receiver can directly or through authorized agents authorize further disclosures of the contents of their electronic communication. The second category are disclosures which are necessary for the efficient operation of the communications system. Such business procedures are included in the section 2511(2)(a) exemption as well as the exemptions of this subsection relating to the disclosure of the message to forwarding facilities and the exemption for service provider activities designed to **3592 *38 protect the system and perform the service. The third category are disclosures to the government. In this area there are two types of disclosures. Those pursuant to a court order under the procedures of sections 2516 and 2703 and those disclosures undertaken at the initiative of the service provider in the exceptional circumstances when the provider has become aware of the contents of a message that relate to ongoing criminal activity.

*New section 2703.—Requirements for governmental access*

Subsection (a) of section 2703 provides requirements for the government to obtain the contents of an electronic communication that has been in electronic storage for 180 days or less. A government entity can only gain access to the contents of such an electronic communication pursuant to a warrant issued under the Federal Rules of Criminal Procedure or an equivalent State warrant.

Subsection (b) of section 2703 provides that for electronic communications that are maintained by a remote computing service and that have been in storage in an electronic communication service for more than 180 days the Government can gain access in several ways. If the Government wishes to obtain the contents of a communication without the required notice to the subscriber then the governmental entity must obtain a warrant issued under the Federal Rules of Criminal Procedure or an equivalent State warrant. With prior notice from the government entity to the subscriber or customer, the entity may obtain the contents of the electronic communication either by using an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury subpoena or obtain a court order pursuant to subsection (d) of this section. In addition, the required notice may be delayed pursuant to the requirements of section 2705 of title 18 as provided in the Act.

Subsection (b) of new section 2703 of title 18 is made applicable to all electronic communications held or maintained by the service provider on behalf of a customer or subscriber and received by means of electronic transmission as well as electronic communications in storage or computer processing if the provider is not authorized to access the contents of any communications for purposes other than storage or computer processing.

Subsection (c) provides for access to records or other information pertaining to a subscriber to or customer of an electronic communications or remote computer service, not including the content of electronic communications. This section permits the provider of the service to divulge, in the normal course of business, such information as customer lists and payments to anyone except a Government agency. It should be noted that the information involved is information about the customer's use of the service not the content of the customer's communications.

A provider of electronic communication service or remote computing service must disclose information pertaining to a subscriber or customer, but not the contents of any communications of that customer, to a Government entity only when the Government entity either (i) uses an administrative subpoena authorized by a Federal or State statute, or a Federal or State grand jury subpoena; (ii) obtains a warrant issued under the Federal Rules of Criminal Procedure or an equivalent state warrant; (iii) obtains a court **3593 *39 order for such disclosure under subsection (d) of this section; or (iv) has obtained the consent of the subscriber. A Government entity which receives customer records pursuant to one of these four alternatives is not required to provide notice to the subscriber or customer that it has requested or obtained this information.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subsection (d) provides that orders requiring access by a Government entity to the contents of a wire or electronic communication or to the records or other information sought shall issue only if the governmental entity shows there is reason to believe the contents of the wire or electronic communication, or the records or other information sought, are relevant to a legitimate law enforcement inquiry. This section provides no authority for the issuance of a state subpoena that is prohibited under the law of such state.

This subsection also permits the provider of the communications or remote computing service to move to quash or modify any other issued under this section if the information or records requested are unusually voluminous or compliance with the order would cause an undue burden on the provider. This specific standing for the service provider to contest an overly broad order is intended to protect the service provider from unduly burdensome requirements and to permit an impartial judicial officer to evaluate the appropriateness of the government's request.

Subsection (e)—No cause of action against a provider disclosing information under this chapter.

This subsection of the proposed new section provides a defense for the service provider, its employees and officers, from suits arising because of its disclosure of information pursuant to a warrant or other court order issued under this chapter.

*New section 2704—Backup preservation*

Subsection (a) of proposed section 2704 of title 18 provides that a Government entity may include in its subpoena or court order obtained pursuant to the provisions of new section 2703(b)(2) a requirement that the service provider create and maintain a duplicate copy of the contents of the electronic communications sought in order to preserve those communications. Without notifying the customer or subscriber, the service provider must create such a duplicate copy as soon as practicable and confirm to the Government entity that the duplicate file has been created. In all cases the service provider must create such a duplicate file within two business days after receipt by that provider of the subpoena or court order directing that such a duplicate file be created.

