United States District Court
For the Northern District of California

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5
6
7   MATTHEW CAMPBELL, et al.,

8          Plaintiffs,                    No. C 13-5996 PJH

9          v.                             **ORDER GRANTING IN PART AND
                                          DENYING IN PART MOTION TO**
10  FACEBOOK INC.,                        **DISMISS**

11         Defendant.
    _____/
12

13         Defendant's motion to dismiss plaintiffs' consolidated amended complaint came on

14  for hearing before this court on October 1, 2014.  Plaintiffs Matthew Campbell, Michael

15  Hurley, and David Shadpour ("plaintiffs") appeared through their counsel, Michael Sobol.

16  Defendant Facebook, Inc. ("defendant" or "Facebook") appeared through its counsel,

17  Joshua Jessen.  Having read the parties' papers and carefully considered their arguments

18  and the relevant legal authority, and good cause appearing, the court hereby GRANTS in

19  part and DENIES in part defendant's motion as follows.

20                              **BACKGROUND**

21         This is a privacy case involving the scanning of messages sent on Facebook's social

22  media website.  Facebook describes itself as the "world's largest social networking

23  platform," with approximately 1.2 billion users worldwide.  Facebook users are able to share

24  content – such as photos, text, and video – with other users.  Users can select the group of

25  people with whom they wish to share this content, and may choose to share certain

26  information publicly (i.e., with all Facebook users), or may choose to share certain

27  information only with their "friends" (i.e., Facebook users with whom they have mutually

28  agreed to share content).  Facebook users may also choose to share certain information

United States District Court
For the Northern District of California

1   privately, with just one other Facebook user, through the use of a "private message."  While
2   not identical to email, a private message is analogous to email, in that it involves an
3   electronic message sent from one user to one or more other users.  Facebook users can
4   access a "messages" inbox through the Facebook website, which is akin to an email inbox.
5   This suit arises out of Facebook's handling of these "private messages."

6       Plaintiffs allege that Facebook scans the content of these private messages for use
7   in connection with its "social plugin" functionality.  Specifically, certain websites have a
8   Facebook "like" counter displayed on their web pages, which enables visitors of the page to
9   see how many Facebook users have either clicked a button indicating that they "like" the
10  page, or have shared the page on Facebook.  In essence, the "like" counter is a measure
11  of the popularity of a web page.

12      Plaintiffs allege that Facebook scans the content of their private messages, and if
13  there is a link to a web page contained in that message, Facebook treats it as a "like" of the
14  page, and increases the page's "like" counter by one.  Plaintiffs further allege that
15  Facebook uses this data regarding "likes" to compile user profiles, which it then uses to
16  deliver targeted advertising to its users.  Plaintiffs allege that the messaging function is
17  designed to allow users to communicate privately with other users, and that Facebook's
18  practice of scanning the content of these messages violates the federal Electronic
19  Communications Privacy Act ("ECPA," also referred to as the "Wiretap Act"), as well as
20  California's Invasion of Privacy Act ("CIPA"), and section 17200 of California's Business
21  and Professions Code.

22      Plaintiffs seek to represent a nationwide class of "all natural person Facebook users
23  located within the United States who have sent or received private messages that included
24  URLs in their content, from within two years before the filing of this action up through and
25  including the date when Facebook ceased its practice."  Consolidated Amended Complaint
26  ("CAC"), ¶ 59.

27

28

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DISCUSSION**

A.    Legal Standard

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint. Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8.

Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Specific facts are unnecessary – the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  All allegations of material fact are taken as true. Id. at 94.  However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations and quotations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level. Id.

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. See id. at 558-59. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that  the pleader is entitled to relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

In addition, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).  There are several exceptions to this rule.  The court may consider a matter that is properly the subject of judicial notice, such as matters of public record. Id. at 689; see also Mack v. South Bay Beer Distributors, Inc., 798 F.2d

1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment). Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced by the complaint and accepted by all parties as authentic. See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).

B.    Legal Analysis

　　1.    Wiretap Act

　　The Wiretap Act provides for civil penalties against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). As the statutory text indicates, the focus of this provision is on the interception of the communication itself. While another provision of the Wiretap Act prohibits the use of the contents of a communication, that prohibition applies only if the interception itself is unlawful under section 2511(1)(a). Specifically, section 2511(1)(d) applies to any person who "intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication," but only if that person knows or has reason to know "that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." See 18 U.S.C. § 2511(1)(d) (emphasis added). In other words, if there is no unlawful interception, there can be no unlawful use.

