UNITED STATES DISTRICT COURT **ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE

| | | |
|---|---|---|
| MATTHEW CAMPBELL, MICHAEL | ) | **MOTION TO DISMISS** |
| HURLEY, AND DAVID SHADPOUR, | ) | |
| | ) | |
| PLAINTIFFS, | ) | PAGES 1 - 77 |
| | ) | |
| VS. | ) | NO. C 13-05996PJH |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | WEDNESDAY, OCTOBER 1, 2014 |

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

APPEARANCES:

FOR PLAINTIFFS:            LIEFF CABRASER HEIMANN & BERNSTEIN LLP
                           275 BATTERY STREET, 30TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94111
                    BY:  MELISSA A. GARDNER,
                           MICHAEL W. SOBOL, ATTORNEY AT LAW

                           LIEFF CABRASER HEIMANN & BERNSTEIN LLP
                           780 THIRD AVENUE, 48TH FLOOR
                           NEW YORK, NEW YORK  10017-2024
                    BY:  NICHOLAS R. DIAMAND, ATTORNEY AT LAW

            (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

## **A P P E A R A N C E S (CONT'D.)**

```
FOR PLAINTIFFS:          CARNEY BATES & PULLIAM PLLC
                         11311 ARCADE DIVE, SUITE 200
                         LITTLE ROCK, ARKANSAS  72212
                    BY:  HANK BATES, ATTORNEY AT LAW

FOR DEFENDANT:           GIBSON, DUNN & CRUTCHER LLP
                         1881 PAGE MILL ROAD
                         PALO ALTO, CALIFORNIA  94304
                    BY:  JOSHUA A. JESSEN,
                         JEANA BISNAR MAUTE,
                         JESSICA S. OU, ATTORNEYS AT L

                         GIBSON, DUNN & CRUTCHER LLP
                         333 SOUH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071
                    BY:  CHRISTOPHER CHORBA, ATTORNEY AT LAW
```

--oOo--

```
 1   WEDNESDAY, OCTOBER 1, 2014                        9:22 A.M.

 2                      P R O C E E D I N G S

 3           THE CLERK:  CALLING CIVIL CASE NO. 13-5996, CAMPBELL

 4   ET AL. VERSUS FACEBOOK.

 5                   (PAUSE IN THE PROCEEDINGS.)

 6           MR. SOBOL:  MORNING, YOUR HONOR.

 7           THE COURT:  GOOD MORNING.

 8           MR. SOBOL:  I'M MICHAEL SOBOL.  I'M HERE FOR THE

 9   PLAINTIFFS.

10           THE COURT:  ALL RIGHT.  GOOD MORNING.

11           MR. BATES:  GOOD MORNING.  HANK BATES FOR THE

12   PLAINTIFFS AS WELL.

13           THE COURT:  IT'S BATES?

14           MR. BATES:  BATES.

15           THE COURT:  OKAY.  ANYONE ELSE?

16           MS. GARDNER:  MELISSA GARDNER FOR THE PLAINTIFFS.

17           THE COURT:  ALL RIGHT.  GOOD MORNING.

18           MR. DIAMOND:  GOOD MORNING.  NICHOLAS DIAMOND FOR

19   PLAINTIFFS.

20           THE COURT:  SIMON?

21           MR. DIAMOND:  DIAMOND.

22           THE COURT:  ALL RIGHT.  GOOD MORNING.

23       AND FOR THE DEFENDANTS?

24           MR. JESSEN:  GOOD MORNING, YOUR HONOR.  JOSHUA JESSEN

25   FROM GIBSON, DUNN & CRUTCHER ON BEHALF OF DEFENDANT FACEBOOK.
```

```
 1              MR. CHORBA:  MORNING, YOUR HONOR.  CHRIS CHORBA ALSO

 2   GIBSON, DUNN ON BEHALF OF FACEBOOK.

 3              THE COURT:  ALL RIGHT.

 4              MS. BISNAR MAUTE:  JEANA BISNAR MAUTE, GIBSON, DUNN

 5   FOR FACEBOOK.

 6              THE COURT:  GOOD MORNING.

 7              MS. OU:  JESSICA OU, GIBSON, DUNN ALSO ON BEHALF OF

 8   FACEBOOK.

 9              THE COURT:  ALL RIGHT.  GOOD MORNING.

10         ALL RIGHT.  NOW, THIS MATTER'S ON FOR HEARING ON THE

11   MOTION TO DISMISS FILED BY FACEBOOK.

12         ONLY THE TWO WHO ARE GOING TO BE ARGUING THE MOTION NEED

13   TO REMAIN AT THE LECTERN.

14         ALL RIGHT.  I'VE READ THE PAPERS.  AND MR. JESSEN?

15              MR. JESSEN:  YES, YOUR HONOR.

16              THE COURT:  ALL RIGHT.  DID YOU WISH TO BE HEARD

17   FURTHER?

18              MR. JESSEN:  YES, YOUR HONOR.  AND I'M HAPPY TO

19   PROCEED IN WHATEVER WAY THE COURT LIKES, AND I WOULD REQUEST

20   AN OPPORTUNITY TO ADDRESS ANY COMMENTS MR. SOBOL MAKES.

21              THE COURT:  WELL, WHY DON'T -- WHY DON'T WE START

22   FIRST WITH THE -- I MEAN, THE HEART OF THE DISPUTE --

23              MR. JESSEN:  YES.

24              THE COURT:  -- IS AROUND THE WIRE TAP ACT.  BEFORE WE

25   LOOK AT THIS -- THE STATE ACT OR THE U.S. --
```

1        **MR. JESSEN:**  SURE, YOUR HONOR.

2        IF -- IF I CAN PUT THIS CASE INTO CONTEXT, TO BEGIN WITH,

3   THIS IS A CASE -- THE CONSOLIDATED AMENDED COMPLAINT

4   CHALLENGES ROUTINE COMMERCIAL CONDUCT THAT WAS COMPLETELY

5   INNOCUOUS THAT PLAINTIFFS ADMIT CEASED OVER TWO YEARS AGO,

6   AROUND OCTOBER OF 2012.

7        THE REASON THERE WAS A 15-MONTH DELAY BETWEEN FILING OF

8   THE FIRST COMPLAINT IN THIS CASE AND THE CESSATION OF THE

9   CONDUCT WAS VERY SIMPLE.  THIS IS A COPY-CAT LAWSUIT.

10        **THE COURT:**  WHEN YOU SAY "THE CESSATION OF CONDUCT,"

11   WHAT SPECIFIC CONDUCT CEASED?

12        **MR. JESSEN:**  YEAH, WELL, THE CONDUCT THAT CEASED

13   WAS -- AND I'M HAPPY TO GET INTO THE DETAILS.  THERE ARE A

14   NUMBER OF FACTORS THAT THERE ARE -- THERE -- FACEBOOK HAS

15   SOCIAL PLUG-INS, WHICH PLAINTIFFS DISCUSS IN -- COMPLAINT, AND

16   WE DISCUSS IN OUR BRIEF.  AND THESE SOCIAL PLUG-INS APPEAR ON

17   THIRD-PARTY WEBSITES.  SO AN EXAMPLE WE GIVE IN OUR MOTION IS

18   WE MIGHT HAVE A *NEW YORK TIMES* TRAVEL ARTICLE THAT HAS THE

19   PARTICULAR SOCIAL PLUG-IN.  IF YOUR HONOR'S BROWSING THE --

20        (OFF-THE-RECORD DISCUSSION.)

21        **THE COURT:**  SLOW DOWN.

22        **MR. JESSEN:**  UNDERSTOOD.

23        LOTS OF DIFFERENT TECHNOLOGY COMPANIES HAVE SOCIAL

24   PLUG-INS, OKAY, FACEBOOK AMONG THEM.  SO IF YOU GO TO,

25   EXAMPLE, A *NEW YORK TIMES* TRAVEL ARTICLE, IT MIGHT HAVE THE

1    FACEBOOK SOCIAL PLUG-IN, WHICH CAN TAKE DIFFERENT FORMS, ONE

2    OF WHICH IS THE "LIKE" BUTTON.  OFTENTIMES, THAT SOCIAL

3    PLUG-IN WILL HAVE A NUMBER NEXT TO IT, AND THAT IS THE NUMBER

4    OF PEOPLE WHO HAVE "LIKED" THIS PARTICULAR -- THIS PARTICULAR

5    WEB PAGE.

6         PRIOR TO OCTOBER OF 2012, ONE OF THE THINGS THAT WAS

7    INCLUDED IN THAT ANONYMOUS AGGREGATE NUMBER WAS IF A FACEBOOK

8    USER SENT A MESSAGE ON THE FACEBOOK PLATFORM TO ANOTHER

9    FACEBOOK USER AND INCLUDED A -- A URL, A LINK TO THAT WEBSITE,

10   THEN THE -- THE COUNT ON THAT WEBSITE WOULD GO UP.

11        NOW, THERE ARE OTHER THINGS, OF COURSE, THAT GO INTO THAT.

12   IF SOMEONE AFFIRMATIVELY IS ON THE SITE AND AFFIRMATIVELY

13   CLICKS "LIKE," THAT INCREASES IT.  IF YOU SHARE THAT ON --

14   WITH YOUR FRIENDS -- SO THERE WERE DIFFERENT -- THERE ARE

15   DIFFERENT FACTORS THAT --

16             **THE COURT:**  SO THE "LIKE" NUMBER WOULD INCREASE --

17             **MR. JESSEN:**  CORRECT.

18             **THE COURT:**  -- ONCE IT'S SENT BY A FACEBOOK USER

19   AND --

20             **MR. JESSEN:**  CORRECT.

21             **THE COURT:**  -- TO A RECIPIENT, IT WOULD INCREASE BY

22   ONE?  AND THEN IF THE PERSON -- IF THE RECIPIENT CLICKED ON

23   IT, IT WOULD INCREASE BY ANOTHER?

24             **MR. JESSEN:**  I BELIEVE THAT'S CORRECT, YOUR HONOR.

25        THERE ARE MULTIPLE THINGS THAT GO INTO IT -- NOW, THERE

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1     WAS A -- THERE'S SOME DISCUSSION OF THIS IN THE COMPLAINT.

2     THERE WAS A BUG FOR A PERIOD OF TIME WHERE THE COUNT WAS

3     ACTUALLY GOING UP BY TWO, BUT -- BUT PUTTING THE BUG ASIDE,

4     YES, THAT WAS -- IF YOU INCLUDED THE URL IN THE MESSAGE, THIS

5     ANONYMOUS AGGREGATE NUMBER, WHICH IS NOT LINKED TO A PERSON AT

6     ALL, WENT UP.

7          AND THAT'S THE CONDUCT, THAT'S -- THAT STOPPED AROUND

8     OCTOBER OF 2012.  AND THAT'S REALLY WHAT THIS -- THIS CASE IS

9     ABOUT.

10         NOW --

11              THE COURT:  WAIT.  THE CONDUCT THAT STOPPED IS THAT

12    THE NUMBERS WOULDN'T GO UP.

13              MR. JESSEN:  THAT'S CORRECT, YOUR HONOR.

14              THE COURT:  OKAY.  AFTER THE OCTOBER --

15              MR. JESSEN:  THAT'S CORRECT.  THE NUMBER --

16              THE COURT:  FACEBOOK STOPPED COUNTING THEM IN THE

17    "LIKE" --

18              MR. JESSEN:  CORRECT.  IN -- FOR -- FOR A SHARE IN A

19    MESSAGE.  THAT'S THE CONDUCT THAT STOPPED.

20         AND THAT'S REALLY -- MAYBE WE'LL HAVE SOME DISPUTE, BUT

21    THAT'S REALLY WHAT'S DRIVING THIS CASE.

22         PLAINTIFFS INITIALLY, AS YOUR HONOR --

23              THE COURT:  BUT IS IT REALLY JUST THE NUMBER THAT

24    APPEARS IN THE "LIKE" BUTTON THAT THE PLAINTIFFS ARE

25    COMPLAINING ABOUT?  ISN'T IT ACTUALLY THE SCANNING -- AND I'M

1  NOT EXACTLY SURE WHAT THAT MEANS, AND I'M SURE SOMEONE WILL

2  TELL ME -- OR REVIEW OF THE ACTUAL MESSAGE THAT WAS SENT FROM

3  A FACEBOOK USER TO SOMEONE ELSE?  SO MY QUESTION IS -- WHEN I

4  ASKED YOU WHAT CONDUCT CEASED --

5       **MR. JESSEN:**  YES.

6       **THE COURT:**  -- YOU'VE EXPLAINED THAT THE CONDUCT OF

7  COUNTING THAT TRANSMISSION AS A "LIKE" CEASED.

8       **MR. JESSEN:**  CORRECT.

9       **THE COURT:**  BUT DID THE ACTUAL CONDUCT OF SCANNING OR

10 LOOKING AT THESE MESSAGES THAT ARE SENT STOP?

11      **MR. JESSEN:**  ANYTHING THAT'S SHARED ON -- FACEBOOK IS

12 A PLATFORM.  IT'S THE WORLD'S LARGEST SOCIAL NETWORKING

13 SERVICE.  IT HAS OVER A BILLION USERS.

14      ANYTHING THAT IS SHARED ON THAT SITE IS BY DEFINITION

15 ANALYZED BY COMPUTERS.  IT HAS TO BE FOR A VARIETY OF REASONS,

16 ABOVE ALL OF WHICH ARE PROTECTING THE INTEGRITY OF THE SITE.

17      AS YOU CAN IMAGINE, SUCH A LARGE PLATFORM IS SUBJECT TO

18 ALL KIND OF ATTEMPTS TO HACK THE SITE, SERVE SPAM TO ITS

19 USERS, MAL-WARE, SO ANY -- ANYTHING THAT'S SHARED ON THE SITE,

20 YOUR HONOR, IS GOING TO BE SUBJECT TO AUTOMATIC -- AUTOMATED

21 SYSTEMS THAT ARE DESIGNED TO FILTER SPAM, PROTECT THE

22 INTEGRITY OF THE SITE, AND EVEN VERY BASIC --

23      **THE COURT:**  SO THE ANSWER TO MY QUESTION IS NO, THAT

24 THAT CONDUCT -- THAT THE PROCESS STILL EVALUATES THE -- THE --

25 WHAT'S EITHER THE CONTENT OF OR WHAT'S ATTACHED TO THE

1    MESSAGES THAT ARE SENT.

2         **MR. JESSEN:**   THERE -- THERE IS ANALYSIS THAT'S GOING

3    ON.  WE DON'T -- WE DON'T THINK THAT THAT ANALYSIS RUNS AFOUL

4    OF THE WIRETAP ACT OR ANY OTHER CRIMINAL STATUTE.  BUT --

5    AND --

6         AND AN IMPORTANT POINT TO BEAR IN MIND, YOUR HONOR, IS

7    THEY'RE NOT CHALLENGING -- THEY'RE CHALLENGING A VERY SPECIFIC

8    THING, WHICH WAS THEY SAY, FACEBOOK, YOU WERE USING THESE

9    SHARES TO INCREASE AN -- AN ANONYMOUS NUMBER.  THEY'RE NOT

10   CHALLENGING THAT VARIOUS PROCESSES HAVE TO TAKE PLACE ON

11   THE -- ON THE PLATFORM TO PREVENT SPAM, TO PREVENT THINGS LIKE

12   CHILD PORNOGRAPHY.

13        THERE ARE SYSTEMS IN PLACE TO KEEP FACEBOOK AND ITS USERS

14   SAFE AND SECURE.  SO, OF COURSE, THAT'S STILL GOING ON, YOUR

15   HONOR.  AND THEY'RE NOT -- THAT'S NOT -- THEY'RE NOT

16   COMPLAINING ABOUT THAT.

17        AND THIS IS, I THINK, AN IMPORTANT POINT ON REALLY THE

18   WIRETAP ACT CLAIM AND ALSO THE STATE LAW COROLLARY, WHICH IS

19   631.  WE'VE LAID OUT A NUMBER OF REASONS WHY WE THINK THAT

20   THAT CLAIM FAILS AS A MATTER OF LAW.  ONE OVERARCHING THING TO

21   BEAR IN MIND, I THINK, IS THESE ARE CRIMINAL STATUTES THAT

22   THEY'RE ASSERTING, PASSED IN -- INITIALLY IN (SIC) 1960'S AND

23   THEN IN THE 1980'S, YEARS BEFORE THE WORLDWIDE WEB EVEN

24   EXISTED.  BUT THEY'RE CRIMINAL STATUTES.

25        AND UNDER CLEAR SUPREME COURT PRECEDENT, NINTH CIRCUIT

1  PRECEDENT, AND YOUR HONOR'S OWN OPINIONS, THEY HAVE TO BE

2  CONSTRUED STRICTLY.  SO I THINK THAT SHOULD SORT OF OVERLAY

3  THE ENTIRE ANALYSIS HERE.

4       **THE COURT:**  SURE, BUT YOU'VE CHARACTERIZED THROUGHOUT

5  YOUR PAPERS THE PLAINTIFFS' COMPLAINT AS BEING ONE CHALLENGING

6  THE USE BY FACEBOOK OF THE INFORMATION CONTAINED OR

7  TRANSMITTED WITH THAT LINK.

8      AND AS I READ THEIR PAPERS, THEY APPEAR TO BE CONTESTING

9  MORE THAN JUST THE USE BUT ACTUALLY THE -- THE ACTUAL

10  INTERCEPTION OF THE INFORMATION.  AND I UNDERSTAND THROUGH

11  YOUR ARGUMENT IF THERE'S NO INTERCEPTION, THEN THERE CAN'T BE

12  ANY LIABILITY FOR USE --

13       **MR. JESSEN:**  CORRECT.

14       **THE COURT:**  -- IF THERE'S NO UNLAWFUL INTERCEPTION.

15       **MR. JESSEN:**  CORRECT.

16       **THE COURT:**  SO THAT DISTINCTION'S REALLY IMPORTANT.

17  YOU'VE CHARACTERIZED THEIR ARGUMENT AS ONE AGAINST USE.  I'M

18  NOT SURE THAT'S THE ONLY ARGUMENT THEY'RE MAKING.

19       **MR. JESSEN:**  WELL, YOU'RE RIGHT.  THEY'RE MAKING BOTH

20  ARGUMENTS.  THERE -- THERE ARE TWO SUBSECTIONS THAT ARE

21  IMPLICATED BY THEIR COMPLAINT AND THE WIRETAP ACT.  IT'S

22  2511(1)(A), WHICH IS THE INTERCEPTION PROVISION; AND THEN

23  2511(1)(D), WHICH IS THE USE PROVISION.

