UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW CAMPBELL, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>FACEBOOK INC.,<br><br>    Defendant. | Case No. 13-cv-05996-PJH   (MEJ)<br><br>**DISCOVERY ORDER**<br><br>Re: Dkt. Nos. 112, 113, 122 |

## INTRODUCTION

The parties in this putative privacy class action recently filed three Joint Discovery Letters outlining various disputes. Dkt. Nos. 112, 113, 122. In the first Letter, they dispute whether Defendant Facebook, Inc. must produce documents regarding how it monetarily values information obtained by allegedly scanning putative class members' private Facebook messages. Dkt. No. 112 ("RFP Ltr."). In their second Letter, they dispute whether Facebook must produce an interrogatory response and related documents about how Facebook processes users' private messages. Dkt. No. 113 ("Rog/RFP Ltr."). The Court held a telephonic hearing on these matters on September 29, 2015. Dkt. No. 118. Subsequently, the parties filed an additional letter disputing whether Plaintiffs may take Facebook's Rule 30(b)(6) deposition concerning certain of its interrogatory responses. Dkt. No. 122 ("Dep. Ltr."). Having considered the parties' positions, relevant legal authority, and the record in this case, the Court issues the following Order.[1]

---

[1] The parties have also filed five Administrative Motions to Seal various documents related to the Discovery Letters discussed in this Order. *See* Dkt. Nos. 110, 111, 121, 125, 127. The Court's Order on those Motions is forthcoming. In the meantime, to the extent the Court cites or references certain portions of the redacted documents in this Order, the Court has already determined that those portions of the redacted documents are not properly sealed.

# BACKGROUND

Plaintiffs allege that Facebook "has systematically intercepted Facebook users' private Facebook messages without their consent[,]" in violation of the Electronic Communications Privacy Act ("ECPA" or the "Wiretap Act") and the California Invasion of Privacy Act ("CIPA"). Consol. Am. Compl. ("CAC") ¶ 1, Dkt. No. 25.

According to Plaintiffs, whenever a private Facebook message contains a Uniform Resource Locator ("URL"), Facebook uses a software application called a "web crawler" to scan the URL. *Id.* ¶ 25. Plaintiffs allege that "when their ostensibly private messages contained links to other websites, . . . Facebook scanned those messages and then analyzed the URL in the link." *Id.* ¶ 4. If the website contained a Facebook "Like" button,[2] Facebook treated the content of Plaintiffs' private messages as an endorsement of the website, adding up to two "Likes" to the page's count." *Id.* ¶¶ 4, 25-27. Plaintiffs further allege that "Facebook retains the user data it has collected, including the "Likes" assigned through intercepting users' private messages." *Id.* ¶ 52. They allege Facebook uses the data it collects during a scan of a private message for other purposes including, among others, enhancing its targeted advertising efforts. *Id.* ¶¶ 30, 49-51. Plaintiffs seek to represent a class of "all natural-person Facebook users located within the United States who have sent or received private messages that included URLs in their content, from within two years before the filing of this action up through and including the date when Facebook ceased its practice." *Id.* ¶ 59.

The deadline to file the class certification and summary judgment motions is November 15, 2013. Dkt. No. 117.

# LEGAL STANDARD

Federal Rule of Civil Procedure 26 provides that a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P.

---

[2] Certain third-party websites contain a Facebook "Like" button, which is a Facebook "social plugin" that allows the website's visitors to interact with Facebook. CAC ¶ 26. Facebook's "Like" plugin allows visitors to see how many users have clicked a button indicating they "Like" the page or have shared it with their friends, essentially measuring the page's popularity. *Id.* ¶ 32.

26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id*. A court "must limit the frequency or extent of discovery otherwise allowed by [the Federal] rules" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C).

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including by (1) prohibiting disclosure or discovery; (2) conditioning disclosure or discovery on specified terms; (3) preventing inquiry into certain matters; or (4) limiting the scope of disclosure or discovery to certain matters. Fed. R. Civ. P. 26(c)(1). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

## DISCUSSION

**A.  Interrogatory No. 8 and Request for Production No. 41**

The first dispute concerns Interrogatory No. 8 of Plaintiffs' Second Set of Interrogatories and Request for Production of Documents ("RFP") No. 41. Interrogatory No. 8 asks Facebook to

> Identify all facts relating to the Processing of each Private Message sent or received by Plaintiffs containing a URL, including, for each Private Message:
> (A) all Objects that were created during the Processing of the Private Message, including the (id) and the Object Type for each Object, as well as any Key -> Value Pair(s) contained in each Object;
> (B) all Objects that were created specifically when the embedded URL was shared, including the (id) and the Object Type for each Object, as well as any Key -> Value Pair(s) contained in each Object;
> (C) all Associations related to each Private Message, identified by the Source Object, Association Type, and

3

>    Destination Object, as well as any Key -> Value Pair(s) contained in each Association;
> (D) the database names and table names in which each Association and Object is stored;
> (E) each application or feature in Facebook that uses the Objects or Associations created for each Private Message; and
> (F) how each Object associated with the Private Message was used by Facebook.

