1   GIBSON, DUNN & CRUTCHER LLP
    JOSHUA A. JESSEN, SBN 222831
2   JJessen@gibsondunn.com
    JEANA BISNAR MAUTE, SBN 290573
3   JBisnarMaute@gibsondunn.com
    PRIYANKA RAJAGOPALAN, SBN 278504
4   PRajagopalan@gibsondunn.com
    ASHLEY ROGERS, SBN 286252
5   ARogers@gibsondunn.com
    1881 Page Mill Road
6   Palo Alto, California  94304
    Telephone:  (650) 849-5300
7   Facsimile:   (650) 849-5333

8   GIBSON, DUNN & CRUTCHER LLP
    CHRISTOPHER CHORBA, SBN 216692
9   CChorba@gibsondunn.com
    333 South Grand Avenue
10  Los Angeles, California 90071
    Telephone:  (213) 229-7000
11  Facsimile:   (213) 229-7520

12  Attorneys for Defendant
    FACEBOOK, INC.
13

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                  OAKLAND DIVISION

17  MATTHEW CAMPBELL and MICHAEL          Case No. C 13-05996 PJH
    HURLEY,
18                                        **PUTATIVE CLASS ACTION**
                      Plaintiffs,
19                                        **DEFENDANT FACEBOOK, INC.'S**
          v.                              **OPPOSITION TO PLAINTIFFS' MOTION**
20                                        **FOR CLASS CERTIFICATION**
    FACEBOOK, INC.,
21                                        **APPENDIX OF EVIDENCE (INCLUDING**
                      Defendant.          **SUPPORTING DECLARATIONS AND**
22                                        **REBUTTAL EXPERT REPORTS)**
                                          **SUBMITTED CONCURRENTLY**
23
                                          **HEARING:**
24                                        Date:    March 16, 2016
                                          Time:    9:00 a.m.
25                                        Place:   Courtroom 3, 3rd Floor
                                                   The Honorable Phyllis J. Hamilton
26

27          REDACTION VERSION OF DOCUMENT TO BE SEALED

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND.......................................... 4

      A.    The Named Plaintiffs And Their Action .................................. 4

      B.    Facebook And The Technology At Issue In This Action ................. 4

III.  THE LEGAL STANDARDS GOVERNING THIS MOTION ........................... 10

IV.   STATEMENT OF ISSUE TO BE DECIDED PURSUANT TO RULE 7-4(a)(3) ............... 10

V.    AN INDIVIDUALIZED ANALYSIS IS REQUIRED TO DETERMINE WHETHER PUTATIVE CLASS MEMBERS WERE SUBJECTED TO THE CHALLENGED PRACTICES.......................................................................... 10

VI.   PLAINTIFFS CANNOT MEET THE REQUIREMENTS OF RULE 23(a) ...................... 13

      A.    Plaintiffs' Proposed Class Is Not Ascertainable ...................... 13

      B.    Plaintiffs And Their Counsel Are Not Adequate Under Rule 23(a)(4).................... 15

      C.    Plaintiffs Have Not Met Their Burden To Show Common Legal Or Factual Issues ................................................................ 17

VII.  PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b)(3)............... 18

      A.    Individualized Factual And Legal Issues Regarding Liability Predominate Over Any Alleged "Common" Issues (Which Plaintiffs Do Not Identify) ............... 18

            1.    Implied Consent.......................................... 19

            2.    Elements of Wiretap Act/CIPA Claims. ...................... 22

      B.    Plaintiffs Also Have Not Met Their Burden To Prove A Reliable, Classwide Damages Methodology................................................. 23

            1.    Actual Damages.......................................... 23

            2.    Statutory Damages. ..................................... 25

            3.    The Court Should Exclude Mr. Torres's Expert Opinion ............... 27

VIII. PLAINTIFFS CANNOT CERTIFY AN ALTERNATE RULE 23(b)(2) CLASS ............... 28

      A.    Injunctive Relief Would Not Impact All Class Members The Same Way ................ 28

      B.    The Primary Relief Sought By Plaintiffs Is Monetary Relief, Not Injunctive Relief ................................................................ 29

IX.   CONCLUSION .............................................................. 30

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ades v. Omni Hotels*, No. 13-02468, 2014 WL 4627271 (C.D. Cal. Sept. 8, 2014) .......................... 19

*Algarin v. Maybelline, LLC*, 300 F.R.D. 444 (S.D. Cal. 2014) ...................................................... 30

*Allied Orthopedic Appl., Inc. v. Tyco Health. Grp. LP*, 247 F.R.D. 156 (C.D. Cal. 2007) ................ 25

*Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013) ..................................................... 10

*Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-4387-PJH, 2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ..................................................................................................................... 13, 24

*Backhaut v. Apple, Inc.*, No. 14-2285-LHK, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ....................................................................................................................................... 19

*Bateman v. AMC, Inc.*, 623 F.3d 708 (9th Cir. 2010) ...................................................................... 26

*Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014) .................................................... 18

*Bodner v. Oreck Direct, LLC*, No. 06-4756-MHP, 2007 U.S. Dist. LEXIS 30408 (N.D. Cal. Apr. 25, 2007) ............................................................................................................... 15

*Bohn v. Pharmavite, LLC*, No. 11-10430, 2013 WL 4517895 (C.D. Cal. Aug. 7, 2013) ................. 16

*Bouaphakeo v. Tyson Foods Inc.*, *cert granted*, 135 S. Ct. 2806 (2015) ............................................ 30

*Building Ind. Ass'n of Wash. v. WSBCC*, 683 F.3d 1144 (9th Cir. 2012) ......................................... 27

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ......................................................... 10, 22, 23

*Connelly v. Hilton Grand Vacations Co.*, 294 F.R.D. 574 (S.D. Cal. 2013) ...................................... 29

*Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115 (N.D. Cal. 2014) ............................................. 17, 24

*Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993) ............................................................ 27

*Davis v. Astrue*, 250 F.R.D. 476 (N.D. Cal. 2008) ........................................................................... 15

*DirecTV, Inc. v. Huynh*, No. 04-3496-CRB, 2005 WL 5864467 (N.D. Cal. May 31, 2005), *aff'd*, 503 F.3d 847 (9th Cir. 2007) ........................................................................... 24

*Dish Network LLC v. Gonzalez*, No. 13-107, 2013 WL 2991040 (E.D. Cal. June 14, 2013), *rec. adopted by*, 2013 WL 4515967 (E.D. Cal. Aug. 26, 2013) ..................................... 26

*Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304 (9th Cir. 1977) ............................................. 10, 20, 22

*Dysthe v. Basic Res. LLC*, 273 F.R.D. 625 (C.D. Cal. 2011) ........................................................... 16

ii

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ........................................ 17

*Fraley v. Facebook, Inc.*, No. 11-1726-LHK, 2012 WL 555071 (N.D. Cal. Feb. 21, 2012) ........................................................................................................................ 17

*Fraley v. Facebook, Inc.*, No. 14-15595, 2016 U.S. App. LEXIS 518 (9th Cir. Jan. 6, 2016) ........................................................................................................................ 26

*Gannon v. Network Tel. Servs.*, No. 13-56813, 2016 WL 145811 (9th Cir. Jan. 12, 2016) ........................................................................................................................ 19

*Gonzales v. Comcast Corp.*, No. 10-1010, 2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ........................ 30

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .............................................. 18

*Hansberry v. Lee*, 311 U.S. 32 (1940) ........................................................................ 15

*Hebrew Univ. of Jerusalem v. GM*, No. 10-03790, 2012 WL 12507522 (C.D. Cal. May 31, 2012) ...................................................................................................... 27

*In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) ........................................... 27

*In re Facebook Internet Tracking Litig.*, No. 12-02314-EJD, 2015 WL 6438744 (N.D. Cal. Oct. 23, 2015) .............................................................................................. 23

*In re Facebook, Inc., PPC Adv. Litig.*, 282 F.R.D. 446 (N.D. Cal. 2012) ............................ 15, 24

*In re Gmail Litig.*, No. 13-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ... 19, 20, 21, 22

*In re Google, Inc. Privacy Policy Litig.*, No. 12-001382-PSG, 2015 WL 4317479 (N.D. Cal. July 15, 2015) .............................................................................................. 27

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ...................... 27

*In re Nickelodeon Consumer Privacy Litig.*, MDL No. 2443, 2014 WL 3012873 (D.N.J. July 2, 2014) ........................................................................................................ 23

*In re Zynga Privacy Litig.*, 750 F.3d 1098 (9th Cir. 2014) ........................................... 22, 23

*Jones v. ConAgra Foods, Inc.*, No. 12-1633-CRB (MEJ), 2013 U.S. Dist. LEXIS 99336 (N.D. Cal. July 16, 2013) ........................................................................................ 17

*Kavu v. Omnipak Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007) ......................................... 29

*Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) ........................................ 26

*Kulig v. Midland Funding, LLC*, No. 13-4715, 2014 U.S. Dist. LEXIS 137254 (S.D.N.Y. Sept. 26, 2014) ........................................................................................ 16

*Leyva v. Medline Indus.*, 716 F.3d 510 (9th Cir. 2013) ............................................... 24

iii

*Lightbourne v. Printroom Inc.*, 307 F.R.D. 593 (C.D. Cal. 2015) ........................................... 22

