Michael W. Sobol (State Bar No. 194857)
msobol@lchb.com
David T. Rudolph (State Bar No. 233457)
drudolph@lchb.com
Melissa Gardner (State Bar No. 289096)
mgardner@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Hank Bates (State Bar No. 167688)
hbates@cbplaw.com
Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
11311 Arcade Drive
Little Rock, AR 72212
Telephone:  501.312.8500
Facsimile:  501.312.8505

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW CAMPBELL and MICHAEL HURLEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No.  C 13-05996 PJH<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:  March 16, 2016<br>Time:  9:00 a.m.<br>Judge:  Hon. Phyllis J. Hamilton<br>Place:  Courtroom 3, 3rd Floor |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. ARGUMENT .................................................................................................... 2

    A.  Plaintiffs and their Counsel are Adequate Under Federal Rule 23(a)(4)................................................................................................ 2

    B.  The Class Is Ascertainable through Facebook's Databases ...................... 5

    C.  Facebook's Manufactured "Variabilities" Are Irrelevant to Resolving the Material Legal and Factual Issues Through Common Proof ................................................................................................ 6

    D.  Facebook's Affirmative Defense of Implied Consent Does Not Defeat Predominance ................................................................... 10

        1.  Facebook's Interception and Use of Private Message Content Extends Beyond Inflating Like Counts .......................... 10

        2.  Facebook Fails to Point to Sufficient Evidence from which Consent to Interceptions for Inflating Like Counts Could Be Implied ....................................................................... 11

        3.  ████████████████████████████ ........... 13

        4.  Facebook's "URL Preview" Is a Separate Functionality From the Interceptions and Uses Challenged by Plaintiffs .......... 13

    E.  Common Proof Establishes the Class's Entitlement to Monetary Recovery ........................................................................ 13

        1.  Statutory Damages ....................................................... 13

        2.  Equitable Relief and Disgorgement of Profits ............................ 16

    F.  Alternatively, Plaintiffs Have Demonstrated that Certification is Appropriate Pursuant to Rule 23(b)(2) ................................................ 18

III. CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ades v. Omni Hotels Mgmt. Corp.*,
  46 F. Supp. 3d 999 (C.D. Cal. 2014)............................................................................... 15

*Ades v. Omni Hotels Mgmt. Corp.*,
  No. 13-02468, 2014 WL 4627271 (C.D. Cal. Sept. 8, 2014) ........................................... 11, 16

*Ashker v. Governor of Cal.*,
  No. 9-5796, 2014 WL 2465191 (N.D. Cal. June 2, 2014)................................................ 20

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  No. 10-4387, 2014 WL 60097 (N.D. Cal. Jan. 7, 2014) .................................................. 3

*Backhaut v. Apple Inc.*,
  No. 14-2285, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ................................................ 12

*Banks v. Nissan N. Am., Inc.*,
  301 F.R.D. 327 (N.D. Cal. 2013)..................................................................................... 3

*Bateman v. AMC, Inc.*,
  623 F.3d 708 (9th Cir. 2010)........................................................................................... 16

*Bodner v. Oreck Direct, LLC*,
  No. 6-4756, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .............................................. 4

*Bohn v. Pharmavite, LLC*,
  No. 11-10430, 2013 WL 4517895 (C.D. Cal. Aug. 7, 2013)............................................ 4

*Californians for Disability Rights, Inc. v. Cal. DOT*,
  249 F.R.D. 334 (N.D. Cal. 2008)..................................................................................... 20

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013).................................................................................................... 16

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003)........................................................................................... 3

*Daniel F. v. Blue Shield of Cal.*,
  305 F.R.D. 115 (N.D. Cal. 2014)..................................................................................... 17

*Desilets v. Wal-Mart Stores, Inc.*,
  171 F.3d 711 (1st Cir. 1999) ........................................................................................... 15

*DirectTV v. Rawlins*,
  523 F.3d 318 (4th Cir. 2008)........................................................................................... 14

*DirecTV, Inc. v. Huynh*,
  No. 4-3496, 2005 WL 5864467 (N.D. Cal. May 31, 2005) .............................................. 14, 17

*Dish Network LLC v. Gonzalez*,
  No. 13-107, 2013 WL 2991040 (E.D. Cal. 2013)............................................................ 14

*Dunakin v. Quigley*,
  99 F. Supp. 3d 1297 (W.D. Wash. 2015)......................................................................... 19

*Edwards v. First Am. Corp.*,
  289 F.R.D. 296 (C.D. Cal. 2012) .................................................................................... 3

*Ellsworth v. U.S. Bank, N.A.*,
  No. 12-2506, 2014 WL 2734953 (N.D. Cal. June 13, 2014) ............................................ 12

*Gannon v. Network Tel. Servs.*,
  No. 13-56813, 2016 WL 145811 (9th Cir. 2016) ............................................................ 12

*Guido v. L'Oreal, USA, Inc.*,
  No. 11-1067, 2013 WL 3353857 (C.D. Cal. July 1, 2013) .............................................. 2, 3

*Gutierrez v. Wells Fargo Bank, N.A.*,
  No. 7-5923, 2008 WL 4279550 (N.D. Cal. Sept. 11, 2008) ............................................ 2

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)......................................................................................... 6

*Hebrew Univ. of Jerusalem v. GM*,
  No. 10-3790, 2012 WL 12507522 (C.D. Cal. May 31, 2012) .......................................... 17

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Holloway v. Full Spectrum Lending,*
    No. 6-5975, 2007 WL 7698843 (C.D. Cal. 2007)..................................................... 14

4   *In re ConAgra Foods, Inc.,*
    302 F.R.D. 537 (C.D. Cal. 2014) ............................................................................ 18

5   *In re Facebook Internet Tracking Litig.,*
    No. 12-2314, 2015 WL 6438744 (N.D. Cal. Oct. 23, 2015) ..................................... 9

6   *In re Facebook, Inc., PPC Advert. Litig.,*
    282 F.R.D. 446 (N.D. Cal. 2012) .............................................................................. 4

7   *In re Google Inc. Gmail Litig.,*
    No. 13-2430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ................................... 10

8   *In re Google Inc. Gmail Litig.,*
    No. 13-2430, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ................................... 12

9   *In re Hulu Privacy Litig.,*
    No. 11-3764, 2013 WL 6773794 (N.D. Cal. 2013) .................................................. 15

10  *In re Nickelodeon Consumer Privacy Litig.,*
    No. 12-7829, 2014 WL 3012873 (D.N.J. July 2, 2014)............................................. 9

11  *In re Online DVD Rental Antitrust Litig.,*
    No. 9-2029, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010)....................................... 3

12  *In re Static Random Access Memory Antitrust Litig.,*
    264 F.R.D. 603 (N.D. Cal. 2009) .............................................................................. 4

13  *In re TFT-LCD Antitrust Litig.,*
    267 F.R.D. 583 (N.D. Cal. 2010) .............................................................................. 4

14  *In re Yahoo Mail Litig.,*
    308 F.R.D. 577 (N.D. Cal. 2015) ............................................................................ 19

15  *In re Zynga Privacy Litig.,*
    750 F.3d 1098 (9th Cir. 2014).................................................................................... 9

16  *Kanawi v. Bechtel Corp.,*
    254 F.R.D. 102 (N.D. Cal. 2008).............................................................................. 2

17  *Kanter v. Warner-Lambert Co.,*
    265 F.3d 853 (9th Cir. 2001).................................................................................... 20

18  *Kehoe v. Fidelity Fed. Bank & Trust,*
    421 F.3d 1209 (11th Cir. 2005)................................................................................ 15

