UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW CAMPBELL, et al.,

           Plaintiffs,

    v.

FACEBOOK INC.,

           Defendant.

Case No. 13-cv-05996-PJH

**ORDER GRANTING FINAL APPROVAL TO CLASS ACTION SETTLEMENT; GRANTING MOTION FOR ATTORNEYS' FEES AND SERVICE AWARDS**

Re: Dkt. Nos. 237, 238

      Plaintiffs' motions for final approval of a class action settlement and for attorneys' fees, costs, and service awards came on for hearing before this court on August 9, 2017. Plaintiffs appeared through their counsel, Hank Bates, Melissa Gardner, and David Rudolph. Defendant appeared through its counsel, Christopher Chorba, Joshua Jessen, and Jeana Maute. Anna St. John, the sole objector the settlement (the "Objector"), appeared through her counsel, William Chamberlain. For the reasons stated on the record at the hearing, and well as the reasons stated in plaintiffs' proposed orders, see Dkt. 244-1, 244-2, which are hereby adopted by the court and incorporated by reference, the court GRANTS plaintiffs' motions for final approval, attorneys' fees and costs, and service awards for the class representatives, and OVERRULES the objection of St. John. This supplemental order addresses Objector's concerns in greater detail.

## BACKGROUND

      The court has reviewed the facts of this case extensively in several prior orders. See Dkt. 43, 192. In brief, this is a certified class action alleging violations of the federal Electronic Communications Privacy Act ("ECPA") and California's equivalent, the Invasion of Privacy Act ("CIPA"). See Second Amended Complaint ("SAC"), Dkt. 196. Plaintiffs Matthew Campbell and Michael Hurley, as class representatives, allege that Facebook's practice of scanning its users' messages without consent violates these

statutes. Specifically, the allegations in this suit concerns the links to websites (URLs) that are sent in messages. Plaintiffs allege that Facebook's practice of scanning the content of their messages and its use of the URLs therein violates ECPA and CIPA.

## A. Procedural History

The case was filed on December 30, 2013. On December 23, 2014, the court granted in part and denied in part Facebook's motion to dismiss, finding that the complaint sufficiently alleged that Facebook's scanning was an "interception" of a private message under ECPA, and that the "ordinary course of business" and "consent" exceptions did not apply.

Plaintiffs' original theory of liability was that when Facebook scans its users' messages, Facebook counts the inclusion of a URL in a message as a "like" of the website, and increases the public "like counter" by one. At the class certification stage, plaintiffs alleged two new theories of what constitutes the alleged "interception": (1) when a URL is included in a message, Facebook uses that information to generate "recommendations" for Facebook users; and (2) when a URL is included in a message, Facebook uses the information to create user profiles, which it shares with third parties so that they can generate targeted advertising. See Dkt. 192 at 4–5 (summarizing the three uses of URLs challenged by plaintiffs).

On May 18, 2016, plaintiffs achieved certification of the following class under Rule 23(b)(2): "All natural-person Facebook users located within the United States who have sent, or received from a Facebook user, private messages that included URLs in their content (and from which Facebook generated a URL attachment), from within two years before the filing of this action up through the date of the certification of the class." Id. at 2–3. The court found that ascertainability and the Rule 23(a) requirements were met. Id. at 13–17.

However, the court rejected plaintiffs' motion for class certification under Rule 23(b)(3), finding that individual issues of damages predominated over common ones. Id. at 27. The court therefore granted certification only under Rule 23(b)(2), relying on

2

plaintiffs' representation that they sought only injunctive and declarative relief for the Rule 23(b)(2) class. Id. at 29. Following the class certification ruling, plaintiffs filed the operative SAC, which contained new allegations in support of their targeted advertising and recommendation theories. Dkt. 196.

On April 26, 2017, the court granted preliminary approval of a proposed class settlement agreement. Dkt. 235. The court certified a settlement class of "[a]ll natural-person Facebook users located within the United States and its territories who have sent, or received from a Facebook user, private messages that included URLs in their content (and from which Facebook generated a URL attachment), from December 30, 2011 to March 1, 2017." Id.

**B.    The Terms of the Proposed Settlement Agreement**

The key terms of the Settlement Agreement ("S.A."), Dkt. 227-3, are:

- **Declaratory Relief.** Pursuant to the settlement, Facebook "acknowledges" its "cessation" of a number of practices in 2012, 2014, and 2017:

    - **The "Like" Count Increment.** "On or about December 19, 2012," Facebook changed its source code so that the "like" count increment "no longer included the number of shares, by users, of URLs in private messages that resulted in creation of EntShares." S.A. ¶ 40(a)(i).