Paragraph (2) of this new subsection requires the Government entity to give notice to the subscriber or customer that such a duplicate file has been created and has been ordered to be provided to the Government. This notification to the customer or subscriber must be given within three days of the receipt of confirmation from the service provider (as required by subsection (a) above) that the duplicate file has been created, unless the Government agency has obtained permission to delay such notification pursuant to proposed subsection 2705(a).

Paragraph (3) also prohibits the service provider from destroying the backup copy until the information has been delivered to the Government entity or any proceedings, including all appeals, concerning**3594 *40 the Government's subpoena or court order have been resolved, whichever is later. The service provider is required to comply with the order and release the copy to the requesting Government entity no sooner than fourteen days after the Government entity has notified the subscriber or customer that it is seeking this information.

Paragraph (4) provides that the service provider should release the information to the Government only if the service provider has not received notice from its subscriber or customer that the subscriber or customer has challenged the Government's request and if the service provider has not itself challenged the request of the Government entity.

Finally, paragraph (5) provides that when a Government entity seeks to require the creation of the backup or duplicate copy under this subsection and the governmental entity further determines that notification under section 2703 of this title of the existence of the subpoena or court order may result in destruction of or tampering with the evidence this later determination is not subject to challenge either by the subscriber or customer or by the service provider.

While this subtitle provides the subscriber or customer, and in some circumstances the service provider a right to challenge the necessity for or scope of a court order, neither this section or any other section of this Act provides

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

grounds to challenge the determination of the Government agency that no notification is to be given to the subscriber or customer of the mere creation of the duplicate file. The file is created and maintained by the service provider solely for the purpose of assuring that potential evidence is not tampered with or destroyed. Keeping the fact of the creation of this file secret does not harm any privacy interest since there are adequate safeguards included in the bill and in this chapter to control the actual release of the duplicate file to the Government agency.

Subsection (b) of proposed section 2704 provides a procedure for challenges to a court order by the subscriber or customer. The subscriber or customer whose records are sought can within 14 days after notification by the Government under subsection (a)(2) of this section file a motion to quash such subpoena or vacate such court order in an appropriate State or Federal court. The subscriber or customer challenging the subpoena or order must serve a copy of the motion on the governmental entity and provide written notice to the service provider that such a challenge has been initiated.

The subsection further provides that the application or motion must state that the applicant is the customer or subscriber to the service from which the contents of electronic communications maintained for him have been sought and state the reasons for believing that the records sought are not relevant to a legitimate law enforcement inquiry or state that there has not been substantial compliance with the provisions of this chapter in some other respect.

The service required by this subsection shall be made upon the governmental entity by delivering or mailing by registered or certified mail a copy of the papers to the person, or office, or department specified in the notice which the customer has received pursuant to this chapter. The term 'delivery' in this subsection has **3595 *41 the meaning given that term in the Federal Rules of Civil Procedure.

If a court determines that the customer or subscriber has complied with the requirements for such a motion including the requirements of 'dlivery' to the Government entity, then the court shall order the Government entity to file a sworn response to the motion or application. Such response may be in camera if the governmental entity includes in its response the reasons which make such an in camera review appropriate. If the motion and response provide insufficient information for the court to make a determination, the court may conduct such additional proceedings as it deems appropriate. Any additional proceedings and a decision on the challenge shall occur as rapidly as feasible, *i.e.* within 7 calendar days in all but the most unusual circumstances.

The subsection also provides that the court shall enforce the process if it finds that the applicant challenging the order or application is not the subscriber or customer for whom the records are maintained or if it finds that the law enforcement inquiry is legitimate and that the communications sought are relevant to that inquiry. If the court finds that the customer or subscriber challenging the order or application is the subscriber or customer for whom the records are maintained and that the records are not relevant to a legitimate law enforcement inquiry or that there has not been substantial compliance with the provisions of this chapter in some other respect, then the court shall order the process quashed.