　　Facebook argues that this distinction between "interception" and "use" favors dismissal of plaintiffs' Wiretap Act claim. According to Facebook, plaintiffs' real objection is not to Facebook's interception of private messages, but rather, to Facebook's use of the information. Facebook argues that it must have access to the messages in order to facilitate their delivery, so there cannot be any unlawful interception; and thus, there can be no unlawful use. See Noel v. Hall, 568 F.3d 743, 751 (9th Cir. 2009) ("use" provision "protects against the dissemination of private communications that have been unlawfully

4

1   intercepted.") (emphasis in original).

2        However, the <u>Noel</u> court also made clear that the term "interception" should not be

3   interpreted as narrowly as urged by Facebook.  The <u>Noel</u> court quoted the Wiretap Act's

4   definition of "intercept," which is "the aural or other acquisition of the contents of any wire,

5   electronic, or oral communication through the use of any electronic, mechanical, or other

6   device," and then held that an "acquisition" occurs "when the contents of a wire

7   communication are captured or <u>redirected</u> in any way."  <u>Noel</u>, 568 F.3d at 749 (emphasis

8   added).

9        At this stage of the case, the court is unable to determine whether Facebook

10  unlawfully "redirected" the content of plaintiffs' private messages.  While Facebook must

11  certainly receive the contents of any message in order to transmit it to the recipient(s),

12  there is no evidentiary record from which the court can determine whether Facebook

13  "redirected" messages in order to scan their content for use in increasing "like" counters

14  and for targeted advertising.

15       In the CAC, plaintiffs allege that Facebook uses a software application called a "web

16  crawler" to scan any URLs that are contained in messages and to send server requests to

17  that web page.  CAC, ¶ 25.  If true, the use of this "web crawler" could constitute a

18  "redirection" of the contents of users' messages, and therefore, a separate "interception"

19  under the Wiretap Act.  Because the court takes the complaint's allegations as true, it

20  would be premature to find that plaintiffs' claims center only around Facebook's use, not its

21  interception, of users' private messages.

22       Facebook raises a second threshold challenge to plaintiffs' Wiretap Act claim.  It

23  argues that any actionable "interception" under the Wiretap Act must involve the

24  communication being acquired during <u>transmission</u>, rather than during storage.  Facebook

25  points out that Congress created a separate statute, the Stored Communications Act, to

26  address access to stored electronic communications.  Facebook argues that the "sequence

27  of actions that plaintiffs allege involves use of content already in storage."  Dkt. 29 at 27.

28       However, the CAC does indeed allege that "Facebook's interception occurred in

United States District Court

For the Northern District of California

1    transit, in transmission, and/or during transfer of users' private messages."  CAC, ¶ 25.

2    While Facebook may ultimately produce evidence showing that the messages were

3    actually accessed while in storage, not during transmission, that issue is premature at this

4    stage of the case, and would be better addressed as part of a motion for summary

5    judgment with a more developed factual record.  See also In re Yahoo Mail Litigation, 7

6    F.Supp.3d 1016, 1027-28 (N.D. Cal. 2014).

7         Having addressed the threshold issues regarding plaintiffs' Wiretap Act claim, the

8    court now turns to Facebook's primary arguments: that any alleged interception falls within

9    the "ordinary course of business" exception to the Wiretap Act, and that plaintiffs consented

10   to any alleged interception of their messages.

11              a.    "Ordinary course of business" exception

12        As mentioned above, the Wiretap Act defines "intercept" as "the aural or other

13   acquisition of the contents of any wire, electronic, or oral communication through the use of

14   any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  The statute then further

15   defines "electronic, mechanical, or other device" as "any device or apparatus which can be

16   used to intercept a wire, oral, or electronic communication other than" a device or

17   apparatus that is "being used by a provider of wire or electronic communication service in

18   the ordinary course of its business."  18 U.S.C. § 2510(5).  Essentially, the Wiretap Act

19   creates an exception for interceptions conducted by an electronic communications service

20   provider occurring in "the ordinary course of its business."

21        The scope of this "ordinary course of business" exception has been the subject of

22   extensive litigation in this district.  The parties focus on two cases in particular:  In re

23   Google Inc. Gmail Litigation, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) (referred to as

24   "Gmail") and In re Google Inc. Privacy Policy Litigation, 2013 WL 6248499 (N.D. Cal. Dec.

25   3, 2013) (referred to as "Google").