24      BUT UNDER EITHER ONE OF THOSE, YOU NEVER GET TO THE USE

25  PROVISION UNLESS THERE'S AN UNLAWFUL INTERCEPTION IN THE FIRST

```
1    PLACE.  AND THE STATUTE OF THE LANGUAGES MAKES THAT CLEAR.

2    AND THERE'S A NINTH CIRCUIT CASE *NOEL* VS. *HALL* ON THAT POINT,

3    SO THE THRESHOLD ISSUE, YOUR HONOR, IS, IS THERE AN

4    INTERCEPTION?  IS THERE UNLAWFUL INTERCEPTION?

5        NOW, THIS STATUTE DEFINES INTERCEPTION IN PART TO MEAN

6    ACQUISITION.  SO IF THE QUESTION IS, IS FACEBOOK ACQUIRING

7    USERS' MESSAGES THAT ARE SHARED ON ITS PLATFORM?  OF COURSE,

8    IT IS.  THAT'S THE NATURE OF THE COMMUNICATION SERVICE.  IT'S

9    STORING A CONTENT THAT USERS ARE SHARING ON THE PLATFORM

10   REGARDLESS OF WHETHER IT'S SHARED IN A -- IN A PUBLIC POST OR

11   IN A MESSAGE.  SO --

12       AND THEY'RE NOT CHALLENGING THAT.  THEY'RE NOT SAYING

13   THERE'S SOMETHING WRONG WITH FACEBOOK ACTUALLY HAVING THESE

14   MESSAGES.  WE HAVE THEM ALL.  THEY'RE SAYING -- WHAT THEY'RE

15   OBJECTING TO IS A SPECIFIC USE THAT THE MESSAGES ARE BEING PUT

16   TO.  AND THAT -- THERE -- THERE'S ANOTHER STATUTE, YOUR HONOR,

17   WHICH IS THE -- ALSO PART OF THE ELECTRONIC COMMUNICATIONS

18   PRIVACY ACT, THE STORED COMMUNICATIONS ACT, WHICH GOVERNS HOW

19   ELECTRONIC COMMUNICATIONS THAT ARE IN ELECTRONIC STORAGE CAN

20   BE TREATED.  OKAY?

21       SO IF THEY THINK THEY HAVE A CLAIM BASED UPON THAT, THEY

22   CAN ASSERT A CLAIM.  THEY HAVEN'T, BUT WE'RE REALLY NOT IN A

23   WORLD WHERE THE WIRETAP ACT OR -- OR SECTION 631 IS APPLYING

24   HERE.  I MEAN, THE WIRETAP ACT WAS ENACTED IN ORDER TO COMBAT

25   CRIMINAL WIRETAP.  OKAY?  AND THEY'RE -- SO IT'S --
```

1    IN THE QUINTESSENTIAL EXAMPLE, YOU HAVE PERSON "A"

2  COMMUNICATING WITH PERSON "B," EITHER OVER THE PHONE OR EITHER

3  OVER A -- OVER A COMPUTER, AND YOU HAVE AN INTERLOPER, AN

4  INTRUDER, A THIRD PARTY, TAPPING INTO THE LINE OR SOMEHOW

5  INTERCEPTING THE COMMUNICATION WHILE IT'S IN TRANSIT.

6    WE'RE NOT IN THAT UNIVERSE HERE.  OKAY?  WE ARE THE

7  PROVIDER OF THE ELECTRONIC COMMUNICATION SERVICE.  SO OF

8  COURSE WE'RE GETTING THE MESSAGES.  THEY'RE BEING STORED ON

9  FACEBOOK SERVERS, AND EVERYONE UNDERSTANDS THAT.  AND THEY'RE

10  NOT THAT CHALLENGING THAT.

11    SO I THINK A FAIR READING OF THEIR COMPLAINT IS WHILE, OF

12  COURSE, THEY SAY -- THEY USE WORDS LIKE "INTERCEPT," THAT'S

13  NOT -- THERE'S NO FACTUAL CONTENT THAT ACTUALLY SETS THAT OUT.

14    BUT I'M HAPPY TO GO INTO MORE DETAIL.  I MEAN, THERE'S

15  SEVERAL LAYERS TO THIS, YOUR HONOR.  THERE'S THE POINT ABOUT

16  "ORDINARY COURSE OF BUSINESS," WHICH WE'VE GONE OVER IN

17  DETAIL.  THERE'S THE POINT ABOUT IT HAS TO BE IN TRANSMISSION,

18  WHICH IS THE *KONOP* CASE IN THE NINTH CIRCUIT.  BUT I DON'T

19  EVEN THINK THE COURT NECESSARILY NEEDS TO GET THERE BECAUSE

20  THE THRESHOLD INQUIRY IS ACQUISITION.

21    INTERCEPTION IS ACQUISITION, AND THEY'RE NOT CHALLENGING

22  THAT WE HAVE A RIGHT TO ACQUIRE THESE MESSENGERS.  THEY'RE --

23  THEY'RE ON FACEBOOK SERVERS.  SO I DON'T THINK WE'RE IN A

24  WORLD WHERE THE WIRETAP ACT IS EVEN APPLICABLE.

25    LET'S ASSUME THAT WE ARE, THOUGH.  ASSUME FOR THE SAKE OF

```
1    ARGUMENT THAT WE ARE.  CONSENT IS A DEFENSE TO A CLAIM UNDER

2    THE WIRETAP ACT AS WELL AS 631 AS WELL AS 632.  OKAY?

3        AND AS WE'VE LAID OUT IN OUR PAPERS, THEY -- ALL

4    PLAINTIFFS ACKNOWLEDGE IN THEIR COMPLAINT THAT THEY READ AND

5    AGREED TO FACEBOOK'S TERMS OF USE -- THAT'S THE STATEMENT OF

6    RIGHTS AND RESPONSIBILITIES -- AND FACEBOOK'S DATA USE POLICY.

7            THE COURT:  WHERE IN THE DATA USE POLICY WOULD YOU

8    SAY I COULD FIND THE LANGUAGE THAT SUGGESTS THAT THEY

9    CONSENTED TO THIS CONDUCT THAT YOU'VE DESCRIBED?

10           MR. JESSEN:  WELL, A COUPLE PLACES, YOUR HONOR.

11   THE -- THE MOST OBVIOUS PLACE IS IN THE DATA USE POLICY UNDER

12   THE SECTION ABOUT "INFORMATION WE RECEIVE ABOUT YOU."  IT SAYS

13   IN NO UNCERTAIN TERMS FACEBOOK RECEIVES DATA ABOUT YOU

14   WHENEVER YOU USE OR -- WHENEVER YOU USE OR ARE RUNNING

15   FACEBOOK.  AND IT LISTS SOME EXAMPLES SUCH AS WHEN YOU SEND OR

16   RECEIVE A MESSAGE.  SO WE THINK THAT DISCLOSURE IS CRYSTAL

17   CLEAR.  FACEBOOK RECEIVED DATA ABOUT YOU WHENEVER YOU'RE USING

18   THE PLATFORM, SUCH AS WHEN YOU SEND OR RECEIVE A MESSAGE, SO I

19   THINK THAT'S THE CLEAREST PLACE.

20       FRANKLY, THE FIRST -- THE FIRST PART OF THE POLICY AS

21   WELL.

22           THE COURT:  WELL, WAIT A MINUTE.  WAIT A MINUTE.

23   THAT --

24           MR. JESSEN:  SURE.

25           THE COURT:  -- POINT IS UNDER THE SECTION "OTHER
```

1      INFORMATION WE RECEIVE ABOUT YOU."

2           **MR. JESSEN:** CORRECT. I MEAN, THAT'S --

3           **THE COURT:** AND IT SAYS, WE RECEIVE DATA ABOUT YOU

4      WHENEVER YOU USE -- WHENEVER YOU USE FACEBOOK, BUT -- BUT IT

5      DOESN'T SAY WHAT USE FACEBOOK WILL MAKE OF THAT INFORMATION WE

6      RECEIVE. SO IS THE USER TO JUST ASSUME THAT FACEBOOK WILL DO

7      WHATEVER IT WISHES WITH THE INFORMATION THAT IT RECEIVES?

8       DO YOU EVER TELL THEM SPECIFICALLY ABOUT THIS "LIKE"

9      COUNTING THAT YOU DO UPON TRANSMISSION OF A URL EMBEDDED IN A

10     EMAIL?

11          **MR. JESSEN:** THE -- THE DISCLOSURES DO NOT -- ARE NOT

12     THAT -- DON'T -- ARE NOT -- THERE'S NOT THAT LEVEL OF

13     GRANULARITY, NOR DO WE THINK IT'S REQUIRED, YOUR HONOR.

14      TO YOUR LARGER -- TO YOUR HONOR'S POINT, IF YOU GO DOWN A

15     LITTLE BIT FURTHER INTO THE POLICY, THERE IS AS SECTION CALLED

16     "HOW WE USE THE INFORMATION WE RECEIVE."

17          **THE COURT:** OKAY. THAT'S THE SECTION I WANTED YOU TO

18     REFER TO.

19          **MR. JESSEN:** YEAH.

20          **THE COURT:** OKAY.

21          **MR. JESSEN:** AND I'M HAPPY TO WALK THROUGH WHAT.

22          **THE COURT:** BECAUSE THERE IS A DIFFERENCE, IS THERE

23     NOT, BETWEEN RECEIPT AND USE BY FACEBOOK? I MEAN --

24          **MR. JESSEN:** I AGREE.

25          **THE COURT:** THE USER -- THE USER CAN UNDERSTAND AND

```
 1    APPRECIATE THAT YOU'RE GOING TO RECEIVE THE INFORMATION.

 2    BUT --

 3              MR. JESSEN:  YEAH.

 4                      (SIMULTANEOUS COLLOQUY.)

 5              THE COURT:  -- IN ORDER FOR A CONSENT TO BE VALID,

 6    DOESN'T THE CONSENT HAVE TO TELL THE FACEBOOK USER WHAT

 7    THEY'RE CONSENTING TO?  DO YOU --

 8              MR. JESSEN:  ACTUALLY --

 9              THE COURT:  DO YOU EVER TELL ANYONE IN THIS -- IN

10    THIS SET OF RULES HOW YOU'RE GOING TO USE THE INFORMATION THAT

11    YOU RECEIVE?

12              MR. JESSEN:  IT'S AN EXCELLENT QUESTION, YOUR HONOR,

13    AND -- AND LET ME ANSWER IT IN TWO PARTS.  THERE'S A LEGAL

14    ASPECT TO THIS, AND THERE'S A -- THERE'S A FACTUAL ASPECT.

15        AS A -- AS A LEGAL MATTER, CONSENT TO THE USE, THE PURPOSE

16    OF THE INTERCEPTION, WE DO NOT BELIEVE IS REQUIRED.  AND IT'S

17    CLEAR FROM THE -- FROM THE LANGUAGE OF THE STATUTE -- THERE'S

18    A CONSENT EXCEPTION BUILT INTO THE WIRETAP ACT.  AND IT SAYS

19    CONSENT -- YOU HAVE TO CONSENT TO THE INTERCEPTION.  OKAY.  SO

20    THE -- SO THE THRESHOLD ISSUE IS, IS THERE CONSENT TO THE

21    INTERCEPTION.  OKAY.

22        NOW, CONGRESS WENT ON TO SAY THAT THE CONSENT CAN BE

23    INVALID IF THE INTERCEPTION WAS MADE FOR THE PURPOSE OF

24    CREATING -- ENGAGING IN CRIMINAL OR TORTIOUS CONDUCT.  THEY

25    HAVEN'T ALLEGED THAT HERE.  I MEAN, THEY HAVE A SENTENCE ON IT
```

1   IN THEIR BRIEF, BUT THEY DON'T CHALLENGE THAT IN THEIR

2   OPPOSITION BRIEF.  IN FACT, THEY SAY THIS IS -- THIS IS

3   ROUTINE COMMERCIAL CONDUCT.

4       SO WE DON'T THINK CONSENT TO THE PURPOSE IS REQUIRED AS A

5   MATTER OF LAW.  BUT EVEN IF IT WERE, YES, YOUR HONOR, THESE --

6   THESE DISCLOSURES IN FACEBOOK'S DATA USE POLICY COVER A LOT OF

7   GROUND.  HOW WE USE THE INFORMATION WE RECEIVE.  WHEN WE WALK

8   THROUGH IT, WE THINK, ARE THE KEY PARTS THAT -- IN THE PAPERS?

9       BUT IT SAYS, AMONG OTHER THINGS -- I MEAN, WE USE THE

10  INFORMATION WE RECEIVE ABOUT YOU AS PART OF OUR EFFORTS TO

11  KEEP FACEBOOK PRODUCTS, SERVICES, AND INTEGRATION SAFE AND

12  SECURE.

13          THE COURT:  OKAY.  LET ME -- I CAN MAKE IT REALLY

14  SIMPLE.

15          MR. JESSEN:  SURE.

16          THE COURT:  WHERE IN THIS BULLETED LIST OF THESE

17  VARIOUS -- POINTS ABOUT HOW FACEBOOK USES IT --

18          MR. JESSEN:  RIGHT.

19          THE COURT:  -- WOULD I FIND WHAT YOU'VE DESCRIBED AS

20  WHAT FACEBOOK DOES WHEN IT GETS --

21          MR. JESSEN:  RIGHT.

22          THE COURT:  -- AN EMAIL WITH AN EMBEDDED URL?

23          MR. JESSEN:  MULTIPLE PLACES, YOUR HONOR.

24      SO THE FIRST PLACE -- THE FIRST PLACE IS THE VERY FIRST

25  SENTENCE UNDER "HOW WE USE THE INFORMATION WE RECEIVE."  "WE

1    USE THE INFORMATION WE RECEIVE ABOUT YOU," WHICH WHAT IS THIS

2    IS, "IN CONNECTION WITH THE SERVICES AND FEATURES WE PROVIDE

3    TO YOU AND OTHER USERS LIKE" -- AND THEN IT GOES ON TO SAY THE

4    DEVELOPERS THAT BUILD THE GAMES, APPLICATIONS, AND WEBSITES

5    YOU USE.  OKAY.

6        SO GOING BACK TO THE POINT ABOUT THE SOCIAL PLUG-INS,

7    THAT'S A WEBSITE OWNED BY A DEVELOPER THAT IS HOSTING A SOCIAL

8    PLUG-IN, SO THIS PUTS USERS ON NOTICE, AND THEY AGREE, WE USE

9    THE INFORMATION AND WE MAY -- WE MAY USE IT WITH -- IN

10   CONNECTION WITH THE WEBSITES YOU USE.

11       IF YOU DROP DOWN A LITTLE FURTHER, THERE'S A PROVISION

12   WHICH SAYS, "YOUR TRUST IS IMPORTANT TO US, WHICH IS WHY WE

13   DON'T SHARE INFORMATION WE RECEIVE ABOUT YOU WITH OTHERS

14   UNLESS WE HAVE RECEIVED YOUR PERMISSION, GIVEN YOU NOTICE,

15   SUCH AS BY TELLING YOU ABOUT IT IN THIS POLICY OR REMOVED YOUR

16   NAME AND ANY OTHER PERSONALLY IDENTIFYING INFORMATION FROM

17   IT."

18       SO -- AND THAT'S EXACTLY WHAT YOU HAVE WHEN YOU HAVE AN

19   INCREASE IN THIS ANONYMOUS AGGREGATE NUMBER ON A WEBSITE.  YOU

20   HAVE INFORMATION THAT A USER HAS SHARED AND THAT FACEBOOK HAS

21   ACQUIRED THAT IS THEN -- THERE'S NO PERSONALLY IDENTIFYING

22   INFORMATION ON IT.  THE WEBSITE'S JUST GETTING A NUMBER.  AND

23   THAT'S BEING DISCLOSED TO A DEVELOPER OF THE WEBSITE.  SO

24   THAT'S --

25            THE COURT:  SO --

```
 1              MR. JESSEN:  SO THAT'S --

 2              THE COURT:  I WOULD READ THIS PROVISION AS THEN

 3      PERMITTING YOU, FACEBOOK, TO USE THE INFORMATION IN WHATEVER

 4      WAY YOU WISHED AS LONG AS YOU REMOVED THE IDENTIFYING

 5      INFORMATION OF THE FACEBOOK USER REGARDLESS OF WHETHER OR NOT

 6      YOU'VE GIVEN NOTICE OR WHETHER OR NOT YOU'VE OBTAINED CONSENT.

 7         IS THAT WHAT'S INTENDED HERE?

 8              MR. JESSEN:  I'M NOT SURE I UNDERSTAND YOUR HONOR'S

 9      QUESTION.

10              THE COURT:  THE THREE POINTS.

11              MR. JESSEN:  RIGHT.

12              THE COURT:  THE THREE POINTS THAT YOU JUST REFERRED

13      TO --

14              MR. JESSEN:  YEAH, SURE.

15              THE COURT:  -- THEY'RE WRITTEN IN THE DISJUNCTIVE.

16      WE WON'T USE IT -- WE WON'T SHARE THE INFORMATION ABOUT YOU,

17      UNLESS --

18              MR. JESSEN:  RIGHT.

19              THE COURT:  -- WE, ONE, RECEIVE YOUR PERMISSION --

20              MR. JESSEN:  RIGHT.

21              THE COURT:  -- TWO, GIVE YOU NOTICE --

22              MR. JESSEN:  UM-HMM.

23              THE COURT:  -- OR --

24              MR. JESSEN:  RIGHT.

25              THE COURT:  -- THREE, REMOVE YOUR NAME OR OTHER
```

1    PERSONALLY IDENTIFYING INFORMATION.

2            **MR. JESSEN:**  UNDERSTOOD.

3            **THE COURT:**  SO --

4            **MR. JESSEN:**  IT IS --

5            **THE COURT:**  DOES THAT --

6            **MR. JESSEN:**  IT IS IN THE DISJUNCTIVE.

7            **THE COURT:**  IT IS.

8            **MR. JESSEN:**  YEAH, UNDER EITHER -- UNDER EITHER

9    ONE -- UNDER ANY OF THOSE BULLET POINTS, WE COULD -- WE COULD

10   DO THIS INCREMENTING OF THE COUNT.  SO I MEAN, THAT'S -- I

11   DON'T KNOW IF YOUR HONOR'S READING IT A DIFFERENT WAY, BUT IT

12   CLEARLY SAYS IF WE REMOVE YOUR NAME AND OTHER PERSONALLY

13   IDENTIFYING INFORMATION FROM IT, THEN -- THEN WE CAN SHARE IT.

14       AND THEY'RE NOT CLAIMING THAT WE DISCLOSED ANY PERSONALLY

15   IDENTIFIABLE INFORMATION TO A THIRD PARTY.

16           **THE COURT:**  RIGHT.  BUT ARE YOU CONCEDING THAT THERE

17   HAS NOT BEEN PERMISSION GIVEN OR THAT YOU HAVE NOT GIVEN

18   NOTICE?

19           **MR. JESSEN:**  NO, I THINK -- I THINK -- I THINK, YOUR

20   HONOR, THAT BOTH OF THOSE QUALIFY AS WELL.  I MEAN, THE -- THE

21   POLICY GOING BACK UP TO THE FIRST PART WE -- WE WERE

22   DISCUSSING, IT ACTUALLY DOES GO INTO DIFFERENT -- A NUMBER OF

23   DIFFERENT THINGS THAT PUT USERS ON NOTICE, RIGHT?

24       SO, YOU KNOW, WE TALK ABOUT -- ONE EXAMPLE IS -- AND THIS

25   IS NOT WHAT THIS CASE IS ABOUT EVEN THOUGH PLAINTIFFS HAVE

```
1    ATTEMPTED TO MAKE IT SIMILAR TO THE OTHER CASES -- IT'S NOT
2    ABOUT SERVING TARGETED ADS OR BUILDING USER PROFILES.  BUT IF
3    IT WERE, WE HAVE A BULLET THAT SAYS WE USE THE INFORMATION WE
4    RECEIVE ABOUT YOU TO MEASURE OR UNDERSTAND THE EFFECTIVENESS
5    OF ADS YOU AND OTHERS SEE, INCLUDING TO DELIVER RELEVANT ADS
6    TO YOU.
7         SO IF THAT CONDUCT WERE IMPLICATED, OF COURSE, WE'RE
8    PUTTING -- WE'RE PUTTING USERS ON NOTICE OF IT, AND THEY'RE
9    AGREEING TO IT.  SO THERE ARE A NUMBER OF PARTS OF THIS
10   POLICY, YOUR HONOR -- IT'S A VERY -- IT'S A BROAD POLICY, AND
11   THERE ARE A NUMBER OF ELEMENTS TO IT THAT DISCLOSE THIS
12   CONDUCT.
13        AND I WOULD GO FURTHER, THE LAST BULLET POINT, YOUR HONOR,
14   UNDER THE "HOW WE USE THE INFORMATION WE RECEIVE" TALKS ABOUT
15   DATA ANALYSIS.  RIGHT?  THAT'S WHAT THIS IS.  IT'S A NUMBER --
16   IT'S THE NUMBER OF PEOPLE WHO HAVE SHARED OR LIKED THIS
17   PARTICULAR URL.  IT'S -- IT'S DATA -- SO THERE ARE A NUMBER OF
18   USE PROVISIONS THAT WOULD ENCOMPASS THIS.  BUT, AGAIN, FOR
19   PURPOSES OF -- I DON'T THINK THE COURT EVEN HAS TO GET THERE
20   BUT BECAUSE -- BECAUSE UNDER THE WIRETAP ACT AND 631, THE
21   ISSUE IS, IS THERE CONSENT TO THE INTERCEPTION.  IF THERE'S
22   CONSENT TO THE INTERCEPTION, THEN -- THEN THAT'S THE END OF
23   THE INQUIRY, UNLESS -- UNLESS IT WAS INTERCEPTED FOR A
24   CRIMINAL OR TORTIOUS PURPOSES.  OKAY?  THEY HAVE NOT ALLEGED
25   THAT HERE.
```

1    SO I THINK CONSENT IN THIS CASE IS A COMPLETE DEFENSE, AND

2  THERE'S NO NEED TO TAKE DISCOVERY ON THIS, TO BE IN THIS COURT

3  FOR MONTHS AND YEARS FIGURING THIS OUT.  I MEAN, THESE

4  DISCLOSURES ARE CLEAR.  AND THE CASE LAW IS ALSO CLEAR UNDER

5  THE *DOUBLECLICK* CASE AND IN *U.S.* VS. *AMEN* THAT CONSENT MUST BE

6  CONSTRUED BROADLY.

7    SO FOR PURPOSES OF THE WIRETAP ACT -- AND, FRANKLY,

8  CONSENT, YOUR HONOR, IS A DEFENSE TO ALL THESE CLAIMS, TO

9  WIRETAP ACT, 631, 632.

10    I'M HAPPY TO ANSWER FURTHER QUESTIONS THE COURT MAY HAVE,

11  BUT I THINK ON THOSE TWO GROUNDS ALONE, THE WIRETAP ACT CLAIM

12  AND THE 631 CLAIM HAVE TO GO.  NO UNLAWFUL INTERCEPTION.

13  OKAY?  AND -- AND ALL PARTIES CONSENTED.  THEY AGREE THEY

14  CONSENTED.

15    AND THERE ARE -- THEY QUIBBLE WITH THE PLACEMENT OF

16  DISCLOSURES AND WHATNOT, BUT THIS KIND OF, AS WE SAY IN OUR

17  BRIEF, EDITORIAL SECOND-GUESSING, YOU KNOW, THE -- THE

18  PROVISIONS SPEAK FOR THEMSELVES.

19    NOW --

20    **THE COURT:**  THERE'S AN AWFUL A LOT OF TIME SPENT BY

21  BOTH SIDES ARGUING ABOUT THE "ORDINARY COURSE OF BUSINESS."

22    **MR. JESSEN:**  YES, YOUR HONOR.

23    **THE COURT:**  ASSUMING THAT --

24    (SIMULTANEOUS COLLOQUY.)

25    **THE COURT:**  -- THEN OBVIOUSLY I'M GOING TO HAVE TO

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    REACH THAT.