Dkt. No. 113-1 at 9-10 (Plaintiffs' Second Set of Interrogatories).  Plaintiffs generally define "Objects and Associations" as "metadata structures that Facebook generates to catalog its users' online activity."  Rog/RFP Ltr. at 2 n.1.  Plaintiffs' RFP No. 41 seeks "[a]ll Documents and [electronically stored information ("ESI")] relied upon, reviewed, or referenced by [Facebook] in answering Interrogatory No. 8."  Dkt. No. 113-2 at 8.

After meeting and conferring with Facebook, Plaintiffs narrowed the requests to focus on only 19 private messages, communicated by the named Plaintiffs; Facebook searched for the specified messages, but located only 16 of them.  Rog/RFP Ltr. at 1-2.[3]  On September 1, 2015, Facebook produced documents in response to Plaintiffs' requests.  Dkt. No. 113-5.  Plaintiffs consider Facebook's production inadequate and unresponsive.  Rog/RFP Ltr. at 2-3.  First, they assert Facebook "wholly ignored" Interrogatory No. 8 and instead provided only an "assortment of printouts from unidentified databases," which "lack the necessary context and breadth to properly answer Plaintiffs' Interrogatory."  *Id.* at 3.  Second, they object to Facebook narrowing its responses to only a "subset" of their requests; specifically, Facebook only provided responses related to Objects and Associations created from URLs present in Plaintiffs' messages, excluding other content.  *Id.*  Third, they contend Facebook has refused to provide the names of the databases and tables in which the Objections and Associations are stored.  *Id.*  Fourth, they assert Facebook has provided no documents that respond to Plaintiffs' request that Facebook identify how it uses these Objections and Associations.  *Id.*  Finally, Facebook's current production describes other documents that may serve as explanatory or reference materials for interpreting the documents produced thus far.  *Id.*  Plaintiffs contend they are entitled to all the foregoing information.

---

[3] Facebook indicated it is unable to find the remaining three messages identified by Plaintiffs (Rog/RFP Ltr. at 4); its counsel confirmed this at the hearing.

Facebook objects and refuses to produce more or different documents, asserting that Plaintiffs' requests are irrelevant, overbroad, and burdensome. *Id.* at 3-5. Its primary objection appears to be that "***Facebook has in fact already produced the information that is relevant to Plaintiffs' claims***" in the form of the source code, which demonstrates how Facebook scans users' messages. *Id.* at 4-5 (emphasis in original). Specifically, Facebook agreed to produce "all source code related to the private message function from creation through end storage, including any scanning or acquisition of private message content and any data structures that connect or associate users to messages or message content, and messages to attachments or URLs." *Id.* at 2 (emphasis omitted); *see* Dkt. No. 92 (Order granting stipulation for production of source code). Plaintiffs argue that what they currently seek—the information relating to the Objects and Associations created from Plaintiffs' private messages—is a "corollary" to the source code. *Id.* They explain that while "[t]he source code enables Plaintiffs to understand the processes Facebook employs for its messaging functionality, . . . . Plaintiffs wish to learn what *specific* data was generated by Facebook . . . and how that data was used and stored." *Id.* (emphasis in original).

Facebook also argues it has already produced the Objects and Associations relevant to Plaintiffs' allegation of scanning of URLs to increase the "Like" count on webpages. *Id.* at 4. Facebook states that "Plaintiffs' Complaint challenges a very specific practice—namely, the alleged 'scanning' of URLs sent in 'private messages' to increase the 'like' counter on third-party websites before the end of 2012." *Id.* (emphasis omitted). Facebook also points to Plaintiffs' proposed class definition, which is limited to "Facebook users located within the United States who have sent or received private messages that included URLs." *Id.* (emphasis omitted); CAC ¶ 59. Facebook thus argues Plaintiffs' request for "the production of *any* 'objects' and 'associations' related to these [19] messages," not just those related to URLs contained in those messages, has "no conceivable relevance to Plaintiffs' allegations of 'scanning' URLs to increase the 'like' counter." *Id.* (emphasis in the original).

In response, Plaintiffs assert their requests "are narrowly tailored to provide specific examples of how Facebook's message-scanning practices work, complementing the source code already provided by Facebook." *Id.* at 3. They further contend the "information not only allows

5

Plaintiffs to determine the extent to which their message content was acquired, stored and used, but also to measure these data points against Facebook's defenses that all message scanning and content acquisition at issue was conducted within the ordinary course of its business."[4]  *Id.*; *see also* Answer to CAC, Dkt. No. 53 at 22.  Facebook has indicated it intends to seek summary judgment based on its ordinary course of business defense.  *See* Jt. Case Management Statement at 4-7, Dkt. No. 60.