*London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003) ........................................... 16

*Mahfood v. QVC, Inc.*, No. 06-0659, 2008 WL 5381088 (C.D. Cal. Sept. 22, 2008) ...................... 30

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ............................................. 14

*Moeller v. Taco Bell Corp.*, No. 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) ............................................................................................................ 29

*Moheb v. Nutramax Labs. Inc.*, No. 12-3633, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ............................................................................................................ 16

*Mortensen v. Bresnan Commc'n, L.L.C.*, No. 10-13, 2010 WL 5140454 (D. Mont. Dec. 13, 2010) ................................................................................................. 21

*Murray v. Fin. Visions, Inc.*, 2008 WL 4850328 (D. Ariz. Nov. 7, 2008) ................................. 19

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ............................................ 26

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .............................................................. 30

*Pecover v. EA Inc.*, No. 08-2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .................... 25

*Ries v. Arizona Bevs. USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012) ....................................... 30

*Robins v. Spokeo, Inc.*, *cert granted*, 135 S. Ct. 1892 (2015) .......................................... 30

*Sanchez v. Wal-Mart Stores, Inc.*, No. 06-02573, 2009 WL 1514435 (E.D. Cal. May 28, 2009) ............................................................................................................ 15

*Schulken v. Wash. Mut. Bank*, No. 09-02708-LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ...................................................................................................... 28, 29

*Schwartz v. Upper Deck Co.*, 183 F.R.D. 672 (S.D. Cal. 1999) .......................................... 15

*Serna v. Big A Drug Stores, Inc.*, No. 07-276, 2007 WL 7665762 (C.D. Cal. Oct. 9, 2007) ............................................................................................................ 26

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010) ...................... 26

*Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389 (N.D. Ohio 2012) .................................. 19

*Soto v. Commercial Recovery Sys., Inc.*, No. 09-2842-PJH, 2011 WL 6024514 (N.D. Cal. Dec. 5, 2011) ............................................................................................ 15

*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ...................................... 26

*Thomasson v. GC Servs. Ltd. P'ship*, 539 F. App'x 809 (9th Cir. 2013) ................................. 17

iv

Gibson, Dunn &
Crutcher LLP

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ..................... 10, 14, 17, 19, 20, 22, 28, 29, 30

*Welling v. Alexy*, 155 F.R.D. 654 (N.D. Cal. 1994) ......................................................... 15

*Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ....................................... 29

**Statutes**

18 U.S.C. § 2510, *et seq.* ........................................................................................................ 4

18 U.S.C. § 2511 .........................................................................................................19, 22, 23

18 U.S.C. § 2520 ................................................................................................................... 24

18 U.S.C. § 2701 *et seq.* ...................................................................................................... 23

Cal. Bus. & Prof. Code § 17200.............................................................................................. 4

Cal. Penal Code § 631 ....................................................................................................... 4, 19

Cal. Penal Code § 632 ....................................................................................................... 4, 24

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................. 10, 13

Fed. R. Civ. P. 23(a)(1).......................................................................................................... 14

Fed. R. Civ. P. 23(a)(4).......................................................................................................... 15

Fed. R. Civ. P. 23(b)(2) .................................................................................................... 28, 29

Fed. R. Civ. P. 23(b)(3) .....................................................................................18, 22, 23, 25

Fed. R. Civ. P. 23(g) .............................................................................................................. 17

Fed. R. Evid. 702................................................................................................................... 27

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' lawsuit challenges a simple feature—called "URL preview"—that enables people who receive and send messages on Facebook to see a thumbnail or snapshot of a website link (called a URL) that is being shared.  Instead of having to decipher a string of characters in a URL (such as http://www.website.com/abc!123?), Facebook, like many other online services, provides a convenient, and entirely optional, way for people to preview what information appears on the website to which the link points so they can confirm they want to send the link or whether they want to click on it.  Plaintiffs claim that this feature somehow infringes upon people's privacy rights and violates a litany of federal and state laws, including criminal laws that prohibit wiretapping.  Plaintiffs are wrong.  No one's "private message content" was ever shared with, or disclosed to, any third party by Facebook, or used in the allegedly unauthorized ways that Plaintiffs challenge.

Instead, this lawsuit has devolved into a technical attack on basic elements of computer programming, such as the use of data structures ("objects") to efficiently manage the sharing of information across Facebook's service, and the internal "logging" of these processes.  Plaintiffs also challenge the use of these objects to tabulate anonymous, aggregate information about the number of times people across Facebook have shared a particular link on Facebook.  Far from "reading its users' personal, private Facebook messages" (Dkt. 1 ¶ 1) and "divin[ing] the … messages content" (Mot. at 3), the information at issue in this case is more akin to *The New York Times* publishing a list of bestselling books, Nielsen publishing TV ratings, and Billboard charting the top 100 songs—in each instance, the anonymized and aggregated data is used to indicate the popularity of information.

Not only is there no merit to their claims, but Plaintiffs also have failed to satisfy the requirements of Rule 23 to certify a proposed nationwide class of anyone on Facebook who has ever sent or received Facebook messages "that included URLs in their content (and from which Facebook generated a URL attachment)"[1] from December 2011 to the present.  Plaintiffs' Motion for Class Certification repeatedly misstates the underlying Facebook technology, and it ignores the significant

---

[1]  A URL preview is an attachment to the message that was sometimes generated if a message containing a URL was sent under a specific set of conditions, described in detail below.

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

amount of variability surrounding the challenged practices.  Notably, Plaintiffs departed from the class definition included in the operative complaint, now adding the language "*(and from which Facebook generated a URL attachment)*" because they learned in discovery that Facebook's systems did not operate in the way alleged in their complaint, or in a way that is amenable to classwide adjudication. But Plaintiffs cannot solve their problems by revising the class definition, and they have failed to carry their evidentiary burden to establish any of the Rule 23 requirements:

*First*, an individualized inquiry would be necessary to ascertain the proposed class.  Plaintiffs' own Facebook messages—which are conspicuously absent from their Motion and accompanying expert reports—demonstrate that the proposed class is not ascertainable without individual proof.  For example, even the cherry-picked set of their own messages that Plaintiffs selected for further discovery revealed that Facebook could not determine whether several messages were part of the new class definition, and that determining class membership would be a laborious **person-by-person**, **browser-by-browser**, **URL-by-URL**, and **message-by-message** inquiry.  Contrary to Plaintiffs' suggestion, there is no computerized "short cut" to overcome these hurdles, because Plaintiffs' technical expert acknowledged in her deposition that her proposals (write new "code" or a "database query") would not reliably identify putative class members.  Self-identification also is not an option, because, among other things, Plaintiffs admitted in discovery that ██████████████████████████████████ ██████████████████████████████████████

*Second*, Plaintiffs cannot demonstrate that they (or their counsel) are adequate to represent a putative class, because counsel recruited their close, longtime friends to bring this action—an approach to class litigation that courts in this District have rejected as putting the "cart before the horse."  Plaintiffs also have deferred all decision-making in this case to their close friends, which further undermines their adequacy.  Further, counsel's mistreatment of Plaintiff David Shadpour— ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████—independently precludes a finding of adequacy.

*Third*, Plaintiffs have not even attempted to meet their burden of showing common issues pursuant to Rule 23(a)(2); instead, they misstate Facebook's position in a case management statement,

2

Gibson, Dunn &
Crutcher LLP

without citing (much less carrying their burden of *proving*) alleged "common" issues.  In light of the inherently individualized nature of putative class members' experiences with Facebook's messages product— ███████████████████████████████████████████ ███████████████████████████████████████████ —it is impossible to develop "common" questions (much less common *answers*) that will "drive the resolution of the litigation."

*Fourth*, Plaintiffs cannot meet the requirements of Rule 23(b).  For starters, *no* court has certified a Rule 23(b)(3) class in these "message scanning" suits.  Judge Koh rejected such an attempt in the *Gmail* case because she concluded that implied consent—which is a full defense to Plaintiffs' claims here—is an inherently factual inquiry that takes into account the individual knowledge and understanding of each party to each alleged "interception"—not only the named plaintiffs, but their message correspondents.  This is why the plaintiffs in the other "email scanning" lawsuit that inspired this case (*Yahoo Mail*) did not even seek certification under Rule 23(b)(3).  Those same problems exist here:  (a) as in *Gmail*, many public sources disclosed the challenged practices; (b) the "URL preview" feature put senders on notice that the URL was being processed; (c) by defining the class to the present day, Plaintiffs have included people (including themselves) who knew about the challenged practices and consented by continuing to send messages; and (d) ██████████████████████ ███████████████████████████████.  These issues predominate and defeat certification here.

Nor have Plaintiffs met their burden of offering a classwide damages methodology under Rule 23(b)(3).  Their proposed damages expert (Fernando Torres) does not even offer a methodology that aligns with Plaintiffs' theory of injury (a basic and disqualifying flaw under Supreme Court precedent), or that tracks the remedies available under either statute at issue.  The Court should strike his report for this reason, as well as the other methodological and evidentiary flaws described below.