19  *Lee v. Pep Boys-Manny Moe & Jack of Cal.,*
    No. 12-5064, 2015 WL 9480475 (N.D. Cal. Dec. 23, 2015)..................................... 3

20  *London v. Wal-Mart Stores, Inc.,*
    340 F.3d 1246 (11th Cir. 2003)................................................................................. 4

21  *Moheb v. Nutramax Labs. Inc.,*
    No. 12-3633, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ...................................... 4

22  *Murray v. Fin. Visions, Inc.,*
    No. 7-2578, 2008 WL 4850328 (D. Ariz. Nov. 6, 2008).......................................... 12

23  *Murray v. GMAC Mortg. Corp.,*
    434 F.3d 948 (7th Cir. 2006)................................................................................... 14

24  *P.P. v. Compton Unified Sch. Dist.,*
    No. 15-3726, 2015 WL 5752770 (C.D. Cal. Sept. 29, 2015) ................................... 19

25  *Pecover v. Elec. Arts Inc.,*
    No. 8-2820, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010)...................................... 18

26  *Poulos v. Caesars World, Inc.,*
    No. 94-1126, 2002 WL 1991180 (D. Nev. June 25, 2002)........................................ 3

27  *Rex Trailer Co. v. U.S.,*
    350 U.S. 148 (1956)................................................................................................. 15

28  *Sanchez v. Wal-Mart Stores, Inc.,*
    No. 6-2573, 2009 WL 1514435 (E.D. Cal. May 28, 2009) ....................................... 4

**TABLE OF AUTHORITIES**
(continued)

Page

*Shelton v. Bledsoe*,
775 F.3d 554 (3d Cir. 2015) .................................................................................. 19
*Shook v. El Paso Cnty.*,
386 F.3d 963 (10th Cir. 2004) ............................................................................... 19
*Smilow v. Sw. Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003) ................................................................................... 12
*Stuart v. Radioshack Corp.*,
No. 7-4499, 2009 WL 281941 (N.D. Cal. Feb. 5, 2009) ......................................... 3
*Trosper v. Stryker Corp.*,
No. 13-607, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ..................................... 4
*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ............................................................................................ 6
*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998) .......................................................................... 19, 20
*Watkins v. L.M. Berry & Co.*,
704 F.2d 577 (11th Cir. 1983) ............................................................................... 10
*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994) ............................................................................. 4
*Yaffe v. Powers*,
454 F.2d 1362 (1st Cir. 1976) ............................................................................... 19
*Zhu v. UCBH Holdings, Inc.*,
682 F. Supp. 2d 1049 (N.D. Cal. 2010) ................................................................... 3

**Statutes**

18 U.S.C. § 2520(b)(1) .............................................................................................. 16
18 U.S.C. § 2520(c)(2)(A) ................................................................................... 16, 17
Cal. Penal Code § 637.2(a) ........................................................................................ 15
Cal. Penal Code § 637.2(c) ........................................................................................ 15

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................... 6
Fed. R. Civ. P. 23(a)(4) ............................................................................................... 2
Fed. R. Civ. P. 23(b)(2) ........................................................................... 2, 18, 19, 20
Fed. R. Civ. P. 23(b)(3) ............................................................................. 2, 5, 6, 16

**Other Authorities**

7A Charles Alan Wright et al.,
Federal Practice & Procedure § 1775 (2d ed. 1986) .............................................. 20
Cong. Rec. May 23, 1968 at S6 ................................................................................. 15
Damodaran, Aswath,
"Research and Development Expenses:  Implications for Profitability Measurement and
Valuation," (http://people.stern.nyu.edu/adamodar/pdfiles/papers/R&D.pdf ) ........ 18
Damodaran, Aswath,
Damodaran on Valuation: Security Analysis for Investment and Corporate Finance, 2nd Ed.
2006, John Wiley & Sons, NY .................................................................................. 18
Manual for Complex Litigation (Fourth) § 21.26 ........................................................ 2

1   **I.       INTRODUCTION**

2          Plaintiffs trust that the Court will not be fooled by Facebook's latest misdirection which

3   opens its Opposition, falsely claiming that this litigation concerns nothing more than displaying

4   previews of URLs within Private Messages.  The record incontrovertibly puts at issue Facebook's

5   systematic capturing and cataloging of the content of its users' Private Messages, and redirecting and

6   repurposing that content through a host of undisclosed, privacy-invasive practices.  That Facebook's

7   practices are an exploitation, and *not* a natural extension, of its provision of electronic

8   communication services, is evident from the very nature of those practices which Facebook does not

9   deny, including mining the content ████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████ .

12         Facebook trivializes these privacy invasions, comparing itself to the *New York Times*

13  compiling a bestseller list, or *Billboard* charting the top 100 hits.  The comparisons are wholly inapt

14  because neither the *Times* nor *Billboard* gather the identities of purchasers, nor secretly obtain the

15  information from communications which it holds out to be "private."  By prominently highlighting

16  this ill-fitting analogy, Facebook betrays its fundamental disregard for the importance of not only the

17  legal strictures of ECPA and CIPA, but the long-established common law heritage embodied in those

18  statutes which recognizes the vital importance of privacy to our democratic values.  ECPA and CIPA

19  ensure that this guarantee of privacy extends to electronic communications, as they become the

20  dominant medium of the 21st Century. Yet without obtaining consent—████████████████

21  ████████████████████████—Facebook has engineered its system architecture to intercept

22  and catalog the URLs people are discussing and sharing with each other in communications that

23  *Facebook* itself represents as being "private."  Facebook then utilizes these data for the current and

24  future objective of accumulating, analyzing and refining user data and enhancing its targeted

25  advertising efforts.  CAC ¶ 31.  Facebook's interception of Private Message content breaches the

26  barrier traditionally respected by common carriers in the context of postal mail and telephone calls.

27         Facebook's attempts to disregard—and consign to the past—ECPA's and CIPA's legal limits

28  cannot distract from the core, common concern of this litigation:  Facebook structured its system to

1   capture content of Private Messages, to use that information for its own, undisclosed purposes, and to

2   store that information in perpetuity.  This privacy intrusion is common to a class of users

3   ascertainable from Facebook's data.  It was effectuated by a uniform functionality engineered by

4   Facebook to ███████████████████████████████████████████████.  The

5   predominant questions of liability and the appropriate remedies—statutory damages and equitable

6   and injunctive relief—are suitable for class treatment under Rule 23(b)(3) or alternatively Rule

7   23(b)(2).

## II.   ARGUMENT

### A.   Plaintiffs and their Counsel are Adequate Under Federal Rule 23(a)(4)

Matthew Campbell and Michael Hurley are exemplary representative plaintiffs.  They are completely fulfilling their duties as class representatives.  They remain informed of developments in the litigation, communicate with counsel, review pleadings prior to filing, and timely respond to discovery.[1]  They are fairly and adequately protecting the interests of the class.  Facebook's challenges to their adequacy are baseless.

In a case centered on Facebook's internal, surreptitious processing of information which no class member would have any reason to suspect, Plaintiffs learning of their claims from counsel is unsurprising and entirely proper.  "[T]hat is simply the nature of a claim of this type." *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008) (finding adequacy where plaintiffs learned of claims from law firm advertisement; noting, "[t]he average person would have no reason to [know of his claims] particularly when a substantial part of the allegations involve the concealment of material information.").  Moreover, far from being "recruited," Campbell and Hurley affirmatively volunteered to serve as class representatives.[2]  Therefore, Facebook's accusation that this is a "lawyer-driven" case is baseless.

---

[1] Ex. 2 (Campbell Dep. 17:3-7; 77:3-16; 128:8-22; 132:17-22; 139:3-23); Ex. 3 (Hurley Dep. 65:18-66:1; 70:19-72:5; 77:19-80:2; 84:8-85:9).  Unless otherwise noted, all cited Exhibits are to the Declaration of David Slade ("Slade Decl.").