    - **Sharing URL Data with Third Parties via "Insights."** "On or about October 11, 2012," Facebook changed its source code such that "it ceased including information about URL shares in Facebook Messages that resulted in creation of EntShares (and attendant statistics and demographic information) within Insights and its related API." S.A. ¶ 40(a)(ii).

    - **Uses URLs to Generate "Recommendations."** "On or about July 9, 2014," Facebook changed its source code such that it "ceased utilizing the PHP backend as the backup system for its Recommendations Feed." "The PHP backend considered . . . the number of times a URL had been shared in a Facebook Message." S.A. ¶ 40(a)(iii).

    - **Uses of EntShares in Messages.** As of March 1, 2017, Facebook "confirms . . . that it is not using any data from EntShares created from URL attachments sent by users in Facebook Messages for: 1) targeted advertising; 2) sharing personally identifying user

3

information with third parties; 3) use in any public counters in the 'link_stats' and Graph APIs; and 4) displaying lists of URLs representing the most recommended webpages on a particular web site." S.A. ¶ 40(b).

- **Disclosure Changes:**

  - **The Data Policy Change.** In "January 2015, Facebook's Data Policy was revised" to disclose "that Facebook collects the 'content and other information' that people provide when they 'message or communicate with others.'" S.A. ¶ 40(c).

  - **The Supplemental Help Center Disclosure.** Facebook shall display the following message on its United States Help Center website, for one year: "We use tools to identify and store links shared in messages, including a count of the number of times links are shared." S.A. ¶ 40(d).

- **Attorneys' fees and costs of up to $3.89 million**. S.A. ¶ 57. Facebook agrees to take "no position" on plaintiffs' attorneys' fee application. The amount was negotiated independently of the other settlement terms. Id.

- **Incentive awards of $5,000** for the two class representatives. S.A. ¶ 60.

- **The "Settlement Class Members' Released Claims"** are claims that "arise out of, are based on, or relate in any way to the practices and claims that were alleged in, or could have been alleged in, the Action" but not including "claims for monetary relief, damages, or statutory damages." S.A. ¶ 49. The class representatives' release is broader, releasing claims for monetary damages as well. S.A. ¶ 47.

Plaintiffs now move for final approval of the settlement, an award of the full $3.89 million in attorneys' fees and costs permitted under the agreement, and incentive awards for the named plaintiffs. Dkt. 237, 238.

## DISCUSSION

### A. Legal Standards

#### 1. Final Settlement Approval

A certified class action may not be settled without court approval. See Fed. R. Civ. P. 23(e)(1)(A). In order for approval to be granted, the court must find that the settlement is "fair, reasonable, and adequate," after holding a hearing on the matter. See Fed. R. Civ. P. 23(e)(1)(C). At the fairness hearing, the burden is on the proponents of the settlement to disclose what consideration is being given or paid for the dismissal of

4

the class claims, and they must further prove that: the settlement is not collusive and is the result of arms' length negotiation; sufficient discovery has been conducted by the lawyers representing the class to evaluate the claims and defenses; the lawyer recommending the settlement is competent, experienced and not subject to influence by the opposing party; and only a small fraction of the class has objected. See, e.g., In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995).

In deciding whether the settlement is fair, reasonable, and adequate, the court should compare the terms of the settlement with the likely rewards of litigation. Factors to consider include (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).

Any class member may object to the proposed settlement, and the trial court must allow all objectors the opportunity to present evidence showing that the settlement is contrary to the best interests of the class. See In re Gen. Motors Corp., 594 F.2d at 1131. Generally speaking, the higher the number of objectors to a settlement, the heavier the proponents' burden in proving fairness.

### 2. Attorneys' Fees

Rule 23(h) of the Federal Rules of Civil Procedure provides that, in a certified class action, "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Like all provisions in a class action settlement, attorneys' fees awards must be "fundamentally fair, adequate and reasonable." Staton v. Boeing Co., 327 F.3d 938, 963 (9th Cir. 2003) (citing Fed. R. Civ. P. 23(e)). The district court has discretion to apply either the lodestar method or the

percentage-of-the-fund method in calculating the fee award.  Fischel v. Equitable Life Assurance Soc'y, 307 F.3d 997, 1006 (9th Cir. 2002).

The lodestar method is primarily used in cases, such as this one, involving a statutory fee-shifting provision or where the relief sought is injunctive in nature and thus not easily monetized.  See, e.g., Hanlon, 150 F.3d at 1029; In re Gen. Motors Corp., 55 F.3d at 821.  "[T]o calculate the 'lodestar' amount, [the court] multipl[ies] the number of hours reasonably expended by the attorney(s) on the litigation by a reasonable hourly rate, raising or lowering the lodestar according to the factors identified by this circuit." Gerwen v. Guarantee Mutual Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000).