Finally, the subsection provides that a court order denying a motion or application under section 2704 shall not be deemed a final order and no interlocutory appeal may be taken by the customer or subscriber from such a denial.

In the event that there is no indictment then the person whose records are involved may move for the return of the records. Obviously, nothing precludes a customer or subscriber who is later the subject of a criminal proceeding from raising these issues again subject to the sanctions limitation of section 2708 of title 18.

*New section 2705—Delayed notice*

This proposed section provides procedures and requirements for implementation for a delay of notice to the customer or subscriber that his records are being sought or have been provided to a government entity.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subsection (a) of this section 2705 provides that when a Government entity seeks or obtains access to the contents of an electronic communication by application for a court order notification can be delayed for an initial period of up to 90 days, if the Government entity requests such a delay and the court determines that there is reason to believe that the notification of the existence of the court order may have an adverse result as described in this subsection. Where an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury subpoena is obtained, a delay of notification for a period of not more than 90 days can be obtained upon the execution of a written certification of a supervisory official that there is reason to believe that notification of the existence of the subpoena may have an adverse result.

**3596 *42** For purposes of a delay of notification, an adverse result is defined as (A) endangering the life or physical safety of an individual; (B) flight from prosecution; (C) destruction of or tampering with evidence; (D) intimidating of potential witnesses; or (E) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

In the case of an administrative or grand jury subpoena, the governmental entity is required to maintain a true copy of the required certification, and the certification can only be given by a 'supervisory official'. The subsection defines such an official as the investigative agent in charge of an agency's headquarters or regional office, or the assistant to such an agent or the equivalent, or the chief prosecuting attorney or the first assistant prosecuting attorney of an agency's headquarters or regional office, or the equivalent.

The subsection also provides that extensions of the delay period for not more than 90 days each may be granted by the court upon application or by certification by the government agency provided the requirements of subsection (b) of section 2705 are met for each extension.

When the delay period, including any extensions thereof, as provided in this subsection and subsection (b), has expired the governmental entity must serve upon, or deliver by registered or first-class mail to the customer or subscriber, a copy of the process or request together with notice that states the nature of the law enforcement inquiry and informs the customer or subscriber: (i) that the information maintained for such customer or subscriber by the service provider was supplied or requested by the Government agency and stating the date on which the information was supplied or requested; (ii) that notification to the customer of this action was delayed; (iii) what Government entity or court made the certification or determination that notification could be delayed; and (iv) which provision or provisions of this chapter allowed the delay.

Subsection (b) provides that if a governmental entity has delayed notice or has not been required to give notice under the provisions of section 2703, then the governmental entity may also apply to the court for an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, not to notify any peson of the existence of the warrant, subpoena, or court order. The court is required to enter such an order to prevent disclosure by the service provider if notification of the existence of the warrant, subpoena, or court order will result in any of the five adverse results listed in this subsection. The entity must apply to a court for preclusion under this subsection, even if the underlying process—an administrative subpoena, for example—does not require a court order.

*New section 2706—Cost reimbursement*

This proposed section provides that when a governmental entity obtains the contents of communications, records or other information under the authority of sections 2702, 2703, or 2704, it shall pay to the person or entity assembling or providing the information a fee for reimbursement for the reasonably necessary direct costs. The section provides an exception to this general rule with regard to records or other information maintained by a communications **3597 *43** common carrier that relate to telephone toll records and telephone listings obtained under section 2703. No fee is

normally required for access to such records. However, the court may order a payment if the court determines the information required is unusually voluminous. The amount of the fee provided in this subsection is to be mutually agreed upon by the governmental entity and the person or entity providing the information. If they are unable to reach an agreement, the court which issued the order for production of the information, or the court before which a criminal prosecution relating to the information would be brought if no court order was issued, is empowered to determine a reasonable fee.

*New section 2707—Civil action*

Subsection (a) of this proposed section provides that, except as provided in section 2703(e), any provider of electronic communication service, subscriber, or customer of such service aggrieved by any violation of this new chapter may recover from any person or entity—including governmental entities—who knowingly or intentionally violated this chapter.