26        The Gmail case involved allegations that the defendant, Google Inc., was scanning

27   the content of users' emails in order to facilitate its delivery of targeted advertising, and to

28   create "user profiles to serve their profit interests that were unrelated to providing email

6

services to particular users."  Plaintiffs asserted that the email scanning violated the

Wiretap Act, and Google moved to dismiss based on the "ordinary course of business"

exception.  The court denied the motion to dismiss, finding that the "ordinary course of

business" exception must be given a "narrow reading" that requires "some nexus between

the need to engage in the alleged interception and the subscriber's ultimate business, that

is, the ability to provide the underlying service or good."  Gmail at *11.  In other words, the

court held that the interception must "facilitate[]" or be "incidental" to the provision of the

electronic communication service at issue.  Id.  Plaintiffs alleged that Google had

intercepted emails "for the purposes of creating user profiles and delivering targeted

advertising, which are not instrumental to Google's ability to transmit emails."  Id.  Plaintiffs

also alleged that the interceptions of emails for targeting ads and creating user profiles

occurred separately from other processes that were related to the transmission of emails,

such as spam filtering, antivirus protection, and spell check.  Thus, the complained-about

interceptions were "physically and purposively unrelated to Google's provision of email

services."  Id.  Additionally, the Gmail court further found that the defendant's actions were

in violation of its own internal policies, and thus could not be considered within the ordinary

course of its business.

    While the Google case involved the same defendant as the Gmail case, it involved a

different Google product, and thus, a different application of the "ordinary course of

business" exception.  Rather than involving claims of scanning users' emails, Google

involved allegations that Google would combine personal information collected from its

different services – Google search, Gmail, YouTube, Google Maps, Picasa, etc. – in order

to create a single user profile.  The plaintiffs pointed out that Google previously allowed its

users to keep information gathered from one Google product separate from information

gathered from other Google products, but then changed its policy to commingle all of that

data.  Plaintiffs alleged that this commingling violated the Wiretap Act, and Google moved

to dismiss, invoking the "ordinary course of business" exception.

    The Google court rejected a "narrow read" of the exception that would be "limited to

United States District Court
For the Northern District of California

1    only action taken to deliver the electronic communication." <u>Google</u> at *10.  Instead, the

2    court found that "Congress specifically chose the broader term 'business' that covers more

3    far-ranging activity."  <u>Id.</u>  The pairing of the term "business" with the terms "ordinary course"

4    further "suggest[ed] an interest in protecting a provider's customary and routine business

5    practices."  <u>Id.</u>  The <u>Google</u> court found that targeted advertising was indeed within

6    Google's ordinary course of business, and dismissed plaintiffs' Wiretap Act claim.

7         The Ninth Circuit has not yet ruled on the scope of the "ordinary course of business"

8    exception.  In the absence of any such authority, both the <u>Gmail</u> court and the <u>Google</u> court

9    looked to cases from other circuit courts, and gave careful consideration to the Second

10   Circuit's decision in <u>Hall v. Earthlink Network, Inc.</u>, 396 F.3d 500 (2nd Cir. 2005), and the

11   Tenth Circuit's decision in <u>Kirch v. Embarq Management Co.</u>, 702 F.3d 1245 (10th Cir.

12   2012).

13        In <u>Hall</u>, an email user had a dispute with his email provider (Earthlink) that resulted

14   in the termination of his email account.  However, even after the termination, Earthlink

15   continued to receive emails that were sent to the user's address, and the user complained

16   that the receipt of his messages constituted an unlawful "interception" under the Wiretap

17   Act.  The court found that receiving the emails was within Earthlink's ordinary course of

18   business, and noted that, at the relevant time, Earthlink did not have the technological

19   capacity to "bounce back" emails that were sent to a terminated email address.

20        In <u>Kirch</u>, the plaintiffs' internet service provider (Embarq) placed a device on its

21   servers that redirected its users' Internet traffic to a third-party company (NebuAd) that

22   tracked which websites the users visited and used that information to target ads.  The

23   district court granted summary judgment on two bases – but not on the ordinary course of

24   business exception.  Instead, the district court first found that Embarq did not actually

25   intercept the data, and instead merely siphoned it off to NebuAd.  Second, the district court

26   found that plaintiffs had consented to the interception by agreeing to Embarq's privacy

27   policy.  On appeal, the Tenth Circuit seemingly agreed with the first of the district court's

28   reasons, but also applied the ordinary course of business exception, finding that Embarq

United States District Court
For the Northern District of California

1   had no more access to the users' data than it did in the ordinary course of its business.