2            **MR. JESSEN:** YES, YOUR HONOR. AS YOU KNOW, IN ORDER

3    FOR THERE TO BE AN INTERCEPTION, IT HAS TO BE MADE THROUGH A

4    DEVICE. AND A DEVICE CANNOT BE SOMETHING THAT THE ELECTRONIC

5    COMMUNICATION SERVICE PROVIDER IS USING IN THE "ORDINARY

6    COURSE" OF ITS BUSINESS.

7        THERE HAVE BEEN DIFFERENT DECISIONS ON THIS IN THIS

8    DISTRICT. AND DIFFERENT COURTS HAVE COME TO DIFFERENT

9    CONCLUSIONS.

10        WE -- WE LAY OUT IN OUR REPLY BRIEF WHAT WE THINK IS THE

11    PROPER ANALYSIS. I THINK MOST IMPORTANTLY, YOUR HONOR, I

12    DON'T KNOW IF THE COURT NECESSARILY EVEN HAS TO RESOLVE THE

13    SPLIT BETWEEN THE COURT IN *GMAIL* AND THE COURT IN *GOOGLE*

14    BECAUSE EVEN UNDER THE CONSTRUCTION FROM THE *GMAIL* COURT WHERE

15    THE COURT SAID IT APPEARS THAT THIS NEEDS TO BE -- FACILITATE

16    THE TRANSMISSION OF THE MESSAGE, AGAIN, FACEBOOK'S PLATFORM IS

17    DESIGNED TO FACILITATE SHARING. THAT'S WHAT IT IS, SO OF

18    COURSE THE -- THE PROCESSES THAT ARE USED IN THAT REGARD ARE

19    FACILITATING THE MESSAGE.

20        BUT -- BUT IF THE COURT THINKS IT NEEDS TO RESOLVE THIS

21    ISSUE, WE CLEARLY THINK THAT "ORDINARY COURSE OF BUSINESS" IS

22    NOT LIMITED TO SOMETHING THAT'S NECESSARY TO -- TO MAKE -- TO

23    TRANSMIT THE COMMUNICATION.

24        AND AS WITH ANY KIND OF STATUTORY ANALYSIS, I'M HAPPY TO

25    WALK THROUGH IT, YOUR HONOR. THE FIRST THING THE COURT LOOKS

1    AT IS THE PLAIN LANGUAGE OF THE STATUTE.  AND CONGRESS REFERS

2    SPECIFICALLY TO AN ELECTRONIC COMMUNICATION SERVICE, ITS

3    "ORDINARY COURSE OF BUSINESS."  OKAY?  IT COULD HAVE SAID IT

4    HAS TO BE -- YOU KNOW, IT HAS TO BE NECESSARY TO TRANSMIT THE

5    COMMUNICATION.  AND THERE ARE OTHER PARTS OF THE STATUTE WHERE

6    SIMILAR PHRASING IS USED.

7        I MEAN, THEY BRING UP THIS "NECESSARY INCIDENT EXCEPTION."

8    THAT'S ANOTHER CASE WHERE, AGAIN, CONGRESS KNOWS HOW TO USE

9    LANGUAGE WHEN IT WANTS TO LIMIT IT.  IT DIDN'T DO THAT.

10       ANOTHER PLACE THEY ACTUALLY CITE THE DEFINITION, YOUR

11   HONOR OF "ELECTRONIC COMMUNICATION SYSTEM," WHICH IS ANOTHER

12   DEFINITION IN SECTION 2510.  IT'S -- IT'S NOT USED IN ANY OF

13   THE PROVISIONS AT ISSUE HERE.  BUT WHAT THEY SAY IS THAT THAT

14   PARTICULAR DEFINITION, "ELECTRONIC COMMUNICATION SYSTEM,"

15   MEANS ANY WIRE, RADIO, ELECTROMAGNETIC, PHOTO-OPTICAL, OR

16   PHOTOELECTRONIC FACILITIES, FOR THE TRANSMISSION OF WIRE OR

17   ELECTRONIC COMMUNICATIONS.  SO CONGRESS COULD HAVE USED THAT

18   LANGUAGE IN THE "ORDINARY COURSE OF BUSINESS" PROVISION, BUT

19   IT DIDN'T.

20       AND IT'S A WELL-SETTLED CANNON OF STATUTORY CONSTRUCTION

21   THAT WHEN CONGRESS KNOWS HOW TO SAY SOMETHING BUT DOESN'T SAY

22   THAT, THAT IT -- THAT IT MUST MEAN SOMETHING DIFFERENT.  SO WE

23   THINK "ORDINARY COURSE OF BUSINESS" MEANS WHAT IT SAYS, WHICH

24   IS BUSINESS PRACTICES THAT ARE CARRIED OUT ROUTINELY AND

25   SYSTEMATICALLY AS A MATTER OF COURSE, WHICH IS EXACTLY WHAT

1    THEY'RE ALLEGING IN THIS CASE.

2         SO TO THE EXTENT THE -- THE RELEVANCE OF HOW FACEBOOK IS

3    USING THESE MESSAGES IS RELEVANT TO THE "ORDINARY COURSE OF

4    BUSINESS" ARGUMENT, WE THINK THERE -- IF YOU READ THE

5    ALLEGATIONS IN THEIR COMPLAINT, THEY SAY FACEBOOK'S BUSINESS

6    IS, YOU KNOW, FACILITATING COMMUNICATIONS SO THAT -- YOU KNOW,

7    AND MAKING MONEY FROM THAT.  AND THE CONDUCT THAT THEY'RE

8    ALLEGING -- AND THEY TALK ABOUT HOW IMPORTANT THE "LIKE"

9    BUTTON IS, RIGHT?  AND THEY SAY THIS CONDUCT IS SYSTEMATIC AND

10   IT'S AS A MATTER OF COURSE DESIGNED TO MAKE MONEY FOR THE

11   COMPANY.

12        SO THESE ARE THE KIND -- EVEN IF YOU ACCEPT THEIR

13   ALLEGATIONS AS TRUE, AND HOW IS THAT NOT "ORDINARY COURSE OF

14   BUSINESS"?  AND THAT'S EXACTLY WHAT THE COURT IN THE *GOOGLE*

15   PRIVACY POLICY CASE SAID.  THE -- THE LANGUAGE OF THIS

16   PARTICULAR "ORDINARY COURSE OF BUSINESS" EXCEPTION CONFERS

17   BROAD IMMUNITY.  IT'S NOT LIMITED TO SOMETHING THAT'S JUST

18   NECESSARY TO FACILITATE THE -- THE MESSAGE.  NOW --

19             **THE COURT:**  SO EXACTLY HOW IS THE -- THE INFORMATION

20   USED BY FACEBOOK?  WE HAVE THE INTERCEPTION ISSUE AND THE USE

21   ISSUE, AND I'M NOT EXACTLY SURE WHAT CONDUCT WE'RE TALKING

22   ABOUT.

23             **MR. JESSEN:**  WELL --

24             **THE COURT:**  HOW IS THE INFORMATION --

25             **MR. JESSEN:**  YEAH.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
1          THE COURT:  -- THE INFORMATION I ASSUME --

2          MR. JESSEN:  RIGHT.

3          THE COURT:  -- THAT IS GLEANED FROM THE EMAILS --

4          MR. JESSEN:  RIGHT.

5          THE COURT:  -- THAT FACEBOOK USERS SEND --

6          MR. JESSEN:  YEAH.

7          THE COURT:  -- HOW IS THAT USED BY FACEBOOK?

8          MR. JESSEN:  WELL, THEY --

9          THE COURT:  DON'T I NEED TO KNOW THAT IN ORDER TO

10   DETERMINE IF IT'S USED IN THE "ORDINARY COURSE OF BUSINESS"?

11         MR. JESSEN:  I DON'T THINK YOU NEED TO KNOW THAT,

12   YOUR HONOR, BECAUSE WE ARE TALKING ABOUT USE, HOW ARE THESE

13   USED.  AND THAT'S A -- THAT'S WHAT THEIR COMPLAINT'S ABOUT.

14   THEY OBJECT TO THE USE OF THIS MESSAGE INFORMATION.

15      IT'S NOT INTERCEPTION, SO I DON'T -- I DON'T THINK YOU

16   NEED TO GET INTO THAT, YOUR HONOR.  BUT LET'S ASSUME FOR THE

17   SAKE OF ARGUMENT THAT "USE" WERE RELEVANT TO DOES THE

18   "ORDINARY COURSE OF BUSINESS" EXCEPTION APPLY.  AS WE

19   DISCUSSED EARLIER, THEY'RE COMPLAINING ABOUT AN INCREASE IN

20   THIS ANONYMOUS AGGREGATE COUNT, OKAY?  THAT'S WHAT THEY'RE

21   COMPLAINING ABOUT.  SO IF THEIR THEORY IS, WELL --

22         THE COURT:  I THOUGHT THEY WERE COMPLAINING ABOUT

23   FACEBOOK SCANNING THE EMAIL MESSAGES SENT BY FACEBOOK USERS

24   FOR INFORMATION ABOUT LINKS THAT ARE EMBEDDED IN THOSE

25   MESSAGES TO USE.
```

1     **MR. JESSEN:**  IT'S A LITTLE CONFUSING WHAT THEIR

2  COMPLAINT -- WHAT THEIR ARGUMENT IS, YOUR HONOR 'CAUSE THEY

3  KEEP CHANGING IT.  THE INITIAL COMPLAINT IS VERY FOCUSED,

4  COPYING THE OTHER CASES THAT HAVE BEEN FILED ON (SIC) THIS

5  DISTRICT ON BUILDING USER PROFILES AND SERVING TARGETED ADS.

6  OKAY?

7     THEY -- THEY ESSENTIALLY ABANDONED THOSE ALLEGATIONS IN

8  THEIR CONSOLIDATED AMENDED COMPLAINT TO FOCUS MORE ON THIS

9  INCREMENTAL "LIKE" ISSUE SO -- BUT -- BUT -- AND THEN IN THEIR

10  OPPOSITION BRIEF WHEN WE COME BACK AND SAID, WELL, YOU KNOW,

11  THIS WAS -- THIS IS NOT UNLAWFUL, THEY GO BACK TO THE EARLIER

12  ALLEGATIONS.

13     BUT I THINK REGARDLESS OF -- EVEN IF THE COURT CREDITED

14  THOSE ALLEGATIONS, IF FACEBOOK WERE USING THIS INFORMATION TO,

15  QUOTE, BUILD USER PROFILES, WHICH IT'S NOT, TO SERVE TARGETED

16  ADS, THEY ADMIT OR THEY -- THEY ALLEGE THAT'S THE BUSINESS

17  MODEL.  OKAY?  IT'S A PLATFORM WHERE LOTS --

18     **THE COURT:**  BUT YOU SAY THAT'S NOT WHAT FACEBOOK IS

19  DOING.

20     **MR. JESSEN:**  THEY'RE NOT DOING THAT.

21     **THE COURT:**  WHAT ARE THEY --

22     **MR. JESSEN:**  THE PLAINTIFFS KNOW THEY'RE NOT DOING

23  THAT.

24     **THE COURT:**  WHAT ARE THEY DOING?

25     **MR. JESSEN:**  WELL, THE -- THE -- THE -- THE

1   INCREMENTING (SIC) OF THE "LIKE" COUNT THEY'RE NOT DOING

2   ANYMORE.  BASED UPON SHARES AND MESSAGES, THAT'S NOT

3   HAPPENING, WHICH IS -- WHICH IS WHY WE WONDER WHY WE'RE HERE,

4   YOU KNOW, AND -- AND -- AND WHY THEIR CLAIM FOR INJUNCTIVE

5   RELIEF SHOULD BE STRICKEN.  THEY ACKNOWLEDGE IN FOOTNOTE 3 OF

6   THEIR COMPLAINT THIS CONDUCT, THIS INCREMENTING OF THE "LIKE"

7   COUNT, IS NOT GOING ON ANYMORE.

8       SO -- BUT THEY HAVE A THEORY.  THE THEORY IN THEIR

9   CONSOLIDATED AMENDED COMPLAINT IS THE MORE "LIKES" THERE ARE

10  ON THE WEBSITE, THIS SOMEHOW INCREASES THE AMOUNT OF DATA

11  THAT'S AVAILABLE TO FACEBOOK AND THIS -- THIS SOMEHOW HELPS

12  FACEBOOK, AND IT'S VERY AMORPHOUS.  BUT EVEN IF IT WERE

13  TRUE -- EVEN IF THAT WERE TRUE, THEIR -- UNDER THEIR OWN

14  ALLEGATIONS, THAT'S FACEBOOK'S "ORDINARY COURSE OF BUSINESS."

15      SO WE THINK THAT THAT -- YOU KNOW, THAT -- THAT

16  EXCEPTION -- OR NOT EXCEPTION.  IT'S AN EXEMPTION.  THEY SAY

17  IN THEIR BRIEF IT'S AN AFFIRMATIVE DEFENSE.  IT'S NOT AN

18  AFFIRMATIVE DEFENSE.  IT'S PART OF THE --

19          **THE COURT:**  YOU KNOW, I'M JUST LEFT WITH A VERY

20  MUDDLED SENSE AS TO WHAT THE "ORDINARY COURSE OF BUSINESS" IS.

21  AND YOU'RE WILLING TO SAY IF THE PLAINTIFFS' ALLEGATIONS ARE

22  TAKEN AS TRUE, THAT IS "ORDINARY COURSE," BUT YOU'RE NOT

23  WILLING TO SAY THAT THAT'S WHAT FACEBOOK WAS DOING, WHAT --

24          **MR. JESSEN:**  WELL --

25          **THE COURT:**  -- PLAINTIFFS ARE ACCUSING YOU OF DOING.

1        **MR. JESSEN:** WELL -- WELL, WHAT THEY WERE DOING, THEY

2    WERE INCREMENTING THE COUNT BEFORE OCTOBER OF 2012. OKAY?

3    THE NUMBER -- THE ANONYMOUS AGGREGATE NUMBER, THAT WAS

4    HAPPENING. OKAY? THAT WAS HAPPENING. THAT'S NO LONGER --

5    THAT WAS HAPPENING. AND WE WOULD SAY THAT'S "ORDINARY COURSE

6    OF BUSINESS" UNDER ANY DEFINITION.

7        WHAT WE'RE NOT DOING IS SCANNING MESSAGES SHARED ON

8    FACEBOOK'S PLATFORM TO BUILD USER PROFILES AND SERVE TARGETED

9    ADS. WE'RE NOT DOING THAT. BUT MY POINT IS EVEN -- AND WE

10   DON'T THINK THEIR COMPLAINT PLAUSIBLY ALLEGES THAT.

11       MY POINT IS EVEN IF -- EVEN IF -- EVEN IF THE COURT

12   CREDITED THOSE ALLEGATIONS, THAT WOULD STILL BE UNDER THEIR

13   OWN THEORY FACEBOOK'S "ORDINARY COURSE OF BUSINESS."

14       SO WE THINK UNDER EITHER WAY, YOUR HONOR, THE -- THE --

15   THAT WOULD BE FATAL TO THE WIRETAP ACT CLAIM.

16       I THOUGHT THE ANALYSIS BY -- BY THE COURT IN THE *GOOGLE*

17   PRIVACY POLICY OPINION WAS VERY POWERFUL AND -- AND -- AND THE

18   COURT WALKED THROUGH IT VERY SYSTEMATICALLY. HE POINTED TO

19   TWO OTHER CASES. THE NINTH CIRCUIT HASN'T WEIGHED IN ON WHAT

20   THE PARAMETERS OF THE "ORDINARY COURSE OF BUSINESS" EXEMPTION

21   ARE, BUT OTHERS CIRCUITS HAVE, INCLUDING THE SECOND CIRCUIT IN

22   THE *HALL* CASE, AND THE TENTH CIRCUIT IN THE *KIRCH* CASE. AND

23   NEITHER ONE OF THOSE CASES SAID IT HAS TO BE SOMETHING THAT'S

24   NECESSARY TO TRANSMITTING THE MESSAGE.

25       SO, YOU KNOW, AND -- AND IF YOU LOOK AT -- I MEAN, THE

```
 1    THERE IS A LARGE BODY OF CASE LAW.  IT'S TYPICALLY NOT

 2    INVOLVING ELECTRONIC COMMUNICATION SERVICES.  BUT AS TO

 3    WHETHER OR NOT COMPANIES WERE DOING SOMETHING IN THE "ORDINARY

 4    COURSE OF BUSINESS."

 5        FACEBOOK'S --

 6            THE COURT:  SO ARE YOU ADVOCATING FOR A BROAD

 7    INTERPRETATION OF "ORDINARY COURSE" THAT WOULD PERMIT FACEBOOK

 8    TO ESSENTIALLY ADOPT ANY PRACTICE IN -- IF IT BECOMES A

 9    REGULAR ROUTINE PRACTICE TO THEN HAVE THAT DETERMINED TO BE

10    "ORDINARY COURSE OF BUSINESS"?

11            MR. JESSEN:  WELL, I DON'T THINK THE COURT HAS TO

12    DETERMINE WHAT THE OUTER BOUNDS ARE OF "ORDINARY COURSE OF

13    BUSINESS."  I THINK IN THE GOOGLE PRIVACY POLICY OPINION, THE

14    COURT SAID THIS -- THIS EXEMPTION CONFERS BROAD IMMUNITY,

15    SO -- AND -- AND THAT WAS ALSO A CASE INVOLVING ALLEGEDLY

16    BUILDING USER -- GETTING USER PROFILES AND SERVING TARGETED

17    ADS, WHICH THE COURT IN THAT CASE FOUND WAS WITHIN GOOGLE'S

18    "ORDINARY COURSE OF BUSINESS."  SO WE'RE VERY SIMILARLY

19    SITUATED.

20        THERE ARE -- THERE ARE LIMITS TO IT.  AND THE CASE LAW, IT

21    HAS TO BE "ORDINARY," OKAY?  AND FACE- -- AND PLAINTIFFS SAY

22    WELL, IF YOU DON'T -- IF IT'S NOT SOMETHING THAT'S NECESSARY

23    OR INCIDENTAL TO TRANSMITTING THE MESSAGE, THEN "ORDINARY"

24    DOESN'T MEAN ANYTHING BUT IT DOES MEAN SOMETHING.  "ORDINARY,"

25    AS THE CASES TALK ABOUT IS CONDUCT THAT IS COMMON, USUAL,
```

```
1    REGULAR, AND SYSTEMATIC.  IT'S NOT SORT OF LIKE A ONE-OFF

2    THING, RIGHT?  SO A LOT --

3         THE COURT:  SO IF ANY COMPANIES DECIDES THAT THEY

4    WANT TO START DOING SOMETHING COMMONLY, ORDINARILY OR AS A

5    ROUTINE MATTER, EVEN IF THAT IS --

6         MR. JESSEN:  WELL --

7         THE COURT:  LET ME FINISH MY QUESTION.

8         MR. JESSEN:  SORRY, YOUR HONOR.  SORRY.

9         THE COURT:  -- EVEN IF THAT'S AT&T LISTENING IN TO

10   USERS' PHONE CONVERSATIONS TO SEE WHAT BRAND OF TENNIS SHOES

11   THEY'RE TALKING ABOUT -- I MEAN, IF THEY START DOING THAT ON A

12   REGULAR AND SYSTEMATIC BASIS, WOULDN'T THAT BECOME, UNDER YOUR

13   DEFINITION, "ORDINARY COURSE OF BUSINESS"?

14        MR. JESSEN:  IT -- IT WOULDN'T, YOUR HONOR.  I MEAN,

15   THEIR -- FIRST OF ALL, THAT -- THIS PARTICULAR PROVISION IS

16   LIMITED TO ELECTRONIC COMMUNICATION SERVICES, SO IT'S NOT "ANY

17   COMPANY."

18     BUT THERE ARE OTHER PROVISIONS, AND THE NECESSARY INCIDENT

19   EXCEPTION IS ONE WHERE CONGRESS PUT LIMITS ON THE ABILITY OF,

20   FOR EXAMPLE, A TELEPHONE COMPANY TO LISTEN IN ON -- ON

21   PEOPLE'S PHONE CALLS, THERE ARE LIMITS TO THAT, SO I THINK

22   THERE ARE OTHER PARTS OF THE STATUTE THAT WOULD DEAL WITH

23   THAT.

24        AND ONE -- ONE POINT THAT IS IMPORTANT -- AND PLAINTIFFS

25   MAKE THIS ASSERTION THAT SORT OF AUTOMATIC PROCESSING OF
```

1    MESSAGES AND INCREMENTING AN ANONYMOUS NUMBER IS AKIN TO A

2    PERSON LISTENING IN ON -- ON PEOPLE'S PHONE CALLS.

3        BUT CONGRESS DREW A VERY CLEAR DISTINCTION IN 1986 WHEN IT

4    UPDATED THE WIRETAP ACT TO INCLUDE ELECTRONIC COMMUNICATIONS.

5    AND IT NOTED INCLUDING -- INCLUDING IN THE LEGISLATIVE HISTORY

6    THAT ELECTRONIC COMMUNICATION SERVICES NATURALLY OBTAIN COPIES

7    OF MESSAGES, RIGHT?  AND THEY ROUTE THEM, AND THEY STORE THEM,

8    AND THAT'S THE BUSINESS.

9        SO I THINK THE -- BUT -- BUT TO GO BACK TO THE POINT OF

10   "ORDINARY COURSE OF BUSINESS" --

11           THE COURT:  BUT THE -- BUT THE CONDUCT COMPLAINED OF

12   AS YOU CHARACTERIZE IT, AND HAS THAT INCREASING THE "LIKE"

13   NUMBER --

14           MR. JESSEN:  RIGHT.

15           THE COURT:  -- DOESN'T HAVE ANYTHING TO DO WITH THE

16   PROVISION OF ELECTRONIC COMMUNICATION SERVICE, DOES IT?

17        I MEAN, ISN'T THE MESSAGE SERVICE A SEPARATE SERVICE THAT

18   FACEBOOK PROVIDES OTHER THAN SOME OF THE OTHER -- I'M NOT A

19   FACEBOOK USER, SO I DON'T HAVE ALL THE TERMINOLOGY DOWN.

20           MR. JESSEN:  I -- IT'S QUITE ALL RIGHT, YOUR HONOR.

21           THE COURT:  BUT THEY PROVIDE ALL OF THESE OTHER

22   PLATFORMS FOR COMMUNICATING WITH YOUR FRIENDS AND OTHERS.

23        ISN'T THE MESSAGE SERVICE SOMETHING THAT'S SEPARATE?  AND

24   ARE YOU SAYING THAT ANYTHING FACEBOOK DOES WITH REGARD TO THE

25   PROVISION OF ALL THESE OTHER PLATFORMS, AS LONG AS IT'S

```
 1    ORDINARY, SYSTEMATIC, AND ROUTINE, DOESN'T MATTER IF IT'S

 2    UNTETHERED TO THE PROVISION OF THE EMAIL SERVICE?

 3              MR. JESSEN:  THERE WAS A LOT PACKED INTO THAT

 4    QUESTION, YOUR HONOR.  AND LET ME TRY TO UNPACK IT.

 5         ONE THING -- JUST A TECHNICAL POINT -- THIS IS NOT

 6    TECHNICALLY "EMAIL."  IT'S -- IT'S -- EVERYONE WHO'S USING THE

 7    MESSAGING SERVICE IS -- IS -- IT'S ON FACEBOOK'S PLATFORM.

 8              THE COURT:  BUT ISN'T IT KIND OF EMAIL ON A INTERNAL

 9    INTERNET WORKS --

10                        (SIMULTANEOUS COLLOQUY.)