Finally, Facebook objects on grounds that "much of the information [sought] is not accessible without undue burden."  Rog/RFP Ltr. at 5.  Facebook contends that "[e]xtracting the data comprising objects and associations into producible form [is something] Facebook's systems were never designed to do;" and that "Facebook's there is no readily identifiable list of th[e] information" sought in subparts (E) and (F) of Interrogatory No. 8.  *Id.* at 4-5.  Consequently, Facebook asserts its "busy and valuable technical employees must take considerable time away from their normal job duties to search for information that is not readily accessible (if it is accessible at all)[.]"  *Id.* at 5.

During the telephonic hearing, the Court discussed the burden issue with the parties and ultimately permitted Facebook to submit a declaration explaining the burden to Facebook in

---

[4] Judge Hamilton's Order on Facebook's Motion to Dismiss the CAC describes the ordinary course of business defense:

> The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The statute then further defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than" a device or apparatus that is "being used by a provider of wire or electronic communication service in the ordinary course of its business." 18 U.S.C. § 2510(5). Essentially, the Wiretap Act creates an exception for interceptions conducted by an electronic communications service provider occurring in "the ordinary course of its business."

Dkt. No. 43 at 6.  The Order further notes the Wiretap Act's ordinary course of business "exception must cover more than just 'necessary' activities, . . . there [also] must be 'some nexus between the need to engage in the alleged interception and the subscriber's ultimate business, that is, the ability to provide the underlying service or good.'"  *Id.* at 11-12 (citations omitted).

producing this information. Facebook submitted the declaration of its Engineering Manager and declarant, Dale Harrison. *See* Harrison Decl., Dkt. No. 125-3.[5] Harrison states that "over the course of August and September, I estimate that I spent more than 25 hours writing new code and conducting the manual searches and extractions." *Id.* at 6. He posits that production of all the Objects related to the 16 identified private messages "is likely impossible." *Id.* He also explains the process he would undertake in order to comply with Plaintiffs' request. *Id.* He explains that to comply, it may require consulting with former and present Facebook engineers to find out what Objects can be generated by their work, determining where in the Facebook system each of these types of Objects may exist, and assessing what functions and tools are available for searching, locating, and extracting each Object type. *Id.* Harrison's "best estimate is that . . . it could take hundreds of man hours" to complete this process. *Id.* There is no indication approximately how much this would cost.

Having considered the foregoing arguments and carefully reviewed the supportive documents, the Court finds Facebook must produce the requested discovery. First, the information requested goes not only to Plaintiff's affirmative claims, but also Facebook's defenses. As Facebook outlines in its portion of the Joint Case Management Statement, the legal issues in this case include: (1) "[W]hether Facebook unlawfully 'redirected' the content of plaintiffs' private messages[;]" (2) "Whether any alleged 'interception' occurred while the messages were 'in transit'"[; and] (3) "Whether the 'ordinary course of business' exemption bars Plaintiffs' Wiretap Act claim[.]" Jt. Case Management Statement at 7 (quoting Order re: Mot. to Dismiss, Dkt. No. 43 (some internal marks omitted)). Plaintiffs' Interrogatory No. 8 and related RFPs seek information about "how Facebook's message-scanning practices work," not only to support their own claims but also to respond to Facebook's defenses, including its ordinary course of business defense and representations about when the alleged interceptions occurred.[6] Plaintiffs

---

[5] Docket number 125-3 is the redacted version of Dale Harrison's Declaration. The unredacted version is found at docket number 125-2.

[6] Facebook redacted its portion of the discovery letter that describes how it processes URLs in users' private messages. *See* Rog/RFP Ltr. at 4.