*Finally*, Plaintiffs cannot meet the requirements for Rule 23(b)(2) certification for injunctive relief.  Their alternate request for such relief is an afterthought, relegated to a short paragraph at the end of their brief.  (Mot. at 24:9–25.)  But the extraordinary relief that Plaintiffs seek—"cessation of the practice, destruction of any records created from illegally-obtained private message content, and a declaration that such conduct violates" federal and state law (*id*. at 24:20–21)—is an improper class-wide remedy, because they do not and cannot show, as they must under binding precedent, (1) that the

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them" (both because many people consented to the conduct, *and* because putative class members disagreed ███████████████████████████████████████); and (2) that monetary relief is merely "incidental" to their requested injunction, because Plaintiffs seek a massive damages award.

In sum, Plaintiffs have not met their evidentiary burden of showing—through a "rigorous analysis"—the requirements for certification, and the Court should deny their Motion.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Named Plaintiffs And Their Action

███████████████████████████████████████████

██████████████████████  ███████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

As discussed in detail below, Plaintiffs' Consolidated Amended Complaint (Dkt. 25) focuses on a basic feature—the URL preview—that many Internet services, including Facebook, use to make it easier for people to know what is being shared when they send or receive a link.  Plaintiffs claim that Facebook's use of this feature violates (1) the federal Wiretap Act (18 U.S.C. § 2510, *et seq*.), (2) the California Invasion of Privacy Act ("CIPA")/Cal. Penal Code § 631, (3) CIPA/Cal. Penal Code § 632, and (4) California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200; "UCL").[2]

### B.      Facebook And The Technology At Issue In This Action

#### 1. *Facebook And Its Messages Product*.  Facebook operates a social networking service that aims to make the world more open and connected.  Its services enable people to post and share text,

---

[2]   The Court dismissed the UCL and CIPA § 632 claims with prejudice (because, *inter alia*, Plaintiffs had not lost any money/property), but it allowed the Wiretap Act and CIPA § 631 claims to proceed because it was unable to resolve several of Facebook's challenges on the pleadings.  (Dkt. 43 at 4–17.)

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

photos, video, links, and other information with one another.  (Dkt. 25 ¶ 15.)  Facebook provides its service, and hosts all the information that people share, for free.

There are many different ways for people to share information on Facebook.  One way is by posting on their personal profile page (a "Timeline"), which is viewable by the audience they select (specific individuals, all friends, the public, or many other options in between).  People also can share information directly to their Timelines by affirmatively clicking on "**Like**" or "**Share**" buttons ("**social plugins**") that appear on other websites (*e.g.*, *The New York Times* or ESPN).  Another way to share information is by sending a Facebook message to one or more people (similar to email), which can be viewed in the sender's and recipient's messages folder.

2. ***URL Previews And "Share Objects" That Store Them On Facebook's System***.[3]  Plaintiffs challenge the core functionality of Facebook's "**URL preview**" feature in messages, and the subsequent logging and use of data derived from that feature.  In simple terms, when a person shares a link or URL (which may look like this: http://www.website.com/abc!123?) in a message, Facebook's systems may provide a "preview" of the actual information found via that link (for example, the title of a news article along with a picture that appears in the article).  This is done for two main reasons: (i) the sender may have shared the wrong link, in which case the preview will make that clear to the sender; and (ii) the recipient will have some sense of what the link is about so she can determine whether she wants to click on it.  The "URL preview" feature is optional.  If the sender does not want to include a preview, she can delete the preview by clicking an "x" at the top right of the preview ("x out").  If the sender clicks "x", the recipient will only see the link (http://www.website.com/abc!123?).  On the other hand, once the preview appears, the sender may remove the URL itself from the message and send only the preview, in which case the recipient will see only the preview.

████████████████████████████████████████████

████████████████████████████████████████████

---

[3]  Plaintiffs have presented this Court with a superficial description of complex, technical material, which Facebook has rebutted here and in its concurrently-filed Declarations of Facebook Engineering Director Alex Himel, Engineering Manager Dan Fechete, and Engineering Manager Michael Adkins, as well as the rebuttal expert report of Dr. Benjamin Goldberg of New York University.  To the extent the Court finds it necessary or helpful, Facebook can make any of these declarants available for live testimony at the hearing pursuant to Local Rule 7-6.

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

1  ███████████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████████

3  ██████████████████████████████████████████████ Facebook also may use

4  data from its internal systems to display aggregate and anonymous statistics about how many times

5  people have interacted with a particular link, so that people can see what links are popular with other

6  Facebook users.  This appears in the form of a number (*e.g.*, "573") next to the "Share" or "Like"

7  button on third-party websites.  The number may be incremented (*e.g.*, from "573" to "574") when

8  someone interacts with the URL in a specified way—for example, by sharing it in a post, or, for a

9  period of time that ended over a year before this lawsuit was filed, in a Facebook message.  (*Id.* 1520.)

10  Importantly, during the class period, no other person or website ever learned about the specific links

11  shared between two specific people in a Facebook message.  (*Id.* 1522, 1527, 1529, 1695, 1977.)

12  Everything described above (and below) occurred internal to Facebook's systems.  (*Id.*)

13      The creation of the "share object" and how Facebook has used it in aggregate ways is at the

14  core of Plaintiffs' claims.  (Mot. at 5–6; Dkt. 138-4 [Golbeck Report] at 9–12.)  For these reasons, it is

15  important to understand from a technical perspective exactly how these systems and features work.  A

16  summary follows below, and is expanded upon in Facebook's declarations and expert report.  (*Supra*

17  n.3.) ███████████████████████████████████████████████████

18  ██████████████████████████████████ ███████████████████████████

19  ███████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████

21  ███████████████████████████ Here is an example of a draft message including a URL preview:



⁴  URLs entered into messages sent from Facebook's stand-alone Messenger mobile application do **_not_** generate URL previews.  (App.1516.)

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    To prevail, Plaintiffs must show with common proof that every person who sent a message

18  with a URL was impacted by the challenged practice.  But as described above, the circumstances will

19  vary person-by-person, browser-by-browser, URL-by-URL, and message-by-message.  As detailed

20  below, discovery confirmed that Plaintiffs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had varied experiences with these practices.

23    **3.  _The "Like" Button Social Plugin_.**  Facebook also provides "social plugins," such as the

24  "Like" and "Share" buttons, to third-party websites so people can easily share links to Facebook.

25  Sometimes, but not always, these plugins may include a number (or counter) that reflects the number

26  of times Facebook users have interacted with that link, and that is incremented when other people

27  interact with the same link, for example by sharing that link in a post.  The following is an example:

28

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15   **4.** ***News Coverage And Public Information About The Practices*.**  Information about the URL

16  preview feature and its potential use in relation to social plugin counters was disseminated widely in

17  several places.  Facebook's public developer guidance stated as early as March 2011—nine months

18  before the start of the proposed class period—that the number shown next to a "Like" button social

19  plugin "is the sum of" several items, including "[t]he number of ***inbox messages*** containing this URL

20  as an attachment."  (*Id*. 141 (emphasis added).)

21

22

23          Several news organizations also reported on this occurrence, as well as Facebook's processing

24  (or "scanning," as Plaintiffs characterize it) messages for a number of reasons, including to combat

25  spam and abuse, to guard against criminal misuse of its service (including to prevent the sharing of

26  child exploitation images and abuse of minors), and to filter messages.  (*Id*. 39-60.)  Stated differently,

27  there was a lot of public information about these practices, and this widespread publicity was why

28  Plaintiffs filed this lawsuit.  For instance, on October 3, 2012, *The Wall Street Journal* published a

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

blog post titled "*How Private Are Your Private Facebook Messages?*" (*Id.* 122.)  Plaintiffs admit that this post made "national news" (Dkt. 31 at 3), and the post reported that Facebook "scans the links you're sending—registering them as though you 'Like' the page you sent.  It's just one example of how online messages that seem private are often actually examined by computers for data" (App. 122). The blog post specifically acknowledged that Facebook's developer guidance disclosed this practice: "The company's guidance for developers also says that 'the number of inbox messages containing' a link to a page will count as 'Likes' …." (*Id.*)  Dozens of other articles describing Facebook's message processing practices appeared both before and after this article.  (*Id.* 39-376.)

In December 2012, Facebook stopped incrementing its social plugin counters based on share objects created from URL attachments in messages.[5] ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

**5.** **_The New Conduct Challenged In Plaintiffs' Motion_**.  Because their complaint focused on a practice that ceased more than three years ago, Plaintiffs have now shifted gears in their Motion to challenge the core computer programming practices that are basic to the operation of services like Facebook that enable people to share information, including (i) the very **creation** of share objects, (ii) the incrementing of the anonymous, aggregate **internal counter** █████████████, and (iii) various basic forms of **internal** "**logging**." (Mot. at 5–10.)  But as discussed above and detailed in Facebook's declarations, the creation of share objects and the incrementing of internal counters involve a host of individualized information ██████████████████ and no user-specific information has ever been disclosed.  (App. 1515-19, 1523-26, 1967-74.)  And the same thing is true of Plaintiffs' new "logging" allegations.  (*Id*. 1523-26, 1975-76.)

Additionally, Plaintiffs now challenge Facebook's alleged *use* of the anonymous, aggregate information from ██████████████ or other internal counters for analytics purposes and to help

---

[5]  Facebook believed the practice ceased in October 2012 (which was the company's understanding, and the information Facebook's counsel had at the time of the last hearing), but subsequent investigation revealed that the practice was completely stopped in December 2012.  (*Id.* 1615.)