[2] Dkt. 158-161; 163 (Facebook Appendix of Evidence, ("App.")), at 5:6-7; 485-86.  Furthermore, "[t]here is nothing inherently improper with the recruitment of class representatives."  *See Guido v. L'Oreal, USA, Inc.*, No. 11-1067, 2013 WL 3353857, at *8 (C.D. Cal. July 1, 2013) (citing Manual for Complex Litigation (Fourth) § 21.26); *Gutierrez v. Wells Fargo Bank, N.A.*, No. 7-5923, 2008 WL 4279550, at *18 (N.D. Cal. Sept. 11, 2008) (Alsup, J.) (plaintiff solicited through

1   Facebook incorrectly asserts that Plaintiffs have unduly deferred to counsel. In fulfilling

2 their duties as class representatives, Plaintiffs hired competent counsel to prosecute this case. *See*

3 *Stuart v. Radioshack Corp.*, No. 7-4499, 2009 WL 281941, at *10 (N.D. Cal. Feb. 5, 2009).[3]

4 Adequacy does not require that Plaintiffs participate in "legal strategy" or draft discovery

5 requests. Nor do Plaintiffs' prior relationships with associates in the offices of the firms proposed

6 as class counsel undermine their independence. *But see Cummings v. Connell*, 316 F.3d 886, 896

7 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of

8 speculative conflicts"); *In re Online DVD Rental Antitrust Litig.*, No. 9-2029, 2010 WL 5396064,

9 at *4 (N.D. Cal. Dec. 23, 2010), *aff'd*, 779 F.3d 934 (9th Cir. 2015) (same); *Banks v. Nissan N.*

10 *Am., Inc.*, 301 F.R.D. 327, 334 (N.D. Cal. 2013) (rejecting "purely speculative" argument that

11 plaintiff was inadequate). Plaintiffs' independence is particularly exemplified by Mr. Campbell,

12 who, in addition to being a lawyer himself, is an accomplished investigative journalist who has

13 broken stories leading to the resignation or termination of Arkansas's Lieutenant Governor, a

14 district judge, and the superintendent of the Little Rock School District.[4]

15   Facebook's speculation finds no support in the law. "While some courts have expressed

16 reservations about the adequacy of a proposed class representative when he or she is a close

17 family member of an attorney representing the class . . . they have not expressed similar concerns

18 when proposed class representatives are merely friends or acquaintances of the class members'

19 attorney." *Poulos v. Caesars World, Inc.*, No. 94-1126, 2002 WL 1991180, at *6 n.9 (D. Nev.

20 June 25, 2002) *aff'd in part*, 379 F.3d 654 (9th Cir. 2004). Moreover, "courts routinely observe

21 [that] a named plaintiff will not be disqualified simply because of a close or familial relationship

---

22

23 radio advertisement adequate); *Zhu v. UCBH Holdings, Inc.*, 682 F. Supp. 2d 1049, 1054-55 (N.D. Cal. 2010) (White, J.) (plaintiff solicited through press releases adequate); *Edwards v. First*

24 *Am. Corp.*, 289 F.R.D. 296, 302-03 (C.D. Cal. 2012) (plaintiff solicited by counsel who came to her house and knocked on her door adequate).

25 [3] *See also Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-4387, 2014 WL 60097, at *8 (N.D. Cal. Jan. 7, 2014) ("The plaintiff's burden of showing adequacy is fairly minimal."); *Lee v. Pep*

26 *Boys-Manny Moe & Jack of Cal.*, No. 12-5064, 2015 WL 9480475, at *10 (N.D. Cal. Dec. 23, 2015) ("a party . . . will be deemed inadequate only if [he or] she is 'startlingly unfamiliar' with the case."); *L'Oreal, USA*, 2013 WL 3353857, at *7-8 ("A representative plaintiff's lack of

27 detailed, comprehensive knowledge about the legal technicalities of the claims asserted in class litigation . . . provides no basis on which to deny a motion for class certification.").

28 [4] *See, e.g.,* Exs. 4 & 5.

1    with one of the attorneys representing the class." *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583,

2    594-95 (N.D. Cal. 2010); *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603,

3    609 (N.D. Cal. 2009) ("[d]efendants have not shown how . . . these relationships have manifested

4    a conflict nor have they provided legal authority . . . that these relationships establish conflicts").

5          Facebook cites three out-of-District cases which concerned manifest evidence—not

6    present here—of an actual conflict or inadequate diligence, distinct from a mere friendship

7    between the plaintiff and one of the counsel. *See London v. Wal-Mart Stores, Inc.*, 340 F.3d

8    1246, 1255 (11th Cir. 2003) (counsel had deposited a large sum with the plaintiff (his friend and

9    stock broker) following resolution of a lawsuit similar to the one for which plaintiff proposed to

10   represent the class); *Bohn v. Pharmavite, LLC*, No. 11-10430, 2013 WL 4517895, at *3 (C.D.

11   Cal. Aug. 7, 2013) (plaintiff was inadequate, in part, because her deposition testimony and lack of

12   diligence "raise[d] serious questions about her interest and commitment to protecting the interest

13   of the classes")*; Moheb v. Nutramax Labs. Inc.*, No. 12-3633, 2012 WL 6951904, at *5 (C.D.

14   Cal. Sept. 4, 2012) (conflating adequacy and typicality inquiries, holding that plaintiff was

15   inadequate, in part, because her claims and injuries were not typical).[5]  Likewise, Facebook cites

16   *Bodner v. Oreck Direct, LLC,* where plaintiff displayed "undeniable and overwhelming ignorance

17   regarding the nature of [the] action, the facts alleged, and the theories of relief."  No. 6-4756,

18   2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007) (noting also that the same counsel and

19   plaintiff had been the subject of controversy in a past case)*. See Trosper v. Stryker Corp.*, No. 13-

20   607, 2014 WL 4145448, at *13-14 (N.D. Cal. Aug. 21, 2014) (finding defendant's reliance on

21   *Bodner* "unpersuasive" given "lack of any allegations or showing of impropriety concerning class

22   counsel").

23

24

---

25   [5] Facebook's other citations each found plaintiffs inadequate on grounds with no analog here. *See In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012) (plaintiff who

26   knew "essentially nothing about the case" inadequate); *Sanchez v. Wal-Mart Stores, Inc.*, No. 6-2573, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (plaintiff who made claim-splitting

27   decision that "create[d] a conflict" with the class inadequate); *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (plaintiff with "demonstrated level of disinterest in [the] lawsuit [and] vast

28   experience as a . . . class action plaintiff render[ing] him subject to unique defenses" inadequate).

1    Next, Facebook presents misleading excerpts of the deposition testimony of a former

2    plaintiff dismissed from the case, David Shadpour, to suggest improprieties of proposed class

3    counsel.  Mr. Shadpour filed a copycat complaint through not the proposed class counsel, but

4    other counsel which no longer seeks appointment to represent the class.  To the extent that Mr.

5    Shadpour ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████, it does not impugn the class representatives or class counsel

8    proposed here.  Indeed, immediately upon learning, in late May 2015 ████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████.  Further, when LCHB and CBP

11   ████████████████████████████████████████████████████, they promptly

12   took steps to effectuate such withdrawal (*id.* ¶¶ 6-10), including by litigating his right to leave the

13   case without a deposition for which he was unwilling to sit.[6]  If ████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████.  *Id.* ¶ 6.  Accordingly, Facebook's misleading attempt to tar proposed

16   class counsel with questions concerning the adequacy of Mr. Shadpour and his lawyers

17   (Pomerantz LLP, Tostrud Law Group, and Glancy Prongay & Murray LLP), who have not been

18   proposed to serve the class, should be rejected outright.