The Supreme Court has articulated eleven factors relevant in calculating the lodestar figure: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) time limitations; (7) the amount involved and the results obtained; (8) the experience, reputation and ability of the attorneys; (9) the undesirability of the case; (10) the nature and length of the professional relationship with the client; and (11) awards in similar cases.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  For the hourly rate, the Ninth Circuit instructs district courts to use "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation."  Chalmers v. Los Angeles, 796 F.2d 1205, 1211 (9th Cir. 1985).

### 3.    Incentive Awards

Incentive awards for class representatives are "fairly typical in class action cases." Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958 (9th Cir. 2009).  Incentive awards, which are also known as service awards, are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  Id. at 958–59.  "Incentive payments to class representatives do not, by themselves, create an impermissible conflict between

class members and their representatives." In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 943 (9th Cir. 2015).  However, the settlement agreement may not "condition[] the incentive awards on the class representatives' support for the settlement."  Radcliffe v. Experian Info. Sols. Inc., 715 F.3d 1157, 1164 (9th Cir. 2013).  Nor may the class counsel and the representatives enter into an ex ante agreement to compensate the representatives.  Rodriguez, 563 F.3d at 958–60.

Finally, the discrepancy between the incentive awards and the amount received by a typical class member must not be so great that it compromises the adequacy of class representation.  Radcliffe, 715 F.3d at 1164; Staton, 327 F.3d at 977.  Incentive awards of $5,000 or less are usually considered presumptively reasonable in this district.  See, e.g., In re LinkedIn User Privacy Litig., 309 F.R.D. 573, 592, (N.D. Cal. 2015) ("In this district, a $5,000 incentive award is presumptively reasonable."); see also In re Online DVD Rental Antitrust Litig., 779 F.3d at 942–43 (approving $5,000 incentive awards for named plaintiffs even though class members received $12).

**B.     Analysis**

**1.     Final Settlement Approval**

Applying the Hanlon factors—which are further discussed in plaintiffs' proposed order, see Dkt. 244-2—the court concludes that the proposed settlement is fair, reasonable, adequate, and in the best interests of the class.  The settlement offers immediate, tangible benefits directed to the three uses of URLs challenged by plaintiffs, without requiring class members to release any claims for monetary damages that they may have against Facebook.  In contrast, proceeding with litigation would be very risky for the class.  This case settled a few days prior to the close of discovery, which was extensive, allowing both sides to negotiate the settlement on a fully-informed basis.  Class counsel is highly experienced and supports the settlement.  Procedurally, the settlement is non-collusive and the result of four in-person, arms'-length mediations before two different mediators.  Tellingly, only a single class member has objected to the settlement.

It is true, as Objector points out, that much of the relief obtained for the class was the result of Facebook's changes in business practice in response to the litigation, rather than a result of the Settlement Agreement per se. However, the settlement still provides substantial benefits to the class, who give up almost nothing in return. Through the work of class counsel, the class has obtained essentially all of declaratory and injunctive relief that they sought. Facebook has confirmed that the three challenged practices have ceased, and there is no ECPA or CIPA violation going forward in light of the disclosure changes adopted by Facebook. While class members do not obtain any monetary relief, that is the natural result of this court's orders, which certified an injunctive-relief-only Rule 23(b)(2) class, and refused to certify a Rule 23(b)(3) damages class.

In the Settlement Agreement, Facebook represents that the complained-of practices ended in 2012 and 2014. In 2015, Facebook's Data Policy was changed to obtain explicit consent to Facebook's collection of data in messages. As the court stated in preliminary approving the settlement, "There are no damages at issue. You all have arrived at a mutually agreeable position with respect to the challenged uses . . . . I think that's reasonable. I mean, that's what [plaintiffs] were seeking in the case." Dkt. 236, April 19 Hearing Tr. at 4:7–11 (emphasis added). The additional disclosure on the Help Center website provides further relief to the class, explaining Facebook's policy regarding its use of data in messages in plain English, on a webpage accessed by hundreds of thousands of Facebook users per year.

Objector asserts that the class would get "no value" from the settlement. The court disagrees. Objector completely discounts the Help Center disclosure, as well as the value of the declaratory relief and the Data Policy change, which were the result of the litigation and are clearly acknowledged in the Settlement Agreement. Moreover, the relief to the class must be viewed against the likely rewards of litigation. Hanlon, 150 F.3d at 1026. Here, any possible benefit to the class from continued litigation is both uncertain and insubstantial. In light of the Data Policy change and Facebook's representation of "cessation" of practices, it is not clear what further benefit the class

could obtain if the case proceeded.  The class would receive nothing if the case continued and Facebook prevailed on summary judgment.