Under subsection (b), appropriate relief in a civil action under this title includes: (1) such preliminary, declaratory, or other equitable relief as may be appropriate; (2) damages under the section including the sum of actual damages suffered by the plaintiff and any profits made by the violator as the result of the violation as provided in (c) with minimum statutory damages of $1,000; and (3) reasonable attorney's fees and other reasonable litigation costs.

The section also provides a defense to an action under this chapter. If the defendant's action was based on a good faith reliance on a court order or warrant, a grand jury subpoena, a legislative or statutory authorization; or a request of an investigative or law enforcement officer under section 2518(7) of this title, or if it was based on a good faith determination that section 1511(3) of this title permitted the conduct complained of, then this good faith reliance or determination is a complete defense to any civil or criminal action brought under this chapter or under any other law.

This new section also provides that any action under this section must be commenced not later than 2 years after the date upon which the claimant first discovered or had a reasonable opportunity to discover that a violation had occurred.

*New section 2708—Exclusivity of remedies*

The remedies and sanctions provided in this chapter are the only judicially available remedies and sanctions for nonconstitutional violations of the chapter.

*New section 2709.—Counterintelligence access to telephone toll and transactional records*

Section 2709 provides for FBI counterintelligence access to telephone toll and transactional records. This provision is substantially the same as language recently reported by the Intelligence Committee as section 503 of the Intelligence Authorization Act for Fical Year 1987. There are two differences. The first is that section 2709 applies not only to FBI requests for telephone subscriber information and toll billing information, but also to FBI requests **3598 *44** for electronic communication transactional records. This ensures that the FBI has the necessary authority with regard to subscriber information and toll billing information with respect to electronic communication services other than ordinary telephone service.

Section 2709 is a carefully balanced provision that remedies the defect in current law that the FBI cannot gain access on a mandatory basis to telephone toll records maintained by communications common carriers, for counterintelli-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

gence purposes. As a result, especially in states where public regulatory bodies have created obstacles to providing such access, the FBI has been prevented from obtaining these records, which are highly important to the successful investigation of counterintelligence cases.

The second difference concerns the standard that the FBI must meet before it can require a common carrier or service provider to supply the requested records. Section 2709 requires a certification by a designated FBI official that the information sought is relevant to an authorized foreign counterintelligence investigation and that there are specific and articulable facts giving reason to believe that the person or entity to whom the information sought pertains a foreign power or an agent of a foreign power as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978. Section 503 of the Intelligence Authorization Act for Fiscal Year 1987, as reported by the Intelligence Committee, contains a slightly different 'reason to believe' standard requiring specific and articulable facts giving reason to believe that the target 'is or may be' a foreign power or an agent of a foreign power.

Subsection 2709(a) of this proposed section provides that a wire or electronic communication service provider must comply with a request for subscriber information and toll billing records in its custody or possession made by the Director of the Federal Bureau of Investigation under subsection (b) of this section. It should be noted that this applies only to transactional records, not to the content of the electronic messages of a customer or subscriber.

Subsection 2709(b) provides that in order for the requirement to provide information in subsection (a) of this section to apply, the Director of the Federal Bureau of Investigation, or a specific person within the Bureau designated for this purpose by the Director, must certify in writing to the wire or electronic communication service provider that (1) the information sought is relevant to an authorized foreign counterintelligence investigation; and (2) that there are specific, articulable facts giving reason to believe that the person or entity to whom the information sought pertains is a foreign power or an agent of a foreign power as defined in section 101 of the Foreign Intelligence Surveillance Act.

The House Judiciary Committee report on the Electronic Communications Privacy Act of 1986 does not discuss the meaning of the 'reason to believe' standard in section 2709. It is essential, therefore, to clarify the intent of the Senate with respect to this item.

The 'reason to believe' requirement in section 2709 is intended to be substantially less stringent than the requirement of 'probable cause.' It is intended that the application of the 'reason to believe' requirement will be determined by a senior FBI official at the level of Deputy Assistant Director or above. It is intended that **3599 *45 in applying the 'reason to believe' standard to a specific case, the FBI official may take into account any facts or circumstances that a prudent investigator would consider, so long as there is an objective, factual basis of the determination.