2   And because there was no aiding-and-abetting liability under the Wiretap Act, Embarq

3   could not be held responsible for any alleged interception by NebuAd.

4        While Hall and Kirch present useful discussions of the "ordinary course of business"

5   exceptions, the court ultimately finds that the factual differences preclude any meaningful

6   application of those courts' reasoning to this case.  In Hall, there was no "interception"

7   analogous to the alleged interception in this case – instead, the complained-about conduct

8   was nothing more than the receipt of emails itself, which would be "ordinary" even under

9   the narrowest view of the word.  And while Kirch involved analysis of users' web activity to

10  aid in targeting advertising (similar to the allegations in the present case), the court's

11  dismissal of the Wiretap Act claim was based primarily on the fact that any unlawful

12  interception was performed by a third-party, rather than by the defendant.  Notably, the

13  Kirch court did not explain whether its decision would have been the same if the defendant

14  itself had analyzed the web traffic to deliver targeted advertising, and the court never

15  expressly held that targeted-ad-analysis was within the ordinary course of Embarq's

16  business as an internet service provider.  Instead, the court held only that Embarq was not

17  involved in any such analysis, and thus, had the same level of access that it would have

18  even in the absence of NebuAd's analysis.  Because there are no such third-party issues in

19  this case, the court finds that Kirch is not applicable.

20       Instead, the court finds the analyses of the Gmail and Google courts to provide the

21  most value to the present case.  To summarize the difference between the two rulings,

22  Gmail took a narrow view of the "ordinary course of business" exception and held that it

23  covers only interceptions that are "instrumental" (or "facilitate[]" or are "incidental") to the

24  provision of electronic communication services, while Google took the broader view that the

25  interception need only be part of a defendant's "customary and routine" business practices.

26  In so doing, both courts presented persuasive reasons to avoid an overly broad or narrow

27  approach.

28       For instance, the Google court rejected a "narrow read" of the exception that would

9

United States District Court

For the Northern District of California

1    be "limited to only action taken to deliver the electronic communication."  Instead, as

2    mentioned above, the <u>Google</u> court found that "Congress specifically chose the broader

3    term 'business' that covers more far-ranging activity."  <u>Google</u> at *10.  The <u>Google</u> court

4    rejected the plaintiffs' argument that the exception should cover only "necessary" activities,

5    pointing out that such a rule would "beg[] the question of what exactly it means for a given

6    action to be 'necessary' to the delivery of Gmail."  <u>Google</u> at *11.

7         While the <u>Google</u> court emphasized the need to give meaning to the term

8    "business," the <u>Gmail</u> court cautioned that an overly broad interpretation of the exception

9    would read the word "ordinary" out of the statute.  <u>Gmail</u> at *8 ("The presence of the

10   modifier 'ordinary' must mean that not everything Google does in the course of its business

11   would fall within the exception.").  The <u>Gmail</u> court ultimately found that the exception must

12   be given a "narrow reading" that requires "some nexus between the need to engage in the

13   alleged interception and the subscriber's ultimate business, that is, the ability to provide the

14   underlying service or good."  <u>Gmail</u> at *11.

15        The court agrees that the word "ordinary" serves to narrow the exception, while the

16   term "business" serves to broaden it.  The court also finds it significant that the statute

17   exempts activities conducted by a "provider of wire or electronic communication service in

18   the ordinary course of <u>its</u> business."  The use of the word "its" indicates that the court must

19   consider the details of <u>Facebook's</u> business, and must not rely on a generic, one-size-fits-

20   all approach that would apply the exception uniformly across all electronic communication

21   service providers.  However, Facebook has not offered a sufficient explanation of how the

22   challenged practice falls within the ordinary course of its business, which prevents the court

23   from determining whether the exception applies.

24        For instance, in both its motion and its reply, Facebook emphasizes that plaintiffs'

25   original complaint accused Facebook of using users' message content to target advertising,

26   but points out that plaintiffs "have now abandoned their inaccurate, advertising-related

27   allegations (except for some lingering amorphous allegations)."  Dkt. 29 at 8. Facebook

28   repeatedly characterizes plaintiffs' advertising-related allegations as "false claims," or

United States District Court
For the Northern District of California

1  "factually incorrect," or lacking "any factual basis whatsoever."  Dkt. 29 at 14, 22; Dkt. 35 at

2  8.  However, Facebook then turns around and argues that serving targeted advertisements

3  is indeed the type of "legitimate purpose" that warrants application of the "ordinary course

4  of business" exception, and that "systematic conduct of the type alleged by plaintiffs that

5  generates revenue for a company is the very essence of a company acting in the ordinary

6  course of business."  Dkt. 29 at 22.