11              THE COURT:  -- SO TO SPEAK --

12              MR. JESSEN:  IT'S SIMILAR, YOUR HONOR.

13         BUT HISTORICALLY THE -- IF YOU WENT TO THE FACEBOOK

14    WEBSITE, WWW.FACEBOOK.COM, AS PLAINTIFFS NOTE IN THEIR

15    COMPLAINT, THERE ARE DIFFERENT WAYS TO SHARE INFORMATION,

16    RIGHT?

17         YOU CAN HAVE -- YOU CAN POST THINGS ON YOUR TIMELINE WHERE

18    WHOEVER -- YOUR FRIENDS CAN SEE IT OR WHOEVER YOU DESIGNATE

19    CAN SEE IT.  AND THERE WAS ALSO WITHIN THE SAME PLATFORM

20    THIS -- THE ABILITY TO SEND SOMEONE A MESSAGE SEPARATELY.  SO

21    WHAT'S -- THINGS HAVE -- THINGS EVOLVE OVER TIME, AND NOW

22    THERE'S A SEPARATE APP FOR IT ON YOUR IPHONE.

23         BUT IN GENERAL, THIS IS ALL PART OF THE SAME -- IT'S ALL

24    PART OF THE SAME SERVICE, YOUR HONOR, SO I -- I WOULDN'T

25    DRAW -- WE'RE NOT DRAWING A DISTINCTION BETWEEN THINGS THAT
```

1    ARE SHARED WITH YOUR FRIENDS, YOUR FACEBOOK FRIENDS, AND A

2    MESSAGE.

3         THE REALITY IS ALL OF THIS IS USING THAT INFORMATION,

4    RIGHT?  FACEBOOK RECEIVES INFORMATION -- RECEIVES DATA ABOUT

5    YOU WHENEVER YOU USE OR ARE RUNNING FACEBOOK -- USING THAT

6    INFORMATION TO -- WHETHER IT'S INCREMENTING THE "LIKE" COUNT

7    OR EVEN IF -- THEY'RE NOT DOING IT, BUT IF THEY WERE, SERVING

8    TARGETED ADS, WOULD FALL WITHIN THE "ORDINARY COURSE OF

9    BUSINESS."

10        I DON'T THINK YOUR HONOR HAS TO DETERMINE THE OUTER BOUNDS

11   OF THAT.  UNDER THE *GOOGLE* PRIVACY POLICY CASE, THE COURT

12   THERE SAID COLLECTING INFORMATION TO SERVE TARGETED ADS,

13   THAT'S QUINTESSENTIAL "ORDINARY COURSE OF BUSINESS" TODAY.

14   AND, IN FACT, IF YOU LOOK AT THE -- IF THE COURT LOOKS AT THE

15   *KIRCH* DECISION OUT OF THE TENTH CIRCUIT, THEY SAID SOMETHING

16   VERY SIMILAR.

17        SO -- AND FINALLY, YOUR HONOR, ON THE -- ON THE "ORDINARY

18   COURSE OF BUSINESS" POINT, THIS GETS BACK TO CRIMINAL STATUTES

19   MUST BE STRICTLY CONSTRUED.  I MEAN, PLAINTIFFS SEEM TO WANT

20   TO SAY, WE'LL JUST KEEP IT OPEN ENDED, BUT THAT'S NOT THE WAY

21   CRIMINAL LAW WORKS.  IT'S SUPPOSED TO DRAW VERY CLEAR LINES

22   BETWEEN THE KIND OF CONDUCT THAT'S PERMITTED AND THE KIND OF

23   CONDUCT THAT'S NOT.

24        AND SO TO THE EXTENT THERE IS AMBIGUITY IN THIS "ORDINARY

25   COURSE OF BUSINESS" EXCEPTION, IT MUST BE -- IT SHOULD BE

1    CONSTRUED IN FAVOR OF LENITY.  AND I'M HAPPY TO ANSWER MORE

2    QUESTIONS ABOUT THE -- ABOUT "ORDINARY COURSE OF BUSINESS,"

3    YOUR HONOR.

4        BUT IF THERE ARE NONE, LET ME JUST MAKE A COUPLE MORE

5    QUICK POINTS.

6        ON THE -- SO WE THINK ALL OF THOSE ARGUMENTS ARE

7    DISPOSITIVE OF BOTH -- BOTH WIRETAP ACT AS WELL AS SECTION

8    631.

9        TURNING BRIEFLY TO SECTION 632, CONSENT IS ALSO

10   DISPOSITIVE OF THAT CLAIM.  THAT'S THE EAVESDROPPING CLAIM.

11   UNDER THE -- UNDER 632, THERE HAVE -- THE -- IT'S NOT EVERY

12   COMMUNICATION.  IT'S -- IT'S COMMUNICATIONS THAT ARE COVERED

13   BY THE STATUTE.  AND IT'S VERY CLEAR THAT MESSAGES THAT ARE

14   TRADED OVER THE INTERNET IN A WRITTEN FORMAT, WHETHER IT'S --

15   WHETHER IT'S TEXTS OR CHATS OR EMAILS, AREN'T COVERED UNDER

16   THE STATUTE.

17       WE CITE FOUR CASES FOR THAT PROPOSITION IN OUR MOTION.

18   THEY DON'T ADDRESS ANY OF THEM.  SO I THINK THAT -- THAT ONE'S

19   A PRETTY EASY ONE.

20       AND EVEN -- EVEN THE 632 CLAIM DOESN'T SURVIVE THE *GMAIL*

21   CASE.  AND THEN FINALLY THEY OBVIOUSLY HAVE A CLAIM UNDER --

22   UNDER CALIFORNIA'S UNFAIR COMPETITION LAW.  WE THINK, AGAIN,

23   THAT'S ANOTHER EXCEEDINGLY EASY ONE.

24       AS YOUR HONOR DETAILED IN THE *ROCKYOU* OPINION AND AS THE

25   NINTH CIRCUIT HAS RECENTLY AFFIRMED, CALIFORNIA'S UNFAIR

1   COMPETITION LAW, TO HAVE STANDING, REQUIRES LOST MONEY OR

2   PROPERTY.  THAT'S AN ECONOMIC INJURY.

3       IT'S UNDISPUTED THAT FACEBOOK IS FREE SERVICE, AND

4   PLAINTIFFS HAVE NOT ARTICULATED ANY THEORY FOR HOW -- HOW

5   THEIR MESSAGE -- HOW THEY LOST MONEY OR PROPERTY OR SUFFERED

6   ANY KIND OF ECONOMIC HARM.  SO I THINK THAT'S ANOTHER --

7   ANOTHER VERY EASY ONE.

8       AND RELATED TO THAT, THE CLAIM FOR RESTITUTION SHOULD ALSO

9   BE STRICKEN.  THERE'S NOTHING TO RESTORE TO THESE PLAINTIFFS.

10  THEY DIDN'T HAVE ANY INVESTED INTEREST IN MONEY OR PROPERTY

11  THAT COULD BE RESTORED TO THEM.

12      AND THEN FINALLY, WE THINK THE CLAIM FOR INJUNCTIVE RELIEF

13  SHOULD BE STRICKEN 'CAUSE THEY ACKNOWLEDGE IN THEIR BRIEF THAT

14  THIS INCREMENTAL "LIKE" ISSUE CEASED APPROXIMATELY TWO YEARS

15  AGO.

16      SO I'M HAPPY TO ANSWER ANY FURTHER QUESTIONS THE COURT MAY

17  HAVE --

18          **THE COURT:**  I HAVE ONE --

19      **MR. JESSEN:**  SURE.

20          **THE COURT:**  -- GOING BACK TO THE "ORDINARY COURSE OF

21  BUSINESS," IS IT YOUR POSITION THAT THAT IS A DEFENSE -- THAT

22  EXCEPTION PROVIDES A DEFENSE TO THE 631 CLAIM AS WELL AS THE

23  WIRETAP CLAIM, EVEN THOUGH THE LANGUAGE IN THOSE TWO CLAIMS IS

24  A LITTLE DIFFERENT?

25          **MR. JESSEN:**  I'M NOT SURE IF YOUR HONOR SAID

```
 1        "EXEMPTION" OR "EXCEPTION."
 2               THE COURT:  I SAID, "EXCEPTION."  THAT'S WHAT I MEANT
 3        TO SAY.
 4               MR. JESSEN:  WE WOULD SAY THAT IT'S AN EXEMPTION.
 5        THERE'S NO -- THERE'S NO -- WHICH IS THEY HAVE THE BURDEN
 6        ESSENTIALLY IS WHAT IT BOILS DOWN TO.  THERE'S NO INTERCEPTION
 7        IF IT'S NOT --
 8               THE COURT:  OKAY.
 9               MR. JESSEN:  -- THEIR DEVICE.
10           IT'S UNCLEAR.  IT'S UNCLEAR, YOUR HONOR.  AND IT WOULD BE
11        AN ODD RESULT, WHICH I DOUBT CONGRESS OR THE CALIFORNIA
12        LEGISLATURE INTENDED, IF A COMPANY THAT WAS ACTING IN THE
13        "ORDINARY COURSE OF BUSINESS" AS AN ELECTRONIC COMMUNICATION
14        SERVICE PROVIDER COULD BE -- WOULD HAVE NO LIABILITY UNDER THE
15        WIRETAP ACT BUT COULD SOMEHOW BE LIABLE UNDER 631.  IT WOULD
16        BE A VERY ODD RESULT.
17               THE COURT:  BUT THE LANGUAGE OF THE TWO IS VERY
18        DIFFERENT.
19               MR. JESSEN:  THERE ARE DIFFERENCES IN LANGUAGE, AND
20        THERE'S NO EXPRESS -- THERE'S NOTHING IN 631 THAT EXPRESSLY
21        SAYS THAT.  I MEAN, PART OF THE PROBLEM HERE, YOUR HONOR, IS
22        WE'RE LIVING IN A WORLD WHERE THESE ARE REAL OLD STATUTES.
23        OKAY?  THE -- THE ECPA (PHONETIC), WHICH WAS PASSED IN 1986,
24        THAT WAS FOUR YEARS BEFORE THE WORLD WIDE WEB EVEN EXISTED.
25           SO PART OF THE PROBLEM HERE, THESE OLD STATUTES WERE
```

1    NOT -- THEY WERE NEVER INTENDED -- THEY WERE INTENDED TO

2    CRIMINALIZE CRIMINAL WIRETAPPING, CRIMINAL ACTIONS.  THEY WERE

3    NOT INTENDED TO COVER ROUTINE BUSINESS PRACTICES BY SOCIAL

4    NETWORKING PLATFORMS.  SO --

5         BUT I HOPE THAT ANSWERS YOUR HONOR'S QUESTION.  I'M HAPPY

6    TO ANSWER ANY OTHER QUESTIONS AS WELL.

7              **THE COURT:**  OKAY.

8              **MR. JESSEN:**  THANK YOU.

9              **THE COURT:**  ALL RIGHT?

10             **MR. SOBOL:**  THANK YOU, YOUR HONOR.  I WANT TO START

11   OFF, I SUPPOSE, TO ADDRESS THE QUESTION THAT YOU ASKED AT THE

12   OUTSET OF THIS HEARING, AND THAT IS ISN'T THE WIRETAP ACT WHAT

13   REALLY DRIVES THIS AND WHAT IS THE BEHAVIOR THAT PLAINTIFFS

14   ARE COMPLAINING ABOUT THAT MAY OR MAY NOT HAVE CEASED BECAUSE

15   WE -- WE'RE NOT CERTAIN THAT IT CEASED.

16        WE SAY AT TIMES IN OUR AMENDED COMPLAINT THAT IT MAY HAVE

17   STOPPED, BUT FROM WHAT I HEARD THIS MORNING, I MAY HAVE

18   QUESTIONS ABOUT WHETHER OR NOT THE SCANNING AND THE ANALYSIS

19   ACTUALLY IS -- IS -- CONTINUES TO GO ON.

20        THE PLAINTIFFS ARE FACEBOOK USERS WHO WENT ON LINE, OPENED

21   UP A FACEBOOK ACCOUNT, AND DID READ THROUGH THE FACEBOOK

22   MATERIALS, LOOKED AT THE REPRESENTATIONS ABOUT HOW TO USE

23   FACEBOOK AND WHAT MEANT WHAT AND HOW YOU SHARE INFORMATION,

24   HOW YOU SHARE INFORMATION PUBLICLY TO THE WHOLE WORLD, HOW YOU

25   SHARE INFORMATION WITH A SMALL GROUP -- A SELECT GROUP OF

1    FRIENDS, OR HOW YOU SHARE INFORMATION PRIVATELY IN A PRIVATE

2    MESSAGE FOR ONLY YOU AND THE RECIPIENT.

3        AND THE CONDUCT HERE IS THAT THESE PLAINTIFFS SENT PRIVATE

4    MESSAGES WITH AN UNDERSTANDING CONFIRMED BY FACEBOOK THAT IT

5    WAS ONLY GOING TO BE EXCLUSIVE BETWEEN SENDER AND RECIPIENT.

6        AND WHAT HAPPENED INSTEAD IS FACEBOOK SCANNED, ANALYZED

7    THE EMAILS, LOOKED FOR URL'S, TURNED A PRIVATE MESSAGE INTO A

8    PUBLIC ENDORSEMENT OF A THIRD-PARTY WEBSITE FOR THE PURPOSE OF

9    INCREASING "LIKE" COUNTS.  INCREASING "LIKE" COUNTS ADDS TO

10   USER PROFILES, AND USER PROFILES ARE USED FOR TARGET

11   ADVERTISING.

12       THERE'S NO QUESTION HERE THAT THE ALLEGATIONS IN THIS

13   COMPLAINT ALLEGE THAT FACEBOOK IS ENGAGED IN THIS COURSE OF

14   CONDUCT TO ENHANCE ITS ABILITY TO TARGET ADVERTISING TO ITS

15   USERS.  AND THEY DO IT BY INTERCEPTING A PRIVATE MESSAGE THAT

16   THEY SAY IS EXCLUSIVE JUST BETWEEN SENDER AND RECIPIENT.

17           **THE COURT:**  SO YOU DISAGREE, THEN, WITH THE NARROW

18   WAY IN WHICH THE DEFENSE HAS CHARACTERIZED YOUR ARGUMENT?

19           **MR. SOBOL:**  ABSOLUTELY CORRECT, YOUR HONOR.  I DO.

20           **THE COURT:**  OKAY.

21           **MR. SOBOL:**  THERE'S -- THERE'S A LOT MORE GOING ON

22   HERE, AND, YOU KNOW, THIS IS --

23       FACEBOOK TRADES IN "LIKES."  THIS IS THEIR BUSINESS MODEL.

24   THERE'S NO QUESTION ABOUT IT.  AND THEIR ABILITY TO UNPRIVATE

25   (PHONETIC) A CONFIDENTIAL MESSAGE FURTHERS THEIR "LIKE" COUNTS

1    AND THEIR ABILITIES TO TARGET ADVERTISING.

2        THIS IS NOT THE KIND OF "ORDINARY COURSE" THAT THE STATUTE

3    REFERS TO.  THIS IS A SEPARATE BUSINESS MODEL TO MAKE MONEY,

4    TO KEEP ITSELF AFLOAT.  BUT THIS IS A STATUTE DIRECTED AT

5    ELECTRONIC COMMUNICATION SERVICES.  IT GOVERNS ELECTRONIC

6    COMMUNICATION PROVIDERS.

7        AND WHEN IT SAYS, "ORDINARY COURSE 'IN ITS BUSINESS'" AND

8    IN THE SAME SENTENCE REFERS TO "SERVICE PROVIDERS," THEY'RE

9    TALKING ABOUT THE BUSINESS OF FACILITATING A TRANSMISSION TO

10   GET IT FROM ONE PLACE TO THE NEXT, NOT SOME BACKGROUND OF A

11   BUSINESS MODEL IN ORDER TO SUSTAIN ITSELF ECONOMICALLY SO THAT

12   IT CAN PROVIDE A FREE SERVICE.

13       IT PROVIDES A FREE SERVICE, AND IT MAKES -- IT'S

14   CAPITALIZED AT SEVERAL HUNDRED BILLION DOLLARS.  SO IT'S A

15   PROFIT MODEL, AND IT'S GOT NOTHING TO DO WITH PROVIDING THE

16   ELECTRONIC COMMUNICATION SERVICE.

17       YOUR HONOR, IT HELPS ME -- I APOLOGIZE -- BUT IT HELPS ME

18   TO ACTUALLY LOOK AT THE WORDS OF THE STATUTE BECAUSE ONE OF

19   THE THINGS THAT I HEARD HERE IS THAT THERE'S NO INTERCEPTION

20   AND THAT WE DON'T -- WE DON'T CONSIDER USE.

21       THERE'S TWO THINGS --

22           **THE COURT:**  WELL, DO YOU AGREE WITH THE PREMISE,

23   THOUGH, THAT, INDEED, IF THERE IS NO UNLAWFUL INTERCEPTION,

24   THERE CAN BE NO UNLAWFUL USE?

25

1    MR. SOBOL: IT IS A CORRECT STATEMENT OF LAW, IF WE

2 LOOK AT THE STATUTE, THAT YOU WILL SEE THAT IN THE ENFORCEMENT

3 SECTION OF 2511, THERE IS NOT ONLY THOU SHALT NOT INTERCEPT --

4 YOU CAN'T SNATCH IT. BUT ONCE YOU SNATCH IT, YOU CAN'T USE IT

5 EITHER. BUT THAT DOES NOT TAKE "USE" -- THE CONCEPT OF "USE"

6 OUT OF DETERMINING WHETHER IT'S AN INTERCEPTION IN THE FIRST

7 PLACE.

8    AND THE ANSWER TO THAT IS ACTUALLY IN THE WORDS OF THE

9 STATUTE. THE STATUTE SAYS, IT -- IF I -- IF I CAN, YOUR

10 HONOR, JUST SORT OF BACK UP A LITTLE BIT BEFORE I DIVE RIGHT

11 INTO THAT. BUT WHAT THE STATUTE SAYS IS, IS IT A DEVICE

12 "BEING USED" "IN THE COURSE OF ORDINARY BUSINESS?"

13    SO "USE" IS PLAINLY RELEVANT TO HOW THE DEVICE BEING

14 EMPLOYED OPERATES TO DETERMINE IS IT OPERATING "IN THE COURSE

15 OF ORDINARY BUSINESS" TO FACILITATE A TRANSMISSION, TO GET IT

16 FROM THE ONE PLACE TO THE NEXT, OR IS THE DEVICE DOING

17 SOMETHING ELSE, TO FULFILL A BUSINESS MODEL FOR PROFIT.

18    IF I -- IF I COULD DIRECT -- I THINK I HAVE IT --

19 HOPEFULLY YOU HAVE IT.

20    THE COURT: IT'S ON THE SCREEN.

21    MR. SOBOL: OH, OKAY GOOD. SO THE QUESTION IS TO

22 INTERCEPT -- THE OTHER WORD THAT WE DIDN'T HEAR IS --

23 "INTERCEPT" IS AN ACQUISITION, BUT IT'S NOT AN ACQUISITION OF

24 EVERYTHING. IT'S AN ACQUISITION OF THE CONTENTS, THE

25 SUBSTANCE, THE MEANING, THE PURPORT OF THE MESSAGE. AND YOU

1   CANNOT EQUATE SENDING AND RECEIVING A MESSAGE -- OF COURSE,

2   THEY SEND AND RECEIVE MESSAGES THAT'S PART OF WHAT THEY DO.

3   JUST LIKE THE MAILMAN.  HE TAKES A LETTER, AND HE BRINGS IT --

4   TAKES IT OUT OF ONE MAILBOX AND HE PUTS IT IN ANOTHER MAILBOX.

5   THAT'S NOT ACQUIRING THE CONTENTS.  THAT'S NOT INTERCEPTING

6   THE CONTENTS.

7       THIS STATUTE TALKS ABOUT INTERCEPTING THE CONTENTS.  THAT

8   WOULD BE THE MAILMAN TAKING IT OUT, GETTING HIS LETTER OPENER

9   OUT, OPENING UP THE LETTER, READING IT, UNDERSTANDING, AND

10  THEN MAKING USE OF IT SOMEHOW ELSE.

11      WELL, THAT HAS NOTHING TO DO WITH GETTING THAT LETTER FROM

12  ONE MAILBOX TO ANOTHER.

13      THE CONDUCT THAT WE ALLEGE IS VIOLATIVE IS NOT HOW IT

14  SCANS FOR CRIMINAL CONDUCT, ILLEGAL PORNOGRAPHY, VIRUSES.

15  THE -- THE POINT IS, IS THAT THEY DO MUCH MORE THAN THAT, MUCH

16  MORE THAN WHAT COULD REASONABLY BE COVERED UNDER THE TERMS OF

17  THE STATUTE GOVERNING ELECTRONIC SERVICE PROVIDERS.

18      AND WHAT THEY DO INSTEAD IS REACH INTO YOUR MAIL THAT THEY

19  TOLD YOU WAS PRIVATE, SCAN IT, LOOK AT IT, COMMUNICATE THE

20  CONTENTS TO A THIRD PARTY, REGISTER A PUBLIC ENDORSEMENT FOR

21  THE WHOLE WORLD TO SEE, AND THEN HAVE THAT RUN THROUGH THEIR

22  "LIKE" MACHINE FOR PROFIT.

23      SO QUITE CLEARLY, WE HAVE AN INTERCEPTION UNDER THE

24  STATUTE BECAUSE, A, THEY ACQUIRE THE CONTENTS.  THEY DERIVE

25  THE MEANING OF THOSE CONTENTS.  AND BY THE WAY, THEY'RE NOT

1   SAYING -- THEY'RE NOT SAYING -- WHAT -- WHAT THEY'RE ARGUING,

2   YOUR HONOR, IS MORE THAN JUST THEY CAN DO IT -- LOOK AT THE

3   URL'S.  WHAT THEY'RE ARGUING IS THAT APPARENTLY -- APPARENTLY

4   UNDER THEIR CURRENT DATA USE POLICY, THEY CAN READ THE WHOLE

5   DARNED THING.  THEY'RE NOT STOPPED AT -- AT GENERATING LIKES.

6   THEY'RE LOOKING FOR PERMISSION TO ACTUALLY GO AND READ

7   EVERYTHING IN THE EMAIL AND THEN GO AND USE IT, BECAUSE, AFTER

8   ALL, THAT'S OUR BUSINESS MODEL, AND THE STATUTE QUITE CLEARLY

9   SAYS WE CAN DO THAT.

10          THE COURT:  BUT YOUR COMPLAINT IS NOT THAT THEY'RE

11  READING EVERYTHING IN THE EMAIL EXCEPT TO THE EXTENT THAT

12  THEY'RE USING THE INFORMATION IN THE EMBEDDED LINK FOR OTHER

13  BUSINESS PURPOSES.

14          MR. SOBOL:  ABSOLUTELY CORRECT, YOUR HONOR.  THAT IS

15  WHAT -- THAT IS WHAT IS IN OUR COMPLAINT, BUT --

16          THE COURT:  AND WHAT --

17          MR. SOBOL:  BUT WHAT I'M POINTING OUT -- I'M SORRY.

18  I DIDN'T MEAN TO INTERRUPT IF YOU WANT TO --

19          THE COURT:  GO AHEAD.

20          MR. SOBOL:  OKAY.  SORRY.

21      WHAT I'M POINTING OUT IS WHERE THIS ARGUMENT THEY'RE

22  MAKING TAKES US.  AND A DECLARATION UNDER THE ARGUMENT THEY'RE

23  MAKING RIGHT NOW THAT THEY'RE ALLOWED TO LOOK AT THE URL'S FOR

24  THIS PURPOSE -- THEY'RE OUT TO INTERCEPT THAT THIS IS

25  "ORDINARY COURSE" -- THIS AS A USE IN THE "ORDINARY COURSE OF

1    BUSINESS" WILL ALLOW THEM TO READ EVERYBODY'S EMAIL.  THAT'S

2    THEIR ARGUMENT.

3        NOW, THEY MAY SAY, WELL, WE'RE NOT DOING IT, THEY DON'T

4    ALLEGE IT, BUT THAT'S WHERE -- THAT'S WHERE THE LEGAL

5    DECLARATION TAKES US.  AND THAT'S WHY THIS IS AN EXTREMELY

6    IMPORTANT CASE.  WE'RE IN A NEW DIGITAL WORLD.  AND THE

7    QUESTION IS, WHAT ARE WE GOING TO SAVE FROM THE PAST IN

8    APPLYING -- IN LOOKING AT A NEW DIGITAL WORLD?

9        WE HAVE A STATUTE THAT IS OLD BECAUSE IT EMBODIES

10   TIME-HONORED COMMON LAW PRINCIPLES.  IT PROVIDES A CIVIL

11   REMEDY IN ADDITION TO HAVING ORIGINS IN THE CRIMINAL LAW.  AND

12   IT PROTECTS PEOPLE AGAINST INTRUSION FROM CONTENTS.

13       AND IN THIS NEW WORLD OF ELECTRONIC COMMUNICATIONS,

14   ACQUIRING CONTENTS BECOMES ALL THE MORE IMPORTANT, VARIED, AND

15   DANGEROUS, AND WE NEED TO DRAW THE LINE.

16           **THE COURT:**  WHY WOULDN'T THE DATA USE POLICY,

17   PARTICULARLY THOSE THREE BULLET POINTS THAT I DISCUSSED WITH

18   OPPOSING COUNSEL, RESULT IN THIS COURT'S FINDING CONSENT?

19          **MR. SOBOL:**  WELL, I -- AGAIN, IT HELPS ME TO ACTUALLY

20   BE ABLE TO LOOK AT THE POLICY AND SO I -- I PUT IT UP HERE,

21   YOUR HONOR.  AND LET ME -- LET ME TAKE YOU THROUGH OUR VIEW OF

22   IT.

23       I'M SAYING -- I'M SORRY.  IT'S UP ON THE SCREEN THERE.

24   FACEBOOK HAS THE BURDEN OF PROOF, OF COURSE, ON THIS ONE TO

25   ESTABLISH CONSENT.  AND HERE'S WHY THEY COMPLETELY FAIL TO

1   CARRY THEIR BURDEN.

2       THEY POINT IN THEIR BRIEFS AGAIN THIS MORNING -- THEY

3   POINT TO ONE SECTION OF THE DATA USE POLICY TO ESTABLISH

4   GROUNDS FOR CONSENT.  AND THAT SECTION DOES NOT APPLY TO THE

5   INFORMATION AT ISSUE IN THIS CASE.

6       LET ME TAKE YOU THERE.  IF YOU'LL LOOK AT THE DATA USE

7   POLICY, WHAT YOU'LL SEE HERE IS IT DEFINES INFORMATION WE

8   RECEIVE ABOUT YOU.  INFORMATION WE RECEIVE ABOUT YOU.

9       AND LATER ON, WHEN THEY'RE TALKING ABOUT USE, THIS IS THE

10  WORLD OF INFORMATION THAT THEY'RE GOING TO USE FOR THEIR

11  BUSINESS PURPOSES.  SO THIS IS THE DISCLOSURE, YOUR HONOR, OF

12  THE INFORMATION THEY'RE GOING TO USE.  AND THERE'S THREE

13  SECTIONS.

14      ONE IS "YOUR INFORMATION."  THE -- THE NEXT IS

15  "INFORMATION THAT OTHERS SHARE ABOUT YOU," NOT REALLY RELEVANT

16  HERE BECAUSE WE'RE TALKING ABOUT INFORMATION DERIVED BY THE

17  USER.  AND THEN THE SECTION THEY POINT TO.  AND THE SECTION

18  THEY POINT TO IS "OTHER INFORMATION WE RECEIVE ABOUT YOU."

19      WE NOW HAVE THREE TYPES OF INFORMATION, YOUR HONOR.  AND

20  WHICH ONE -- WHICH OF THESE THREE TYPES -- BECAUSE THAT'S HOW

21  THEY SET IT UP -- IT'S TYPES OF INFORMATION.  WHICH OF THESE

22  THREE TYPES APPLIES HERE?

23      AND WE ARGUE THAT IT'S "YOUR INFORMATION."  BECAUSE IT'S

24  "YOUR INFORMATION" IS THE INFORMATION YOU CHOOSE TO SHARE.

25  THAT'S THE TYPE AT ISSUE.