7

1  specifically allege that "Facebook intercepted electronic communications sent by and to Plaintiffs
2  and Class Members (a) for undisclosed purposes; (b) for the purpose of generating 'Likes' for
3  third-party websites; (c) for purposes of providing web traffic data to third parties; (d) for purposes
4  of cataloging user data; (e) for purposes beyond facilitating private messages sent via Facebook;"
5  and they allege "[t]hese activities are not within the ordinary course of business of a provider of an
6  electronic communication service." CAC ¶ 86. Plaintiffs' Interrogatory and RFP appropriately
7  seek discovery tuned to this and related allegations.
8    Second, while in some cases the production of certain discovery will negate the need for
9  further unnecessary discovery on the same issue, the Court does not find these discovery requests
10 redundant or superfluous. Facebook may be correct that the source code it has already produced
11 may provide much of the discovery Plaintiffs seek. *See* Harrison Decl. at 6 ("[T]he
12 comprehensive record of Facebook functions that used any given Object or Association type at
13 any given time is Facebook's source code."). But as Plaintiffs note elsewhere, "[t]he source code
14 at issue consists of over 10 million lines[,]" Dep. Ltr. at 3, and Facebook's own declarant explains
15 that it "would be exceedingly burdensome to review the source code in its entirety—to develop a
16 list of all possible uses of Objects and Associations." Harrison Decl. at 6-7. But seemingly this is
17 what Facebook wishes Plaintiffs to do, instead of working together to more efficiently locate and
18 uncover the information. Furthermore, Facebook's responses to Plaintiffs' Interrogatory No. 8
19 and RFP No. 41 can be used differently than information obtained from the source code. Among
20 other things, in answering an interrogatory, a party makes that answer "in writing under oath."
21 Fed. R. Civ. P. 33(b)(3). Rather than having experts duel over technical coding, Plaintiffs can use
22 a sworn interrogatory response in conjunction with related documents to show Facebook's actions.
23   Finally, the Court is not persuaded by Facebook's burden argument. First, twenty-five
24 hours of work over the course of two months does not constitute an undue burden. *See, e.g.*,
25 *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033 (E.D. Cal. 2010) (collecting cases and finding 111
26 hours to conduct data review in response to interrogatory did not amount to undue burden); *Pham*
27 *v. Wal-Mart Stores, Inc.*, 2011 WL 5508832, at *5 (D. Nev. Nov. 9, 2011) (document request
28 requiring 56 hours to review files did not constitute undue burden). Moreover, Facebook's

United States District Court
Northern District of California

8

declarant does not describe how those 25 hours were allocated.  He does not state, for instance, how much time he spent writing new code versus conducting the searches and extractions or, for that matter, how much time he spent consulting with counsel.

   Second, he does not explain how much time he realistically believes it will take him to acquire the rest of the information Plaintiffs requested.  While Harrison indicates it could take hundreds of hours to find the information Plaintiffs seek because "there is no search function that returns all Objects for a given user," he also indicates there may be a very simple way of locating and extracting the information sought; specifically, he states that "if [he] were to learn of an Object type that may exist for these messages, [then] it may be that there is existing search functionality for locating and extracting that Object."  Harrison Decl. at 6.  Plaintiffs' Interrogatory No. 8 asks Facebook to tell them what "Objects that were created during the Processing of the Private Message" and what "Objects that were created specifically when the embedded URL was shared."  Rog/RFP Ltr. at 1; Dkt. No. 113-1 at 9-10.  By refusing to provide Plaintiffs with a list of Objects, Facebook puts Plaintiffs in a position where they cannot request specific Objects types to locate and extract—which, according to Harrison, may aid him in the locating and extracting those Objects.  *See* Harrison Decl. at 6.  Facebook has not said it does not know which Object types exist for its messages, and it seems unlikely Facebook would not possess this information as it created and controls the mechanisms for processing these messages.  Thus, while Harrison's declaration may raise the question of whether he is the appropriate person to respond to Plaintiffs' requests, it does not show Facebook is unduly burdened.  If other engineers, etc., know what Objects "can be generated as a result of their work at Facebook, and whether any of those Objects could be generated from sending a message," those individuals may be the more appropriate persons to address these discovery requests.

   In sum, it seems there are a number of simple steps Facebook can take to more easily find and extract the information Plaintiffs seek.  And even if there are not, Facebook has not demonstrated that its burden outweighs the likely benefit of this information in resolving the issues at stake in this action, and which the parties will in all probability address in their summary judgment and class certification motions.  Accordingly, Plaintiffs' Motion to Compel Facebook's

responses to Interrogatory No. 8 and RFP No. 41 is **GRANTED**.

**B.      Request for Production Nos. 53-60**

The second dispute concerns Plaintiffs' Third Set of Requests for Production of Documents, which seek the following:

> **Request for Production No. 53**: All Documents and ESI relating to Your efforts, or efforts by Third Parties on Your behalf—whether undertaken or contemplated but not undertaken—to assign a monetary value to Facebook Users (and/or any additional information derived therefrom), or to determine the revenue or profits made from data received or content collected by You from Facebook Users (and/or any additional information derived therefrom).
>
> **Request for Production No. 54**: All Documents and ESI relating to Your efforts, or efforts by Third Parties on Your behalf—whether undertaken or contemplated but not undertaken—to assign a monetary value to the data contained within, or data received or content collected from, Private Messages, and/or any additional information derived therefrom.
>
> **Request for Production No. 55:** All Documents and ESI sufficient to identify the number of web pages with "Like" Social Plugins embedded, by month, during the Relevant Time Period.
>
> **Request for Production No. 56**: All Documents and ESI sufficient to identify the number [of] "Likes" generated, by month, during the Relevant Time Period.
>
> **Request for Production No. 57**: All Documents and ESI sufficient to identify the number of Passive Likes generated, by month, during the Relevant Time Period.
>
> **Request for Production No. 58**: All Documents and ESI related to any analysis—for internal or external use—correlating the acquisition of "Likes" by Third Parties and the advertising spend of those Third Parties on Facebook ad buys.
>
> **Request for Production No. 59**: All Documents and ESI relating to Your efforts, or efforts by Third Parties on Your behalf—whether undertaken or contemplated but not undertaken—to assign a monetary value to the presence of a "Like" Social Plugin on a Third-Party website, or to determine the value of data received or content collected from the presence of a "Like" Social Plugin on a Third-Party website (and/or any additional information derived therefrom), or to determine the revenue or profits made from the