Gibson, Dunn & Crutcher LLP

identify trends in what information people are sharing on Facebook and may find interesting.[6]  None of these practices is mentioned in the complaint, and Plaintiffs are wrong about many of the particulars of these challenged "uses."  (*See, e.g.*, *id.* 1705.)  Regardless, whether or not a particular URL in a message sent by a particular person was ever "used" in one of the innocuous ways Plaintiffs now challenge remains a highly variable inquiry (including, but not only, because the practices changed over time and have been discontinued), and there is no administratively feasible way to determine whether a given URL was ever used in a specific way.  (*Infra* pp. 11–13.)

### III.    THE LEGAL STANDARDS GOVERNING THIS MOTION

A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (same).  Rule 23 "imposes stringent requirements for certification that in practice exclude most claims."  *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013).  Specifically, it "does not set forth a mere pleading standard," *Dukes*, 131 S. Ct. at 2551, and "[m]ere invocation of the language of Rule 23 … is no mystical legal talisman guaranteeing class treatment," *Doninger v. Pac. Nw. Bell*, *Inc.*, 564 F.2d 1304, 1312 (9th Cir. 1977).  Instead, the plaintiff "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." "and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis," that plaintiff met its burden.  *Dukes*, 131 S. Ct. at 2551; *Comcast*, 133 S. Ct. at 1432 (same).

### IV.    STATEMENT OF ISSUE TO BE DECIDED PURSUANT TO RULE 7-4(a)(3)

Have Plaintiffs met their burden to affirmatively demonstrate through a "rigorous analysis" that each of the Rule 23 requirements has been satisfied in this case?

### V.    AN INDIVIDUALIZED ANALYSIS IS REQUIRED TO DETERMINE WHETHER PUTATIVE CLASS MEMBERS WERE SUBJECTED TO THE CHALLENGED PRACTICES

As a threshold matter, whether a particular person was impacted by the challenged practices

---

[6]  In their Motion, Plaintiffs take issue with use of aggregated and anonymous statistics about share objects to (i) display information on third-party websites about what URLs are popular ("Activity" and "Recommendation" feeds), (ii) provide anonymous and aggregate demographic data to third-party website administrators about the types of people interacting with their sites, and (iii) provide basic statistics about the *number* of times URLs were shared.  (Mot. at 5–6.)  All of these practices varied over time and with different user behavior, and none continue to involve URLs shared in messages.

depends on a variety of factors specific to each █████████████████ and time period. This individualized inquiry precludes a finding of ascertainability, commonality, or predominance.



███████████████████████. Many people who send Facebook messages do not send messages containing URLs, such as Plaintiffs' proposed damages expert. (*Id.* 1037-38.)

*Second*, URLs entered into messages sent from Facebook's stand-alone Messenger mobile application (*e.g.*, on a smartphone or other mobile device) do ***not*** generate URL previews. (*Id.* 1516.)

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

1   ███████████████████████████████████

2   ████████████████████████████████████████████████

3   █████████████████████████████████████████████

4   ████████████████████

5       **2.  _Incrementing The Social Plugin Count_.**  With respect to the primary practice challenged in

6   the complaint—alleged "scanning" of Facebook messages to detect a URL and increment the social

7   plugin counter (Dkt. 25 ¶¶ 2, 4, 25, 27, 31)—there is additional variability arising from the fact that

8   many third-party websites did not display Facebook social plugins (or ones with counters).  (App.

9   1521.) █████████████████████████████████████████████

10  ████████████████████████████████████

11      ██  ████████████████████████████

12      ██  ███████████████████████████████████
        ████████████████████████████████

13      ██  ██████████████████████████████████
        ███████████████████████████████████

14      ███████████████████████████████

15      ██  ███████████████████████████████████
        ████████████████████████

16      Further, some counters in social plugins displayed unrelated information like the number of

17  people who "liked" a particular page on Facebook (a "fan count") (_id._ 1520).  ████████████████

18  ██████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  There also is variability over time, because, as explained above, URL attachments shared in Facebook

23  messages have not been included in any social plugin counters since December 2012.  (_Id._ 1520-21.)

24      **3.  _Other Challenged Practices_.**  The foregoing variability also impacts Plaintiffs' new

25  challenges to the various logs and internal counters██████████████████████████████████████

26  _see_ Mot. at 5) and "uses" (Recommendations/Activity Feeds, Insights, and various APIs) (_see id._ at 5,

27  8; Dkt. 138-4 [Golbeck Report] at 12–22).  ████████████████████████████

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

In addition, there was considerable variability over time in the challenged practices (as explained in detail in the Goldberg Report, the Fechete and Himel Declarations, and Exhibits D & PP (*id.* 30-37, 1508-33, 1693-1710, 1939-92)), and some of the practices were discontinued before the proposed class period.  (*Id.* 1520-21, 1523, 1527, 1530, 1703, 1706.)

## VI.   PLAINTIFFS CANNOT MEET THE REQUIREMENTS OF RULE 23(a)

### A.   Plaintiffs' Proposed Class Is Not Ascertainable

Plaintiffs concede (Mot. at 14–15), and this Court has held, that ascertainability is a Rule 23 requirement.  *See Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-4387-PJH, 2014 WL 60097, at *3 (N.D. Cal. Jan. 7, 2014) ("Because plaintiff has not shown that a method exists for determining who … fits within the proposed class, the class is not ascertainable.").  Plaintiffs cannot satisfy their burden to show that the class is objectively ascertainable.

In their Motion, Plaintiffs contend that "any Facebook user can readily determine whether she sent or received a Facebook message containing a URL within the relevant time period."  (Mot. at 15.) But that overly simplistic suggestion sidesteps the technical complexities described above, while simultaneously ignoring Plaintiffs' own class definition, which is *not* limited to individuals who "sent or received a Facebook message containing a URL," but rather everyone who sent or received

13

Gibson, Dunn &
Crutcher LLP

Facebook messages (1) "that included URLs in their content" and (2) "from which Facebook generated a URL attachment." (*Id.* at 10, 15 n.48.)  As detailed above, however, there are several individualized circumstances in which a "URL attachment" would not have been created or would not have been sent with the message ███████████████████. (*Supra* pp. 11–12.)

To overcome these barriers, Plaintiffs attempt to shift their evidentiary burden to Facebook, suggesting in Dr. Golbeck's report that Facebook could use a "database query" or write new "code" to identify putative class members. (Dkt. 137-6, ¶¶ 103–105.)  But these proposals are not only speculative, they would be futile:  Dr. Golbeck's subsequent deposition testimony confirmed that the proposals in her report would not produce a reliable, much less accurate, list of putative class members.  For example, her proposals would not identify (i) message recipients, (ii)███████ ████████████████████████████████████████████████████████ ████████ (iii) senders who had deleted URL attachments, or (iv) senders who had deleted URLs in the body of the message.  She also admitted that her proposals would not distinguish between (v) people "located within the United States" and people in other countries, (vi) people who sent messages before or during the proposed class period, or (vii) individuals who indisputably knew about and consented to Facebook's practices.  (App. 1324-26, 1329-34, 1340-42.)  Nor could she identify individuals whose URLs were "logged" (*id.* 1334-36) or whether any given share object was "used" in any of the aggregate, anonymous ways discussed in her report—she admitted that ████████ ████████████████ and in fact it is unascertainable.  Facebook has submitted evidence to confirm these and other barriers to identifying the putative class.  (*Id.* 1511-12.)

Nor is self-identification an option, as Plaintiffs admit that █████████████████ ████████████████████████████████████████████████ ████████████████ (*Id.* 563, 694.)[8]

---

[8]  Because the proposed class is not ascertainable, Plaintiffs also do not meet their burden of showing Rule 23(a)(1) numerosity.  They offer only conclusory assumptions on this element—they "assum[e] an even distribution among active message users worldwide," and speculate that "as many as tens of millions of [putative class] members exist in the United States." (Mot. at 11–12.)  But "Rule 23 does not set forth a mere pleading standard," *Dukes*, 131 S. Ct. at 2551, and assumptions and speculation are cannot satisfy numerosity. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) (by relying on "common sense," district court "crossed the line separating inference and speculation," "[g]iven the complete lack of evidence" of numerosity); *Davis v. Astrue*, 250 F.R.D. 476, 486 (N.D.

[Footnote continued on next page]

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

**B.      Plaintiffs And Their Counsel Are Not Adequate Under Rule 23(a)(4)**

Rule 23(a)(4) also requires that "the representative parties will fairly and adequately protect the interests of the class," and class representatives have a strict fiduciary duty to represent and protect the interests of absent class members, *Hansberry v. Lee*, 311 U.S. 32, 43 (1940).  This factor is paramount in a class action, because in order "[t]o satisfy constitutional due process concerns, unnamed class members must be afforded adequate representation before entry of a judgment which binds them." *Soto v. Commercial Recovery Sys., Inc.*, No. 09-2842-PJH, 2011 WL 6024514, at *6 (N.D. Cal. Dec. 5, 2011).  Plaintiffs and their counsel are inadequate for several reasons.