19       **B.       The Class Is Ascertainable through Facebook's Databases**

20       As explained in the opening and rebuttal reports of Dr. Golbeck, the class members can be

21   readily ascertained for the purposes of Rule 23(b)(3) through Facebook's own database records—

22   a fact that, despite nitpicking the particular code example Dr. Golbeck provides, Facebook never

23   denies.  When a Private Message is sent with a URL attachment, Facebook source code

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████ █ ████████████████████████████████████

---

[6] Ex. 6 (Shadpour Dep. 67:4-69:8); *See also* Dkt. 89, 94, 96, 105.
[7] Dkt. 138 (Plaintiffs' Motion for Class Certification), at 4:15-22.

1

2

3

4

5

6

7 ⁹

8          Facebook's contention that Dr. Golbeck's method of identifying class members is both

9   over- and under-inclusive is simply a reframing of its meritless "variabilities" argument addressed

10  in the following section.  The simple fact is that Facebook ████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ███████████████████████████████████████████   There are no "barriers" to

14  readily ascertaining the class.

15          **C.**     **Facebook's Manufactured "Variabilities" Are Irrelevant to Resolving the**
            **Material Legal and Factual Issues Through Common Proof**
16

17          The commonality requirement of Rule 23(a) is "the capacity of a classwide proceeding to

18  generate common answers apt to drive the resolution of the litigation," and commonality fails

19  only where there are "*[d]issimilarities within the proposed class* [that] impede the generation of

20  common answers."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quotation

21  omitted) (emphasis added).  The predominance inquiry, while more rigorous and only relevant to

22  the Rule 23(b)(3) inquiry, still revolves around common issues, requiring that "common questions

23  present a significant aspect of the case and they can be resolved for all members of the class in a

24  single adjudication."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation

25

26  ─────────────────────
[8] Ex. 1 (Golbeck Rebuttal Rpt.), at ¶¶ 8-10; Ex. 7 (████████████████████████████).
27  [9] Golbeck Rpt., at ¶¶ 98-106; Ex. 1 (Rebuttal Rpt.), at ¶¶ 8-10.
    [10] Facebook maintains ███████
28  ████████████████████████████████████   Ex. 1 (Rebuttal Rpt.), at ¶ 17.1.

omitted).  Facebook's arguments regarding purported "variabilities" or "individualized issues"

fail to defeat a finding of commonality and predominance here.

As a threshold matter, Facebook does not dispute that the core functionality used to

intercept Private Message content— ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████.[11]

Contrary to Facebook's assertion, the technical refinement of the class definition to specify the

inclusion of the URL attachment within the Private Message simply ████████████████████████

████████████████████████████████████████████████████████████████. This

refinement allows for both precision in the class definition and ascertainment of the members.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Accordingly, each class member

was subjected to uniform conduct because when each class member sent or received a Private

Message containing a URL attachment, such message was subject to the same interception of

content.  A determination of whether such conduct violates ECPA and CIPA will be decided

uniformly as to all class members.

Facebook's irrelevant parade of "variabilities" fall into two, broad categories:

(1) variables that simply determine that a user falls *outside* the class, and (2) variabilities in

Facebook's *post-interception* use of the redirected and stored message content.

*First,* Facebook lists a variety of situations in which a user could send a Private Message

that does not include a URL attachment ████████████████████████████████████████████████

████████████████████████████████. These "variabilities" are simply instances where

the user would *not* qualify for membership in the class and would *not* be included in Dr.

Golbeck's method of ascertaining class members:  (1) a user could have sent a private message

without a URL; (2) a user could send a Private Message via Facebook's mobile application,

which ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

_____

[11] Golbeck Rpt., at ¶¶ 32-55, 107, 116-118; *see also,* App. at 1606-1692 (Jun. 1, 2015 Decl. of
Alex Himel).

1

2

3

4     ██████████████   [12]  These are not "dissimilarities" *within* the proposed class; they are simply

5     examples of instances that fall *outside* the class definition—instances where a user did not send or

6     receive a Private Message with a URL attachment.  As such, these variables are irrelevant to the

7     issues to be determined *within* the class.[13]

8             *Second,* Facebook lists several post-interception uses of Private Message content,

9     asserting that each use creates a separate path to liability.  Plaintiffs do allege that Facebook used

10    ████████████   the unlawfully obtained Private Message content in several ways, as such

11    demonstrates that the interception was both for purposes other than transmission of the message

12    and outside the ordinary course of Facebook's business.[14]  These uses also show how Facebook

13    unjustly enriched itself in multiple ways.  However, proof of Facebook's use outside the course of

14    ordinary business is common to all class members because, as Plaintiffs' analysis of Facebook's

15    source code shows, Facebook made at least one of those uses—████████████—

16    with respect to all the Private Messages sent which would qualify users for class membership.

17    *See,* Golbeck Rpt., at ¶¶ 32-42 (detailing the code used to ██████████████

18    ████); *Id.* at ¶¶ 98-105 (illustrating a methodology for identifying class members based upon

19    ██████████████); Ex. 1, (Golbeck Rebuttal Rpt.) at ¶¶ 8-12 (illustrating

20    a methodology to confirm, ██████████████

21    ████████████████████████

22    ████████████████████████  is

23    immaterial to liability but evinces Facebook's unjust enrichment.  If anything, Facebook's

24    _____

25    [12] Opp. at 11:11-28, 12:1-4; 17:12-13; 18:12-16; 22:13-17; 23:14-17.

26    [13] Facebook also misconstrues the class definition with its hypothetical where a user types or
      inserts a URL and then once the URL Attachment is generated and visible within the message
      deletes the URL text that prompted its inclusion.  The class definition does not require that the

27    URL be included in the Private Message twice as both (a) the original text that prompts the
      creation of the URL attachment and (b) the URL attachment.  Once is enough.

28    [14] *See, e.g.*, Dkt. 29 (Motion to Dismiss), at 14-15.

1   reference to these many uses highlights the significance of its underlying interception ███

2   ███████████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████.  While the

4   scope of Facebook's exploitation of message content is immaterial to commonality and

5   predominance, it underscores the significance of the privacy intrusion and the importance of the

6   injunctive relief sought by Plaintiffs.

7          In addition, none of the cases Facebook cites support its proposition that the URL's

8   included within Private Messages may not constitute "content."  In *In re Zynga Privacy Litig*.,

9   750 F.3d 1098, 1105 (9th Cir. 2014), the Ninth Circuit addressed the question of whether "HTTP

10  referer information" (metadata about a particular web request) constituted the contents of a

11  communication, and held that it does not.  Specifically, the court drew a distinction between the

12  "contents" of a communication and "record information" related to that communication, such as

13  who sent the communication or where it was sent from, holding "the term 'contents' refers to the

14  intended message conveyed by the communication, and does not include record information

15  regarding the characteristics of the message that is generated in the course of the

16  communication".  *Id.*, at 1106-107.  Facebook does not—and cannot— argue that URLs sent by

17  users *within* their Private Messages constitute "record information" as opposed to the "intended

18  message" of the communication, and thus *Zynga* is inapposite, as are its progeny cited by

19  Facebook.  *See In re Facebook Internet Tracking Litig*., No. 12-2314, 2015 WL 6438744, at *9

20  (N.D. Cal. Oct. 23, 2015) (no ECPA claim where plaintiffs alleged interception of "cookies

21  [which] contain only a Facebook user's unique identification information and a record of

22  browsing history" as opposed to the contents of a communication); *In re Nickelodeon Consumer

23  Privacy Litig*., No. 12-7829, 2014 WL 3012873, at *1, *15 (D.N.J. July 2, 2014) (no interception

24  of contents of communication where defendants collected cookies linking IP addresses to videos

25  and webpages viewed).  Finally, Facebook illogically claims Plaintiffs did not redact the URLs

26  from Private Messages produced in discovery because "they do not view the URLs as 'content,'"

27  (Opp. Br., at 23), while knowing full well Plaintiffs disclosed this private content only for the

28  purposes of furthering discovery and pursuant to the privacy safeguard of the Protective Order.