Objector's real concern relates less to the terms of the settlement in itself, and more to the proportionality between the benefits for the class and the attorneys' fees sought.  Although plaintiffs seek approval of their attorneys' fees separately from approval of the settlement, the Ninth Circuit has held that courts should be "particularly vigilant" for potential collusion when "counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded."  See In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011) ("Bluetooth").  Because the benefits to the class here are declaratory and injunctive in nature, it is difficult to put a dollar figure on their value and compare them to the attorneys' fees sought.  Nonetheless, as explained above, the privacy interests of the class vindicated by the settlement and through this litigation are substantial, and the court rejects Objector's characterization of them as having "no value."

In any event, even assuming arguendo that attorneys' fees are "disproportionate," that is merely one of the three "warning signs" of collusion identified in Bluetooth.  The other two "warning signs"—a "clear sailing" arrangement, and the "reversion" of attorneys' fees, see id. at 947—concern the relationship between the "class fund" and the attorneys' fees.  These considerations are inapplicable to this case because there is no common fund, "constructive" or otherwise:  the certified class is injunctive-relief-only, and monetary damages claims are not at issue.  Arguably, Bluetooth is not even applicable to this settlement because it does not involve a Rule 23(b)(2) damages class.  Regardless, Bluetooth only requires that the court carefully scrutinize the settlement for collusion. Having done so, the court finds that there is no evidence of collusion here.  The case was extremely hard-fought, and settled at an advanced procedural stage, after multiple mediations.  Any disparity between the attorneys' fees award and the relief to the class is not the result of collusion, but merely a function of this court's decision to certify only an injunctive relief class, combined with the fee-shifting provisions of ECPA.  Moreover, the

9

1    significant lodestar discount accepted by class counsel (discussed below) mitigates any

2    disproportionality.

3        The other authorities relied on by Objector are all clearly distinguishable. Koby v.

4    ARS National Services, Inc., 846 F.3d 1071 (9th Cir. 2017), involved a pre-certification

5    settlement of Fair Debt Collection Practices Act ("FDCPA") claims. The suit was based

6    on defendant ARS's failure to disclose on its voicemail messages that it was a debt

7    collector. Id. at 1074. Shortly after suit was filed, ARS "voluntarily adopted a new,

8    standardized voicemail message" that complied with FDCPA. Id. In the proposed

9    settlement, ARS agreed to continue using the new voicemail message, pay the named

10   plaintiffs $1000, class counsel $67,500, and $35,000 in cy pres for the class. Id. at

11   1074–75. The Ninth Circuit reversed settlement approval because the class received

12   "worthless" injunctive relief in exchange for "g[iving] up their right to assert damages

13   claims against the defendant in any other class action." Id. at 1073.

14       Koby is distinguishable for two related reasons. First, as discussed above, the

15   settlement here provides substantial value to the class. Second, and critically, the class

16   is not giving up anything of real value in exchange for the settlement. Unlike the

17   settlement in Koby, the class members here (other than the named representatives) do

18   not waive any claims for damages. Indeed, monetary damages are no longer at issue in

19   the case because of the court's class certification ruling. Thus, even if the court agreed

20   with Objector that that the "settlement's injunctive relief is of no real value" to the class—

21   which it does not—this case would still be unlike Koby because the class is not "required

22   to give up anything [of value] in return." Id. at 1080.

23       Objector further relies on In re Dry Max Pampers Litigation, 724 F.3d 713 (6th Cir.

24   2013) ("Pampers"). Like Koby, the Pampers settlement was reached prior to class

25   certification and very early on in the case; indeed, the Pampers plaintiffs settled "before

26   any formal discovery." Id. at 716. The settlement in Pampers resolved putative class

27   claims for a diaper that allegedly caused severe diaper rash. Under the settlement, the

28   named plaintiffs received $1000 per "affected child" and class counsel received $2.73

million in attorneys' fees. The class, however, received "nearly worthless injunctive relief": specifically, a resumption of a refund program (which defendants had already made available), a "rudimentary disclosure" about diaper rash on Pampers' website, a minor labeling change, and a cy pres contribution. Id. at 716. Although the unnamed class members did not waive their damages claims, the court found that "illusory" injunctive relief could not support nearly $3 million in fees. Id. at 721.