The Senate Select Committee on Intelligence has informed the Judiciary Committee that the language contained in the bill would not significantly affect the application of the current FBI investigative standard in this area. Further discussion of the investigatory standard in particular cases is contained in the reports of the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence on FY 87 Intelligence Authorization Act (S. 2477 and H.R. 4759).

Subsection 2709(c) prohibits a service provider, or any officer, employee, or agent of the service provider from disclosing to any person that the Federal Bureau of Investigation has sought or obtained access to information or records under this section.

Subsection 2709(d) permits the Federal Bureau of Investigation to disseminate such information only in conformance with guidelines approved by the Attorney General for foreign intelligence and foreign counterintelligence investigations. If the information is to be disseminated to another federal agency, it can only be disseminated if the information is clearly relevant to the authorized responsibilities of such agency.

Subsection 2709(e) further requires that on a semiannual basis the Director of the Federal Bureau of Investigation fully inform the Permanent Select Committee on Intelligence of the House of Representatives and the Select Com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

mittee on Intelligence of the Senate concerning all requests made by the Bureau under subsection 2709(b).

*New section 2710—Definitions for chapter*

Terms used in section 2510 retain the definitions given to each term by that section. The term 'remote computing service' is defined to mean the provision to the public of computer storage, or computer processing services by means of an electronic communications system.

This section also provides for the change in the table of chapters of title 18 of the United States Code by adding chapter 121 to the table.

*Section 202—Effective date*

This section provides that the amendments made by Title II of the bill shall be effective 90 days after the date of enactment. It further provides that changes made by this title that apply to conduct pursuant to court order or extension, apply only with respect to court orders or extensions made after the effective date of the title.

## TITLE III—PEN REGISTERS AND TRAP AND TRACE DEVICES

Title III of the Electronic Communications Privacy Act proposes to add a new chapter 206 to title 18 of the United States Code. This chapter will govern the use, application and issuance of orders for pen registers and trap and trace devices. Those terms are defined **3600 *46** in proposed section 3126 of title 18. Briefly, a pen register is a device which can be attached to a telephone line for the purpose of decoding and recording the numbers dialed from that line. A trap and trace device is used to identify the originating number of an incoming wire or electronic communication. These devices do not identify or record the contents of the communciation.

*Section 301—Pen registers and trap and trace devices*

Subsection 301(a) of the Electronic Communications Privacy Act sets out the six proposed sections of title 18 governing pen registers and trap and trace devices.

*New section 3121—General prohibition on use of pen registers and trap and trace devices*

Subsection (a) of proposed section 3121 of title 18 contains a general prohibition against the installation or use of a pen register or trap and trace device without a court order. Such a court order may be obtained under section 3123 of title 18 or under the Foreign Intelligence Surveillance Act (FISA).

Proposed subsection 3121(b) contains exceptions to subsection (a)'s general prohibition against the use of pen registers and trap and trace devices. Providers of electronic or wire communication services may use pen registers or trap and trace devices if one of three conditions are met. The provider may use a pen register or trap and trace device (1) if it relates to the operation, maintenance, and testing of a wire or electronic communication service, or to the protection of the rights or property of such provider, or to the protection of users of that service from abuse or unlawful use of the service; (2) to record the fact that a wire or electronic communication was initiated or completed in order to

protect the provider, another provider furnishing service toward completion, or a user of that service from fraudulent, unlawful or abusive use of service; or (3) where the consent of the user has been obtained.

Proposed subsection 3121(c) imposes a penalty for a knowing violation of subsection (a). The penalty is a fine under this title, imprisonment for up to 1 year, or both.

*New section 3122—Applications*

Proposed section 3122 of title 18 sets out the procedures for applying for a court order for a pen register or trap and trace device. Under subsection (a), a government attorney may apply for an order, or the extension of an order, authorizing or approving the installation and use of a pen register or trap and trace device. Such order must be made in writing under oath or affirmation to a court of competent jurisdiction.

Proposed paragraph 3122(a)(2) contains parallel provisions for state investigative or law enforcement officers. The phrase 'Unless prohibited by state law,' makes clear that this law does not preempt any existing state law regulating the installation and use of pen registers or trap and trace devices by state officials. To the extent that state law currently provides that a pen register or trap and trace device may only be installed or used by a state official based on some other, higher standard of proof, that law will continue in effect with respect to such officials.

**3601 *47** Proposed subsection 3122(b) of title 18 sets out the contents required in an application for a court order for a pen register or a trap and trace device. The application must include the identity of the applicant and the law enforcement agency conducting the investigation. Also, the applicant must certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the agency.

*New section 3123—Issuance of orders*

Subsection (a) of proposed section 3123 provides that, upon application, a court shall issue an *ex parte* order authorizing the installation and use of a pen register or trap and trace device within its jurisdiction. To issue an order, the court must first be satisfied that the information sought is relevent to an ongoing criminal investigation. This provision does not envision an independent judicial review of whether the application meets the relevance standard, rather the court needs only to review the completeness of the certification submitted.

Proposed paragraph 3123(b)(1) describes the contents of the order authorizing the use or installation of a pen register or trap and trace device. The order shall specify (A) the identity, if known, of the person whose telephone line will receive the pen register; (B) the identity, if known, of the person who is under criminal investigation; (C) the number and, if known, location of the telephone line and, in the case of a trap and trace device, the geographic limits of the order; and (D) a statement of the offense to which the information likely to be obtained relates.

Under proposed paragraph 3123(b)(2), the order, upon request of the applicant, shall direct a third party to furnish information, facilities, and technical assistance necessary to install the pen register or trap and trace device. This provision of the order relating to cooperation is intended to codify the existing informal practice of cooperation between telephone companies and the Department of Justice.

Under proposed subsection 3123(c), the time period of authorization of installation and use of a pen register or a trap and trace device is 60 days, with possible extensions of 60 days. An extension may be granted upon application for a section 3122 order. The same judicial findings required by subsection 3123(a) are also required.

Proposed subsection 3123(d) provides that an order authorizing or approving the installation and use of a pen register or trap and trace device shall direct that the order be sealed, until otherwise ordered by the court. In addition, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

order shall bar the disclosure of the existence of the pen register or trap and trace device and the disclosure of an investigation to the listed subscriber or to any other unauthorized person unless or until otherwise directed by the court. Intentional violations of the non-disclosure provisions may be, in appropriate circumstances, punishable as contempt.

*New section 3124—Assistance in installation and use*

Proposed subsection 3124(a) provides that upon the request of an authorized person, a wire or electronic communication service provider, landlord, custodian, or other person shall furnish such requester**3602 *48** with all information, facilities, and technical assistance necessary to effectuate the pen register order unobtrusively and with a minimum of interference. The Committee assumes that the current practice of law enforcement officials installing and maintaining pen registers will continue.

For trap and trace devices, proposed subsection 3124(b) provides that upon request of a government attorney or law enforcement officer authorized to receive the results, a wire or electronic communication service provider, landlord, custodian or other person shall promptly install the trap and trace device and furnish the requester all additional information, facilities and technical assistance, including installation and operation of the device unobtrusively and with a minimum of interference with services, provided that the installation and service is ordered under section 3123(b). This provision also requires that the results be furnished to the law enforcement officer designated by the court, at reasonable intervals, during regular business hours for the duration of the order, unless the court orders otherwise.

Proposed subsection 3124(c) provides reasonable compenation for those providing facilities and assistance under this section. This compensation provision is modeled after that which applies under section 2518 of title 18 and subsection 106(b) of this bill. It is intended to be interpreted and implemented in a similar fashion.

Proposed subsection 3124(d) provides that no cause of action shall lie in any court against a wire or electronic communication service provider, its officers, agents, employees or other specified persons for providing information, assistance or facilities in accordance with the terms of a chapter 206 court order.

Proposed subsection 3124(e) establishes a good faith defense against any civil or criminal action brought under chapter 206 or any other law.

*New section 3125—Reports*

Under a current order of the Attorney General, statistics concerning pen registers are compiled. Proposed section 3125 requires that this information be reformulated and submitted to the appropriate committees of Congress. It also extends such reporting requirements to trap and trace devices.

Specifically, proposed section 3125 requires that the Attorney General annually report to Congress on the number of pen register and trap and trace device orders applied for by law enforcement agencies of the Department of Justice. The Committee requests that these reports include information as to the nature of the offenses for which the pen registers and trap and trace devices are being used.

*New section 3126—Definitions*

Proposed section 3126 contains definitions for this chapter. The terms 'wire communication,' 'electronic communication,' and 'electronic communication service' have the same meanings as in section 2510 of title 18. The term

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

'court of competent jurisdiction' means (A) a district court of the United States (including a magistrate of such court) or a U.S. Court of Appeals; or (B) a state court **3603 *49 of general criminal jurisdiction authorized to enter pen register or trap and trace orders.

As indicated in proposed section 3126(3), the term 'pen register' means a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted for purposes of routing telephone calls, with respect to wire communications, on the telephone line to which such device is attached. Pen registers do not record the contents of a communication. They record only the telephone numbers dialed.

Devices used by a provider or customer or wire or electronic communication service incident to billing or cost accounting, or for any other similar purposes in the ordinary course of business are excluded from the definition of a pen register. Thus, devices that many companies and firms use to record billable time for their clients' accounts are outside this bill's prohibitions against the installation and use of pen registers.

Trap and trace devices are defined in proposed subsection 3126(4). A 'trap and trace device' is a device which captures the incoming electronic or other impulses which identify the originating number of an incoming wire or electronic communication. Trap and trace devices do not record the contents of communications.

The term 'attorney for the government' has the meaning given to that term by the Federal Rules of Criminal Procedure. The term 'State' means a State, the District of Columbia, Puerto Rico, and any other possession or territory of the United States.

Subsection 301(b) of the bill contains a clerical amendment to the table of chapters.

*Section 302—Effective date*

Section 302 of the bill contains the effective date for Title III of the Electronic Communications Privacy Act. Subsection (a) provides that as a general rule, Title III of the bill shall take effect 90 days after enactment. In the case of conduct pursuant to a court order or extension, these amendments apply only with respect to court orders or extensions made after this title takes effect. Subsection 302(b) of the bill contains special rules which, in essence, give states two years to bring their laws into conformity with the Electronic Communications Privacy Act's amendments to Federal law.

*Section 303—Interference with the operation of a satellite*

This section of the bill adds a new section to chapter 65 of title 18, United States Code.

*New section 1367—Interference with the operation of a satellite*

Subsection (a) of this proposed section provides that anyone who, without the authority of the satellite operator, intentionally or maliciously interferes with the authorized operation of a satellite or obstructs or hinders any satellite transmission, including both the transmission from the ground to the satellite and the transmission from the satellite to the ground (commonly known as the up-link and the down-link respectively) is subjected to criminal penalties including a fine of up to $250,000, imprisonment for not more than 10 years, or both. The subsection does not prohibit any actions by **3604 *50 the authorized satellite operator which are designed to protect the satellite from unauthorized use.

Subsection (b) of this new section makes it clear that the criminal act described in subsection (a) does not include

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

any lawfully authorized investigative, protective, or intelligence activity of a law enforcement or intelligence agency of the United States. This subsection does not provide any new authority for such activities.

Finally, this section of the bill provides that the table of sections for chapter 65 of title 18 is amended to include the new section 1367.

## VI. AGENCY VIEWS

On June 25, 1986 and July 29, 1986, the Committee received the following letters from the Department of Justice.

U.S. DEPARTMENT OF JUSTICE,
OFFICE OF LEGISLATIVE AND INTERGOVERNMENTAL AFFAIRS,
*Washington, DC, June 25, 1986.*

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: This letter is to advise you of the Department of Justice's position with regard to S. 2575, the Electronic Communications Privacy Act of 1986. This bill, which is identical to H.R. 4952 as recently passed by the House of Representatives, makes important changes to the existing wiretap statutes and fills gaps in current laws by creating provisions to regulate interception of and access to new forms of electronic communication such as data transmissions.

The Department of Justice has worked intensively on this legislation over the past several weeks with the staff of the Subcommittee on Patents, Copyrights and Trademarks, as well as with interested representatives of industry and civil liberties groups. While initial versions of this legislation did not in our view adequately safeguard legitimate and vital law enforcement and national security needs for access to communications, as a result of the negotiations that have occurred the bill has been substantially modified to accommodate our concerns. In our judgment the bill as presently drafted fairly balances the interests of privacy and law enforcement and its enactment would represent a major accomplishment of the 99th Congress, holding forth the promise of significant benefits for business, privacy, and law enforcement alike.

Accordingly, the Department of Justice strongly supports the enactment of S. 2575.

Sincerely,

JOHN R. BOLTON,
*Assistant Attorney General.*
**3605 *51** U.S. DEPARTMENT OF JUSTICE,
OFFIE OF LEGISLATIVE AND
INTERGOVERNMENTAL AFFAIRS,
*Washington, DC, 20530 July 29, 1986.*

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: This is with further reference to my letter of June 25, 1986, expressing support for S. 2575, the Electronic Communications Privacy Act of 1986. A copy of my earlier letter is enclosed for ready reference.

We continue to believe that this measure is a well balanced one which, in addition to modernizing the 1968 electronic surveillance law, also benefits both law enforcement and individual privacy by clarifying many aspects of this highly complex area of the law. As the 99th Congress is rapidly drawing to a close, we sincerely hope that the Senate will act on S. 2575 at an early date.

We would deeply appreciate your consideration of S. 2575 and, if possible, your formal co-sponsorship of the bill.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Having your name on the bill would, we believe, be most helpful in efforts to process this important legislation this year.

Sincerely,

JOHN R. BOLTON,
*Assistant Attorney General*.

VII. COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 23, 1986*.

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 2575, the Electronic Communications Privacy Act of 1986, as ordered reported by the Senate Committee on the Judiciary, September 19, 1986. CBO estimates that enactment of this legislation would result in no significant cost to the federal government and in no cost to state or local governments.

S. 2575 would make a number of amendments to Title 18 of the U.S. Code concerning access to electric communications. Title I of the bill would establish penalties for the unlawful interception or disclosure of electronic communications, provide for the recovery of civil damages for persons whose communications are intercepted, disclosed or used in violation of this provision, and modify procedures for government interception of communications. Title II would create specific penalties for unlawful access to stored wire and electronic communications, while Title III would establish a general prohibition on the use of pen registers. These titles would mandate specific procedures for access to stored communications and use of pen registers by government entities, and Title II would allow for civil actions.

**\*\*3606 \*52** S. 2575 would require government entities to compensate private parties assembling or providing information concerning stored electronic communications, or assisting in the installation and use of a pen register. Because such compensation is currently provided in Department of Justice (DOJ) investigations, CBO does not expect the these provisions would result in any significant additional cost to the federal government.

Based on information from the DOJ, we do not expect that enactment of this bill would result in a significant change in the government's law enforcement practices or expenditures. S. 2575 would specifically authorize law enforcement efforts the DOJ is currently undertaking with other authority.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,

Sincerely,

JAMES BLUM
(for Rudolph G. Penner, Director).

VIII. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b) of Rule XXVI of the Standing Rules of the Senate, the Committee has concluded that no significant additional regulatory impact would be incurred in carrying out the provisions of this legis-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

lation. After due consideration, the Committee concluded that the changes in existing law contained in the bill will not increase or diminish any present regulatory responsibilities of the U.S. Department of Justice or any other department or agency affected by the legislation.

### IX. VOTE OF COMMITTEE

On August 12, 1986, the Subcommittee on Patents, Copyrights, and Trademarks, with a quorum present, reported S. 2575, with an amendment in the nature of a substitute, to the Committee on the Judiciary by voice vote. On September 19, 1986, the Judiciary Committee adopted two further changes in the bill as reported by the Subcommittee. The Judiciary Committee, with a quorum present, and without objection heard, approved the amendment in the nature of a substitute. The Committee then favorably reported S. 2575, as amended, by unanimous consent.

1. 98 S.Ct. 364, 54 L.Ed.2d 376.

2. These new forms of telecommunications and computer technology are described in the Glossary below.

3. 96 S.Ct. 1619, 48 L.Ed.2d 71.

4 Multiplexing refers to the transmission of communications by means of modulation techniques whose essential parameters have been withheld from the public.

S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 3555, 1986 WL 31929, S. REP. 99-541 (Leg.Hist.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.