7      The court finds it problematic that Facebook is attempting to have it both ways by

8  maintaining that plaintiffs' advertising-related allegations lack any factual basis, and even to

9  emphasize that the allegations have been removed apart from a "few conclusory

10  stragglers," but then using those largely-removed allegations to invoke the "ordinary course

11  of business" exception.  Regardless, if the court does take as true plaintiffs' remaining

12  allegations regarding targeted advertising, it still finds an insufficient record on which to

13  base a finding that the challenged practice is within the ordinary course of Facebook's

14  business.  Facebook's unwillingness to offer any details regarding its targeted advertising

15  practice prevents the court from being able to determine whether the specific practice

16  challenged in this case should be considered "ordinary."

17      The court rejects the suggestion that any activity that generates revenue for a

18  company should be considered within the "ordinary course of its business."  At the hearing,

19  Facebook's counsel suggested that, because the practice is in the service of making

20  money, it must necessarily fall within the ordinary course of business.  However, as

21  discussed above, the statute's inclusion of the word "ordinary" implies some limits on a

22  company's ability to self-define the scope of the exception.  An electronic communications

23  service provider cannot simply adopt any revenue-generating practice and deem it

24  "ordinary" by its own subjective standard.  The court instead finds that any interception

25  falling within the exception must be related or connected to an electronic communication

26  provider's service, even if it does not actually facilitate the service.  While the court agrees

27  with the Google court's holding that the exception must cover more than just "necessary"

28  activities, it also agrees with the Gmail court's finding that there must be "some nexus

11

United States District Court

For the Northern District of California

1   between the need to engage in the alleged interception and the subscriber's ultimate

2   business, that is, the ability to provide the underlying service or good."  Based on the

3   current record, the court cannot find any facts alleged in the complaint or facts presented

4   by Facebook that indicate a nexus between Facebook's alleged scanning of users' private

5   messages for advertising purposes and its ability to provide its service.

6        Facebook separately argues that, even putting aside the allegations regarding

7   targeted advertising, its interception of users' messages fell within the ordinary course of its

8   business.  Facebook argues that the "receipt of its users' electronic messages is in fact

9   necessary to facilitate the transmission of the communications at issue," and thus, the

10  "ordinary course of business" exception would apply even if the court were to apply the

11  Gmail court's narrow view of the exception.

12       However, at this stage of the case, the court rejects Facebook's attempt to treat its

13  receipt of a user's message and the scanning of that message's content for advertising

14  purposes as part of the same "interception."  The court has no evidentiary record regarding

15  the technical details of Facebook's handling of messages, and thus, has no basis to

16  determine whether Facebook's alleged use of a "web crawler" constitutes an "interception"

17  separate from the receipt of the message itself.

18       At the hearing, Facebook represented that it ceased the challenged practice in

19  October 2012, but confirmed that it still conducts some analysis of the content of users'

20  messages – to protect against viruses, to filter spam messages, and to "protect the integrity

21  of the site."  The fact that Facebook can configure its code to scan message content for

22  certain purposes, but not for others, leaves open the possibility that the challenged practice

23  constitutes a separate "interception."  Simply put, the application of the "ordinary course of

24  business" exception to this case depends upon the details of Facebook's software code,

25  and those details are simply not before the court on a motion to dismiss, and thus, the court

26  must deny Facebook's motion on that basis.  However, the court may re-address the

27  "ordinary course of business" exception at the summary judgment stage of the case, with a

28  more complete evidentiary record before the court.

United States District Court

For the Northern District of California

1    The court also notes that the Gmail court found the "ordinary course of business"

2  exception inapplicable because the plaintiffs alleged that Google had violated its own

3  internal policies.  However, that finding was not critical to the court's rejection of the

4  "ordinary course of business" exception.  The Gmail court had already found that Google's

5  interceptions were "neither instrumental to the provision of email services, nor are they an

6  incidental effect of providing these services," and thus, the plaintiffs had "plausibly alleged

7  that the interceptions fall outside Google's ordinary course of business."  Gmail at *11.

8  Only after making that finding did the court address the independent argument that Google

9  had violated its own internal policies.

10    Facebook attempts to persuade the court that, because plaintiffs have not alleged a

11  violation of internal policies in this case, the "ordinary course of business" exception must

12  apply.  The court disagrees.  While the court does find that plaintiffs have failed to identify a

13  violation of internal policies[1] in this case, that analysis does not affect the above finding that

14  Facebook is not entitled to dismissal based on the ordinary course of business exception.

15    Finally, the court recognizes the need for the ECPA in general, and the "ordinary

16  course of business" exception in particular, to be read as flexible enough to adapt to

17  technologies that arose long after the statute's passage in 1986.  Much of what is "ordinary"

18  today was not at all "ordinary" in 1986, so the scope of the exception cannot be set in

19  stone.  The defendant in Gmail raised concern of a "slippery slope" that would "make it

20  impossible for electronic communication service providers to provide basic features, such

21  as email searches or spam filtering."  Gmail at *11, n.4.  Presumably, Facebook has similar

22  concerns about adding new and innovative features to its service.  However, as the Gmail

23  court noted, "a service provider can seek consent to provide features beyond those linked

24  to the provision of the service."  Id.  In other words, an electronic communication provider

25  _____

26    [1]Plaintiffs do not identify any policy which expressly disallows Facebook from scanning
its users' messages for their content for advertising purposes.  While plaintiffs argue that
27  neither the Data Use Policy nor the Statement of Rights and Responsibilities (both of which
are discussed in more detail below) expressly disclose the challenged practice, that is a
28  separate issue from whether any internal policy was affirmatively violated.

1   need not be concerned that every new feature of its service could trigger Wiretap Act

2   liability – as long as it obtains consent for those features.  And, indeed, Facebook does

3   claim that it obtained consent for the interceptions alleged in this case.

4               b.    Consent

5        If either party to a communication consents to its interception, then there is no

6   violation of the Wiretap Act, "unless such communication is intercepted for the purpose of

7   committing any criminal or tortious act."  See 18 U.S.C. § 2511(2)(d).  Consent can be

8   either express or implied, and Facebook argues that plaintiffs both expressly and impliedly

9   consented to any alleged interception.

10       In support of its express consent argument, Facebook points to its "Statement of

11  Rights and Responsibilities" and its "Data Use Policy," both of which must be agreed to by

12  users in order to use the Facebook website.  As an initial matter, the court notes that

13  Facebook's motion provides specific citations only to the Data Use Policy, and does not

14  identify any portion of the Statement of Rights and Responsibilities that purportedly

15  establishes consent.  The court has reviewed the Statement of Rights and Responsibilities,

16  and finds that it does not establish that users consented to the scanning of their messages

17  for advertising purposes, and in fact, makes no mention of "messages" whatsoever.

18  Instead, it appears that the only relevance of the Statement of Rights and Responsibilities

19  to this case is Facebook's statement that it "encourage[s]" the reader to "read the Data Use

20  Policy, and to use it to help you make informed decisions."  Dkt. 42, Ex. A at 1.

21       The parties have included three versions of the Data Use Policy (in effect at various

22  times during the class period) as part of their joint stipulation regarding judicially noticeable

23  documents.[2]  See Dkt. 41, Exs. D-F.  The specific language of the policy changes slightly in

24  these three versions, but the general principles remain the same.  Facebook informs the

25  user that "we receive data about you whenever you use or are running Facebook,"

26  including when you "send or receive a message."  Dkt. 41, Ex. D at 2; see also Ex. E at 1,

27  _____

28       [2]The court GRANTS the parties stipulation regarding judicially noticeable documents.

14

United States District Court

For the Northern District of California

1  Ex. F at 2.  As plaintiffs point out, this disclosure is made under a heading called "other

2  information we receive about you."

3      In another section, titled "how we use the information we receive," Facebook states:

4      We use the information we receive about you in connection with the services
       and features we provide to you and other users like your friends, our partners,

5      the advertisers that purchase ads on the site, and the developers that build
       the games, applications, and websites you see.  For example, in addition to

6      helping people see and find things that you do and share, we may use the
       information we receive about you:

7
       1.   as part of our efforts to keep Facebook products, services, and

8           integrations safe and secure;
       2.   to protect Facebook's or others' rights or property;

9      3.   to provide you with location features and services, like telling you and
            your friends when something is going on nearby;

10     4.   to measure or understand the effectiveness of ads you and others see,
            including to deliver relevant ads to you;

11     5.   to make suggestions to you and other users on Facebook, such as:
            suggesting that your friend use our contact importer because you

12          found friends using it, suggesting that another user add you as a friend
            because the user imported the same email address as you did, or

13          suggesting that your friend tag you in a picture they have uploaded
            with you in it; and

14     6.   for internal operations, including troubleshooting, data analysis, testing,
            research, and service improvement.

15  Dkt. 42, Ex. D at 4; see also Ex. E at 2, Ex. F at 4.

16

17      When asked, at the hearing, which portion of this policy provided notice of

18  Facebook's practice of scanning users' messages, Facebook's counsel pointed to the

19  disclosure that Facebook "may use the information we received about you" for "data

20  analysis."  However, this disclosure is not specific enough to establish that users expressly

21  consented to the scanning of the content of their messages – which are described as

22  "private messages" – for alleged use in targeted advertising[3].

23      Facebook argues that users have already consented to the messages' "interception"

24  for purposes of facilitating delivery, and thus, Facebook has blanket immunity for any use of

25  _____

26      [3]As discussed above, Facebook disputes plaintiffs' allegations that users' messages
    were scanned for the purpose of targeting advertising.  However, just as Facebook argued that

27  the allegations of the complaint must be taken as true for the purpose of analyzing its "ordinary
    course of business" argument, so too must the allegations be taken as true for the purpose of

28  analyzing its "consent" defense.

15

1    that information other than for the purpose of committing a criminal or tortious act.

2    However, as discussed above, plaintiffs have alleged that Facebook uses a "web crawler"

3    to scan any URLs that are contained in messages, and to increase the corresponding web

4    page's "like" counter accordingly, and the use of that "web crawler" may constitute a

5    separate "interception" under the Wiretap Act.  Accordingly, the court rejects Facebook's

6    argument that plaintiffs expressly consented to the alleged interceptions.

7         Facebook further argues that plaintiffs impliedly consented to the alleged

8    interceptions.  Implied consent may be based on the overall circumstances of a particular

9    communication, and the "critical question with respect to implied consent is whether the

10   parties whose communications were intercepted had adequate notice of the interception."

11   Gmail, 2013 WL 5423918 at *12.

12        Facebook argues that, "[g]iven the features of the Messages product, plaintiffs had

13   full notice of, necessarily expected, and consented to Facebook's processing of message

14   data."  Facebook also emphasizes the "URL preview" feature of Facebook messages,

15   which creates a thumbnail preview of the website whenever a user includes a valid web link

16   in a message.

17        However, as discussed above in the context of express consent, any consent with

18   respect to the processing and sending of messages itself does not necessarily constitute

19   consent to the specific practice alleged in this case – that is, the scanning of message

20   content for use in targeted advertising.  And because the court is without any evidentiary

21   record at this stage of the case, it cannot determine whether the process by which

22   Facebook generates a thumbnail preview is the same process by which it analyzes the

23   URL link to increase the web page's "like" counter.  Thus, the court finds that plaintiffs have

24   not impliedly consented to the alleged interception.

25        Accordingly, the court DENIES Facebook's motion to dismiss plaintiffs' Wiretap Act

26   claim.

27        2.    California's Invasion of Privacy Act

28        Section 631 of CIPA is the state-law corollary to the Wiretap Act, and creates civil

16

liability for:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained. . .

Facebook argues that plaintiffs' claim under section 631 fails for two reasons.  First, Facebook argues that plaintiffs consented to any alleged interception.  This argument is identical to the "consent" argument addressed above, and the court rejects it for the same reasons.

Second, Facebook argues that plaintiffs' messages could not have been intercepted "in transit," as required by the statute, because the "messages were entirely contained within Facebook's network during the purported 'interception.'" However, plaintiffs' opposition points out that Facebook's messaging function allows users to send messages to non-Facebook email addresses, which shows that the messages cannot be "entirely contained within Facebook's network."  Facebook does not address this argument in its reply.  Moreover, the complaint's allegation that users' messages were intercepted in transit is to be taken as true at this stage of the case.

Accordingly, the court DENIES Facebook's motion to dismiss plaintiffs' claim under section 631 of CIPA.

Plaintiffs also assert a claim under section 632 of CIPA, which provides for liability against "[e]very person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication."

Facebook again argues that plaintiffs consented to any alleged interception, which the court rejects for the same reasons discussed above.  However, Facebook also argues that plaintiffs have not alleged any "confidential communication."

17

United States District Court

For the Northern District of California

1    The California Supreme Court has held that a conversation is "confidential" under

2  section 632 "if a party to that conversation has an objectively reasonable expectation that

3  the conversation is not being overheard or recorded."  See Kearney v. Salomon Smith

4  Barney, Inc., 39 Cal.4th 95, 117 n.7 (2006); see also Faulkner v. ADT Sec. Services, Inc.,

5  706 F.3d 1017, 1019 (9th Cir. 2013).  California appeals courts have generally found that

6  Internet-based communications are not "confidential" within the meaning of section 632,

7  because such communications can easily be shared by, for instance, the recipient(s) of the

8  communications.  See, e.g., People v. Nakai, 183 Cal.App.4th 499, 518 (2010).  Although

9  Nakai involved an Internet chat, rather than email, the Gmail court found that "email by its

10  very nature is more similar to internet chats" than it is to phone conversations.  Gmail, 2013

11  WL 5423918 at *23.  The court finds the reasoning of the Gmail court persuasive, and

12  similarly finds that plaintiffs have not alleged facts leading to the plausible inference that

13  their communications were "confidential" under section 632.  Accordingly, Facebook's

14  motion to dismiss plaintiffs' section 632 claim is GRANTED.  Because no amendment could

15  establish that plaintiffs' communications were indeed "confidential," plaintiffs shall not be

16  granted leave to amend this claim.

17    3.    Section 17200

18    California Business & Professions Code section 17200, also referred to as the

19  "Unfair Competition Law" (or "UCL"), prohibits any "unlawful, unfair, or fraudulent business

20  act or practice."  A plaintiff seeking to assert a UCL claim must meet the statute's

21  requirements for standing, which are that he or she (1) has suffered an "injury in fact," and

22  (2) "lost money or property."  See Kwikset Corp. v. Superior Court, 51 Cal.4th 310, 322

23  (2011).  Facebook argues that plaintiffs fail to meet either requirement.

24    As to the "injury in fact" requirement, the court notes that the Ninth Circuit recently

25  rejected this argument, finding "a plaintiff demonstrates an injury sufficient to satisfy Article

26  III when bringing a claim under a statute that prohibits the defendant's conduct and grants

27  'persons in the plaintiff's position a right to judicial relief.'"  See In re Zynga Privacy

28  Litigation, 750 F.3d 1098, 1105 n.5 (9th Cir. 2014) (citing Edwards v. First American Corp.,

1  610 F.3d 514, 517 (9th Cir. 2010)).  As discussed above, plaintiffs have established viable

2  claims under the Wiretap Act and under CIPA section 631, which is sufficient to satisfy the

3  "injury in fact" requirement.

4      However, plaintiffs have not alleged that they have lost any money or property as a

5  result of Facebook's conduct.  Plaintiffs argue that they have a property interest in their

6  personal information, including the content of their messages, but courts have consistently

7  rejected such a broad interpretation of "money or property."  See, e.g., Opperman v. Path,

8  2014 WL 1973378 at *23, n.22 (N.D. Cal. May 14, 2014); In re Facebook Privacy Litigation,

9  791 F.Supp.2d 705, 715 (N.D. Cal. 2011); Claridge v. RockYou, Inc., 785 F.Supp.2d 855,

10  862 (N.D. Cal. 2011).

11      Accordingly, Facebook's motion to dismiss plaintiffs' UCL claim is GRANTED

12  without leave to amend.

13      4.    Injunctive relief

14      Facebook moves to strike plaintiffs' request for injunctive relief, arguing that it

15  ceased the challenged practice "nearly two years ago."  However, plaintiffs have

16  adequately alleged that there is a "sufficient likelihood" that Facebook could resume the

17  practice, so the court DENIES Facebook's request to strike the prayer for injunctive relief at

18  this time.

19                                    **CONCLUSION**

20      For the foregoing reasons, Facebook's motion to dismiss is GRANTED in part and

21  DENIED in part.  The motion to dismiss plaintiffs' Wiretap Act claim and CIPA section 631

22  claim is DENIED, and the motion to dismiss plaintiffs' CIPA section 632 claim and section

23  17200 claim is GRANTED.  Facebook's request to strike plaintiffs' prayer for injunctive

24  relief is DENIED.

25      **IT IS SO ORDERED.**

26  Dated: December 23, 2014

27                                    PHYLLIS J. HAMILTON
                                      United States District Judge

28