```
 1        I'M NOT GROUSING ABOUT THE LOCATION OF TEXT IN AN

 2   AGREEMENT.  I'M TALKING ABOUT THE FACT THAT THE SECTION THEY

 3   RELY ON DOESN'T EVENLY APPLY AND, THEREFORE, THEY'VE FAILED TO

 4   MEET THEIR BURDEN ON CONSENT.

 5        IF YOU LOOK AT MY NEXT SLIDE, YOUR HONOR, AND THIS IS FROM

 6   THE -- THE CONSOLIDATED AMENDED COMPLAINT AT PARAGRAPH 21, AND

 7   THIS IS FROM -- THIS IS FACEBOOK'S MATERIAL HERE.  AND THEY

 8   SAID "HOW TO POST AND SHARE."

 9        AND AS I MENTIONED EARLIER, YOUR HONOR, YOU CAN SHARE WITH

10   A BROAD AUDIENCE.  YOU CAN SHARE WITH A GROUP OF FRIENDS.  YOU

11   CAN SHARE WITH AN INDIVIDUAL.  AND YOU CAN EVEN SHARE

12   SOMETHING PRIVATELY.  YOU CAN SHARE -- YOU COULD ALWAYS SHARE

13   WITH SOMEONE WITH A PRIVATE MESSAGE.

14        OKAY.  WELL, I GUESS WE'RE TALKING ABOUT THINGS THAT

15   PEOPLE SHARE.  AND LO AND BEHOLD, "OTHER INFORMATION WE

16   RECEIVE ABOUT YOU," THE SECTION THAT THEY RELY ON, ISN'T ABOUT

17   INFORMATION YOU SHARE.  IT'S ABOUT -- IT'S THAT -- IT REPLIES

18   (SIC) TO OTHER TYPES OF INFORMATION.  IT DOESN'T EVEN APPLY TO

19   THE PRIVATE MESSAGES THAT WE ALLEGE -- THAT WE ALLEGE ARE AT

20   ISSUE HERE.

21        WHAT WE ALLEGE AT ISSUE IS THE HARVESTING OF THE CONTENT

22   OF PEOPLE'S PRIVATE MESSAGES THAT THEY SHARE WITH ANOTHER

23   INDIVIDUAL, AND THEY RELY HERE ON A SECTION THAT SAYS, "OTHER

24   TYPES," NOT "THE INFORMATION YOU SHARE."  AND THE REASON WHY,

25   YOUR HONOR, IS BECAUSE THESE -- THAT'S ALL THEY GOT UNDER
```

 1    THESE THINGS BECAUSE THERE'S NOTHING ELSE THAT SPECIFIES WHAT

 2    THEY'RE REALLY DOING HERE, WHICH IS FROM ONE MAILBOX TO THE

 3    OTHER, WE'RE NOT ONLY GOING TO TAKE IT THERE WE'RE GOING TO

 4    OPEN IT UP AND READ IT.

 5        THAT'S NOT HERE.  THEY DIDN'T SAY THAT TO PEOPLE TO

 6    CONSENT TO.

 7            THE COURT:  WELL, THEY RELY ON THE SECTION FOLLOWING

 8    THE SECTION YOU'RE REFERRING TO ON "HOW WE USE INFORMATION WE

 9    RECEIVE."  AND IN YOUR PAPERS, YOU ARGUE THAT THAT DOES NOT

10    PERMIT THE COURT TO FIND EXPRESS CONSENT.

11            MR. SOBOL:  THAT'S RIGHT.  THE OTHER INFORMATION THAT

12    THEY RECEIVE IS OTHER -- DID I UNDERSTAND YOU RIGHT?

13            THE COURT:  I'M SORRY.  IT'S HOW WE USE THE

14    INFORMATION WE RECEIVE FROM YOU.

15            MR. SOBOL:  NO, IT DOESN'T, YOUR HONOR.  BECAUSE WHEN

16    YOU GET TO HOW WE USE THE INFORMATION, FIRST WHAT INFORMATION

17    ARE THEY TALKING ABOUT?  AND THEY'RE TALKING ABOUT THE

18    INFORMATION WE RECEIVE ABOUT YOU.  AND IF WE -- IF YOU -- IF

19    YOU GO BACK TO THE -- TO THE BIG DATA USE POLICY HERE, THIS

20    ONE UP ON THE SCREEN NOW, THIS -- WHAT THIS DEFINES IS

21    INFORMATION WE RECEIVE ABOUT YOU.  THIS IS THE INFORMATION

22    THAT THEY SAY THEY CAN USE.

23        SO WHETHER THEY CAN -- WHETHER THEY DESCRIBE HOW THEY USE

24    IT LATER OR NOT, THEY FIRST HAVE TO TELL YOU THAT -- WHICH

25    INFORMATION THEY'RE GOING TO USE TO BEGIN WITH, WHAT TYPE.

     1          AND THEY DON'T TELL YOU -- THEY DON'T TELL YOU.  THEY'RE

     2     CERTAINLY NOT SPECIFIC TO THE POINT OF TELLING YOU THAT WE'RE

     3     GOING TO OPEN -- THE CONTENT TO YOUR PRIVATE MESSAGES WILL BE

     4     ONE.  IF YOU LOOK AT THE "YOUR INFORMATION" ASPECT OF THIS,

     5     WHAT YOU SEE IS THEY DO REFER TO SOME KINDS OF EMAIL-LIKE

     6     COMMUNICATIONS, AND THOSE ARE WITH FACEBOOK ITSELF.  THEY DO

     7     DISCLOSE THAT.  AND THEY SAY QUITE CLEARLY, WELL, YOU KNOW, IF

     8     YOU EMAIL US, WE MIGHT USE THAT.

     9          BUT THEY DON'T SAY THAT WITH REGARD TO PRIVATE MESSAGES.

    10     AND THIS IS SOMETHING THAT JUDGE KOH IN THE *GMAIL* CASE, WELL,

    11     YOU KNOW, LOOK, IF YOU'RE GOING TO BE SPECIFIC ABOUT THAT KIND

    12     OF INFORMATION, YOU CERTAINLY COULD HAVE BEEN SPECIFIC ABOUT,

    13     YOU KNOW, OTHER MESSAGES TO YOUR FRIENDS THAT YOU CHOOSE TO

    14     SHARE PRIVATELY.  AND IT'S NOT THERE.

    15          THE SECTION THAT THEY DO RELY ON, YOUR HONOR, LOOK AT IT.

    16     IT'S NOT EVEN ABOUT -- IT'S NOT ABOUT USER-DERIVED CONTENT.

    17     THE "YOUR INFORMATION" IS ABOUT USER-DERIVED CONTENT.  THIS

    18     ONE'S DATA.  THIS IS DATA.  THIS IS DATA OF A TECHNICAL

    19     NATURE.  IT'S METADATA.  IT'S WHAT'S ON THE OUTSIDE OF THE

    20     ENVELOPE.  IT'S NOT ABOUT THE CONTENTS OF YOUR PRIVATE -- YOU

    21     CANNOT REASONABLY READ THAT TO PUT PEOPLE ON NOTICE THAT

    22     SOMEHOW THE CONTENT OF YOUR PRIVATE MESSAGE -- DATA WE RECEIVE

    23     ABOUT YOU WHEN YOU SEND A MESSAGE IS NOT, OH, WHAT YOU SAID IN

    24     THE MESSAGE.  THAT'S WHAT THEY WOULD HAVE NEEDED TO HAVE DONE,

    25     AND THEY DIDN'T DO IT.

1    THE LINE OF DEMARCATION HERE, YOUR HONOR, REALLY HAS TO

2  BE -- FOR PRIVATE MESSAGES IS DRAWN FROM THE METADATA.  THAT'S

3  UP FOR GRABS.  BUT IF IT'S NOT DRAWN THERE, THERE'S NO

4  LIMITATION WHATSOEVER.

5    AND WHAT FACEBOOK IS BASICALLY ARGUING IN THAT POINT OF

6  VIEW IS THAT THE CONTENTS OF PRIVATE MESSAGES ARE NO MORE

7  DIFFERENT THAN A PUBLIC POST FOR OUR PURPOSES.  AND I THINK WE

8  HEARD THAT AGAIN TODAY, THAT THAT'S WHAT FACEBOOK'S GOING TO

9  DO.  THEY'RE GOING TO TREAT YOUR PRIVATE MESSAGE LIKE A

10  PRIVATE (SIC) POST FOR THEIR PURPOSE.

11    NOW, OBVIOUSLY THAT'S NOT WHAT THE DATA USE POLICY SAYS.

12  DATA USE POLICY SAYS YOU HAVE A CHOICE WHAT YOU CAN SHARE.

13  BUT IN THE FACE OF THOSE REPRESENTATIONS, GIVING THE ILLUSION

14  USERS HAVING A CHOICE AS TO WHAT THEY CAN SHARE, THEY GO AHEAD

15  AND AVAIL THEMSELVES OF THAT WITHOUT ADEQUATELY DISCLOSING IT.

16    THEY ALSO ARGUE FOR AN IMPLIED CONSENT, AND, YOU KNOW,

17  THE -- AGAIN, THE -- THE *GMAIL* CASE IS INSTRUCTIVE.  BUT

18  IMPLIED CONSENT, YOUR HONOR, IS NOT CONSTRUCTIVE.  IT'S NOT

19  INQUIRY NOTICE.  IT'S NOT -- IT'S ACTUAL.  AND WHAT WE HAVE IS

20  ALLEGATIONS IN THE COMPLAINT THAT THE PLAINTIFFS ACTUALLY DID

21  NOT CONSENT.

22    IN ADDITION TO THAT, IF YOU LOOK AT THE YAHOO! EMAIL

23  LITIGATION CASE, THE CASE THAT WE SUBMITTED UNDER A STATEMENT

24  OF RECENT OPINION, THE PURPOSE AND USE TO WHICH YOU PUT THINGS

25  IS VERY IMPORTANT.  AND THERE, THE JUDGE DID FIND CONSENT.

```
 1        BUT LOOK, YOUR HONOR, AT THE NATURE OF THE DISCLOSURE IN

 2   THE YAHOO! CASE.  YAHOO!'S AUTOMATED SYSTEMS SCAN AND ANALYZE

 3   ALL INCOMING AND OUTGOING COMMUNICATIONS CONTENT SENT AND

 4   RECEIVED FROM YOUR ACCOUNT, PARENTHETICAL, INCLUDING THOSE

 5   STORED IN YOUR ACCOUNT, TWO, WITHOUT LIMITATION, PROVIDE

 6   PERSONALLY RELEVANT PRODUCT FEATURES AND CONTENT TO MATCH AND

 7   SERVE TARGETED ADVERTISING.

 8        THAT'S A GOOD DISCLOSURE, JUDGE KOH FOUND.  AND THERE'S

 9   JUST NOTHING LIKE IT HERE.  THE ONLY IMPLAUSIBLE ARGUMENT THEY

10   HAVE IS THAT YOU GET A URL THUMBNAIL PREVIEW IF YOU EMBED A

11   URL IN YOUR MESSAGE AND THAT SOMEHOW USERS ARE SUPPOSED TO

12   GLEAN FROM THAT THAT THEY'RE GOING TO READ MY MESSAGE AND --

13   AND PURPORT TO MAKE IT A PUBLIC ENDORSEMENT OF SOME

14   THIRD-PARTY WEBSITE.  IT'S JUST NOT PLAUSIBLE, AND IT'S NOT,

15   IN FACT, WHAT HAPPENED.

16        SO THERE'S CLEARLY NO CONSENT HERE, YOUR HONOR.

17        GETTING BACK TO THE "ORDINARY COURSE OF BUSINESS," I THINK

18   IT'S IMPORTANT TO LOOK AT THE MOST DIRECT CASE ON POINT, YOUR

19   HONOR.  IN THE GMAIL LITIGATION, THERE'S A VERY CAREFUL

20   ANALYSIS OF THE LEGISLATIVE HISTORY, THE CASE LAW, THE

21   STATUTORY SCHEME, CAME TO THE WELL-REASONED CONCLUSION THAT

22   THE EXCEPTION ONLY APPLIES IF THE INTERCEPTION FACILITATED A

23   TRANSMISSION OR WAS INCIDENTAL TO THE TRANSMISSION OF A

24   COMMUNICATION.  WHAT YOU'RE REALLY TALKING ABOUT IS GETTING IT

25   FROM ONE PLACE TO THE NEXT.
```

1    AND WE DON'T WANT TO TRIP UP SERVICE PROVIDERS IN THEIR

2    ABILITY TO DO THAT.  AND IF IN THEIR ABILITY TO DO THAT THEY

3    NEED TO INTERCEPT THE CONTENTS ARGUABLY, LIKE CHECKING FOR A

4    VIRUS OR CHECKING FOR PORNOGRAPHY, ILLEGAL PORNOGRAPHY, THEN

5    WE'RE NOT GOING TO HOLD THEM LIABLE HERE.

6         BUT THAT'S A LOT DIFFERENT, AS JUDGE KOH FOUND, TO

7    BLESSING A BUSINESS MODEL ASSOCIATED WITH PROVIDING MESSAGE

8    SERVICES.  THERE CAN BE A NUMBER OF THINGS.  YOU KNOW, YOUR

9    HONOR USED THE EXAMPLE OF AT&T EARLIER, AND WE -- WE CAME UP

10   WITH -- WITH ONE OF OUR OWN.  AND IT'S QUITE SIMPLER.  WE

11   SAID, WELL, I MEAN, WHAT'S TO STOP COMCAST?  WHAT'S TO STOP

12   COMCAST, WHICH IS AN ELECTRONIC COMMUNICATION SERVICE

13   PROVIDER, FROM WIRETAPPING EVERYBODY'S PHONE AND SETTING UP

14   SOME SORT OF SURVEILLANCE EQUIPMENT TO LOOK FOR PATTERNS, SOME

15   SORT OF ALGORITHM THAT WILL LOOK FOR, YOU KNOW, WHAT SORT OF

16   GOODS OR SERVICES PEOPLE ARE IN INTERESTED IN AND THEN TURN

17   AROUND AND SEND THEM TARGETED ADVERTISING THROUGH THEIR EMAIL

18   SERVICE, WHICH THEY ALSO PROVIDE.  AND THEN THEY SAY, WELL,

19   THIS IS GOOD FOR EVERYBODY.  MAYBE THEY DON'T PROVIDE A FREE

20   SERVICE.  BUT MAYBE THEY SAY, WELL, THIS KEEPS THE PRICE DOWN.

21   THIS IS A GOOD THING.  THIS IS A BUSINESS MODEL.  COME ON,

22   WE'RE IN A BUSINESS OF ELECTRONICS -- SO WE CAN WIRETAP YOUR

23   PHONE TO GIVE YOU DIRECT -- DIRECT TARGETED ADVERTISING 'CAUSE

24   THAT'S WHAT --

25         **THE COURT:**  I DON'T THINK THEY NEED TO WIRETAP YOUR

1   PHONE THEY GET THAT INFORMATION SOMEWHERE ELSE.

2          **MR. SOBOL:**  MAYBE THEY DON'T NEED TO, YOUR HONOR, BUT

3   CERTAINLY UNDER FACEBOOK'S PERMUTATION, THIS WOULD BE

4   PERMITTED, TOO.  THERE'D BE NO STOP TO IT.

5          **THE COURT:**  WELL, WE HAVE IN THE DISTRICT, TWO

6   DIFFERENT VIEWS OF TWO OF MY COLLEAGUES ON THE "ORDINARY

7   COURSE OF BUSINESS" EXCEPTION.  BOTH ARE WELL-REASONED

8   OPINIONS, AND I'M PROBABLY GOING TO END UP SOMEWHERE IN THE

9   MIDDLE OF THOSE TWO.

10         **MR. SOBOL:**  WELL, I -- FOR DIFFERENT REASONS, YOUR

11  HONOR, THAN DEFENDANT, I DON'T THINK YOU NEED TO REALLY MAKE

12  THAT CHOICE.  WHAT YOU HAVE IS EVERY COURT THAT HAS LOOKED AT

13  AN ISSUE SIMILAR TO THIS, WHICH IS THE SECRET ACQUISITION OF

14  PRIVATE MESSAGES HAS FOUND THAT THAT'S OUTSIDE OF THE

15  "ORDINARY COURSE."  AND THAT'S JUDGE KOH'S OPINION IN THE

16  *GMAIL* CASE.

17     JUDGE GREWAL -- DID I PRONOUNCE THAT RIGHT?

18         **THE COURT:**  UM-HMM.

19         **MR. SOBOL:**  JUDGE GREWAL, HIS OPINION, I THINK,

20  DOESN'T REALLY APPLY HERE.  IT'S A DIFFERENT SET OF FACTS.  I

21  THINK I HEARD EARLIER THAT IT HAD TO DO WITH PROVIDING

22  TARGETED ADVERTISING -- EMAIL, BUT THAT'S NOT WHAT IT HAD TO

23  DO WITH.  THAT HAS TO DO -- THAT'S A *GOOGLE* PRIVACY CASE.

24  THAT CASE HAS TO DO WITH WHETHER OR NOT IT WAS PROPER FOR

25  *GOOGLE* TO TAKE THE DATA FROM ALL ITS VARIOUS SERVICES --

1              **THE COURT:**  AND SHARE THEM.

2           **MR. SOBOL:**  -- AND SHARE THEM.

3      UNDER AN ANNOUNCED BUSINESS PLAN MADE PUBLIC.

4       AND ULTIMATELY WHAT HE CAME DOWN TO, IS HE SAYS, WELL,

5  LOOK, YOU KNOW, THIS IS -- THIS IS AN ANNOUNCED BUSINESS PLAN

6  TO THE GENERAL PUBLIC.  THAT SEEMS LIKE ORDINARY BUSINESS TO

7  ME.

8       NOW, YOU DON'T HAVE TO DECIDE WHETHER THAT'S A CORRECT

9  ANALYSIS OR NOT UNDER THE ECPA TO SAY THAT CASE LOOKS A LOT

10  DIFFERENT THAN THE *GMAIL* CASE.  THE *GMAIL* CASE LOOKS LIKE AN

11  UNDISCLOSED -- ALLEGED UNDISCLOSED SECRET ACQUISITION OF

12  PRIVATE CONTENT FOR PROFIT OUTSIDE THE "ORDINARY COURSE OF

13  BUSINESS."  AND, THEREFORE, I DON'T NEED TO -- I DON'T NEED

14  TO -- YOU DON'T NEED TO -- TO -- THERE'S NO GREAT CLASH HERE,

15  YOUR HONOR.  IT'S REALLY TWO DIFFERENT CIRCUMSTANCES

16  PRESENTING THEMSELVES.

17       AND, YOU KNOW -- YOU KNOW, IF YOU -- IF YOU PRESS ME ON

18  IT, I WOULD -- I WOULD COMMEND THAT -- YOU KNOW, THAT IT'S

19  TRUE, YOU KNOW.  BOTH COURTS LOOKED AT TWO DIFFERENT -- TWO

20  CASES.  THEY LOOKED AT TWO OF THE SAME CASES, AND THEY CAME UP

21  WITH OPPOSITE CONCLUSIONS.  BUT THE *KIRCH* CASE, THERE WAS --

22  THE DEFENDANT DIDN'T ACQUIRE CONTENT.  THE SETTLING PARTY DID.

23       AND THE QUESTION IN THAT CASE WAS WITHOUT AIDING AND

24  ABETTING LIABILITY, DOES THE ISP, WHO DIDN'T ACQUIRE THE

25  CONTENT, HAVE LIABILITY?  AND THE COURT SIMPLY SAID NO,

1    BECAUSE AS AN ISP, IT DID NOT ENGAGE IN THE INTERCEPTION.  THE

2    THIRD PARTY DID.

3        SO THAT'S NOT A CASE THAT STANDS FOR THE PROPOSITION THAT

4    IT'S WITHIN THE "ORDINARY COURSE" TO HAVE A BUSINESS MODEL TO

5    DERIVE PROFIT FROM THE INTERCEPTION OF THE CONTENT OF -- OF

6    EMAILS.  THAT'S A SIMPLY -- ONE THAT SAYS, WHEN YOU DON'T DO

7    AN INTERCEPTION AND SOMEBODY ELSE DOES, YOU'RE NOT LIABLE FOR

8    IT.

9        THE *HALL* CASE, YOU KNOW, THIS IS SIMPLY ABOUT STORING

10   MESSAGES FOR USERS WHO NO LONGER ARE USING THE SERVICE.  YOU

11   KNOW, I STOPPED MY EARTHLINK ACCOUNT AND -- BUT THE PEOPLE OUT

12   IN THE WORLD DON'T KNOW THAT, AND THEY KEEP SENDING EMAILS TO

13   EARTHLINK AND SO THEY PUT THEM IN STORAGE.  THEY ROUTE THEM

14   INTO STORAGE.

15       I MEAN, YOU KNOW, THIS IS JUST NOT -- YOU KNOW, THIS IS

16   LIKE, YOU KNOW, SENDING LETTERS INTO A PLACE WHERE THERE'S

17   BEEN A -- SOMEONE'S MOVED OUT AND THERE'S NO CHANGE OF

18   ADDRESS; IT JUST SORT OF SITS THERE.  AND THE COURT FOUND NO

19   LIABILITY FOR IT.

20       IT DOES MATTER -- USE DOES MATTER TO THE "ORDINARY COURSE"

21   ANALYSIS, YOUR HONOR, BECAUSE, AGAIN, IF YOU GO BACK TO THE

22   STATUTE, IT SAYS, "BEING USED 'IN THE ORDINARY COURSE.'"  WHAT

23   WE'VE HERE IS QUITE CLEARLY, APPARENTLY, TWO DIFFERENT DEVICES

24   BECAUSE THEY'RE SAYING THEY STOPPED IT.  THEY'RE STILL SENDING

25   AND RECEIVING EMAIL MESSAGES, SO WE HAVE ONE DEVICE DOING

1   THAT.  WE MUST HAVE HAD ANOTHER DEVICE OR CODE IN THIS

2   CIRCUMSTANCE, COMPUTER CODE -- MUST HAVE HAD ANOTHER DEVICE

3   OPERATING TO INTERCEPT THE MESSAGE, LOOK AT -- FOR THE URL,

4   AND GENERATED, YOU KNOW, THE "LIKE" AND THE THIRD-PARTY, YOU

5   KNOW, ENDORSEMENT AND WHATNOT.

6       SO JUST BECAUSE ONE DEVICE IS USED IN THE "ORDINARY COURSE

7   OF BUSINESS" DOESN'T MEAN THAT A SECOND ONE FOR ANOTHER USE

8   WOULD BE IN THE "ORDINARY COURSE."  THAT'S NOT -- THAT'S NOT

9   LOGICAL.  AND SO, YOU KNOW, AND EVEN -- EVEN, YOUR HONOR --

10  WHICH I DON'T THINK IS THE CASE HERE.  I DON'T THINK CAN

11  CREDIBLY BE THE CASE.  BUT EVEN IF IT WERE THE SAME DEVICE BUT

12  THERE WERE TWO DIFFERENT USES, THE QUESTION IS HOW IS THAT

13  DEVICE BEING USED.

14      SO, YOU KNOW, THAT FACEBOOK USES A DEVICE TO SEND AND

15  RECEIVE MESSAGES DOES NOT AFFORD IT AN ORDINARY BUSINESS

16  DEFENSE FOR USE OF THE SAME OR DIFFERENT DEVICE TO ACQUIRE THE

17  CONTENTS OF PRIVATE MESSAGES.

18      YOUR HONOR, LET ME --

19          **THE COURT:**  WE NEED TO KIND OF SPEED THINGS UP.

20          **MR. SOBOL:**  LET ME SAY SOMETHING ABOUT THE UCL IF I

21  CAN, THEN.

22          **THE COURT:**  AND THE CIPA AS WELL.

23          **MR. SOBOL:**  OH, OKAY.  WELL, I'LL DO THAT, TOO.

24  THAT'S --

25          **THE COURT:**  PARTICULARLY WITH REGARD TO THE 632.

1          **MR. SOBOL:** OKAY.

2      WELL, THEN, YOU KNOW, QUITE CLEARLY THE 631 DOES -- I

3 MEAN, YOU KNOW, IF -- IF THERE'S NO -- IF THERE'S NO CONSENT,

4 AND YOU AGREE WITH ME THAT IT WAS INTERCEPTED IN TRANSIT,

5 WHICH I THINK THEY'VE ADMITTED --

6         **THE COURT:** WELL, I DON'T THINK THEY'VE ADMITTED IT

7 WAS INTERCEPTED IN TRANSIT.

8          **MR. SOBOL:** WELL -- OKAY. WELL, LET ME --

9         **THE COURT:** EXCUSE ME.

10     THEY PRETTY CLEARLY ARGUE IT WAS STORED; IT WAS NOT

11 INTERCEPTED IN TRANSIT.

12         **MR. SOBOL:** LET ME -- LET ME ADDRESS THAT, THEN, YOUR

13 HONOR. APOLOGIZE. LET ME ADDRESS THE "IN TRANSIT" ARGUMENT.

14     FIRST OF ALL, WE HAVE AN ALLEGATION -- IT'S QUITE CLEAR

15 ALLEGATIONS. IT'S PARAGRAPH 81 OF OUR CONSOLIDATED AMENDED

16 COMPLAINT THAT INTERCEPTION OCCURRED IN TRANSIT. AND THAT

17 SHOULD BE TAKEN AS TRUE. THAT'S SOMETHING THAT WAS DONE IN

18 THE YAHOO! EMAIL LITIGATION.

19     BEYOND THAT, YOUR HONOR, IN MAKING THEIR "ORDINARY COURSE"

20 ARGUMENT -- AND THIS IS WHY I SAY THEY'VE ALLEGED IT AND THAT

21 WAS A BIT GLIB, SO LET ME -- LET ME UNPACK IT A LITTLE.

22     FACEBOOK IN MAKING THEIR "ORDINARY COURSE" ARGUMENT SAYS

23 THAT THEY RECEIVE MESSAGES IN THE "ORDINARY COURSE" AND THEY

24 MUST DO SO TO FACILITATE THE TRANSMISSION SO THEY THEN MUST

25 ACQUIRE THE CONTENT BEFORE IT'S DELIVERED. AND THUS THE

1    INTERCEPTION MUST HAPPEN IN TRANSIT.

2         THAT'S WHAT THEY SAY.  WE SEND AND RECEIVE MESSAGES IN THE

3    "ORDINARY COURSE," AND WE HAVE TO -- WE HAVE NO CHOICE.  WE

4    HAVE NO CHOICE BECAUSE IT FACILITATES THE TRANSMISSION.

5    THAT'S AT PAGE 16 OF THEIR OPPOSITION.

6              **MR. JESSEN:**  WE DON'T SAY THAT.

7              **THE COURT:**  YOU'LL GET --

8                   (SIMULTANEOUS COLLOQUY.)

9              **MR. JESSEN:**  THANK YOU.

10             **MR. SOBOL:**  ON PAGE 16 OF THEIR -- I SAID

11   "OPPOSITION."  I MEANT "MOTION," OF COURSE.  PAGE 16, LINE

12   25 --

13                  (OFF-THE-RECORD DISCUSSION.)

14             **MR. SOBOL:**  FACEBOOK'S RECEIPT OF ITS USERS

15   ELECTRONIC COMMUNICATIONS IS, IN FACT, NECESSARY TO, QUOTE,

16   FACILITATE THE TRANSMISSION OF THE COMMUNICATION AT ISSUE,

17   CLOSED QUOTE.  SENTENCE GOES ON.

18        SO I TAKE THAT TO MEAN THAT THEY RECEIVE THE MESSAGES AND

19   ACQUIRE THE CONTENT, THEY SAY, BEFORE IT'S -- BEFORE IT GOES

20   OUT.

21        MOREOVER, YOUR HONOR, I THINK AND -- YOU KNOW, THIS IS IN

22   OUR COMPLAINT.  WE -- WE -- WE CITE THE STUDY OF THE SECURITY

23   REACHER (PHONETIC) -- RESEARCHER WHO UNCOVERED THIS, AND WHAT

24   HE FOUND WAS THE UPTICK IN THE "LIKE" COUNTS HAPPENS

25   SIMULTANEOUSLY IN TIME WITH THE TRANSMISSION OF THE URL -- OF

```
1     THE EMAIL WITH THE URL EMBEDDED.  AND THAT ALSO SUGGESTS IT'S

2     IN TRANSIT.  BUT THE FACT OF THE MATTER IS THAT WE HAVE GOOD

3     GROUNDS TO MAKE THE ALLEGATION THAT IT WAS IN TRANSIT AND

4     SHOULD BE ACCEPTED AS TRUE.

5          LET ME TURN TO THE UCL.  SO THE ARGUMENT THAT THEY MAKE --

6               THE COURT:  NO, NO, NO.  YOU SKIPPED THE --

7               MR. SOBOL:  OH, I DID.  I DID 'CAUSE I GOT

8     SIDE-TRACKED.

9               THE COURT:  THEY MAKE A PRETTY GOOD ARGUMENT ABOUT

10    THE CONFIDENTIAL COMMUNICATIONS NOT BEING CONFIDENTIAL IF

11    THEY'RE OVER THE INTERNET.

12              MR. SOBOL:  RIGHT.  SO 632.  AS I UNDERSTAND THEIR

13    ARGUMENT, THEIR ARGUMENT IS THAT AS A MATTER OF LAW, EMAIL

14    COMMUNICATIONS JUST CAN'T BE CONFIDENTIAL.  AND THEY PULL

15    SOUND BYTES FROM VARIOUS CASES THAT LEAD THEM TO THAT

16    CONCLUSION.

17         AND WE WOULD ARGUE THAT THERE ACTUALLY IS NO BLANKET

18    IMMUNITY FOR A MEDIUM LIKE EMAIL, BUT RATHER IT'S WHETHER

19    THERE WAS A REASONABLE EXPECTATION UNDER THIS PARTICULAR

20    STATUTE THAT IT WOULDN'T BE SHARED WITH SOMEBODY, SOME THIRD

21    PARTY, AND THAT IT WOULD BE KEPT EXCLUSIVE.

22         AND, IN FACT, WHAT WE ALLEGE HERE IS THAT THAT WAS TRULY

23    THE EXPECTATION OF THE PARTIES AND THAT OPERATING UNDER

24    FACEBOOK'S OWN RULES, WERE YOU OWN YOUR OWN CONTENT AND YOU

25    CHOOSE WHO YOU SHARE AND THAT SHARING DESIGNATION -- OF A
```

1    PRIVATE MESSAGE MANIFESTED AN OBJECTIVE EXPECTATION OF PRIVACY

2    IN THOSE MESSAGE (SIC), AND THAT SUFFICES FOR THE STATUTE.

3        MAY I -- UCL?  IN TERMS OF THE UCL, THEIR ARGUMENT IS ON

4    STANDING.  AND THEY'RE RIGHT.  YOU NEED TO SHOW INJURY, IN

5    FACT, OR LOST MONEY AND PROPERTY.  THEY ARGUE INJURY, IN FACT,

6    IN THEIR OPENING MOTION.  THEY DROPPED IT ON THEIR REPLY.

7    INJURY, IN FACT, IS EASILY MET THROUGH AN ARTICLE III TYPE OF

8    STANDING REQUIREMENT AND JUST THE VIOLATION OF THE STATUTE

9    SUFFICES SO THERE WE GO WITH THAT ONE, SO THE QUESTION REALLY

10   BECOMES LOST MONEY OR PROPERTY.

11       AND OF COURSE THE LEADING CASE ON -- IN THE CALIFORNIA

12   COURSE IS THE CALIFORNIA SUPREME COURT'S CASE IN *KWIKSET*.  AND

13   IT SAYS WITH RESPECT TO LOST MONEY OR PROPERTY, THAT THERE ARE

14   INNUMERABLE WAYS IN WHICH THAT CAN BE ESTABLISHED.  AND THEN

15   THEY LIST SOME.  AND ONE OF THE THINGS THEY LIST IS HAD -- YOU

16   CAN LOSE MONEY OR PROPERTY IF YOU HAVE A PRESENT OR FUTURE

17   PROPERTY INTEREST DIMINISHED AND THIS QUALIFIES AS AN ECONOMIC

18   HARM.  AND IT MAKES SENSE, SO I'LL GET TO.

19       WHAT WE ALLEGE IS THAT FACEBOOK ENGAGED IN CONDUCT WHICH

20   DIMINISHED A PROPERTY INTEREST, THAT IS, USERS' INTEREST IN

21   THE EXCLUSIVE CONTROL OF THEIR OWN PRIVATE CORRESPONDENCE,

22   THAT PEOPLE HAVE A PROPERTY INTEREST.

23       NOW, A "PROPERTY INTEREST" IS BROADLY DEFINED UNDER

24   CALIFORNIA LAW, AND THEY'RE SOMETHING OF A THREE-PRONGED TEST.

25   THE FIRST ONE IS CAPABLE OF PRECISE DEFINITION.

```
 1          AND THE ANSWER IS YES, PRIVATE CORRESPONDENCE CAN BE

 2     OBJECTIVELY DEFINABLE.  THE SECOND IS, IS IT CAPABLE OF

 3     EXCLUSIVE POSITION?  AND, YES, IT CAN BE, BECAUSE, OF COURSE,

 4     EXCLUSIVE POSSESSION CAN BE BETWEEN TWO PARTIES TO THE

 5     COMMUNICATION.  THAT'S -- IN THE -- IN THE WORLD OF

 6     CORRESPONDENCE, YOU CAN HAVE THAT INTEREST, THAT YOU EXPECT

 7     EXCLUSIVE -- EXCLUSIVE POSSESSION BETWEEN SENDER AND

 8     RECIPIENT.  AND, IN FACT, IT KIND OF MIRRORS THE ECPA A BIT IN

 9     THE SENSE THAT CONSENT MUST -- CAN BE FROM EITHER A SENDER OR

10     RECIPIENT.

11          SO THE NOTION THAT WE HOLD OUR PRIVATE COMMUNICATIONS AS

12     OUR OWN AS BETWEEN PEOPLE WE COMMUNICATE WITH, I THINK, IS AN

13     ESTABLISHED EXCLUSIVE RIGHT THAT WE HAVE, AND IT'S NOT

14     DISSIMILAR TO JOINT OWNERSHIP OF PROPERTY.

15          AND THE THIRD PRONG IS THAT CAN WE ESTABLISH A CLAIM TO

16     THIS EXCLUSIVITY.  AND HERE, FACEBOOK USERS MANIFEST A CLAIM

17     TO EXCLUSIVITY WHEN THEY DESIGNATE IT AS PRIVATE.  THAT --

18     THAT SHOULD HAVE BEEN THE RULES OF THE GAME, NOT FOR FACEBOOK,

19     JUST FOR THEM AND THE SENDER.  AND, IN FACT, UNFORTUNATELY,

20     WHAT HAPPENS IS THAT THE EXCLUSIVE RIGHT TO CONTROL THIS

21     INTEREST PASSED OVER UNWITTINGLY TO FACEBOOK.

22          BY DIMINISHING A USER'S EXCLUSIVE CONTROL, YOU DIMINISH

23     THE PROPERTY INTEREST, AND THAT'S LOST MONEY OR PROPERTY, AND

24     IT'S ECONOMIC HARM.

25          NOW, THEY SAY, OH, YOU DON'T HAVE A CASE FOR THIS -- YOU
```

1    DON'T HAVE A CASE FOR THIS ONE.  THIS IS NEW.  WELL, THEY

2    DON'T HAVE A CASE EITHER 'CAUSE IT IS NEW, BECAUSE NO ONE'S

3    COME BEFORE AND TRIED TO ESTABLISH A PROPERTY INTEREST IN THE

4    PRIVATE COMMUNICATIONS WHICH HAVE BEEN SECRETLY ACQUIRED

5    THROUGH AN ELECTRONIC INTERCEPTION.  AND THAT'S WHAT WE'RE

6    TRYING TO DO HERE.

7        NO -- NOWHERE BEFORE US SOMEONE CAN -- COME AND SAID THAT

8    AN ELECTRONIC COMMUNICATION SERVICE PROVIDER HAS EXERCISED

9    DOMINION AND CONTROL OVER PEOPLE'S PRIVATE CORRESPONDENCE THE

10   WAY FACEBOOK DID AND TRIED TO ALLEGE A LOST PROPERTY INTEREST.

11   BUT I THINK IT'S FITS HERE, YOUR HONOR.

12       YOU KNOW, ONE THING THAT WE HAVE TO -- IF WE STEP BACK AT

13   (SIC) THE UCL A LITTLE BIT -- AND I'LL REALLY WRAP UP RIGHT

14   QUICK.  I -- I APOLOGIZE.  PROP 64 -- THE STANDING REQUIREMENT

15   WAS PUT IN PLACE TO AVOID ABUSE OF OUR CHERISHED UCL BUSINESS

16   AND PROFESSION CODE FROM PEOPLE WHO WOULD BRING SUITS WHO

17   WEREN'T REALLY AFFECTED, WHO WEREN'T AFFECTED BY THE CONDUCT

18   ALLEGED BECAUSE THERE'S ALL SORTS OF RIGHTS AND REMEDIES THAT

19   KICK IN AFTER YOU GET STANDING.  AND -- AND IT -- AND IN A

20   FEAR OF ABUSE, YOU PUT IN THE STANDING REQUIREMENT TO MAKE

21   SURE THAT PEOPLE WHO ARE STANDING UP FOR THE RIGHTS UNDER THE

22   STATUTE ARE THE PEOPLE WHO ARE TRULY AFFECTED.

23       THERE'S NO QUESTION HERE THAT THESE PEOPLE WERE TRULY

24   AFFECTED.  THEY WERE FACEBOOK USERS.  THEY SENT PRIVATE

25   MESSAGES.  THEY SENT PRIVATE MESSAGES TO FRIENDS WHO WOULD NOT

1    HAVE CONSENTED TO AN INTERCEPTION BY THE ELECTRONIC SERVICE

2    PROVIDER FOR PURPOSES OF FOSTERING A BUSINESS MODEL TO DERIVE

3    PROFIT.

4         THERE'S NO QUESTION THEY'RE AFFECTED THAT WAY.  THERE'S NO

5    QUESTION THEY SHOULD BE ENTITLED TO STANDING FOR THIS PROPERTY

6    INTEREST.  THIS IS ACTUALLY THE KIND OF ECONOMIC HARM THAT

7    STATUTE MEANS TO ADDRESS.  YOU HAVE SEVERAL REPRESENTATIONS.

8    YOU OWN YOUR OWN CONTENT.  WE'LL KEEP IT PRIVATE.  PRIVACY'S

9    IMPORTANT TO YOU.  DESIGNATED SHARE.  WE'LL KEEP IT JUST

10   BETWEEN YOU AND THE SENDER.  UNDER ALL THOSE REPRESENTATIONS

11   WHICH TURN OUT TO BE FALSE, THEY HAVE DISENFRANCHISED --

12        **THE COURT:**  HOW DO YOU -- HOW DO YOU QUANTIFY

13   "ECONOMIC HARM" IN THIS SCENARIO?

14        **MR. SOBOL:**  WELL, I QUANTIFY IT AS A DIMINISHMENT IN

15   PROPERTY INTEREST.  AND ALL WE HAVE TO DO IS LOOK AT WHAT

16   FACEBOOK IS DOING WITH THE CONTENT OF OTHER PEOPLE'S MESSAGES,

17   IS THEY'RE DRIVING UP AN ADVERTISING MACHINE, THE CENTRAL

18   TENET OF WHICH IS UP-TICKING "LIKES" AND USING GENERATION

19   "LIKE" TO CREATE INTEREST AND DERIVE ADVERTISING DOLLARS.

20        **THE COURT:**  BUT ISN'T THAT THE SAME ARGUMENT THAT WAS

21   MADE BY ALL OF THE PLAINTIFFS ASSERTING ECONOMIC HARM BY

22   VIRTUE OF LOSS OF PERSONAL IDENTIFYING INFORMATION WHEN THEIR

23   SYSTEMS -- WHEN THE DEFENDANT'S SYSTEMS WERE HACKED, FOR

24   INSTANCE?

25        **MR. SOBOL:**  I DON'T THINK SO.  I DON'T -- I -- I -- I

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
1    THINK HERE, WE'RE NOT TALKING ABOUT PERSONAL IDENTIFYING

2    INFORMATION.  WE'RE NOT TALKING ABOUT METADATA.  WE'RE TALKING

3    ABOUT SOMETHING QUALITATIVELY DIFFERENT, AND THIS IS -- THIS

4    IS PERSONAL CONTENT.  THIS IS PERSONAL CONTENT THAT'S BEING

5    LOST.  AND YOU CAN QUANTIFY THAT.  AND THE WAY THAT THE UCL

6    QUANTIFIES IT, FOR INSTANCE, AS A POTENTIAL MEASURE IS WHAT

7    USE WAS MADE OF IT?  WHAT PROFITS WERE DERIVED FROM IT?

8          THE COURT:  IT IS THE SAME ARGUMENT THAT WAS MADE, AT

9    LEAST IN MY COURT, ON DOZENS OF OCCASIONS ABOUT PERSONALLY

10   IDENTIFYING INFORMATION.  ONCE AGAIN, IT'S THE -- THE ARGUMENT

11   IS THAT IT'S PERSONAL PROPERTY.  OBVIOUSLY NOT LOST MONEY, BUT

12   IT'S PERSONAL PROPERTY AND THE MEASURE OF THE VALUE OF THAT IS

13   THE GAIN BY THE DEFENDANT.  AND I BELIEVE THE NINTH CIRCUIT

14   HAS FORECLOSED THAT ARGUMENT.

15         MR. SOBOL:  I THINK THE -- I THINK THE ARGUMENT IS

16   SLIGHTLY DIFFERENT WHEN YOU'RE TALKING ABOUT PERSONAL CONTENT

17   VERSUS METADATA AND PERSONALLY IDENTIFYING INFORMATION.

18   THAT'S THE DISTINCTION I'M TRYING TO DRAW.

19         THE COURT:  I THINK IT'S A DISTINCTION WITHOUT A REAL

20   DIFFERENCE.  BUT IN ANY EVENT, I THINK YOU'VE USED UP ALL OF

21   YOUR TIME THIS MORNING.

22         MR. SOBOL:  OKAY.

23         THE COURT:  I'M GOING TO GO GIVE YOU A SHORT TIME FOR

24   REBUTTAL, AND THEN I'M GOING TO ADJOURN.

25         MR. JESSEN:  THANK YOU, YOUR HONOR.  CAN YOU GIVE ME
```

1    A SENSE OF HOW MANY TIME I HAVE BECAUSE I COULD GO ON FOR

2    HOURS.

3              **THE COURT:**  WELL, I DON'T NEED HOURS.  SAY, TEN

4    MINUTES.

5              **MR. JESSEN:**  I'M SORRY?

6              **THE COURT:**  TEN MINUTES.

7              **MR. JESSEN:**  OKAY.  VERY WELL, YOUR HONOR.  GOSH,

8    WHERE TO BEGIN.

9                    (OFF-THE-RECORD DISCUSSION.)

10             **MR. JESSEN:**  I THINK IF YOU GO BACK AND -- AND REVIEW

11   THE TRANSCRIPT FROM THIS HEARING, THERE WERE SEVERAL TIMES

12   WHEN MR. SOBOL ADMITTED WHAT THEY'RE COMPLAINING ABOUT IS USE.

13   IN FACT, HE DESCRIBED A SERIES OF EVENTS.  FACEBOOK IS GETTING

14   THE MESSAGE.  THEY'RE SCANNING IT.  THEY'RE FOLLOWING THE URL

15   BACK TO THE WEBSITE.  THEY'RE CHECKING TO SEE IF THERE'S A

16   SOCIAL PLUG-IN.  IF THEY ARE, THEY'RE INCREMENTING IT.

17        THEY'RE COMPLAINING ABOUT USE.  THEY DO NOT HAVE A

18   PLAUSIBLE ALLEGATION OF AN UNLAWFUL INTERCEPTION.  THERE IS

19   ANOTHER STATUTE WHICH DEALS WITH -- WITH COMMUNICATIONS AND

20   ELECTRONIC STORAGE.  IT'S THE STORED COMMUNICATIONS ACT.  AND

21   IF THEY THOUGHT THEY HAD A CLAIM UNDER THAT, THEY WOULD HAVE

22   ASSERTED IT.  THEY HAVEN'T.

23        WE'RE NOT IN A WORLD WHERE WE'RE TALKING ABOUT UNLAWFUL

24   INTERCEPTION, SO I THINK -- YOU KNOW, HE TRIED TO SAY THAT THE

25   USE IS SOMEHOW BUILT INTO THE DEFINITION OF A "DEVICE."  BUT

```
 1    IF THE COURT GOES BACK AND LOOKS AT THE DEFINITION, IT'S

 2    TALKING ABOUT EQUIPMENT OR FACILITY OR ANY COMPONENT THEREOF

 3    BEING USED BY THE PROVIDER OF THE SERVICE IN THE "ORDINARY

 4    COURSE OF BUSINESS," SO --

 5        WHAT THEY'RE COMPLAINING ABOUT IS A LATER USE.

 6        ON THE -- ON THE "ORDINARY COURSE OF BUSINESS" ARGUMENT,

 7    YOUR HONOR, THE -- I WOULD -- I MEAN, MOST OF THE POINTS HE

 8    ADDRESSED, BY THE WAY, I THINK WE ADDRESSED IN OUR REPLY

 9    BRIEF.

10        IF YOU LOOK AT THE HALL AND THE KIRCH CASES, THEY REALLY

11    EXPLAIN THE RATIONALE FOR WHY THESE ALLEGATIONS JUST DON'T

12    MAKE SENSE HERE.  FOR EXAMPLE, THE HALL CASE SAYS IF INTERNET

13    SERVICES PROVIDERS WERE NOT COVERED BY THE "ORDINARY COURSE OF

14    BUSINESS" EXCEPTION, THEY WOULD CONSTANTLY BE INTERCEPTING

15    COMMUNICATIONS UNDER ECPA BECAUSE THEIR BASIC SERVICES INVOLVE

16    THE ACQUISITION OF CONTENTS OF THE ELECTRONIC COMMUNICATION.

17        THAT'S EXACTLY WHAT'S GOING ON IN THIS CASE.

18        SIMILARLY, THE KIRCH CASE, THE COURT SAID, "IN OTHER

19    WORDS, THE UNDISPUTED FACTS ESTABLISH --"

20                    (OFF-THE-RECORD DISCUSSION.)

21        MR. JESSEN:  "-- IN OTHER WORDS, THE UNDISPUTED FACTS

22    ESTABLISHED THAT NEBUAD'S USE OF THE UTA GAVE EMBARQ" -- THAT

23    WAS THE DEFENDANT -- "ACCESS TO NO MORE OF ITS USERS'

24    ELECTRONIC COMMUNICATIONS THAN IT HAD IN THE 'ORDINARY COURSE'

25    OF ITS BUSINESS AS AN ISP."
```

1      THE SAME RATIONALE APPLIES HERE.  FACEBOOK IS NOT

2   GETTING -- GETTING ANYTHING BEYOND WHAT IT ALREADY HAS SITTING

3   ON A SERVER, SO THIS SORT OF UNDERSCORES -- AGAIN, WHAT

4   THEY'RE COMPLAINING ABOUT IS THE USE.

5      NOW, IN THEIR BRIEF AND ALSO IN THE ARGUMENT, THEY SAY,

6   WELL, THIS IS SOMEHOW EQUIVALENT TO A MAILMAN DELIVERING A

7   LETTER FROM POINT A TO POINT B AND OPENING IT UP.  THAT'S NOT

8   AT ALL WHAT THIS IS.

9      ELECTRONIC COMMUNICATIONS ARE BY DEFINITION, INCLUDING THE

10  CONTENT, STORED SOMEWHERE.  SO -- AND IF YOU LOOKED -- IF THE

11  COURT LOOKED AT THE LEGISLATIVE HISTORY OF ECPA, IT MAKES THIS

12  ABUNDANTLY CLEAR.

13      **THE COURT:**  THEY'RE CERTAINLY STORED SOMEWHERE, BUT

14  DOES THE MAILMAN READ THE STORED INFORMATION?

15      **MR. JESSEN:**  THEY'RE NOT COMPLAINING THAT A PERSON IS

16  READING THIS, YOUR HONOR.  I THINK ONE THING THAT WILL BE

17  HELPFUL IS WE SHOULD FOCUS --

18      **THE COURT:**  IT'S NOT -- CLEARLY, IT'S NOT LITERALLY

19  THAT THEY'RE READING THE INFORMATION, BUT THEY'RE GLEANING

20  INFORMATION FROM THE CONTENT OF AN EMAIL.  IT'S NOT METADATA.

21  IT'S INFORMATION EMBEDDED IN THE EMAIL.

22      COUNSEL SAYS THE NEXT STEP IS -- THE NEXT LOGICAL STEP IF,

23  INDEED, FACEBOOK WERE PERMITTED TO DO THIS WOULD BE TO READ

24  THE EMAIL.

25      **MR. JESSEN:**  I THINK ONE THING THAT WILL BE -- THAT'S

1   IMPORTANT TO BEAR IN MIND IS FOCUSING ON THE FACTS OF THIS

2   CASE.  I MEAN, MR. SOBOL TRIES TO PAINT A PICTURE OF "BRAVE

3   NEW WORLD," "1984," OKAY.  WE HAVE TO FOCUS ON WHAT THEY'RE

4   ALLEGING.  THEY'RE ALLEGING THAT LITERALLY AN ADDRESS TO A

5   WEBSITE, THAT'S THE URL, THAT'S INCLUDED IN A MESSAGE WAS --

6   WAS SCANNED AND -- AND AN -- AND A NUMBER WENT UP BY ONE.

7   THOSE ARE THEIR ALLEGATIONS.  SO I THINK THERE'S A LOT OF HAND

8   WAVING HERE ABOUT, OH, MY GOD, WHERE ARE WE GOING TO DRAW THE

9   LINE?  SOMEONE HAS TO DRAW A LINE.  WELL, YOU KNOW WHAT?

10  CONGRESS IS THE ONE TO DRAW A LINE IF THERE'S A LINE.  OKAY?

11      IF CONGRESS IS CONCERNED ABOUT THIS, THEY SHOULD -- THEY

12  CAN ADDRESS IT, OKAY?  BUT THE EXISTING STATUTORY FRAMEWORK,

13  AS -- AS WE'VE LAID IN OUR PAPERS, SIMPLY DOES NOT ADDRESS IT.

14  HE --

15      THERE'S NO -- WHEN YOU'RE TALKING ABOUT ELECTRONIC

16  COMMUNICATION SERVICE, THEY HAVE THE CONTENT.  THE CONTENT IS

17  SITTING THERE.  IT IT'S ON A SERVER.  AND, IN FACT, IF YOU

18  LOOK, YOUR HONOR, WE ATTACH SOME OF LEGISLATIVE HISTORY TO

19  OUR -- TO OUR REQUEST FOR JUDICIAL NOTICE.  CONGRESS IN

20  TALKING ABOUT ELECTRONIC COMMUNICATION SERVICES, SAYS, THESE

21  SERVICES, AS WELL AS THE PROVIDERS OF ELECTRONIC MAIL, CREATE

22  ELECTRONIC COPIES OF PRIVATE CORRESPONDENCE FOR LATER

23  REFERENCE.  WELL, SO THIS IDEA OF, WELL, THIS IS SIMILAR TO

24  LISTENING ON A PHONE CALL, A HUMAN BEING LISTENING IN ON A

25  PHONE CALL, OR THE MAILMAN OPENING A LETTER, IT JUST DOESN'T

```
 1    APPLY IN THIS CASE.
 2        I WANT TO TALK A LITTLE BIT ABOUT THE CONSENT ARGUMENT.
 3    AND PERHAPS MR. SOBOL WOULD INDULGE ME AND PUT THE DATA USE
 4    POLICY --
 5            THE COURT:  I HAVE IT.  I HAVE IT RIGHT HERE.
 6            MR. SOBOL:  WE'LL TRY.
 7            THE COURT:  I HAVE IT HERE.  YOU DON'T HAVE TO --
 8            MR. JESSEN:  THERE'S SEVERAL POINTS THAT COULD BE
 9    MADE HERE, YOUR HONOR.
10        THE FIRST IS HE MADE A PRETTY STUNNING ADMISSION.  I MEAN,
11    THEY -- THEY TALK ABOUT THIS DISCLOSURE IN THE POLICY THAT
12    SAYS -- THEY MAKE A BIG DEAL OF, WELL, WE OWN OUR INFORMATION.
13    FACEBOOK SAYS WE OWN OUR INFORMATION.  I MEAN, THAT'S THEIR
14    THEORY FOR -- THEIR VERY CONTORTED THEORY FOR ECONOMIC HARM
15    UNDER THE UCL.  BUT IT'S ACTUALLY AN ADMISSION THAT THEY SAY
16    MESSAGES ARE PART OF THEIR INFORMATION.  RIGHT?  'CAUSE
17    THEY'RE SAYING FACEBOOK SAYS --
18                (OFF-THE-RECORD DISCUSSION.)
19            MR. JESSEN:  -- FACEBOOK SAYS YOU OWN ALL OF YOUR
20    INFORMATION.  OKAY?  AND THAT'S UNDER THE "HOW WE USE
21    INFORMATION WE RECEIVE" HEADING, YOUR HONOR.
22        THAT'S AN ADMISSION.  THEY THINK -- THEY SAY, MESSAGES ARE
23    PART OF YOUR INFORMATION.  AND THERE'S AN ENTIRE DISCLOSURE,
24    WHICH YOUR HONOR AND I WORKED THROUGH EARLIER, IT SAYS, "HOW
25    WE USE THE INFORMATION WE RECEIVE."  THEY KNOW VERY WELL THAT
```

 1    MESSAGES ARE INCLUDED IN THE DEFINITION OF -- OF

 2    "INFORMATION."

 3         NOW, THEY HAVE THIS INCREDIBLY CONTORTED ARGUMENT THAT

 4    SOMEHOW MESSAGES ARE CARVED OUT OF THE DISCLOSURE, BUT IT

 5    DOESN'T FOLLOW, YOUR HONOR.  IF YOU LOOK AT THE PART -- THE

 6    PORTION OF THE DATA USE POLICY THAT MR. SOBOL WAS FOCUSED ON,

 7    THIS ENTIRE SECTION IS CALLED "INFORMATION WE RECEIVE AND HOW

 8    IT IS USED."  ALL RIGHT?  AND THE FIRST SUBHEADING IS

 9    "INFORMATION WE RECEIVE ABOUT YOU."

10         AND THEY'RE FOCUSED ON "INFORMATION YOU CHOOSE TO SHARE."

11    "YOUR INFORMATION ALSO INCLUDES THE INFORMATION YOU CHOOSE TO

12    SHARE ON FACEBOOK SUCH AS WHEN YOU POST A STATUS UPDATE" --

13    THE "SUCH AS" LANGUAGE IS IMPORTANT.  THIS IS NOT AN EXCLUSIVE

14    LIST.  "YOUR INFORMATION INCLUDES THE INFORMATION YOU CHOOSE

15    TO SHARE ON FACEBOOK SUCH AS WHEN YOU POST A STATUS UPDATE.

16    UPLOAD A PHOTO, OR A COMMENT ON A FRIEND'S STORY."

17         AND IF YOU LOOK AT PARAGRAPH 20 OF THEIR COMPLAINT, THEY

18    ACKNOWLEDGE THAT ONE OF THE WAYS TO SHARE IS THROUGH A

19    MESSAGE.  OKAY?  SO, IN FACT, THIS PROVISION WOULD INCLUDE

20    MESSAGES.  IT'S ANYTHING YOU SHARE.  OKAY?

21         IT'S ALSO COVERED -- IN CASE THERE'S ANY DOUBT -- IN CASE

22    THERE'S ANY UNCERTAINTY, FURTHER DOWN, "OTHER INFORMATION WE

23    RECEIVE ABOUT YOU" WHICH TALKS ABOUT, AS WE WENT OVER EARLIER,

24    "WE RECEIVE DATA ABOUT YOU WHENEVER YOU USE OR ARE RUNNING

25    FACEBOOK, SUCH AS WHEN YOU SEND OR RECEIVE A MESSAGE."  OKAY.

1    THAT'S FURTHER CLARIFICATION.  SO IT'S ACTUALLY COVERED IN

2    BOTH PLACES, YOUR HONOR.

3        THEY HAVE MADE AN INCREDIBLY CONTORTED ARGUMENT THAT THAT

4    ONLY REFERS TO METADATA.  AND THE WAY THAT THEY DID THIS -- WE

5    POINTED THIS OUT IN OUR REPLY BRIEF IN AN EXHIBIT TO THE

6    BRIEF -- IS THEY WENT THROUGH AND BLACK-LINED EVERYTHING

7    AROUND THE RELEVANT DISCLOSURE TO MAKE IT SEEM LIKE, WELL,

8    THIS IS JUST METADATA.  OKAY?  IT'S A HIGHLY MISLEADING

9    ARGUMENT.

10       EVEN IF THE COURT CREDITED IT -- OKAY?  EVEN IF THE COURT

11   CREDITED IT, A URL IS A PIECE OF TECHNICAL DATA.  IT'S -- IT'S

12   AN ADDRESS TO A WEBSITE ON THE INTERNET.  SO THESE -- THESE

13   REALLY CONTORTED ARGUMENTS ABOUT, WELL, THIS JUST WASN'T

14   DISCLOSED, I MEAN, THIS IS JUST MADE UP.

15       WE THINK THESE DISCLOSURES ARE ABUNDANTLY CLEAR, AND THE

16   FACT THAT YAHOO! HAD A DIFFERENT DISCLOSURE -- THERE'S NO

17   REQUIREMENT THAT YOU USE THE WORD "SCAN" OR "ANALYZE."  THAT'S

18   NOT IN ANY CASE.

19       SO, AGAIN, IT'S ONLY BY REALLY CONTORTING THESE

20   DISCLOSURES THAT -- THAT THEY CAN ARGUE, WELL, THERE'S NO

21   CONSENT HERE.

22       THERE'S ALSO -- IF THERE'S -- IF THERE'S FURTHER

23   UNCERTAINTY, THEY SAY, WELL, IT TALKS ABOUT "DATA."  IF MEMORY

24   SERVES, THE YAHOO! POLICY MENTIONED "DATA" AS WELL, BUT "DATA"

25   ACTUALLY HAS A DEFINITION IN THE STATEMENT OF RIGHTS AND

```
1    RESPONSIBILITIES, WHICH IS EXHIBIT A TO THE JORDAN

2    DECLARATION, DOCKET NO. 29-1.

3        AND IT -- GIVEN THE TIME CONSTRAINTS, I WON'T WALK THROUGH

4    IT, BUT IT -- IT DEFINES "DATA" TO INCLUDE "USERS' CONTENT OR

5    INFORMATION."  AND "CONTENT OR INFORMATION," IF YOU READ THOSE

6    DEFINITIONS -- I DON'T KNOW IF THE COURT HAS IT IN FRONT OF

7    YOU.

8            THE COURT:  UM --

9            MR. JESSEN:  IT'S A SEPARATE --

10           THE COURT:  I HAVE THE JORDAN DECLARATION.

11           MR. JESSEN:  YEAH, IT'S EXHIBIT A TO THE JORDAN

12   DECLARATION, YOUR HONOR.

13           THE COURT:  YEAH.

14           MR. JESSEN:  PAGE 7.

15           THE COURT:  OKAY.

16           MR. JESSEN:  THERE'S A DEFINITION -- IF YOU -- ON --

17   18, YOU SEE "DEFINITIONS" --

18           THE COURT:  UM-HMM.

19           MR. JESSEN:  THERE'S A DEFINITION OF "INFORMATION" --

20           THE COURT:  UM-HMM.

21           MR. JESSEN:  IT SAYS, "BY 'INFORMATION,' WE MEAN

22   FACTS AND OTHER INFORMATION ABOUT YOU, INCLUDING ACTIONS TAKEN

23   BY USERS AND NON-USERS WHO INTERACT WITH FACEBOOK," AND THEN

24   THERE'S A DEFINITION OF "CONTENT."  "BY 'CONTENT,' WE MEAN

25   ANYTHING YOU OR OTHER USERS POST ON FACEBOOK."  THAT WOULD NOT
```

1  BE INCLUDED IN THE DEFINITION OF "INFORMATION."

2      THEN THERE'S A DEFINITION OF "DATA." "BY 'DATA' OR 'USER

3  DATA' OR 'USERS DATA,' WE MEAN ANY DATA INCLUDING A USER'S

4  CONTENT OR INFORMATION." AND THEN IT GOES ON.

5      "DATA" IS -- "DATA" IS INCREDIBLY BROAD, SO THIS NOTION,

6  WELL, THAT'S ONLY REFERRING TO TECHNICAL DATA, IT'S JUST --

7  IT'S JUST MADE UP.

8      AND, YOUR HONOR, WE SHOULD NOT HAVE TO SPEND MONTHS AND

9  POTENTIALLY YEARS LITIGATING THIS CASE WHEN -- WHEN IT'S

10  APPARENT FROM THE GET-GO THAT THIS IS SIMPLY PLAINTIFFS

11  CONSENTED TO THIS, AND IT'S NOT THE TIME TYPE OF CONDUCT THAT

12  THESE STATUTES WERE INTENDED TO COVER IN THE FIRST PLACE. AND

13  THERE -- AND WE WALK THROUGH IT IN GREAT DETAIL.

14      THIS NOTION THAT EVERY COURT THAT HAS CONSIDERED THIS

15  ISSUE HAS COME TO THE OPPOSITE CONCLUSION, IT'S ONE COURT.

16  IT'S THE *GMAIL* CASE, AND THERE WAS AN EARLIER CASE IN THE

17  DISTRICT SOMEWHERE IN TEXAS, BUT IT'S THE SAME CASE, SO --

18      FURTHERMORE ON THE "ORDINARY COURSE OF BUSINESS" POINT,

19  YOUR HONOR, THERE'S NO REQUIREMENT THAT IT BE DISCLOSED.

20  THAT'S NOWHERE IN THE STATUTE, OKAY? BUT EVEN IF THERE WERE,

21  I MEAN, JUDGE GREWAL DID SAY, WELL, YEAH, GOOGLE ANNOUNCED

22  THIS NEW POLICY, AND THAT SUPPORTS THE FACT THAT WHAT THEY

23  WERE DOING WAS IN THE "ORDINARY COURSE" OF THIS BUSINESS.

24      PLAINTIFFS ACKNOWLEDGE IN THEIR COMPLAINT THAT THIS

25  PRACTICE OF INCREMENTING THE "LIKE" COUNT BASED UPON SHARES

1    AND MESSAGES WAS IN PUBLICLY AVAILABLE DEVELOPER GUIDANCE.

2         SO IF THE COURT NEEDS SUPPORT FOR THE PROPOSITION THAT

3    THIS IS SOMETHING FACEBOOK WAS DOING IN THE "ORDINARY COURSE"

4    OF ITS BUSINESS, I MEAN, THAT WAS MENTIONED IN THE *WALL STREET*

5    *JOURNAL* ARTICLE THAT'S THE REASON WE'RE HERE.  THIS IS -- THIS

6    WAS NOT SOME HIDDEN PRACTICE.  AND THE FACT THAT THERE'S

7    NOTHING THAT SAYS -- IN THE DATA USE POLICY, BY THE WAY, WE

8    INCREMENT "LIKE" COUNTS.  I MEAN, THERE'S NO REQUIREMENT FOR

9    THAT.  I MEAN, THERE -- THERE'S NO REQUIREMENT FOR THAT KIND

10   OF GRANULARITY.  THESE DISCLOSURES COVER IT.

11        SO FOR ALL OF THOSE REASONS, YOUR HONOR, WE WOULD -- WE

12   WOULD -- WE WOULD URGE THE COURT TO LOOK CLOSELY AT THEIR

13   COMPLAINT.  IN OUR VIEW, THIS IS NOT A COMPLAINT THAT SHOULD

14   ADVANCE BEYOND THE PLEADING STAGE, AND WE RESPECTFULLY REQUEST

15   THAT THE COURT DISMISS THE COMPLAINT, YOUR HONOR.

16        **THE COURT:**  OKAY.  AND IF I WERE TO DISMISS THE

17   COMPLAINT, THE PLAINTIFFS HAVE INDICATED THAT THEY WOULD LIKE

18   TO HAVE LEAVE TO AMEND WITH RESPECT TO ANY OR ALL OF THE

19   COMPLAINT THAT IS DISMISSED.  AND WHY DO YOU THINK IT SHOULD

20   BE DISMISSED WITH PREJUDICE?

21        **MR. JESSEN:**  BECAUSE THE PROBLEM HERE IS NOT -- THIS

22   IS NOT A CASE WHERE, WELL, THEY JUST HAVEN'T READ -- THEY JUST

23   HAVEN'T PLED THE RIGHT LANGUAGE.  THEY FORGOT TO INCLUDE SORT

24   OF A CRITICAL ALLEGATION.  THEIR THEORY FAILS.  THEIR THEORY

25   WHETHER IT'S INCREMENTING THE "LIKE" COUNT OR RUNNING "LIKES"

1   THROUGH THE "LIKE" MACHINE -- HAVEN'T HEARD THAT ONE -- THE

2   THEORY FAILS.  THEY DO NOT HAVE A COGNIZABLE THEORY.  AND

3   THERE'S NO AMOUNT OF RE-PLEADING THAT IS GOING TO MAKE UP FOR

4   THAT, SO I THINK ON THAT BASIS, YOU COULD -- YOU COULD DISMISS

5   IT WITH PREJUDICE.

6       I MEAN, SOME OF THE CLAIMS -- PARTICULARLY UCL AND 632 --

7   I MEAN, THE LAW IS WELL SETTLED ON THOSE.  I MEAN, AS YOUR

8   HONOR NOTED, THERE ARE HALF A DOZEN CASES WHICH STAND FOR THE

9   PROPOSITION THAT WHAT THEY'RE CLAIMING IS NOT LOST MONEY OR

10  PROPERTY.

11      **THE COURT:**  YOU ALL -- BOTH SUBMITTED REQUESTS FOR

12  JUDICIAL NOTICE.  AND GENERALLY MATTERS THAT ARE JUDICIALLY

13  NOTICEABLE ARE MATTERS OF WHICH THERE IS NO DISPUTE.  BUT YET,

14  YOU ALL HAVE MANAGED TO DISPUTE EACH OTHER'S EXHIBITS WHICH

15  ARE SIMPLY INDICATIONS AS TO WHAT THE WEBSITE SAID AT A

16  PARTICULAR TIME --

17      **MR. SOBOL:**  YOUR HONOR --

18      **THE COURT:**  -- AND PLACE -- RATHER THAN REQUIRING ME

19  TO RESOLVE THOSE, I MEAN, THE -- BECAUSE IT SEEMS TO ME THAT

20  YOU CAN SIMPLY SUBMIT A DECLARATION THAT SAYS THIS IS WHAT

21  THIS WEBSITE SAID ON "X" DAY, AND WHO CARES HOW THEY'RE

22  MARKED?  I MEAN, THE RELEVANT PORTIONS ARE -- I'M GOING TO

23  MARK UP ANYWAY.  SO --

24      **MR. JESSEN:**  THAT'S --

25      **THE COURT:**  -- I WOULD LIKE YOU ALL TO RESOLVE THAT.

1    IT DOESN'T SEEM --

2                    (SIMULTANEOUS COLLOQUY.)

3          **THE COURT:**  -- SEEM TO ME TO BE A MATTER THAT SHOULD

4    BE SUBJECT TO --

5          **MR. SOBOL:**  THAT WILL DONE, YOUR HONOR.

6          **MR. JESSEN:**  WE DID THAT, YOUR HONOR.  AND WE DIDN'T

7    OBJECT TO THEIR REQUEST FOR JUDICIAL NOTICE.  THEY OBJECTED TO

8    OURS.

9          **MR. SOBOL:**  WE JUST DIDN'T THINK THAT YOU SHOULD HAVE

10   ONES THAT HAD COUNSEL'S -- AS EVIDENCE -- THERE'S A DIFFERENCE

11   BETWEEN PRESENTING SOMETHING IN ARGUMENT AND PRESENTING

12   SOMETHING AS EVIDENCE.  AND WE DIDN'T THINK YOU SHOULD HAVE IN

13   EVIDENCE -- AND WE FELT THE NEED TO PRESERVE THE RECORD TO SAY

14   THAT COUNSEL'S THOUGHT IMPRESSIONS BY HIGHLIGHTING CERTAIN

15   PORTIONS OF DOCUMENTS THAT THEY THINK --

16         **THE COURT:**  BUT THE HIGHLIGHTING ASSISTS ME.  SO I AT

17   LEAST KNOW WHICH PORTION -- WHAT -- THIS IS WHAT I'D LIKE YOU

18   TO DO.  I'D LIKE YOU TO SUBMIT A JOINT FILING AND BOTH

19   HIGHLIGHT THE PORTIONS THAT YOU WOULD LIKE TO DRAW MY

20   ATTENTION TO.  FACEBOOK MAKE YOUR HIGHLIGHTS YELLOW, AND

21   PLAINTIFFS MAKE YOUR HIGHLIGHTS PINK.  THAT WOULD HELP ME.

22         **MR. SOBOL:**  ABSOLUTELY, YOUR HONOR.  WE WILL --

23         **MR. JESSEN:**  THANK YOU.

24         **MR. SOBOL:**  WE'LL DO THAT, YOUR HONOR, I WONDER IF I

25   COULD ADDRESS THE ISSUE ABOUT THE MOTION TO DISMISS BEING WITH

1    PREJUDICE VERSUS GIVING US LATITUDE TO RE-PLEAD BECAUSE I

2    DIDN'T HAVE A CHANCE TO ADDRESS THAT.

3               **THE COURT:**  OKAY.

4               **MR. SOBOL:**  JUST VERY BRIEFLY, YOUR HONOR, I THINK --

5    YOU KNOW, FOR INSTANCE, IF YOU WERE TO RULE ON A CONSENT --

6    JUST IF YOU WERE TO RULE ON A CONSENT ISSUE AGAINST US,

7    ABSOLUTELY WE'D WANT TO RE-PLEAD BECAUSE IT WASN'T UNTIL WE

8    HEARD REPLY AT ORAL ARGUMENT AFTER ALL THE BRIEFING BACK AND

9    FORTH, AFTER THE OPENING ARGUMENT, AND THEN ON REPLY ARGUMENT,

10   WE'VE HEARD FOR THE FIRST TIME THAT WHEN WE SAY "YOUR

11   INFORMATION THAT YOU SHARE," THAT MEANS EVERYTHING, EVERY LAST

12   KEYSTROKE, BECAUSE AFTER ALL, NOT ONLY WHEN YOU'RE ON

13   FACEBOOK, BUT IF YOU'RE LOGGED INTO FACEBOOK AND YOU'RE

14   SOMEWHERE ELSE ON THE INTERNET, WE CAN TRACK YOUR USE.

15       SO WHAT THEY'RE SAYING IS THAT EVERYTHING FACEBOOK DOES IS

16   UP FOR GRABS IN "YOUR INFORMATION," AND SO THEY HAD A BURDEN

17   OF PROOF TO COME IN AND SAY THIS IS WHAT WE BASE CONSENT ON;

18   THEY BASED IT ON THE WRONG SECTION.

19       AND SO IF YOU'RE GOING TO RULE ON THIS OTHER SORT OF

20   EXPANDED LAST-MINUTE, YOU KNOW, CONSENT-ON-THE-FLY ARGUMENT,

21   WE CERTAINLY WOULD ASK A CHANCE TO RE-PLEAD.  AND I THINK

22   THAT, YOU KNOW, IN THE "ORDINARY COURSE," YOUR HONOR, YOU

23   KNOW, IF -- IF THERE'S -- IF THERE'S CERTAIN ASPECTS OF THIS

24   CASE THAT YOU THINK WE DIDN'T ADEQUATELY ADDRESS IN OUR

25   PLEADINGS, IT'S A COMPLICATED FACT PATTERN.  IT IS AN ARCANE

1    STATUTE THAT IT WOULD BE CERTAINLY NOT AN ABUSE OF DISCRETION

2    TO ALLOW US TO TRY TO CLARIFY WHAT WE MEAN UNDER THESE KINDS

3    OF CIRCUMSTANCES.

4            **THE COURT:** ALL RIGHT. I UNDERSTAND.

5        SOME OF THE ARGUMENTS THAT WERE MADE IN THE PAPERS AND

6    TODAY SUGGEST TO ME, THOUGH, THAT EVERYTHING CAN'T BE RESOLVED

7    ON A 12(B) MOTION IN THIS CASE. THERE ARE SOME ISSUES THAT I

8    THINK REQUIRE AN EVIDENTIARY RECORD OF SOME SORT AND AT LEAST

9    SOME MODICUM OF DISCOVERY BEFORE THEY'RE FULLY FLESHED OUT.

10           **MR. JESSEN:** I UNDERSTAND THAT, YOUR HONOR. AND I

11   THINK SOME OF THE ISSUES DISCOVERY'S NOT GOING TO CHANGE. I

12   MEAN, CONSENT --

13           **THE COURT:** SOME OF THE ISSUES PERHAPS --

14           **MR. JESSEN:** IT'S NOT --

15           **THE COURT:** -- BUT NOT ALL OF THE ISSUES.

16           **MR. JESSEN:** YEAH, WELL --

17           **THE COURT:** WHETHER OR NOT THE INFORMATION WAS

18   STORED, WAS INTERCEPTED, ACQUIRED WHILE STORED OR IN

19   TRANSMISSION, I MEAN, I DON'T KNOW WHAT THE PROCESS IS LIKE.

20   I'D LIKE TO KNOW WHAT THE PROCESS IS BEFORE I MAKE THAT KIND

21   OF DETERMINATION. SO THERE ARE SOME ISSUES. SO ALL I'M

22   TELLING YOU IS REGARDLESS OF WHAT I ULTIMATELY DECIDE, THERE

23   WOULD THERE WILL BE SOME ISSUES THAT REMAIN.

24           **MR. JESSEN:** YOUR HONOR, AND THE ONLY POINT THAT I

25   WOULD MAKE IS I THINK SOME OF THOSE ISSUES YOU DON'T HAVE TO

1  GET TO TO RESOLVE THE MOTION --

2        **THE COURT:**  PERHAPS.

3        **MR. JESSEN:**  "CONSENT" I THINK CAN BE RESOLVED AND,

4  FRANKLY, "ORDINARY COURSE OF BUSINESS" BASED UPON THE LEGAL

5  STANDARD AND WHAT THEY'VE ALLEGED IN THEIR COMPLAINT AND

6  OBVIOUSLY ON THE 632 AND UCL.

7        **THE COURT:**  OKAY.  ALL RIGHT.  MATTER STANDS

8  SUBMITTED.

9     THANK YOU.

10       **MR. SOBOL:**  THANK YOU FOR YOUR PATIENCE, YOUR HONOR.

11       **MR. JESSEN:**  THANK YOU, YOUR HONOR.

12       (PROCEEDINGS WERE CONCLUDED AT 11:05 A.M.)

13                    --oOo--

14             **CERTIFICATE OF REPORTER**

15

16       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

17  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18  I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,

19  NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS

20  HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR

21  OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

22

23       _Raynee H. Mercado_

24       RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

25            SATURDAY, DECEMBER 20, 2014