>1. presence of a "Like" Social Plugin on a Third-Party website (and/or any additional information derived therefrom).
>
>    **Request for Production No. 60**: All Documents and ESI relating to Your efforts, or efforts by Third Parties on Your behalf—whether undertaken or contemplated but not undertaken—to increase and/or maximize the presence of the ["]Like["] Social Plugin on Third Party websites.

Dkt. No. 112-1 at 8-9. In response, Facebook (1) agreed to produce responsive documents to RFP Nos. 55 and 57; (2) objected to but offered to meet and confer on RFP Nos. 53-54 and 59; and (3) objected to RFP Nos. 56, 58, and 60. RFP Ltr. at 1. Facebook later informed Plaintiffs that after a reasonable search and diligent inquiry, it was unable to locate any responsive documents to RFP Nos. 55 and 57 during the relevant time period. *Id.* Plaintiffs contend Facebook has not produced any responsive documents. *Id.* at 1-2.

Plaintiffs' RFP Nos. 53-60 seek "to discover how Facebook generates profits in order to analyze the role played by private messages, social plugins, and Likes, and, specifically, the interception of private messages, generation of passive Likes, and derivative activities, in Facebook's income stream." *Id.* at 2. With such information, "Plaintiffs could accurately model the profits attributable to the challenged conduct," which "is relevant to determine the proportion of Facebook's profits attributable to generating Passive Likes through the alleged ECPA violations." *Id.* at 2-3. Plaintiffs contest Facebook's representation that there are no documents that answer the RFPs, maintaining "[t]here is every reason to believe that responsive documents exist," due in part to Facebook Engineer Alex Himel's June 2015 declaration, which explains how Facebook altered some of its code to collect certain related information. *Id.* Plaintiffs insist "[a] good-faith search . . . would provide documents showing how Facebook categorizes" data related to their requests. *Id.* at 2. Moreover, Plaintiffs assert that "[e]ven if . . . Facebook never directly evaluated the independent worth of its users, Passive Likes, or private messages . . ., the information to ascertain Facebook's profits from scanning private messages, logging URLs within, and generating Likes[] can be determined with expert analysis." *Id.* at 3.

Facebook objects to Plaintiffs' requests on two grounds: first, Facebook contends Plaintiffs' requests go beyond the "District Court's clear instruction at the March 12, 2015 case

11

1  management conference that the parties should focus their discovery efforts on issues relevant to
2  class certification and the open issues from the Court's motion-to-dismiss order." *Id.* at 4.
3  Second, Facebook asserts "Plaintiffs' stated purpose behind RFPs 53-60 . . . is fundamentally
4  flawed and overbroad" because they "are not entitled to documents about how Facebook
5  'generates profits,'" but only "documents . . . relevant to their specific claims and the permissible
6  damages under those claims." *Id.*  Facebook contends it has "already conducted a reasonable
7  search and diligent inquiry" for what it views as responsive documents related to RFP Nos. 54, 55,
8  and 57, but it states it was unable to locate any responsive documents. *Id.* at 4-5.  It asserts,
9  despite Plaintiffs' contention, that such documents exist is "speculation." *Id.* at 5.  As to RFP Nos.
10 53, 56, 58-60, Facebook insists such requests are unrelated to Plaintiffs' claims or potential
11 recoverable damages. *Id.*  As noted, Facebook has not produced any documents in response to
12 these RFPs. *Id.* at 1-2.
13   As an initial matter, to the extent Facebook argues such discovery is premature, the Court
14 disagrees.  The District Court's Case Management Conference Minute Entry provides that both
15 class certification and summary judgment motions shall be filed contemporaneously and reiterated
16 this in its latest Order altering the filing deadlines for these motions.  *See* Dkt. Nos. 62, 117.  Both
17 motions have the potential to consider and test Plaintiffs' theories of relief, whether they have
18 sufficient evidence to support the elements of their claims, and their methodology for determining
19 class-wide relief.  Consequently, this discovery is not premature.
20   Second, Facebook has not shown why Plaintiffs' requests are overbroad or irrelevant.  As
21 Plaintiffs point out, this suit arises under ECPA and CIPA, and Plaintiffs seek all available relief.
22 RFP Ltr. at 2 and 4 n.5.  CIPA provides for actual damages, or statutory damages of $5,000.  Cal.
23 Penal Code § 637.2.  ECPA provides for "appropriate relief," including (1) "the sum of the actual
24 damages suffered by the plaintiff and any profits made by the violator as a result of the violation";
25 (2) statutory damages of $10,000 or $100 per day of violation; and/or (3) other equitable relief "as
26 may be appropriate."  18 U.S.C. § 2520(b)-(c).  Thus, profits made as a result of the violation may
27 be recoverable.
28   Facebook, however, represents it has found no documents showing how it directly profited

12

from the alleged interceptions, indicating that no such information exists. RFP Ltr. at 4. Seemingly, because Facebook located no information it viewed as on point, Facebook now believes it should not have to produce any other information. But as Plaintiffs point out, even though Facebook itself may not have determined the independent value or profits it obtained from scanning private messages, expert analysis of the information Plaintiffs seek may assist them in making that determination, which in turn could assist in establishing a model or methodology for class-wide relief. *Id.* at 3. Although Facebook argues RFP Nos. 53, 56, 58, 59, and 60 are overbroad, they are connected to the conduct Plaintiffs challenge, namely the scanning of putative class members' private messages and the potential benefit Facebook receives as a result of obtaining information from those messages, including URL data that converts to "Likes" on corresponding webpages. Plaintiffs allege that Facebook then uses the data to enhance its targeted advertising efforts, among other things. CAC ¶¶ 30, 49-51. While in a footnote Facebook argues its advertising revenues are irrelevant, Ltr. at 5 n.8, as indicated, Plaintiffs have raised targeted advertising as one of the potential benefits Facebook receives as a result of scanning users' private messages.[7] Otherwise, given (1) Facebook's representation that it has not itself determined a method of valuing profits obtained from scanning users' private messages, and (2) that Facebook has not suggested an alternative way of producing information to assist Plaintiffs with obtaining that basic information they seek, the Court finds it reasonable that Plaintiffs should be permitted somewhat broader discovery to be able to establish a model or methodology for class-wide relief.

Accordingly, Plaintiffs' Motion to Compel Facebook's responses to RFP Nos. 53-60 is **GRANTED**.

C.      **Request for 30(b)(6) Deposition Regarding Facebook's Source Code**

The last dispute between the parties involves Plaintiffs' Rule 30(b)(6)[8] deposition notice,

---

[7] *See also* Order re: Mot. to Dismiss at 10-11 (acknowledging Plaintiffs' allegations regarding targeted advertising and finding "it problematic that Facebook is attempting to have it both ways by maintaining that plaintiffs' advertising-related allegations lack any factual basis, . . . but then using those largely-removed allegations to invoke the 'ordinary course of business' exception.").

[8] Federal Rule of Civil Procedure 30(b)(6) provides in relevant part:

> In its notice or subpoena, a party may name as the deponent a public

13

1    which asks Facebook to designate a corporate representative to testify upon, among other things,

2    the following topics:

3        (1) The identification of Facebook source code utilized to carry out each process characterized in Facebook's Responses and Objections to Plaintiffs' Interrogatories ("Resp."), Interrogatories No. 2 and 3." ("Topic One"); and

        (2) The identification of Facebook source code utilized to carry out each process characterized in Facebook's Responses and Objections to Plaintiffs' Interrogatories ("Resp."), Interrogatory No. 4." ("Topic Two")

8    Dep. Ltr. at 1.[9]  During the parties' meet and confer, Facebook asserted that Topics One and Two

9    were improper and that it would not produce a deponent on those topics.  *Id.*  Shortly after,

10   Plaintiffs' counsel proposed, in lieu of a 30(b)(6) deposition, that Facebook allow Plaintiffs to run

11   Facebook's source code in an "Integrated Development Environment" ("IDE"), suggesting that an

12   IDE would enable Plaintiffs to see the full process that Facebook undertakes when a user

13   composes and sends a private message.  *Id.*  Facebook subsequently informed Plaintiffs that their

14   suggestion to run Facebook's source code in an IDE had no precedent and that it stood on its

15   objection to designating a witness for Topics One and Two.  *Id.*  On September 18, Plaintiffs

---

        or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . . The persons designated must testify about information known or reasonably available to the organization. . . .

[9] Interrogatory No. 2 requests Facebook to "Identify by name, purpose, sequence, function and physical location each Process and/or piece of Architecture involved in Private Message Transmission."

Interrogatory No. 3 states: "For each Process and/or piece of Architecture identified in Interrogatory No. 2, identify whether – and the manner in which – such Process and/or piece of Architecture scans, analyzes, or extracts Private Message Content."

Interrogatory No. 4 requests "For each Process and/or piece of Architecture identified in Interrogatory No. 3, identify all uses to which the scanned/analyzed/extracted Private Message Content – as well as any additional data, metadata or other content generated therefrom – are put."

*See* Dkt. No. 121-4.

1    served their Rule 30(b)(6) deposition notice (Dkt. No. 122-1), and on September 22, Facebook
2    served its Responses and Objections to the Notice (Dkt. No. 122-2). *Id.*
3    　　　　Once again, Facebook falls back on the position that it has already produced the source
4    code and therefore does not need to produce anything more. *Id.* at 4.  Facebook also argues it
5    provided the declaration from a senior Facebook Engineering Director, Alex Himel, which it
6    asserts "explained the processes at issue and attached key technical documents explaining the
7    relevant portions of the source code[,]" as well as detailed responses to Plaintiff's First Set of
8    Interrogatories, "which provide a narrative description of how the challenged practice operated."
9    *Id.* Facebook urges the Court to deny Plaintiff's 30(b)(6) deposition request, asserting "[t]he
10   emerging pattern in this case is that Plaintiffs *never* will be satisfied.  When Plaintiffs demanded
11   Facebook's source code, Facebook explained the technology in lieu of producing it.  Plaintiffs
12   insisted that they have the source code itself, so Facebook ultimately produced it.  But now,
13   Plaintiffs demand a Rule 30(b)(6) witness to explain it." *Id.* at 5 (emphasis in original).  Facebook
14   asserts, without citations, that "[t]he law is clear: Plaintiffs cannot shift their burden of analyzing
15   the source code they insisted they needed to Facebook or insist that Facebook prepare a witness on
16   such burdensome, overbroad topics." *Id.* at 4.
17   　　　　Facebook's argument that Plaintiffs already have all they need—the source code—and that
18   Facebook is not required to produce anything more is belied by two things.  First, Facebook's own
19   declarant has acknowledged that reviewing the entire source code is "exceedingly burdensome,"
20   *see* Harrison Decl. at 6-7, and if Facebook, as the code's developer, has so much difficulty
21   analyzing this data, the burden on Plaintiffs to do the same is conceivably much greater.  Thus, the
22   Court does not currently find evidence that Plaintiffs are "manufacturing disputes" to increase the
23   costs and burden of this litigation as Facebook asserts. *See id.* at 5.
24   　　　　Second, as the Court discussed above in relation to Facebook's objections to Plaintiffs'
25   Interrogatory No. 8 and RFP 41, different types of discovery address different concerns.  While
26   Facebook may have provided detailed responses to Plaintiffs' interrogatories and submitted the
27   declarations of Facebook employees describing how its private message processing works,
28   Plaintiffs have a right to verify and explore the information Facebook provided through a 30(b)(6)

15

deposition, which "permit[s] the examining party to discover the corporation's position via a witness designated by the corporation to testify on its behalf." *Estate of Thompson v. Kawasaki Heavy Indus., Ltd.*, 291 F.R.D. 297, 303 (N.D. Iowa 2013) (quoting *LDA v. Virgin Enters. Ltd.*, 511 F.3d 437, 440 n.2 (4th Cir. 2007)); *accord Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) ("a rule 30(b)(6) designee . . . presents the corporation's 'position' on the topic." (citations omitted)); *JSR Micro, Inc. v. QBE Ins. Corp.*, 2010 WL 1338152, at *11 (N.D. Cal. Apr. 5, 2010) (same); *Memory Integrity, LLC v. Intel Corp.*, ___ F.R.D. ___, 2015 WL 4601177, at *3 (D. Or. July 29, 2015) (same). As Plaintiffs point out, Facebook's responses to Interrogatory Nos. 2-4 are simply narratives, and Plaintiffs should be "entitled to test their veracity and accuracy" by, for instance, obtaining evidence "that provides the foundation for any testimony characterizing the technical details of the private message process[.]" Dep. Ltr. at 2. Indeed, "[p]arties are entitled to test assertions in questioning witnesses during depositions, and it is fundamental that parties may simultaneously utilize any or all of the discovery mechanisms authorized by the rules." *U.S., ex rel. Fry v. Health All. of Greater Cincinnati*, 2009 WL 5227661, at *3 (S.D. Ohio Nov. 20, 2009) (citation and internal marks omitted); *see also Kress v. Pricewaterhouse Coopers, LLP*, 2013 WL 2421704, at *5 (E.D. Cal. June 3, 2013) (noting "there are strong reasons why a party strategically selects to proceed by oral deposition rather than alternate means, including the spontaneity of witness responses." (citation omitted)). Accordingly, such discovery is not "wasteful" as Facebook suggests but may help the parties and the Court better understand how Facebook's private message processing works.

Facebook nevertheless contends that asking it to prepare a witness to identify the source code related to "each process," described in its interrogatory responses, which include 10 and 31 sub-parts, is an "impossible task." Dep. Ltr. at 5 (citations omitted). The Court does not find much merit in this argument. On one hand, Facebook (1) tells the Court that its source code provides "all of the data [Plaintiffs] need" to uncover the information they seek (*id.* at 4)[10] and (2)

---

[10] *See also* Harrison Decl. at 6 ("[T]he comprehensive record of Facebook functions that used any given Object or Association type at any given time is Facebook's source code.").

provides thorough, narrative descriptions about how the source code works—evidently written by someone with knowledge of how Facebook processes its messages. But on the other hand, Facebook complains that it could not possibly produce a person (or persons)[11] who is, or could be made to be, capable of testifying to this same information. *Id.* at 5. Facebook's positions are in conflict, indicating either that its responses to Interrogatory Nos. 2-4 are not based on knowledge of Facebook's source code or that the source code does not in fact provide all the information Plaintiffs seek, underscoring the importance of obtaining more complete information. In either event, without more, the Court cannot find that Facebook is unduly burdened by Plaintiffs' 30(b)(6) deposition request.

Finally, to the extent Facebook contends Plaintiffs' deposition notice should be quashed because it asks for testimony "not limited" to the listed topics, the Court does not find grounds for doing so at this time. Plaintiffs' deposition notice describes with "reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). The mere fact that Plaintiffs generically added the phrase "not limited to" to the matters identified does not necessarily mean that it must be quashed. "The proper scope of the questioning of a Rule 30(b)(6) witness is not defined by the notice of deposition, but by Rule 26(b)(1) of the Federal Rules of Civil Procedure, unless a court otherwise directs." *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 38 (S.D.N.Y. 2009) (citing *Emps. Ins. Co. of Wausau v. Nationwide Mut. Fire Ins. Co.*, 2006 WL 1120632, at *1 (E.D.N.Y. Apr. 26, 2006)). "In fact, a notice of deposition . . . constitutes the minimum, not the maximum, about which a deponent must be prepared to speak." *Id.* (citing *Wausau*, 2006 WL 1120632, at *1 and *Detoy v. City & Cty. of S.F.*, 196 F.R.D. 362, 366 (N.D. Cal. 2000)); *see also Am. Gen. Life Ins. Co. v. Billard*, 2010 WL 4367052, at *4 (N.D. Iowa Oct. 28, 2010) (adopting "the majority view" that "the questioning of a Rule 30(b)(6) deponent is not limited to those subjects identified in the Rule 30(b)(6) notice."); *accord U.S. E.E.O.C. v. Caesars Entm't, Inc.*,

---

[11] *See Dwelly v. Yamaha Motor Corp.*, 214 F.R.D. 537, 540 (D. Minn. 2003) ("if no person exists who is able to speak, on a corporation's behalf, on all of the topics noted in the deposition, the corporation cannot avoid the deposition by such a claim, but must prepare a deponent to testify as to those matters" and "[f]urther, the plain language of the Rule permits a corporation to designate more than one deponent in response to a 30(b)(6) notice." (citations omitted))

237 F.R.D. 428, 432 (D. Nev. 2006) ("Most courts have concluded that once the witness satisfies the minimum standard for serving as a designated witness, the scope of the deposition is determined solely by relevance under Rule 26, that is, that the evidence sought may lead to the discovery of admissible evidence." (citations and internal marks omitted)).

While this is certainly not an invitation for Plaintiffs to go on a fishing expedition for information unrelated to their listed matters for examination, nothing in the Federal Rules of Civil Procedure requires the Court quash Plaintiffs' deposition notice at this time. *Cf. Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000) (quashing a deposition subpoena where "the defendant c[ould] not identify the outer limits of the areas of inquiry noticed, [as] compliant designation is not feasible"); *see also Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 1054279, at *4 (D. Kan. Apr. 9, 2007) (finding that where the examining party used the phrase "including but not limited to," but then followed it with an extensive example list of the records and reports for which information is sought, there can be no claim that the deposed party could not identify the "outer limits of the areas of inquiry." (quoting *Reed*, 193 F.R.D. at 692)).

Accordingly, Plaintiffs' Motion to Compel Facebook's 30(b)(6) Deposition for Topics 1 and 2, above, is **GRANTED**.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Plaintiffs' Motions to Compel Facebook's responses to Interrogatory No. 8 and RFP Nos. 41, 53-60, as well as its Motion to Compel Facebook's Rule 30(b)(6) deposition to testify as to Topics 1-2. Facebook must respond to these requests in accordance with this Order **no later than October 28, 2015**. Given the impending motions deadlines, the parties may stipulate to Facebook's production of other data, documents, or methods of responding to the discovery requests herein in accordance with this Order. They may also stipulate to a different timeline for production.

**IT IS SO ORDERED.**

Dated: October 14, 2015

_____
MARIA-ELENA JAMES
United States Magistrate Judge

18