**1.      *This Lawsuit Was Initiated And Is Driven By Class Counsel*.**  Plaintiffs admitted that interim class counsel recruited them to bring this action and none of them contemplated suing Facebook before speaking with counsel.  (App. 391-92, 485-87, 507-08.)  As another court in this District observed, "such a 'cart before the horse' approach to litigation is not the proper mechanism for the vindication of legal rights." *Bodner v. Oreck Direct, LLC*, No. 06-4756-MHP, 2007 U.S. Dist. LEXIS 30408, at *5–6 (N.D. Cal. Apr. 25, 2007) ("It is clear from the record that plaintiff's counsel, and not plaintiff, is the driving force behind this action.").  Plaintiffs have ███████████ ████████████ let counsel direct the course of the litigation, and have not been involved in strategy and decision-making.  (App. 398-400, 403, 454-55, 544.)  These facts alone warrant denial of the Motion.  *See, e.g.*, *In re Facebook, Inc., PPC Adv. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012); *Sanchez v. Wal-Mart Stores, Inc.*, No. 06-02573, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009); *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994).

**2.      *Plaintiffs' Close Relationships With Class Counsel*.**  Plaintiffs' close relationships with class counsel also undermine their independence as class representatives.  In fact, all of the Plaintiffs were recruited to join this lawsuit by their longtime friends:

███ ███████████████████████████████████████████
   ███████████████████████████████████

███ ███████████████████████████████████

─────────────────────

[Footnote continued from previous page]

Cal. 2008) (plaintiff "failed to put forth non-speculative evidence of the number of members included in the proposed class"); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681–82 (S.D. Cal. 1999) ("Mere speculation as to satisfaction of this numerosity requirement does not satisfy Rule 23(a)(1).").

Gibson, Dunn &
Crutcher LLP



Several courts have held that these close relationships render the named plaintiffs inadequate. *See, e.g., Bohn v. Pharmavite, LLC*, No. 11-10430, 2013 WL 4517895, at *3 (C.D. Cal. Aug. 7, 2013); *Moheb v. Nutramax Labs. Inc.*, No. 12-3633, 2012 WL 6951904, at *5 (C.D. Cal. Sept. 4, 2012); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003).

**3. *Counsel's Mistreatment Of Shadpour*.**  Finally, counsel's mistreatment of former plaintiff Shadpour "creates a serious doubt that counsel will represent the class loyally [and] requires denial of class certification."  *Kulig v. Midland Funding, LLC*, No. 13-4715, 2014 U.S. Dist. LEXIS 137254, at *8–9 (S.D.N.Y. Sept. 26, 2014).  During the deposition that Plaintiffs' counsel actively sought to prevent (*see* Dkt. 89, 94, 96, 105), Mr. Shadpour testified that:

Plaintiffs' counsel will cite Mr. Shadpour's dismissal from the case (*see* Dkt. 123), but this dismissal resulted from his ▇▇▇▇▇▇ with interim class counsel, and evidence from dismissed putative class representatives remains relevant to the certification inquiry.[9]  Rule 23(g)(1)(B)

---

[9]  *See, e.g., Dysthe v. Basic Res. LLC*, 273 F.R.D. 625, 629–30 (C.D. Cal. 2011) (even if plaintiff's
[Footnote continued on next page]

16

1    authorizes the Court to "consider any other matter pertinent to counsel's ability to fairly and

2    adequately represent the interests of the class," and the misconduct here should disqualify counsel

3    from representing any putative class in this action.  Fed. R. Civ. P. 23(g)(1)(B).

4    **C.     Plaintiffs Have Not Met Their Burden To Show Common Legal Or Factual Issues**

5         As this Court explained, "[w]hat matters to class certification … is not the raising of common

6    'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common

7    answers apt to drive the resolution of the litigation."  *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115,

8    126 (N.D. Cal. 2014) (quoting *Dukes*, 131 S. Ct. at 2551).  Plaintiffs "must pose a question that 'will

9    produce a common answer to the crucial question'" in the litigation.  *Ellis v. Costco Wholesale Corp.*,

10   657 F.3d 970, 981 (9th Cir. 2011); *Dukes*, 131 S. Ct. at 2551 (the "common contention … must be of

11   such a nature that it is capable of class wide resolution—which means that determination of its truth or

12   falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").  All

13   of the variability discussed above defeats any finding of commonality here.  *See, e.g.*, *Thomasson v.*

14   *GC Servs. Ltd. P'ship*, 539 F. App'x 809, 810 (9th Cir. 2013) (reversing certification order for lack of

15   commonality, because "[t]o establish the claim at issue here [alleged monitoring of phone calls

16   without consent] would require an individualized inquiry into hundreds of phone calls in order to

17   determine whether and when any warning was given in each call").

18        Plaintiffs' Motion does not bother to identify *any* questions that will produce common answers

19   apt to drive the resolution of this lawsuit.  Instead, Plaintiffs rely on *Facebook*'s portion of a Joint

20   Case Management Statement filed in March 2015, and contend (falsely) that Facebook has conceded

21   that there are "common" questions in this case.  (Mot. at 12 & n.45 ("In the Joint Case Management

22   Conference Statement, Facebook itself identifies relevant common issues which track the elements to

23   establish Facebook's violations of ECPA and CIPA.").)  Alleged statements in a case management

24   statement, however, do not satisfy Plaintiffs' burden.  *See, e.g.*, *Dukes*, 131 S. Ct. at 2551 (moving

25   [Footnote continued from previous page]

26   claims are dismissed, "[h]is testimony regarding his experience … is … highly likely to be relevant to
     class certification issues, including commonality and the typicality of the class representative's claims,
27   even if he no longer wishes to be burdened with this litigation"); *Jones v. ConAgra Foods, Inc.*, No. 12-
     1633-CRB (MEJ), 2013 U.S. Dist. LEXIS 99336, at *4–5 (N.D. Cal. July 16, 2013) (same); *Fraley v.*
28   *Facebook, Inc.*, No. 11-1726-LHK, 2012 WL 555071, at *3 (N.D. Cal. Feb. 21, 2012) (same).

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

party must "affirmatively … prove" commonality; "Rule 23 does not set forth a mere pleading standard").  But more importantly, Plaintiffs affirmatively *misstate* Facebook's portion of the Joint Statement.  At no point did Facebook concede that Plaintiffs' claims are amenable to common proof; to the contrary, Facebook stated repeatedly that this action is *not* appropriate for class treatment.  (Dkt. 60 at 5 ("Finally, *putting the merits to the side*, no class could be certified here for several reasons …"); *id.* at 6 ("Plaintiffs' claims are … not amenable to class certification").)  Plaintiffs' citations relate to the portion of the Joint Statement about Facebook's anticipated *merits* and *summary judgment* defenses (which would be directed against the named Plaintiffs based upon the facts applicable to each), and the issues that this Court was *unable* to resolve on the pleadings.

Plaintiffs hint that whether allegedly unlawful "interceptions" and "uses" occurred may be common questions (Mot. at 12–13), but they are mistaken on both counts:

*First*, Plaintiffs identify several purported "interceptions," but these "interceptions" did not occur in all cases, nor did they apply uniformly.  For any particular Facebook message, it would be necessary to determine whether ██████████████████████████████████████████████████████████████ (*Id.* 1516-26, 1972-77; *see also* Dkt. 138-4 at 25-30.)

*Second*, it is impossible to determine on a classwide basis (to the extent it can be determined at all) whether the various "uses" Plaintiffs allege of shared URLs occurred in any given case.  Dr. Golbeck admitted that ███████████████████ (*id.* 1337), and a message-by-message inquiry would be necessary (although still insufficient) (*supra* pp. 12-13).

## VII.   PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b)(3)

### A.   Individualized Factual And Legal Issues Regarding Liability Predominate Over Any Alleged "Common" Issues (Which Plaintiffs Do Not Identify)

To satisfy Rule 23(b)(3), Plaintiffs must demonstrate that the alleged common questions are "a significant aspect of the case … [that] can be resolved for all members of the class in a single adjudication."  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)).  Individualized inquiries surround each issue that Plaintiffs identify (Mot. at 15–22), defeating any finding of "predominance" here:

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

1. _**Implied Consent**_.  The class action procedure cannot be used to abrogate Facebook's due process right "to litigate its statutory defenses to individual claims."  *Dukes*, 131 S. Ct. at 2561.  As the Court recognized (Dkt. 43 at 14), express or implied consent is a complete defense to a claim under the Wiretap Act and CIPA.  *See* 18 U.S.C. § 2511(2)(d); Cal. Penal Code § 631(a).  But to determine whether an individual putative class member impliedly consented to the alleged practice will require a highly specific, class member-by-class member inquiry.

This barrier is one of the reasons why no court anywhere has agreed to certify a Rule 23(b)(3) class in these "message scanning" lawsuits.  As Judge Koh held in *Gmail*, "[i]mplied consent is an intensely factual question that requires consideration of the circumstances surrounding the interception to divine whether the party whose communication was intercepted was on notice that the communication would be intercepted."  *In re Gmail Litig.*, No. 13-02430-LHK, 2014 WL 1102660, at *16 (N.D. Cal. Mar. 18, 2014).[10]  Here, as in *Gmail*, "[s]ome Class members likely viewed some [Facebook and non-Facebook] disclosures, but others likely did not."  *Id.* at *18.  To differentiate, "[a] fact-finder … would have to evaluate to which of the various sources each individual user [i.e., individuals who sent and received Facebook messages with URLs] had been exposed and whether each individual 'knew about and consented to the interception' based on the sources to which she was exposed."  *Id.*  This analysis "will lead to numerous individualized inquiries that will overwhelm any common questions."  *Id.*  As in *Gmail*, there are a "panoply of sources" from which people who sent or received Facebook messages would have learned of the challenged conduct:

---

[10]   *See also Backhaut v. Apple, Inc.*, No. 14-2285-LHK, 2015 WL 4776427, at *14 (N.D. Cal. Aug. 13, 2015) ("[I]ndividualized issues with respect to consent would predominate" because "proposed class members could have been put on notice of the alleged interceptions from Defendant's own disclosures, numerous online postings and websites, or third-party news articles."); *Murray v. Fin. Visions, Inc.*, 2008 WL 4850328, at *4 (D. Ariz. Nov. 7, 2008) ("The question of consent, either express or implied, is often a fact-intensive inquiry and may vary with the circumstances of the parties."); *see also Gannon v. Network Tel. Servs.*, No. 13-56813, 2016 WL 145811, at *1 (9th Cir. Jan. 12, 2016) ("The district court appropriately determined that it would be extremely difficult to ascertain the identities of the individuals who had not consented to receive the messages.").
Plaintiffs reach out-of-circuit to cite *Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389, 393 (N.D. Ohio 2012) (Mot. at 19), but that case did not involve the Wiretap Act, CIPA, or "implied consent" issues, and the defendant "admitted at deposition that he did not have consent from any person" and that he did not "take steps to confirm that consent was made."  Likewise, *Ades v. Omni Hotels*, No. 13-02468, 2014 WL 4627271 (C.D. Cal. Sept. 8, 2014) (Mot. at 13, 19), distinguished *Gmail* on the basis that the defendant also did not have any evidence of consent.  *Id.* at *12.  *Gmail* is on point here.

---

"*First*, Class members could have learned of the interceptions from various [Facebook] sources." *Id.* at *17.  As early as March 7, 2011, Facebook's publicly-available developer guidance disclosed that the number shown next to a "Like" button "is the sum of" several items, including "[t]he number of ***inbox messages*** containing this URL as an attachment."  (App. 141 (emphasis added).)

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

"*Second*, Class members may have learned about the alleged interceptions from various media sources" (*Gmail*, 2014 WL 1102660, at *17), including the 77 sources Facebook produced regarding alleged message "scanning" (or variations of it) from 2009 to 2013.  These sources, which do not even include media coverage of the instant lawsuit, are summarized in Exhibits F-K (App. 39-376).[11]  As in *Gmail*, "[s]ome Class members likely viewed some of these [Facebook] and non-[Facebook] disclosures, but others likely did not." *Id.* at *18.  ████████████████████████████

██████████████████████████████████████████████████

*Third*, the "URL preview" alerted people ***before*** a message was sent that the URL had been "processed," providing further evidence of implied consent.  (App. 1514.)  This is especially true given that the new class definition includes only messages that generated "URL attachments" (Mot. at 10), which never occurred without URL previews.  ██████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████  The preview also appears in their inboxes after send, and they are therefore on notice that the preview was stored by Facebook.

*Fourth*, by re-defining the putative class to extend to the present day (Mot. at 10), rather than 2012 (*see* Dkt. 25 ¶ 59 n.3), Plaintiffs have included *even more* individuals (including themselves) who knew about the challenged practices and continued to send Facebook messages.  By definition,

---

[11]   Facebook produced these documents at the outset of discovery, belying Plaintiffs' assertion that "Facebook has not produced relevant evidence from which actual notice can be reasonably implied." (Mot. at 19:12–13.)  In any event, it is *Plaintiffs'* burden on this Motion to show common proof; not Facebook's burden to *prove* a lack of common evidence of implied consent.  *See Dukes*, 131 S. Ct. at 2551; *Doninger*, 564 F.2d at 1312.

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

the proposed class includes people who were aware of the alleged practices and continued to use Facebook's messaging service, evidencing their consent.  *See, e.g.*, *Mortensen v. Bresnan Commc'n, L.L.C.*, No. 10-13, 2010 WL 5140454, at *4–5 (D. Mont. Dec. 13, 2010).  Plaintiffs contend that the challenged practices made "national news" (Dkt. 31 at 3) when "exposed by *The Wall Street Journal* in early October 2012" (Mot. at 9; Dkt. 25 ¶ 39).  *See Gmail*, 2014 WL 1102660, at *7, *17 (consent can be implied from "various media sources," and citing "media coverage of the instant … and related litigation").  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

*Fifth*, in addition to assessing whether each Plaintiff and each putative class member consented, "the ultimate merits inquiry [also] requires … consideration of whether … their correspondents consented."  *Gmail*, 2014 WL 1102660, at *14.  Plaintiffs' technical expert (Dr. Golbeck) conceded that users of social media have "vastly different understandings" regarding the collection and processing of their data; she agreed that it is "true that there [are] varying levels of understanding that people have on how that works."  (App. 1092a-92b.)  ██████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████  Plaintiffs offer no basis—and there is none—for presuming that these people did not consent.[12]

---

[12]  Plaintiffs also assert that they "will present common evidence that rather than disclose its practices …, Facebook actively sought to conceal its practices from users" (Mot. at 20:5–7), but they have not offered that evidence in support of their Motion, as they were required to do.  And more importantly, these accusations are *false*.  Plaintiffs have taken documents out of context to mislead the Court:  ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████  Moreover, in response to the October 2012 *Wall Street Journal* blog post, Facebook explained that "the system is working as expected.  'Many websites that use Facebook's
[Footnote continued on next page]

21

In sum, "[a] fact-finder, in determining whether Class members impliedly consented, would have to evaluate … whether each individual 'knew about and consented to the interception' based on the sources to which she was exposed." *Gmail*, 2014 WL 1102660, at *18, 21 (denying certification).

**2.** ***Elements Of Wiretap Act/CIPA Claims***.  Next, Plaintiffs contend that the elements of their Wiretap Act and CIPA claims are subject to "common" proof.  (Mot. at 16–18.)  Once again, their conclusory assertions fail to meet their burden.  *See Dukes*, 131 S. Ct. at 2551; *Doninger*, 564 F.2d at 1312.  Notably, the only case that Plaintiffs cite in support of their argument—*In re Yahoo Mail Litig.*, 308 F.R.D. 577 (N.D. Cal. 2015)—involved Rule 23(b)(2), and *not* Rule 23(b)(3).  As the Supreme Court has explained, Rule 23(b)(3)'s predominance criterion is "even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432.  Plaintiffs also ignore that the same District Court (Judge Koh) *rejected* an attempt to certify a Rule 23(b)(3) class for Wiretap Act/CIPA claims for lack of predominance.  *See Gmail*, 2014 WL 1102660, at *10.  Plaintiffs cannot show predominance here:

*First*, their conclusory claim that "proof of the elements of [the Wiretap Act] and CIPA is necessarily common because it will focus upon *Facebook's* uniform conduct" (Mot. at 12) ignores the individualized inquiries necessary to determine who was exposed to the challenged practices.  (*Supra* pp. 11–13.)  *See Lightbourne v. Printroom Inc.*, 307 F.R.D. 593, 602 (C.D. Cal. 2015) (the need to conduct a "photo-by-photo inquiry" "weigh[ed] against a finding of predominance").

*Second*, the Wiretap Act requires the "interception" of the "contents" of a communication.  18 U.S.C. § 2511(1).  The Ninth Circuit has held that "contents" means "a person's intended message to another (i.e., the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')."  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).  Plaintiffs assume, without evidence or authority, that URLs are "contents" (Mot. at 17:6), but courts have held the opposite—with some limited, individualized exceptions such as when the URL is the subject of the communication, is "the intended message conveyed," or has identifiable embedded terms that reveal the substance, purport, or meaning of the communication.  *See, e.g.*, *Zynga*, 750 F.3d at 1107; *In re*

---

[Footnote continued from previous page]

'Like', 'Recommend', or 'Share' buttons also carry a counter next to them.  The counter reflects the number of times people have clicked these buttons and also the number of times people have shared that page's link on Facebook,' ***including over private messages***." (*Id.* 123.)  (All emphases added).

Gibson, Dunn &
Crutcher LLP

*Facebook Internet Tracking Litig.*, No. 12-02314-EJD, 2015 WL 6438744, at *9 (N.D. Cal. Oct. 23, 2015); *In re Nickelodeon Consumer Privacy Litig.*, MDL No. 2443, 2014 WL 3012873, at *15 (D.N.J. July 2, 2014).  Determining whether the URLs constituted the "contents" of a communication will require an URL-by-URL, message-by-message, sender-by-sender analysis.  Plaintiffs heavily redacted all of the text in the Facebook messages they produced, leaving only URLs that do not indicate *anything* about the "contents."  For example, here is a message that Mr. Campbell sent (App. 822):

To be clear, Plaintiffs did not produce unredacted copies, and the URL ▮▮▮▮▮▮ conveys nothing about the "content" or "meaning," *Zynga*, 750 F.3d at 1106, and Plaintiffs' decision to redact everything *but the URL* indicates that they do not view the URLs as "content."

> *Third*, there are inherently individualized issues surrounding consent.  (*Supra* pp. 19–22.)[13]

> *Fourth*, whether there was an alleged "interception" (18 U.S.C. § 2511(1)(a)) under Plaintiffs' theory turns on a number of fact-intensive inquiries, including whether the individual deleted the URL preview and many other individualized factors.  (*Supra* pp. 11-12.)  The same is true of Plaintiffs' challenged "uses."  (*Supra* pp. 12-13.)

**B.   Plaintiffs Also Have Not Met Their Burden To Prove A Reliable, Classwide Damages Methodology**

> Under Rule 23(b)(3), Plaintiffs must submit "evidentiary proof" of a classwide damages model that is consistent with their liability theory, *Comcast*, 133 S. Ct. at 1432, but they have not done so:

> **1.  *Actual Damages*.**  Although they assert that "common proof" will establish that Facebook "monetizes the content" of messages (Mot. at 1, 21), Plaintiffs do not offer "evidentiary proof" of a classwide damages methodology that is consistent with their liability theory.  *Comcast*, 133 S. Ct.

---

[13]  Plaintiffs' claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are false and ignore the Data Policy and Statement of Rights and Responsibilities, which govern Facebook's treatment of user data (Dkt. 29-1, Exs. A-F), and laws like the Stored Communications Act (18 U.S.C. § 2701), which circumscribe how companies like Facebook may disclose electronic communications in electronic storage.

23

at 1432–34.  In *Daniel F.*, this Court denied class certification and criticized the plaintiff for not "offering any proof that damages can be calculated on a classwide basis" and "suggest[ing] that any inquiry into damages is irrelevant, citing *Leyva v. Medline Indus.*, 716 F.3d 510, 513 (9th Cir. 2013), for the proposition that 'damages calculations alone cannot defeat certification.'"  305 F.R.D. at 130.[14] Plaintiffs cite the same authority and make the same improper argument here (Mot. at 21), and they have not carried their burden of establishing a reliable, classwide damages methodology:

*First*, at best, they assert that "[a] reasonable value to Facebook of the intercepted content ***can be*** assigned on a per URL basis, and ***can be*** allocated to class members on that basis" (*id.* at 22, citing Torres Report ¶ 60 (emphases added)).  Aside from the factual problems with this theory, Plaintiffs must submit a capable model *now*, not later.  *Daniel F.*, 305 F.R.D. at 130.  They did not do so.

*Second*, Mr. Torres focuses exclusively on alleged "benefits to Facebook" (*id.*), a remedy that is not available under the Wiretap Act or CIPA.[15]  For example, in *DirecTV, Inc. v. Huynh*, No. 04-3496-CRB, 2005 WL 5864467 (N.D. Cal. May 31, 2005), *aff'd*, 503 F.3d 847 (9th Cir. 2007), Judge Breyer noted that under the Wiretap Act, "Defendant's benefit is a poor measure of plaintiff's actual losses."  *Id.* at *7.  Thus, even if "benefits to a defendant" were "an appropriate measure of actual damages, the Court would still be relying on speculation regarding the amount," which is "not well-supported."  *Id*.  This flaw undermines Mr. Torres's entire report.

*Third*, Plaintiffs' damages model must "measure only those damages attributable to" their liability theory, *Comcast*, 133 S. Ct. at 1433–34, but Mr. Torres's first methodology regarding the "Social Graph" (which is just a synonym for a social network) has nothing to do with the practices at issue in this case.  Although Mr. Torres devotes a third of his report to this theory (Dkt. 137-8, ¶¶ 35–60), he admitted in his deposition that the value of the Social Graph "is not the amount of damages,"

---

[14]  Likewise, in *Astiana*, 2014 WL 60097, at *13, this Court denied certification—even though "plaintiff may have established that common questions predominate with regard to some elements of some of the claims"—because "[m]ore importantly, [plaintiff's] failure to offer a damages model that is capable of measurement across the entire class for purposes of Rule 23(b)(3) bars her effort to obtain certification of the class."  *See also In re Facebook PPC*, 282 F.R.D. at 459, 461 (same; analyzing under the superiority prong).

[15]  Plaintiffs would be entitled to only three types of monetary relief if they prevailed on their claims: (1) statutory damages, (2) actual damages, and/or (3) "profits" made by Facebook as a result of the alleged violation of the Wiretap Act.  *See* 18 U.S.C. § 2520(b)–(c); Cal. Penal Code § 632.7(a).

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

and that he has not even calculated alleged damages to the putative class.  (App. 1074-76.)  He also deferred repeatedly on questions about Facebook functionality to Plaintiffs' "technical" expert (Dr. Golbeck), who conceded that ███████████████████████████████████

███████████████████████████████████

*Fourth*, even the section of Mr. Torres's report that is loosely related to Plaintiffs' claims in this case—alleged incrementing of the social plugin counter—succeeds only in confirming the individualized inquiries that render this case inappropriate for class treatment.  For example, Mr. Torres testified that if Coca-Cola's social plugin counter is at 500,000 and it experiences an increment of 1 or 2, "that is a miniscule less than a 1%" increase, and Coca-Cola "won't be as influenced or as impressed by the increase" as a company with a smaller count.  (*Id.* 1047-48.)  His expert report ignores several other individualized issues, including:  (1) the economic difference between an individual (i) affirmatively clicking the "Like" button social plugin, and (ii) sending a URL in a message (which at most only may have incremented the counter) (*id.* 2051-53); (2) that "each Like can be leveraged in different ways so it's valued differently" (*id.* 1078-79); (3) the difficulty in determining whether a URL actually incremented the counter, which according to Mr. Torres would require a sampling of "thousands" of individuals' messages (*id.* 1083-84); and (4) the different amounts (if any) that each third-party website (or "Marketer") would be willing to pay to Facebook for advertising (*id.* 2048-51).  Nor may Plaintiffs cure these deficiencies.  As explained in the expert rebuttal report of Dr. Catherine Tucker of MIT's Sloan School of Management, Mr. Torres makes no effort to account for people who were unharmed by the alleged practice or who have actually benefitted from it.  (App. 3054.)[16]

**2.  *Statutory Damages*.**  Plaintiffs have not even attempted to argue, much less prove, that an award of statutory damages here would meet Rule 23(b)(3) requirements.  Nor can they—in deciding whether to award statutory damages under the Wiretap Act, courts consider several factors:  "(1) the

---

[16]  *See, e.g.*, *Pecover v. EA Inc.*, No. 08-2820 VRW, 2010 WL 8742757, at *9 (N.D. Cal. Dec. 21, 2010) ("A class cannot be certified if class members benefit from the same acts alleged [by plaintiffs] to be harmful to other members of the class."); *Allied Orthopedic Appl., Inc. v. Tyco Health. Grp. LP*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) ("[N]o circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class, let alone where some *named* plaintiffs derive such a benefit.").

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

Gibson, Dunn &
Crutcher LLP

1    severity or minimal nature of the violation; (2) whether there was actual damage to the victim; (3) the

2    extent of any intrusion into the victim's privacy; (4) the relative financial burdens of the parties;

3    (5) whether there was a reasonable purpose for the violation; and (6) whether there is any useful

4    purpose to be served by imposing the statutory damages amount."  *Dish Network LLC v. Gonzalez*,

5    No. 13-107, 2013 WL 2991040, at *8 (E.D. Cal. June 14, 2013), *rec. adopted by*, 2013 WL 4515967

6    (E.D. Cal. Aug. 26, 2013).  Each of these factors turns on individualized issues:  (a) Plaintiffs testified

7    that they have not suffered financial harm and many of the putative class members benefited from

8    Facebook (App. 381-85, 4 15,482, 524, 1378-1380, 1414-18); (b) "the extent of any [alleged]

9    intrusion" will vary dramatically based on the number of Facebook messages each putative class

10   member sent or received with URL attachments (*compare* App. 575-688  (███████████████

11   ████████████████████████████████) *with id*. 707-08 (███████████

12   ██████); (c) the use of ████████████████████████████ URL previews is

13   beneficial, for the reasons noted above (*supra* p. 7); and (d) whether "any useful purpose [would] be

14   served by imposing the statutory damages amount" will vary from message-to-message (*see*

15   App. 2016-28 (explaining that many putative class members were unaffected and others benefited

16   from the alleged practices)).

17       Moreover, permitting a class action where the aggregated statutory damages would result in an

18   excessive and disproportionate penalty (as it certainly would here, where no one was harmed), would

19   raise due process concerns.  *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 235 (9th Cir. 1974);

20   *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (due process requires that a

21   punitive award "have a nexus to the specific harm suffered by the plaintiff"); *see also Fraley v.*

22   *Facebook, Inc*., No. 14-15595, 2016 U.S. App. LEXIS 518, at *5 (9th Cir. Jan. 6, 2016) (noting that

23   statutory penalty of $750 per class member "could implicate due process concerns"); *but see Bateman*

24   *v. AMC, Inc.*, 623 F.3d 708, 711 (9th Cir. 2010).[17]

25
26   [17]  *See also Serna v. Big A Drug Stores, Inc.*, No. 07-276, 2007 WL 7665762, at *5–6 (C.D. Cal.
     Oct. 9, 2007) (distinguishing *Murray v. GMAC Mortg. Corp*., 434 F.3d 948 (7th Cir. 2006) (cited in
27   Mot. at 21–22), on the ground that its approach of deferring constitutional impediments improperly
     creates exorbitant settlement pressures on the defendant); *see also Shady Grove Orthopedic Assocs.,*
28   *P.A. v. Allstate Ins. Co*., 130 S. Ct. 1431, 1465 n.3 (2010) ("[A] court's decision to certify a class ...
     places pressure on the defendant to settle even unmeritorious claims.") (Ginsburg, J., dissenting).

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH

**3.**  ***The Court Should Exclude Mr. Torres's Expert Opinion.***  Pursuant to Local Rule 7-3(a), the Court should strike Mr. Torres's report for several reasons.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

*First*, his entire methodology should be excluded as incomplete.  *Supra* p. 24; *see, e.g.*, *Building Ind. Ass'n of Wash. v. WSBCC*, 683 F.3d 1144, 1154 (9th Cir. 2012) (excluding incomplete damages report); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552–53 (C.D. Cal. 2014) (same).[18]

*Second*, Mr. Torres's proposed methodology improperly focuses on alleged "benefits to Facebook" (App. 1035-36, 1042, 1080), which is not an available remedy under the Wiretap Act or CIPA.  This is not the first time Mr. Torres offered a legally unsupported and improper damages model.  *See, e.g.*, *Hebrew Univ. of Jerusalem v. GM*, No. 10-03790, 2012 WL 12507522, at *5–6 (C.D. Cal. May 31, 2012) (striking Mr. Torres's expert opinion as unreliable and lacking academic support).

*Third*, Mr. Torres's flawed methodology also purports to address many practices that are not challenged in the complaint, such as the "Social Graph" (Dkt. 137-8, ¶¶ 35–60), and once again, his opinions have been called into question on this basis.  *In re Google, Inc. Privacy Policy Litig.*, No. 12-001382-PSG, 2015 WL 4317479, at *5 (N.D. Cal. July 15, 2015) ("There is just one problem with Torres's various conclusions:  they are not reflected anywhere in the [operative complaint].").

*Fourth*, Mr. Torres's exclusion of research and development costs from his damages model is inconsistent with generally accepted valuation standards, and inflates his damages number by several billion dollars.  (App. 2044-47.)  His methods also are unreliable under Rule 702(d), judging by the ▮▮▮▮▮ math error in his report.  (*Id.* 1051-64, 2044-45.)

---

[18]  To complete his analysis, Mr. Torres testified that he needs data that Plaintiffs have not requested in discovery (App. 9-11, 1029, 1066)—even though they successfully moved to compel very broad discovery on the basis that it was "critical to establishing" their damages theory, and that "expert analysis of the [] information sought" would allow them to "accurately model the profits attributable to the challenged conduct."  (Dkt. 112; Dkt. 130 at 12–13 (crediting these claims in granting "broader discovery to be able to establish a model or methodology for class-wide relief").)  But their expert now needs *different* information to complete his work.  This Court should not entertain such a belated request.  *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 506 (N.D. Cal. 2008) ("After eight months of discovery, plaintiffs should have the data to formulate their regression analyses with more precision," and they "should be able to provide more than promises at this late stage of the litigation").

## VIII.   PLAINTIFFS CANNOT CERTIFY AN ALTERNATE RULE 23(b)(2) CLASS

Plaintiffs' alternative request for a Rule 23(b)(2) class for injunctive relief, which they relegate to a lone paragraph at the end of their brief (Mot. at 24:10–25), also fails for several reasons.

### A.   Injunctive Relief Would Not Impact All Class Members The Same Way

Rule 23(b)(2) certification is permitted only if there is an "indivisible" class and a "single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 131 S. Ct. at 2557.  Indeed, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is *such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them*." *Id.* (emphasis added; quotation omitted).  That is not the case here, where individual proof will show that many putative class members *impliedly consented* to the challenged practices.  (*Supra* pp. 19–22.)  A practice to which some percentage of putative class members consented, and to which some unknown percentage of putative class members allegedly did not consent cannot be enjoined or declared unlawful "as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 ("In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.").

Moreover, where "it isn't clear that all members of the class feel the same way" about a proposed injunction, "[s]uch injunctive relief for all class members, without notice and the right to opt-out, would raise due process concerns." *Schulken v. Wash. Mut. Bank*, No. 09-02708-LHK, 2012 WL 28099, at *6 (N.D. Cal. Jan. 5, 2012).  There is little doubt that many members of the proposed class here welcome the routine practices challenged here.  By way of example, after *The Wall Street Journal* blog post, one author wrote that Facebook's practices were not a "privacy invasion" and that "[t]here is no reason for anyone to be upset about Facebook doing this."  (*Id.* 180-84.)  The author observed that "e-mail providers like Gmail scan user e-mails all the time … to show relevant ads, fight spam, and slow down viruses," and "services across the Internet use whatever method they can to keep track of the popularity of Webpages.  Google has a list of trends.  *The New York Times* keeps track of the most e-mailed stories."  (*Id.* 182-83.)  "The truth is, there is nothing to see here.  Move along."  (*Id.*)

28

Gibson, Dunn &
Crutcher LLP

Underscoring the point further, the named Plaintiffs and putative class members deposed in this case themselves disagreed about the appropriate scope of message "scanning" (App. 17):



This is only a few opinions from putative class members, but it confirms that a "single injunction" would not impact the class the same way.  *Schulken*, 2012 WL 28099, at *6.

**B.    The Primary Relief Sought By Plaintiffs Is Monetary Relief, Not Injunctive Relief**

"Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive."  *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001); *Moeller v. Taco Bell Corp.*, No. 02-5849 PJH, 2012 WL 3070863, at *4 (N.D. Cal. July 26, 2012) (same); *see also Dukes*, 131 S. Ct. at 2557 (Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.").  Here, Plaintiffs seek a massive damages award, rendering Rule 23(b)(2) treatment inappropriate.

Further, when plaintiffs seek both damages and injunctive relief—as here, but unlike in *Yahoo* (Mot. at 24)—certification under Rule 23(b)(2) is improper unless plaintiffs demonstrate that "[they] would have brought suit to obtain the injunctive relief they seek *even if they could not obtain a money recovery.*"  *Kavu v. Omnipak Corp.*, 246 F.R.D. 642, 649 (W.D. Wash. 2007) (emphasis added).[19]

---

[19]   *See also Connelly v. Hilton Grand Vacations Co.*, 294 F.R.D. 574, 579 (S.D. Cal. 2013) (because
[Footnote continued on next page]

29

Actions speak louder than words, and by continuing to send Facebook messages containing URLs (App. 386-87), ████████████ made clear that he has no interest in injunctive relief.[20] ████████

████████████████████████████████████████████████████████████████████████

illustrating that a plaintiff-by-plaintiff inquiry would be necessary, and that certification of a (b)(2)

class would be inappropriate here. ████████████████████████████████████

████████████████████████ also calls into question his standing under Article III to seek injunctive relief,

see, e.g., O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974), creating another individualized inquiry.[21]

## IX.   CONCLUSION

Plaintiffs cannot certify a class in this action because there is significant variability surrounding the challenged practices and Plaintiffs' (and putative class members') experiences with these practices, and Plaintiffs have failed to carry their evidentiary burden to establish any of the Rule 23 requirements.  Facebook respectfully requests that the Court deny Plaintiffs' Motion.

Dated:  January 15, 2016

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/_____
        Christopher Chorba

Attorneys for Defendant FACEBOOK, INC.

---

[Footnote continued from previous page]

"each plaintiff is independently entitled to statutory damages … Plaintiffs' TCPA claims are ineligible for Rule 23(b)(2) certification, regardless of Plaintiffs' parallel request for injunctive relief.") (citing *Dukes*, 131 S. Ct. at 2557); *Ries v. Arizona Bevs. USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012) ("[A]lthough the monetary amount sought may be small per class member, in the aggregate they can hardly be said to be incidental to the injunctive relief sought."); *Mahfood v. QVC, Inc.*, No. 06-0659, 2008 WL 5381088, at *3–4 (C.D. Cal. Sept. 22, 2008) (same).

[20]  *See, e.g., Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 459–60 (S.D. Cal. 2014) (requested monetary relief was "not 'incidental'" and plaintiffs "cannot possibly benefit from injunctive relief as they are now (or at least should be) fully knowledgeable" of the challenged practice; thus, "monetary relief is necessarily their 'primary concern'"); *Gonzales v. Comcast Corp.*, No. 10-1010, 2012 WL 10621, at *17 (E.D. Cal. Jan. 3, 2012) (rejecting Rule 23(b)(2) certification because former customers "have no interest in the requested injunctive relief" and therefore "[t]he monetary claims are [] the only claims at issue" for them, and because "individual class members' damages would differ from one another" and "will necessarily require 'individualized determinations'"), *rec. adopted by* 2012 U.S. Dist. LEXIS 7271 (E.D. Cal. Jan. 23, 2012).

[21]  Facebook also reserves its rights pursuant to *Robins v. Spokeo, Inc.*, *cert granted*, 135 S. Ct. 1892 (2015), and *Bouaphakeo v. Tyson Foods Inc.*, *cert granted*, 135 S. Ct. 2806 (2015).

DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. C 13-05996 PJH