### D.      Facebook's Affirmative Defense of Implied Consent Does Not Defeat Predominance

In the context of ECPA, "[c]ourts have cautioned that implied consent applies only in a narrow set of cases [and] should not be 'cavalierly implied.'"  *In re Google Inc. Gmail Litig.*, No. 13-2430, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013) (quoting *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983)).  Facebook has deposed each named Plaintiff, as well as three putative class members it hand-picked, and has yet to uncover *any* evidence of actual notice of—and thus implied consent to—any of the practices identified and challenged by Plaintiffs.  Indeed, Facebook's brief declines to *mention*, let alone *address*, implied consent to the overwhelming majority of interceptions identified by Plaintiffs: ███████████████████ ████████████████████████████████.  As to the one interception Facebook does take on (redirecting URL content to increase Like counts) Facebook's discursive arguments *still* do not identify a *single* class member who impliedly consented, nor do they provide evidence reasonably sufficient to imply consent.

### 1.      Facebook's Interception and Use of Private Message Content Extends Beyond Inflating Like Counts

Critically, Facebook does not argue that *a single* user was put on notice to any additional interceptions or uses of Private Message content identified by Plaintiffs through discovery. The full extent of Facebook's scanning practices is still unknown.[15]  Its own declarant concedes that identifying *every* use of message content "would require consulting with engineers in every group who have worked on every past or present product or feature at Facebook."[16]  Although Facebook ████████████████████████████████████████████████ it points to no circumstances that could inform its users as much, and therefore it offers no basis to imply consent.  Thus Facebook can only mention, but not distinguish the instant ligation from, *Ades v. Omni Hotels*

---

[15] This point is underscored by Facebook's counsel's statements at the October 1, 2015 hearing for the Motion to Dismiss.  Despite being asked multiple times by this Court about what scanning, beyond endeavoring to inflate Like counts, Facebook engaged in, counsel only pointed to examples of scanning for spam, or otherwise maintaining site integrity.  Dkt. 45, at 5:10-9:16; 24:19-27:23.

[16] Dkt. 125, Ex. A (Decl. of Dale Harrison), at ¶ 19.

1  *Mgmt. Corp.*, a case squarely on point, finding that issues of implied consent did not defeat

2  predominance where "[d]espite extensive discovery, [the defendant] has not produced evidence

3  that a single person meeting the class definition actually consented" to the plaintiff's alleged

4  violations of CIPA.  No. 13-02468, 2014 WL 4627271, at *12 (C.D. Cal. Sept. 8, 2014).

5        **2.**    **Facebook Fails to Point to Sufficient Evidence from which Consent to Interceptions for Inflating Like Counts Could Be Implied**

6

7       Facebook trumpets the supposed existence of "*various* [Facebook] sources," from which

8  users could have learned of the incrementing of Like counts, but it actually cites only *one*

9  Facebook document:  a developer guidance on Facebook's website from mid-2011 until

10  December, 2012.[17]  Directed to web developers as an overview of how to encode a Like button on

11  a third-party website, it appears *nowhere* in Facebook's Statement of Rights and Responsibilities

12  or its Data Use Policy directed at its users.[18]  The reference itself is obscure,[19] as even Facebook

13  employees concede:  ███████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████"[20]

16       Facebook similarly overstates the significance of the brief coverage that its practice of

17  increasing the Like counter received.  A review of Exhibit E to Facebook's brief reveals that, of

18

19  ──────────────────

20  [17] Opp. Br., at 20:1-4
   [18] *See, e.g.,* App. 139 (FB000000163).
21  [19] Only at the bottom, at the end of an FAQ section, Facebook stated that the number of "Likes" for a given social plugin included, inter alia, "the number of inbox messages containing this URL as an attachment."  App. 139 (FB000000163).  The developer guidance says nothing about
22  Facebook's use of Private Message content ████████████████████████████████
   ████████████████████████████████████████████████████  Moreover, this
23  statement does not put the reader on notice that the "attachment" would then ████████████
   ████████████████████████████.
24     Statement from ████████████████████████████████.  Nov. 13 Gardner Decl. ISO
25  Class Cert., Ex. 28 (emphasis added); The Google Analytics data relied upon by Facebook supports this proposition.  While the webpage with Facebook's developer guidance received 4.3
26  million views in 2011 and 2.5 million views in 2012, visitors spent an average of *78 seconds* viewing the page in 2011, and only *42 seconds* viewing the page in 2012.  (App. 1496, 1502 at
27  entry #1).  Given the average time spent on this multipage document, the bulk of which was devoted to substantive coding instructions, it is not credible that a meaningful percentage of
28  viewers even *saw* the FAQs.

1   the 77 articles listed, only 29 address the scanning of messages to increase Like counts.[21]  With

2   regard to those, Facebook acknowledges that they were published right round the time Facebook

3   ████████████████ ceased inflating Like counts.  As Alex Himel stated in his deposition,

4   ████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████[22]

7         In short, Facebook cites to a single disclosure not directed at its users and minimal media

8   coverage spanning "a few days" before its claimed change in practices.  Accordingly, the instant

9   matter is readily distinguishable from *Gmail,* where the court found "a panoply of sources,"

10  stretching back almost a decade.  *In re Google Inc. Gmail Litig.*, No. 13-2430, 2014 WL

11  1102660, at *17 (N.D. Cal. Mar. 18, 2014).[23]  To the extent that such a paucity of sources would

12  alert some subset of Facebook users to the *lone* practice of scanning messages to inflate Like

13  counts, this does not create an individualized issue sufficient to defeat predominance.  *Ellsworth*

14  *v. U.S. Bank, N.A*., No. 12-2506, 2014 WL 2734953, at *29 (N.D. Cal. June 13, 2014) ("Courts

15  traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because

16  affirmative defenses may be available against individual members . . . instead, where common

17  issues otherwise predominated, courts have usually certified rule 23(b)(3) classes even though

18  individual issues were present in one or more affirmative defenses.") (quoting *Smilow v. Sw. Bell*

19  *Mobile Sys., Inc*., 323 F.3d 32, 39 (1st Cir. 2003)).  Further, as discussed above, *none* of the

20

21  ─────────────────────
    [21] Source nos. 6, 8, 10, 12, 14, 16, 17, 19, 22, 23, 24, 25, 32, 34, 36, 38, 46, 46, 50, 51, 52, 53, 66,
22  67, 69, 70, 71, 72, and 73.  Additionally, Facebook lists its developer guidance twice (source nos.
    3 and 4).  The remaining 36 articles address subjects not challenged in this litigation.
    [22] Ex. 8 (Feb. 4, 2016 Dep. of Alex Himel 251:4-8).
23  [23] The analysis is the same with regard to *Backhaut v. Apple Inc*., which included, *inter alia,*
    multiple disclosures by the defendant, articles in news media outlets and "technical journals"
24  spanning a period of several months, and the named plaintiff's own admission that there was "a
    who[l]e host of information online regarding" the interceptions at issue.  No. 14-2285, 2015 WL
25  4776427, at *14 (N.D. Cal. Aug. 13, 2015).  Facebook's reliance on *Murray v. Fin. Visions, Inc*.,
    is equally misplaced.  No. 7-2578, 2008 WL 4850328 (D. Ariz. Nov. 6, 2008).  There, the
26  defendant re-routed the putative class's emails in order to comply with SEC regulations, and thus
    the court's analysis turned on an inquiry into express consent, based upon the defendant's stated
27  policy.  *Id*. at *1-4.  Finally, *Gannon v. Network Tel. Servs*., concerned ascertainability, and not
    implied consent.  No. 13-56813, 2016 WL 145811 (9th Cir. 2016).
28

information cited to by Facebook addresses the *additional* interceptions and uses identified by Plaintiffs.

**3.** ██████████████████████████████

Facebook's position that Plaintiffs impliedly consented to message scans because they "continued to send Facebook messages containing URLs even after filing this lawsuit and receiving discovery requests"[24] is untenable.  Facebook has repeatedly—████████████████— stated that it ceased scanning messages as of October 2012.[25]  Indeed, at their depositions, Plaintiffs uniformly testified that they were unaware of any continued scanning.[26]  Moreover, Facebook's ██████████████████████████████████████ still could not put the named Plaintiffs on notice.  The Protective Order in place in this litigation prevents counsel from revealing to Plaintiffs any information designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY" by Facebook.[27]

**4.** **Facebook's "URL Preview" Is a Separate Functionality From the Interceptions and Uses Challenged by Plaintiffs**

The presence of the "URL preview" in a private message provides no evidence of implied consent. Indeed, Facebook argues only that the preview "alerted people … that the URL had been 'processed'" or "stored by Facebook."[28]  The preview is a separate functionality from the multiple interceptions and uses challenged by Plaintiffs.  *Supra*, at D.1.  Therefore, the "URL preview" simply puts a user on notice that Facebook has created a URL preview, and nothing more.

**E.** **Common Proof Establishes the Class's Entitlement to Monetary Recovery**

**1.** **Statutory Damages**

Ignoring Plaintiffs' opening citations to authority recognizing the inherent superiority of class litigation in actions for statutory damages, Facebook relies on a single non-binding, non-

---

[24] Opp. Br., at 21:7-8.
[25] *See, e.g.*, Dkt. 45 (Oct. 1, 2015 Hearing Transcript), at 5:3-6, in which Facebook's counsel represented that "the Consolidated Amended Complaint challenges routine commercial conduct that was completely innocuous that Plaintiffs admit ceased over two years ago."
[26] Ex. 3 (Hurley Tr.) 49:10-12; 66:2-13; 157:5-6; Ex. 2 (Campbell Tr.) 196:16-197:24; 200:13-201:9; 205:15-22.
[27] *See generally* Dkt. 76.
[28] Opp. Br., at 20:14-15, 20-21.

1    class-action authority for the proposition that awarding statutory damages requires an

2    "individualized' analysis.  *See, e.g.*, Opening Br. at 21 citing *Holloway v. Full Spectrum Lending*,

3    No. 6-5975, 2007 WL 7698843 at *8-9 (C.D. Cal. 2007) (finding superiority of class actions

4    seeking statutory damages); Opp. Br., at 25-26.[29]  To the contrary, ECPA's statutory damages

5    provision demonstrates that:

> Congress has instructed courts to make a determination regarding the sufficiency of the case against defendant and the seriousness of the alleged conduct.  Where the Court determines that such a threshold is met, it must award the particular amount determined by Congress, rather than engaging in the guesswork involved in gauging the defendant's culpability and the harm to the plaintiff based on minimal evidence and weak inferences.

10   *DirecTV, Inc. v. Huynh*, No. 4-3496, 2005 WL 5864467, at *8 (N.D. Cal. May 31, 2005) *aff'd*,

11   503 F.3d 847 (9th Cir. 2007).  The statutory damages framework allows the Court to avoid

12   speculation about pecuniary losses, and instead first make the determination of whether a

13   violation of ECPA or CIPA occurred.  If so, the set statutory damage amounts may be invoked if

14   the Court agrees that the severity of Facebook's conduct warrants it.

15       The very criteria Facebook asserts will require individualized inquiry can be better

16   addressed through common proof.  Statutory damages serve to deter conduct which would violate

17   ECPA or CIPA.  *Huynh*, 2005 WL 5864467, at *8; *Omni Hotels*, 2014 WL 4627271, at *14 ("the

18   Legislature evidently decided that minimum damages of $5,000 per violation serve CIPA's

19   purposes").  As such, the primary consideration focuses on the conduct of the defendant.

20   Facebook designed its source code to operate the same way across all users and acted

21   indiscriminately towards the class by virtue of its uniform policies and business practices.

22   Therefore, for example, determining the "extent of any intrusion," its "severity," or "purpose,"

23   must all focus on Facebook's uniform conduct.  Indeed, statutory damages offer a path to class

24   certification, not a barrier.  *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)

25   

[29] Both the Eastern District of California case that Facebook cites, and the Fourth Circuit case upon which that case relies, are individual, non-class cases, and therefore quite unsurprisingly neither addresses how common proof can form the proper basis for an award of statutory damages applicable to a certified class.  Opp. Br. at 26 citing *Dish Network LLC v. Gonzalez*, No. 13-107, 2013 WL 2991040 (E.D. Cal. 2013).  See also *DirecTV v. Rawlins*, 523 F.3d 318 (4th Cir. 2008) (cited by *Gonzalez*).

1   (seeking certification of statutory damage claims avoids "the sort of person-specific arguments

2   that render class treatment infeasible").

3          Moreover, the availability of statutory damages under the Wiretap Act, as later amended

4   under ECPA, recognizes that quantifying actual pecuniary losses from violations of privacy may

5   be too difficult.  As the Supreme Court has stated, "liquidated damages serve a particular useful

6   function when damages are uncertain in nature or amount or are unmeasurable."  *Rex Trailer*

7   *Co. v. U.S.*, 350 U.S. 148, 153 (1956).  *See also Desilets v. Wal-Mart Stores, Inc.*, 171 F.3d 711,

8   716 (1st Cir. 1999) (noting that when Congress enacted ECPA, "it chose to fix liquidated

9   damages").[30]  "Damages for a violation of an individual's privacy are a quintessential example of

10  damages that are uncertain and possibly unmeasurable.  Since liquidated damages are an

11  appropriate substitute for the potentially uncertain and unmeasurable actual damages of a privacy

12  violation, it follows that proof of actual damages is not necessary for an award of liquidated

13  damages."  *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1213 (11th Cir. 2005) (Driver's

14  Privacy Protection Act); *In re Hulu Privacy Litig.*, No. 11-3764, 2013 WL 6773794 (N.D. Cal.

15  2013) (same, Video Privacy Protection Act).[31]  The same is true regarding Plaintiffs' CIPA claim.

16  *Ades v. Omni Hotels Mgmt. Corp.*, 46 F. Supp. 3d 999, 1018 (C.D. Cal. 2014); Cal. Penal Code

17  § 637.2(a), (c) (providing for damages of "the greater of" $5000 or "[t]hree times the amount of

18  actual damages, *if any*, sustained by the plaintiff," and expressly not requiring a showing of actual

19  damages) (emphasis added).  The only harm or injury needed to be shown to invoke the statutory

20  damage frameworks of ECPA and CIPA is the invasion of privacy manifested by the violation of

21

22  [30] The Wiretap Act, as originally enacted as part of the Omnibus Crime Control and Safe Streets
    Act of 1968 (P.L. 90-351, Sec 802), contained an enforcement provision that provided for
    recovery of "liquidated damages" as an alternative to actual damages.  In 1986, ECPA renamed
23  these "statutory damages."

24  [31] Here, "proof of actual damages," means calculation of specific pecuniary loss, and not
    demonstration of harm or injury which is established by virtue of the violation of the statute itself.
    The Legislative history makes clear that statutory privacy protections are intended to remedy the
25  invasion into private space rather than mere pecuniary injuries that may follow.  In enacting the
    Wiretap Act, Congress noted that, "the right of privacy, the right to be left alone, and the right
26  against unreasonable searches and seizures – the right, that is, to be personally secure – are
    among the most highly valued rights of an American citizen.  These guarantees have been a part of
27  Anglo-Saxon law ever since the 15th century."  Cong. Rec. May 23, 1968 at S6 (also noting
    that the statute will represent a "landmark in the development of the historic right to privacy in
28  our society").

1    the statute's substantive provisions. *See Vista Mktg., LLC v. Burkett*, No. 14-14068, 2016 WL

2    425165, *12 (11th Cir. 2016) (distinguishing the Stored Communications Act which, in contrast

3    to ECPA, requires a showing of actual damages for entitlement to statutory damages).

4           Accordingly, the assessment of the appropriate statutory damages is inherently well-suited

5    for class treatment in privacy cases.[32]

6                    **2.        Equitable Relief and Disgorgement of Profits**

7           ECPA entitles prevailing Plaintiffs to "any profits made by the violator as a result of the

8    violation," and, additionally, to "equitable relief," which may include disgorgement of ill-gotten

9    gains (*i.e.*, unjust enrichment). 18 U.S.C. § 2520(b)(1), (c)(2)(A). As an alternative to statutory

10   damages, Plaintiffs' economist, Fernando Torres, identifies a methodology which employs

11   common proof to calculate Facebook's revenues derived from adding URL links into its targeted

12   advertising platform, enhancing its analytics regarding user behavior, and inflating the Like

13   count. In addition, he provides a method for an equitable allocation to class members on a per-

14   URL basis that is consistent with Plaintiffs' liability theory.[33] That is what Rule 23(b)(3)

15   requires. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013).

16          In mischaracterizing Plaintiffs' request for equitable disgorgement as one, instead, seeking

17   "actual damages," Facebook incorrectly concludes that Mr. Torres' model will lead to

18   individualized issues of proof.[34] Questions of whether any particular interception of a class

19   member's URL in fact increased a "Like" counter are correctly absent from his methodology. All

20   putative class members are entitled to recovery for the violation of their privacy rights which

21   defines their class membership. Whether or not Facebook successfully or fully exploited each

22   _____

23   [32] Facebook seemingly acknowledges that controlling Ninth Circuit precedent defeats its
     argument that the amount of potential aggregated statutory damages precludes class certification.
     Opp. Br., at 26 citing, as a "*but see*," *Bateman v. AMC, Inc.*, 623 F.3d 708, 711 (9th Cir. 2010)
24   ("enormous" aggregate damages liability "is not an appropriate reason to deny class
     certification"); *see also Omni Hotels*, 2014 WL 4627271 (certifying CIPA claims for class
25   treatment and rejecting argument that amount of potential statutory damages defeated
     superiority).
26   [33] Ex. 9 (Updated Rpt. of Fernando Torres iso Mot. for Class Certification), ¶¶ 11, 51-60, 72-74.
     [34] Facebook's, and Dr. Catherine Tucker's primary challenge to Plaintiffs' damages methodology
27   rests on this false characterization. Plaintiffs reserve their rights to strike as irrelevant the Expert
     Witness Report of Dr. Catherine Tucker to the extent it covers the "actual damages" prong of 18
28   U.S.C. § 2520(c)(2)(A) which are not addressed by Plaintiffs or Fernando Torres.

1    interception (such as where its otherwise ubiquitous social plugin was present alongside each

2    interception), while arguably relevant to an actual damage theory, does not impact the profits and

3    other benefits generated from its broad course of misconduct.  Thus, by definition, Mr. Torres'

4    model does not invite any of these or other individualized issues.[35]

5            Facebook suggests striking Mr. Torres' opinion on similarly faulty premises.  First,

6    Facebook engages in questionable semantics to argue that "benefits to Facebook," as opposed to

7    unjust enrichment or "profits," are not available, as clearly the ECPA provides for them.  18

8    U.S.C. § 2520(c)(2)(A).  Facebook's sole purported grounds for this argument is an out-of-

9    context quote from *Huynh*, 2005 WL 5864467, which addressed the "actual damages" prong of

10   ECPA, not the equitable relief or profits prong.  It is irrelevant in this context that "Defendant's

11   benefit is a poor measure of plaintiff's actual losses," (*id.*, at *7), and that, instead, the Plaintiff's

12   "true *actual damages*" should be measured by a formula of losses the Plaintiff suffered.  *Id.*

13   (emphasis added).[36]

14            Second, Facebook's contention that Mr. Torres' reference in the damages model to

15   Facebook's Social Graph "has nothing to do with the practices at issue" ignores Plaintiffs' theory

16   that Facebook is unjustly enriched by its ability to enhance and augment its most powerful

17   marketing tool with intercepted content from Private Messages.[37]  Quite simply, the spoils from

18   unlawful conduct are pertinent to this case.

19            Third, Facebook's own case law concisely demonstrates that Mr. Torres' methodology is

20   sufficiently complete at this stage.  "It is not necessary that plaintiffs show that their expert's

21   ────────────────────────────

22   [35] *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115 (N.D. Cal. 2014) is inapposite, as there this
     Court found, in an actual damages context, that the necessity of "mini-trials" and discovery on
     damages issues defeated predominance, where plaintiffs offered no methodology at all, but rather

23   unsubstantiated claims that class members had "similar kinds of damages." *Id.*, at 128.

24   [36] *Hebrew Univ. of Jerusalem v. GM*, No. 10-3790, 2012 WL 12507522, at *5-6 (C.D. Cal. May
     31, 2012) is also inapposite.  Facebook does not, and cannot, contend that the Torres Report lacks
     academic support:  among the supporting materials underpinning the Torres Report is "The

25   Anatomy of the Facebook Social Graph" by Johan Ugander et al. (the "Ugander Study").  Ex. 9
     (Torres Rpt.), at ¶ 49, n. 88-92.  All four contributing authors are identified as affiliated with

26   Facebook.

     [37] Ex. 9 (Torres Rpt.), ¶¶ 35-60; Ex. 10 (Transcript of Deposition of Fernando Torres), 87:3-8: "▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

1  methods will work with certainty at [the class certification stage;] rather, plaintiffs' burden is to

2  present the court with a likely method for determining class damages." *Pecover v. Elec. Arts Inc.*,

3  No. 8-2820, 2010 WL 8742757, at *24 (N.D. Cal. Dec. 21, 2010) (internal quotation omitted).

4  Moreover, in *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014), the court struck

5  an expert declaration that "provide[d] no damages model at all," contrasting it with

6  circumstances, as here, where the Court was presented with—and admitted—a damages model

7  with "a structure or framework that could be used to analyze the [relevant] data." *Id.*, at 552-53

8  (internal citation omitted).

9          Lastly, Facebook's own expert has now ███████████████████████████████████

10 ███████████████████████████████████████████████████████████████████. At

11 her deposition, Dr. Tucker ███████████████████████████████████████████

12 ████████████████████████████████████████[38]  Her testimony is compromised on that

13 basis alone.  Moreover, Dr. Tucker ████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████

15 ███████████████████████████████[39]  In fact, the economic literature supports Mr. Torres'

16 contention.  For example, Aswath Damodaran,[40] in his authoritative treatise <u>Damodaran on

17 Valuation</u>,[41] has established the valuation principle that "research and development expenses are

18 designed to generate future growth and should be treated as capital expenditures."[42]  Mr. Torres'

19 expert testimony should not be excluded on this or any of the other bases that Facebook presents.

20     **F.    <u>Alternatively, Plaintiffs Have Demonstrated that Certification is Appropriate
              Pursuant to Rule 23(b)(2)</u>**

21

22          Alternatively, Plaintiffs' claims for declaratory and injunctive relief satisfy Rule 23(b)(2)

23 because, by utilizing a uniform system architecture and source code to intercept and catalog its

24

25 [38] Ex. 11 (Transcript of Deposition of Catherine Tucker), 176:18-21.
   [39] *Id.*, 181: 10-14.
26 [40] http://pages.stern.nyu.edu/~adamodar/.
   [41] *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance*, 2nd Ed.
27 2006, John Wiley & Sons, NY, in Ch. 3 *Estimating Cash Flows*; Ch. 12 *The Value of Intangibles*.
   [42] A. Damodaran, *Research and Dvlpt. Expenses: Implications for Profitability Measurement and
28 Valuation*, (http://people.stern.nyu.edu/adamodar/pdfiles/papers/R&D.pdf), p.3.

1  users' Private Message content, Facebook has "acted or refused to act on grounds generally

2  applicable to the class," and relief can be appropriately fashioned "with respect to the class as a

3  whole." Fed. R. Civ. P. 23(b)(2).  Showing Facebook's practice generally applicable to the

4  putative class is all that is required pursuant to Rule 23(b)(2); there is no concurrent requirement

5  to show predominance of common issues or superiority of class adjudication.  *Walters v. Reno*,

6  145 F.3d 1032, 1047 (9th Cir. 1998).[43]

7        Facebook's principal argument against certifying a 23(b)(2) class is a repetition of its

8  meritless argument that some putative class members impliedly consented to having their

9  messages scanned.[44]  Facebook overlooks that this inquiry goes to predominance and is therefore

10  immaterial in the 23(b)(2) context.  As one court noted in a CIPA context where the "implied

11  consent" affirmative defense had more legitimacy:

12          Yahoo may well be correct that some class members do not have viable SCA or
        CIPA claims because they consented to Yahoo's conduct. That does not, however,
13          vitiate the operative fact that the proposed Rule 23(b)(2) class challenges Yahoo's
        uniform policy of intercepting, scanning, and using contents of emails sent to and
14          from Yahoo Mail subscribers by non-Yahoo Mail subscribers.  As in *Rodriguez*,
        Plaintiffs complain of a pattern or practice that is generally applicable to the class
15          as a whole.  This is sufficient to satisfy Rule 23(b)(2).

16  *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 600 (N.D. Cal. 2015) (internal citations, quotations

17  omitted).

18        Facebook's speculation that some class members may prefer to have their privacy invaded

19  has no legal significance.[45]  "A difference of opinion about the propriety of the specific relief

20  sought in a class action among potential class members is not sufficient to defeat certification."

21

---

22  [43] Additionally, while the Ninth Circuit has not considered whether ascertainability is required in
the Rule 23(b)(2) context, all other Circuits addressing the issue have held that it is not.  *Shelton*
23  *v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015) ("The nature of Rule 23(b)(2) actions, the Advisory
Committee's note on (b)(2) actions, and the practice of many of [sic] other federal courts all lead
24  us to conclude that ascertainability is not a requirement for certification of a (b)(2) class seeking
only injunctive and declaratory relief . . . ."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir.
25  2004); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1976).  District courts in the Ninth Circuit
have adopted this view.  *P.P. v. Compton Unified Sch. Dist.*, No. 15-3726, 2015 WL 5752770, at
26  *23 (C.D. Cal. Sept. 29, 2015); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1325-26 (W.D. Wash.
2015); *In re Yahoo*, 308 F.R.D. at 597-98.
27  [44] Opp. Br., at 28:5-17.
[45] "There is little doubt that many members of the proposed class here welcome the routine
28  practices challenged here."  *Id.* at 28:21-22.

1    *Californians for Disability Rights, Inc. v. Cal. DOT*, 249 F.R.D. 334, 348 (N.D. Cal. 2008);

2    *accord, Walters,* 145 F.3d at 1047 ("All the class members need not be aggrieved by or desire to

3    challenge the defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).")

4    (citing 7A Charles Alan Wright et al., Federal Practice & Procedure § 1775 (2d ed. 1986)).

5    Moreover, despite Facebook's misleading citations to deposition testimony, all the deponents

6    objected to Facebook's redirection and acquisition of Private Message content for purposes

7    unrelated to the transmission of messages.[46]  Thus, the requested relief addresses "a pattern or

8    practice that is generally applicable to the class as a whole."  *Walters,* 145 F.3d at 1047 (9th Cir.

9    1998).  To the extent that Facebook implies that opinions may differ as to the precise scope of the

10   ultimate relief, this argument is premature.  *Ashker v. Governor of Cal*., No. 9-5796, 2014 WL

11   2465191, at *7 (N.D. Cal. June 2, 2014) (citation omitted) (plaintiffs do not need to articulate

12   injunctive relief "with exacting precision at the class certification stage").

13        Finally, Plaintiffs' request for certification pursuant to 23(b)(2) would be *in lieu* of the

14   23(b)(3) class. As clearly pled, Plaintiffs seek damages and declaratory and injunctive relief in

15   their request for class certification pursuant to Rule 23(b)(3), but only declaratory and injunctive

16   relief in the alternative request for certification pursuant to Rule 23(b)(2).[47]  The authority cited

17   by Facebook is thus inapposite, as the proposed classes in those cases sought damages *and*

18   injunctive relief concurrently in a 23(b)(2) context.  Accordingly, Facebook's arguments are

19   without merit.  *Kanter v. Warner-Lambert Co*., 265 F.3d 853, 860 (9th Cir. 2001) (When

20   "injunctive relief is the primary relief sought," class actions "are properly brought under Rule

21   23(b)(2).")

22   **III.    <u>CONCLUSION</u>**

23        Accordingly, Plaintiffs request that the Court grant their motion for class certification.

---

24   [46] Opp. Br., at 29:1-14.  Contrary to Facebook's assertion that absent class member ███████

25   ████████████████████████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████ App. At 1370.

28   Opening Br. at 24: 23-25.

1   Dated:  February 19, 2016          By:  /s/ Michael W. Sobol
                                            Michael W. Sobol
2

3                                     Michael W. Sobol (State Bar No. 194857)
                                      msobol@lchb.com
                                      David T. Rudolph (State Bar No. 233457)
4                                     drudolph@lchb.com
                                      Melissa Gardner (State Bar No. 289096)
5                                     mgardner@lchb.com
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
6                                     275 Battery Street, 29th Floor
                                      San Francisco, CA  94111-3339
7                                     Telephone:  415.956.1000
                                      Facsimile:  415.956.1008
8
                                      Rachel Geman
9                                     rgeman@lchb.com
                                      Nicholas Diamand
10                                    ndiamand@lchb.com
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
11                                    250 Hudson Street, 8th Floor
                                      New York, NY  10013-1413
12                                    Telephone:  212.355.9500
                                      Facsimile:  212.355.9592
13
                                      Hank Bates (State Bar No. 167688)
14                                    hbates@cbplaw.com
                                      Allen Carney
15                                    acarney@cbplaw.com
                                      David Slade
16                                    dslade@cbplaw.com
                                      CARNEY BATES & PULLIAM, PLLC
17                                    11311 Arcade Drive
                                      Little Rock, AR 72212
18                                    Telephone:  501.312.8500
                                      Facsimile:  501.312.8505
19
                                      *Attorneys for Plaintiffs and the Proposed Class*
20

21

22

23

24

25

26

27

28