Pampers is an out-of-circuit decision and merely persuasive authority. However, even if Pampers were binding on this court, it is readily distinguishable for several reasons. First, this case is at a much more advanced procedural stage, having settled near the close of discovery following extensive motions practice, including motions to dismiss, a motion for class certification, and multiple discovery disputes. Second, damages claims were possible in Pampers, even if they were not released in the settlement. However, the damages claims in Pampers were negotiated away by plaintiffs' counsel such that the class members received no monetary reward. Here, there is no analogous potential for collusion; any possibility of monetary damages for the class was foreclosed by this court's orders. Third, unlike Pampers, the attorneys' fees here are sought on a lodestar basis based upon actual work performed by class counsel over more than three years of highly contentious litigation. In contrast, the $2.73 million fee sought in Pampers was unreasonable in part because counsel "did not take a single deposition, serve a single request for written discovery, or even file a response to [defendant's] motion to dismiss." Id. at 718.

Objector also cites to In re Walgreen Co. Stockholder Litigation, 832 F.3d 718 (7th Cir. 2016) ("Walgreens"), another out-of-circuit decision. As an initial matter, Walgreens involves a highly distinct factual context because the putative class action in that case was a "strike suit" filed to tie up a proposed transaction for "the sole purpose of obtaining fees for the plaintiffs' counsel." Id. at 721. Furthermore, the case is distinguishable for many of the same reasons discussed above with respect to Koby and Pampers. Unlike this case, the Walgreens settlement was reached at a very early stage in the litigation (a

11

mere "18 days" after the suit was filed), and the disclosure-only settlement was entirely "worthless" to the class. See id. at 721–24. Objector primarily relies on Walgreens for the proposition that a settlement with "zero" benefit for the class can never be fair. However, as the court has explained, the settlement here provides value to the class.

Finally, Objector raises concerns about the settlement's notice plan. The court already addressed the Rule 23 notice requirements at length at the hearing for preliminary settlement approval. Although the court rejected the proposition that notice is purely discretionary for a Rule 23(b)(2) class, it need only be "reasonable" under Rule 23(e) and 23(h). The court found that the various forms of notice given—including the extensive publicity that the case received, posting of the settlement documents on class counsel's websites, CAFA notice, et al.—were reasonable under the circumstances. Individual direct notice would carry substantial costs in light of ascertainability issues, and, importantly, the court was persuaded that such notice would create serious risks of confusion for the class members. Objector's reliance on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), to assert a Due Process violation is misplaced. Mullane is readily distinguishable because that case involved actual property rights— money in a trust. Id. at 308–09. Here, less process is due because the only thing at stake for the absent class members is their right to sue for an injunction against practices that have already ceased. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976); see also Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 363 (2011).

For all these reasons, the court GRANTS final approval of the settlement.

## 2.      The Reasonableness of the Requested Attorneys' Fees

For the reasons stated on the record at the recording, and in plaintiffs' proposed order, see Dkt. 244-1, the court GRANTS approval of the $3.89 million in attorneys' fees and costs sought by plaintiffs. Although the court usually requires more detailed billing records to support a lodestar application, any concern on this front is mooted by plaintiffs' agreement to accept a very significant lodestar discount. The fees sought by plaintiffs are less than half of their actual lodestar, yielding a "negative multiplier" of 0.497.

To be sure, $3.89 million is still a significant fees award. However, the court finds that class counsel achieved an excellent result for the class and fully earned their fee. This was a very hard-fought case, with heavy motions practice and intensive discovery in a highly technical context. Moreover, the case was taken on contingency, and success was uncertain in light of novel legal issues.

### 3. The Incentive Awards

Finally, the court approves the $5,000 incentive awards for the two named class representatives, Matthew Campbell and Michael Hurley. The amount sought is presumptively reasonable in this district. See In re LinkedIn User Privacy Litig., 309 F.R.D. at 592. "Incentive payments to class representatives do not, by themselves, create an impermissible conflict between class members and their representatives." In re Online DVD-Rental Antitrust Litig., 779 F.3d at 943.

Although these monetary awards are more valuable than the declaratory and injunctive relief received by the unnamed class members, the court finds that this difference does not compromise the adequacy of class representation because: (1) unlike the class, the named representatives are waiving their claims for damages; (2) the awards are not conditioned upon support for the settlement; (3) both named plaintiffs sat for daylong depositions; and (4) both named plaintiffs actively participated in the litigation, including the production of their private Facebook messages in discovery. See Dkt. 239 at 27–33 (supporting declarations of Campbell and Hurley).

### CONCLUSION

For the foregoing reasons, plaintiffs' motions for final settlement approval, an award of attorneys' fees, and incentive awards are GRANTED. St John's objections are OVERRULED.

**IT IS SO ORDERED.**

Dated: August 18, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge