Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Phyllis J. Hamilton, Chief Judge

MATTHEW CAMPBELL and MICHAEL          )
HURLEY,                               )
                                      )
          Plaintiffs,                 )
                                      )   **No. CV 13-5996 PJH (SK)**
     vs.                              )
                                      )
FACEBOOK, INC.,                       )
                                      )   Motion Hearing
          Defendant.                  )
_____)

                              Oakland, California
                              Wednesday, August 9, 2017
                              9:01 a.m.

                    <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:          LIEFF CABRASER HEIMANN BERNSTEIN, LLP
                         275 Battery Street, 29th Floor
                         San Francisco, California 94111
                    BY:  **DAVID TAYLOR RUDOLPH, ATTORNEY AT LAW**
                         **MELISSA ANN GARDNER, ATTORNEY AT LAW**

                         CARNEY BATES & PULLIAM, PLLC
                         519 West 7th Street
                         Little Rock, Arkansas 72201
                    BY:  **JOSEPH HENRY BATES, III**
                         **ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Sarah Goekler, CSR No. 13446, RMR, CRR, CCRR
              Official Reporter

     *Proceedings recorded by mechanical stenography; transcript*
              *produced by computer-aided transcription*

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:              GIBSON DUNN & CRUTCHER LLP
                                 333 South Grand Avenue
 3                               Los Angeles, California 90071
                          BY:   CHRISTOPHER CHORBA, ATTORNEY AT LAW
 4

 5                               GIBSON DUNN & CRUTCHER LLP
                                 1881 Page Mill Road
 6                               Palo Alto, California 94304
                          BY:   JEANA MARIE BISNAR MAUTE
 7                              ATTORNEY AT LAW

 8
                                 GIBSON DUNN & CRUTCHER LLP
 9                               3161 Michelson Drive, Suite 1200
                                 Irvine, California 92612
10                        BY:   JOSHUA AARON JESSEN, ATTORNEY AT LAW

11

12   For Objector:              COMPETITIVE ENTERPRISE INSTITUTE
                                 1310 L Street NW, No. 7
13                               Washington, DC 20005
                          BY:   WILLIAM ISAAC CHAMBERLAIN
14                              ATTORNEY AT LAW

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Wednesday, August 9, 2017**                    **9:01 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling civil case 13-05996, Campbell, |
| 5 | et al. vs. Facebook, Inc. |
| 6 | Counsel, please step forward and state your appearances. |
| 7 | **THE COURT:**  Does someone wish to speak? |
| 8 | **MR. BATES:**  Good morning. |
| 9 | **THE COURT:**  Good morning. |
| 10 | **MR. BATES:**  Hank Bates on behalf of the plaintiffs |
| 11 | and the class. |
| 12 | **THE COURT:**  Good morning. |
| 13 | **MR. RUDOLPH:**  David Rudolph on behalf of plaintiffs |
| 14 | and the class. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MS. GARDNER:**  Melissa Gardner on behalf of the |
| 17 | plaintiffs and the class. |
| 18 | **THE COURT:**  Good morning. |
| 19 | **MR. CHORBA:**  Good morning, Your Honor.  Chris Chorba. |
| 20 | And with me is Josh Jessen and Jeana Maute, on behalf of |
| 21 | Defendant Facebook. |
| 22 | **THE COURT:**  Good morning. |
| 23 | **MR. CHAMBERLAIN:**  William Chamberlain on behalf of |
| 24 | objector Anna St. John. |
| 25 | **THE COURT:**  Good morning. |

1    All right.  Now, this matter is on for hearing on the

2  motion for final approval of the class action settlement in the

3  case.  I've reviewed the papers.

4    Did you wish to be heard, Mr. Bates?

5        **MR. BATES:**  Briefly.  Of course, I'll answer any

6  questions you may have.

7    But quick update, which I think are clear from the papers,

8  but since the preliminary approval hearing, the notice plan

9  required by the Court was implemented.  The attorney generals

10  and the appropriate entities for each of the permanently -- for

11  the territories were notified.

12    We received, as the Court knows, no formal appearance by

13  any of the attorney generals, nor did counsel for Facebook

14  receive any informal questions or concerns, which sometimes

15  occur.

16    And, of course, we're here for final approval now, and I

17  can provide sort of a soft overview.  We briefed it all.  Or I

18  can answer any questions that you may have, whatever your

19  preference may be.

20        **THE COURT:**  I don't have any questions.

21    All right.  Did you wish to be heard?

22        **MR. CHORBA:**  Chris Chorba, Your Honor.

23        **THE COURT:**  Mr. Chorba.

24        **MR. CHORBA:**  Thank you.

25    No.  Unless the Court has questions, I mean, I think we've

1  addressed it exhaustively in the papers.  We've addressed

2  Ms. St. John's objections and reserve any responses to any

3  argument that Mr. Chamberlain is going to present.

4  **THE COURT:**  Sure.

5  All right.  I've spent a lot of time with the parties in

6  the case over the life of this litigation --

7  **MR. CHAMBERLAIN:**  Understood.

8  **THE COURT:**  -- I have no questions of them.

9  I have reviewed the objection that was submitted on behalf

10  of your client.

11  **MR. CHAMBERLAIN:**  Yes, Your Honor.

12  **THE COURT:**  And I'd like to give you an opportunity

13  if you wish to be heard.

14  **MR. CHAMBERLAIN:**  Absolutely, Your Honor.

15  At the outset, I'd like to address the standing question

16  on page 2 of defendant's brief, a question whether my client

17  had standing based on the fact that she didn't submit

18  screenshots of the Facebook messages that she received, with

19  the original objection.

20  **THE COURT:**  I did receive the supplemental

21  declaration, which takes care of that.

22  **MR. CHAMBERLAIN:**  Yeah.  Okay.  Excellent.

23  Well, so the core of our objection is that under *Koby v.*

24  *ARS National Services*, the parties bear the burden of showing

25  that the injunctive relief in the settlement has value to the

1    class and they've simply failed to meet that burden.

2         Most of the purported relief is simply acknowledgments of

3    things that Facebook has already done, not even injunctions

4    preventing them from doing them in the future, but simply

5    acknowledges that these things were changed in the past.  Under

6    *Koby*, even an injunction of past behavior wouldn't count as a

7    settlement benefit, let alone nearly an acknowledgment that

8    change behavior has happened.

9         So the only actual changed behavior that is happening is

10   the addition of this 22 words to one page of Facebook help

11   center.  And the parties bear the burden of showing that has a

12   benefit to the class in order to get any fees, period.  It's

13   not merely what hours are reasonably expended but whether or

14   not those hours actually achieved a class benefit.

15        And they don't have an expert report saying that these

16   22 words will lead to any changes in behavior.  The only

17   evidence they provided is that, I think, something like 370,000

18   page views happened at the site where these words will soon

19   appear.  But that's not enough.  There needs to be an

20   explanation of why that actually will lead to a benefit.

21             **THE COURT:**  Is your client's objection to the

22   settlement as well as to an award of attorneys' fees?

23             **MR. CHAMBERLAIN:**  Yes.  Yes, Your Honor.  Right.

24             **THE COURT:**  And if the Court were to deny the

25   parties' request to settle the case, what would be the next

1    step, in your view?

2        **MR. CHAMBERLAIN:**  So our belief is that the parties

3    either need to be able to come up with a settlement that

4    actually provides a benefit to the class under Ninth Circuit

5    law or that it has to be dismissed.

6        The parties have contended that, "This is as good as we

7    can do," or at least one of the parties has contended that

8    there is no more that could have been achieved except for

9    disclosure injunction.  The reason being it's an injunctive

10   relief class action when all the objected to behaviors have

11   been changed.  So it's not clear that you could get meaningful

12   relief.

13       Judge -- I think it's Judge Posner in the *Walgreens* case

14   that we cite talked about that when there's no meaningful

15   relief that can be extracted the proper avenue is simply to

16   dismiss the case.  And in that case he was confronting strike

17   suits, which is actually very similar to this litigation, how

18   it's resolved itself.  Strike suits where somebody, like, filed

19   suit to stop a merger and extracts merely extra disclosures

20   into the settlement.  That's very similar to this.

21       And Judge Posner says these disclosures are meaningless;

22   they're not available to the class.  We can't approve fees as a

23   result.  And the proper avenue, if this is all that can be

24   done, is to dismiss the case because, ultimately, I mean,

25   plaintiffs need to be achieving results for the class and

1  should be pursuing meritful litigation that can improve the

2  world.

3      And if they're only extracting disclosures that didn't

4  change anybody's behavior, that no one reads, that's not a

5  settlement benefit.  The reason plaintiffs' counsel get

6  lodestar multipliers when they win is because sometimes they

7  lose.  And in this case, it's not clear to me what benefit they

8  have achieved.

9      **THE COURT:**  I've never heard anyone quite articulate

10  that plaintiff counsel's responsibility is to pursue litigation

11  to improve the world.  That seems quite lofty.

12      Are you suggesting that the litigation didn't have any

13  impact whatsoever on Facebook's willingness to change the

14  behaviors that were at issue?

15      **MR. CHAMBERLAIN:**  Not necessarily.  But that's not

16  the judgment you need to make when you're --

17      **THE COURT:**  I'm asking you a question.

18      Are you suggesting that there was no causal connection

19  between the litigation and the change in some of Facebook's

20  practices?

21      **MR. CHAMBERLAIN:**  Your Honor, I wasn't suggesting

22  that.  And I -- I don't want to take a stance on that question

23  either way.  I just simply haven't thought about whether the

24  prior litigation led to prior catalyst in behavior.

25      From the perspective of settling a case, the question is,

1  what does the benefit of the settlement achieve.  And, I mean,

2  that's what happened in *Koby*.  A lot of plaintiffs made a

3  similar claim in the *Koby* case where they talked about how --

4  well, the litigation led to essentially a catalyst change in

5  the defendant's behavior, and the plaintiff should be credited

6  for that.

7      But the Court in *Koby* rejected that argument, saying the

8  question is the settlement benefit that changes prior to the

9  settlement ultimately can't be -- serve as the basis for

10  awarding fees.

11          **THE COURT:**  And so your view is that I should follow

12  the *Koby* decision, which is, what, a Seventh Circuit --

13          **MR. CHAMBERLAIN:**  *Koby* is a Ninth Circuit decision,

14  Your Honor.

15          **THE COURT:**  A Ninth Circuit decision.

16      And that -- do you see any distinguishing facts between

17  this case and *Koby*?

18          **MR. CHAMBERLAIN:**  Yes, Your Honor.  There are

19  distinguishing facts.  There are (b)(3) claims released in

20  *Koby*, whereas there's only (b)(2) claims released here.

21      So the -- that is less distressing in that respect.

22  Right.  The idea of releasing monetary claims in exchange for

23  nothing but injunctive -- redundant injunctive relief is

24  particularly upsetting because that means that, you know,

25  there's such a give-up of --

1      **THE COURT:**  Weren't monetary relief claims negotiated

2  and released in *Koby*?

3      **MR. CHAMBERLAIN:**  Yes, Your Honor.

4      **THE COURT:**  And they're not being released in this

5  case?

6      **MR. CHAMBERLAIN:**  Yes, Your Honor.

7      **THE COURT:**  You don't think it's a significant

8  factor?

9      **MR. CHAMBERLAIN:**  I think it's a distinction.  But I

10  think, ultimately, the decision -- it doesn't change the fact

11  that there still needs to be a demonstrated benefit to the

12  release, even if ultimately what the class is being asked to

13  give up is far less important.  They're only being asked to

14  give up these injunctive claims.  There still needs to be

15  consideration for that exchange.

16      And so if the parties can't show a benefit to the

17  injunctive relief, you know, the -- on one side what the class

18  is giving up might be far less, but what they're gaining is

19  still not greater than zero.  So that's why the logic in *Koby*

20  still applies.

21      **THE COURT:**  Okay.  All right.  Anything else?

22      **MR. CHAMBERLAIN:**  Yes.

23      I think there's other arguments that we want to -- we

24  noticed sort of later on.  Another reason that the injunctive

25  relief, the 22 words doesn't have value, is that it's

duplicative of language in the existing data policy.

In the Justin [sic] declaration, Docket 245-3, it provides a description of the data policy and that's the first -- the change in that policy that happened in 2015, that disclosure is -- essentially includes the information that is being disclosed in these 22 words in the settlement.

So also in the *Walgreens* case Judge Posner talked about how duplicative disclosures don't add value to the class.  In this case in particular, that makes sense because the data policy -- it makes sense that someone viewing a data policy would be interested to know what is happening with data.

But placing it where the parties have placed -- are planning to place this information, in a discussion of messaging that is, you know, separate and apart from this, doesn't particularly add value.

And, finally, the parties submitted that -- the only evidence that I saw that was put forward that there was a benefit is, again, the fact that 370,000 people viewed the relevant help page in the last six months.  So the argument being that something a little less than 800,000 will ultimately view these 22 words as a result of the settlement.

But, you know, under *Bluetooth*, you actually have to estimate the value of injunctive relief.  You don't have to get a precise value; it's not like a common fund where you obviously have a dollar figure that you can be confident is

1    exactly what the settlement is worth.

2        But *Bluetooth* and *Redman* and *Pampers* all talk about the

3    need to make a rough estimate of the value, and in this case

4    you can.  They've told you how many eyeballs will see these 22

5    words.  And the problem is that the value of eyeballs seeing

6    words on the open market is extremely low.  Right.  It's

7    something like $5 for a thousand impressions.

8        So, ultimately, if you, you know, asked the parties to

9    demonstrate what is 700,000 or 800,000 page views worth, you

10   can come to an estimate of what the actual benefit to the class

11   is and realize, even under *Bluetooth*, you have to figure out a

12   way to show that the attorneys' fees aren't disproportionate to

13   the class release.

14       THE COURT:  And value to the class is measured solely

15   by its monetary value?

16       MR. CHAMBERLAIN:  Not always, Your Honor.  Obviously,

17   in civil rights cases, there are, you know, extraneous factors.

18       THE COURT:  What about a case involving injunctive

19   relief only?

20       MR. CHAMBERLAIN:  In a case involving injunctive

21   relief only, that's -- that still applies, Your Honor.

22       *Pampers* is actually a good example of that, where the

23   Court -- I think the only place (b) claims being waived were

24   (b)(2) claims.  But the Court still looked at the injunctive

25   relief and said has to be proportionate, and that's also --

1   *Redman* talks about that; there's a fundamental principle of

2   settlement fairness that the relief -- the attorneys' fees

3   relief be proportionate to the class.  That applies to (b)(2)

4   and (b)(3) cases.

5           THE COURT:  We're not talking about attorneys' fees

6   at this point --

7           MR. CHAMBERLAIN:  Right.

8           THE COURT:  -- we're talking about whether or not I

9   should approve the settlement.  There are two separate issues.

10          MR. CHAMBERLAIN:  You're right, Your Honor.  Yes.

11      Even though that's true, under -- in a (b)(2) -- a

12  settlement isn't fair if there's a wild disproportion between

13  the class' relief and what the attorneys are getting.

14      And if that's the case, especially given --

15          THE COURT:  But isn't that always going to be the

16  case in which only injunctive relief is available to the class?

17          MR. CHAMBERLAIN:  No, Your Honor.  I think -- I

18  believe it's *Hanlon* that's the case that has to do with an

19  injunction that required the reinstitution of a refund program.

20  There are injunctions that are truly very valuable to the

21  class.

22      Another similar case in this court -- not necessarily in

23  front of you but in the Northern District is the *In re Yahoo

24  Mail* case where there was a meaningful injunction that forced

25  Yahoo! to put in place new software to change how it behaved.

1    And that's a real injunction that could have real value to a

2    class of 100 million people.  Right.

3        Changing the way Yahoo! software works would have

4    meaningful value to the class, and you could meaningfully put

5    an estimate on it that made the attorneys' fee award

6    proportional in respect.  But, compared here, this is 22 words

7    on one web page.  That's much less valuable, Your Honor.

8            **THE COURT:**  Okay.  All right.  So your argument

9    essentially boils down to the settlement has no value, and so

10   therefore the case should be dismissed?

11           **MR. CHAMBERLAIN:**  That is the core argument, yes,

12   Your Honor.  There are supplemental arguments underneath that,

13   that, even if you conclude that there's some value, you

14   ultimately have to estimate it.  And that under any reasonable

15   estimation of the value, it's -- it would be wildly

16   disproportionate.

17           **THE COURT:**  Okay.  All right.  Anything else?

18           **MR. CHAMBERLAIN:**  That's all I have for the moment,

19   Your Honor.  Thank you.

20           **THE COURT:**  Well, you only get one chance.  So if you

21   have other things you're saving, now is the time to argue that.

22   You don't get the last word today.

23           **MR. CHAMBERLAIN:**  Yes.  Understood, Your Honor.

24       That's all I have.  Yes.

25           **THE COURT:**  All right.  We'll start first with

1 plaintiffs' counsel.

2     Did you wish to respond to some of the objector's

3 arguments?

4         **MR. BATES:**  We addressed all this in the briefing.

5 If there's any specific point you want us to address, I'd

6 certainly like to start with that.

7         **THE COURT:**  Address the last point.

8     What's the value of this -- what's the value here of this

9 settlement?  Why shouldn't I just dismiss the case?

10         **MR. BATES:**  I think there's -- I would strongly

11 disagree with Ms. St. John that it's more beneficial to the

12 class to dismiss the case.  I can clearly state that.

13     There's a disconnect between our view as class counsel and

14 the importance of these underlying privacy issues and I think

15 Ms. St. John's perspective on these.

16     Her primary concern seems to be this is not a monetary

17 compensation case.  And, as this Court knows, it is not one

18 because those issues were not certified for class treatment.

19 They are not part of the settlement, and, equally importantly,

20 they're not part of the release.

21     But simply because a case isn't about money does not mean

22 it is not important.  I've been doing class action work and

23 injunctive relief work in the privacy area, in the employment

24 discrimination, and school discrimination and pollution areas

25 for years and years.  And many of my cases for the first ten

1   years of my career were never about money; they were always

2   about injunctive relief.  And it's critically important.

3       And why is this case important?  To the extent -- if you

4   go back to our arguments on the monetary relief sides back when

5   we were before you on class certification, whatever -- the

6   monetary relief flows from the privacy interest.  The privacy

7   interest is actually what is at the core of this case.

8       And the reason it's at the core of the case is privacy

9   interest has always been fundamental in the United States.

10  It's been closely tied to personal autonomy, with democracy,

11  with liberty.  And we've always had strong privacy laws in this

12  country.

13      And we're in a very important sort of paradigm shift

14  transition now with movement into a digital world.  And it's

15  moving very, very fast.  The technological changes are moving

16  faster than they ever have in human existence, and law is

17  moving slow and deliberately, as law does.

18      So it's very important in these contexts for these cases

19  to bring privacy laws into this new, very complex, factual and

20  technical context and keep them alive.  And this case is a huge

21  part of that.

22      It was important in terms of simply the legal issues

23  themselves and demarcating the lines in the sand and helping

24  understand how the law applies.  Many of the rulings that this

25  Court made were on novel issues with very little precedent,

1    I'll point out; they're prior to that.

2         And then in terms of what we accomplished, we accomplished

3    the goals of the case, which are twofold in an ECPA and a CIPA

4    context because it's a -- there's two prongs to both statutes;

5    don't do something unless you disclose.

6         So we want cessation of certain practices and we want more

7    transparency and better disclosures.  And over the course of

8    the litigation, we got cessations of practices, culminating

9    with the settlement agreement, and we got changes in the

10   disclosures and even more transparency through the settlement

11   agreement with very specific descriptions of the practices.

12        And additional disclosures related to the continuing

13   practice of continuing to monitor and account for the URLs in

14   terms of internally.

15        So the settlement is clearly fair, adequate, and

16   reasonable.  It accomplishes the goals of the settlement -- of

17   the case.  We're very proud of this settlement.  And this idea

18   because it is not about money, it somehow undercuts it, we

19   strongly disagree with.

20            THE COURT:  Well, even though it's not about money,

21   Counsel also suggested you have to be able to put a value on

22   the actual conduct engaged in by Facebook.  The cessation of

23   practices, the objector doesn't believe that that amounted to

24   much of anything.

25            MR. BATES:  Well, in the papers the objector put it

1  at zero because -- a lot of that bleeds over into the challenge

2  to the attorneys' fees, and so -- two -- three points on that.

3      If the objector doesn't put zero on it, given the size of

4  the class, it very quickly -- just one-quarter starts climbing

5  very quickly.  So they have no choice but to put zero on it.

6      But, more importantly, it's -- there's just no case law

7  that says in an injunctive relief settlement, that one has to

8  put a monetary value on it.  If you're in -- whether it's

9  privacy, whether it's cleaning up pollution, whether it's

10  school desegregation or employment discrimination, the focus is

11  on the rights you're trying to protect and whether you're

12  accomplishing the goals of the case.

13      There are instances where -- it's particularly on the fee

14  side, where if attorneys approach a fee proposal from a

15  lodestar and say they got X or 10 million for the class but

16  also want to say, we got these other benefits and we're going

17  to put a value on that at 10 million, and therefore, under the

18  Ninth Circuit benchmark, we want 25 or 20 million.

19      In those instances, there is a strong requirement that if

20  you're going to point to the injunctive relief as -- as having

21  a monetary component for the purposes of a lodestar percentage,

22  then obviously it is very important to back that up with either

23  an expert report or some sort of quantification.

24      So in a nutshell, when you're looking in terms of whether

25  a settlement is fair, adequate and reasonable and an injunctive

relief component with no monetary aspects to the case or to the

release, there -- it would be a side show to try to put

monetary components on the result.

    And also it may not even be -- I'm involved in a -- just

thinking about this.  I'm involved in a sewer case, a pollution

case against an entity.  We're in the 17th year of the consent

decree.  They've spent hundreds of millions of dollars now in

terms of slowly bringing their sewer system infrastructure up

to be compliant.

    Long ago, when I asked for a fee, I did it on -- it was an

injunctive relief case.  I didn't say give me X percent of

$200 million.  I approached that then on a lodestar basis as

opposed to a percentage of the case.

    And even then, in terms of presenting it to the case, the

focus wasn't on how much it's going to cost; the focus was on,

let's get the result and let's make it better.  And the cost

was actually not part of the settlement.  It was goals.  It

just has turned out that over this long period, it's cost that

much money.

        **THE COURT:**  Okay.

        **MR. CHORBA:**  May I address that point?

        **THE COURT:**  Sure.

        **MR. CHORBA:**  Thank you, Your Honor.

    I think Your Honor earlier made a comment that I just want

to come back to.  We're not yet at the point of evaluating

attorneys' fees, that under the settlement agreement and under
existing Ninth Circuit law, that analysis is distinct from
whether the underlying settlement is fair, reasonable, and
adequate.

And what we have here in the objection is a complete
disregard for the factors that are laid out in the *Hanlon* case
and the *Churchill Village* case, which lay out the factors, the
nonexhaustive list, and not every factor would apply in each
case.  Under binding Ninth Circuit precedent, those are the
factors the Court must consider in determining whether a class
settlement is fair, reasonable, and adequate.

And there's really been no argument here whatsoever that
the underlying class benefits or the whole settlement is
somehow not fair, reasonable and adequate.

Instead, what we have is what *Hanlon* explicitly rejected,
is this argument that the settlement could have been better.
Without any specific suggestion as to what -- how much better
it could have been.  And all the arguments that we've heard
deal with this issue of examining counsels' lodestar against
what Counsel suggests is the value of the settlement.

So I would say we're putting the cart before the horse
even getting into this and talking about evaluation of the
underlying injunctive relief.  It's wholly unnecessary and
Counsel has cited no authority that that is a necessary
component under Ninth Circuit law, not Seventh Circuit law, not

Sixth Circuit law, for evaluating the underlying fairness of a class settlement.

Instead, what Ninth Circuit law holds and what *Bluetooth* actually held, as opposed to what Counsel's colleagues tried to get the Ninth Circuit to hold in that case, is that where you have a lodestar, the District Court must perform a check on that.  It can't just rubber stamp a request under the lodestar. And, in that specific case, the Court looked at a request for 800,000 in attorneys' fees, 50,000 in costs, and $100,000 in cy-près relief.

So another distinction with *Bluetooth*, you had a (b)(3) settlement; you have a comprehensive (b)(3), (b)(2) settlement. The Ninth Circuit looked at that.  It didn't say that was, per se, unreasonable.  Instead, what the Court said is there's no record upon which we can evaluate the reasonableness of a fee request of $800,000.  And there's no record that the District Court undertook that analysis.

So everything we're talking about, trying to value and place a monetary figure on this injunctive relief, we would submit occurs only when you get to the attorneys' fees.  And so that would be our primary response to the arguments that Mr. Chamberlain just made.

And he referenced, again -- I think Your Honor pointed out a lot of the cases that he's talking about dealt with (b)(3) releases, dealt with cases where there was monetary relief to

1    the class.

2         And, as this Court has noted on numerous occasions, you've

3    expressed your skepticism that there was any damage or harm to

4    the class.  You explained that very early in the case.  You

5    explained that in your class certification ruling and, as

6    recently as last April at the preliminary approval hearing, you

7    expressed your concern that many, if not most, class members

8    suffered no injury or damages in this case.

9         So the notion that there would be any monetary relief,

10   which really is the principal focus of their objection, is

11   there's $3.9 million being requested in attorneys' fees but no

12   dollars being provided to the class, is wholly in opposite to a

13   case like this.  Anyone out there who believes they may have a

14   claim to monetary relief is free to pursue it under this

15   settlement.

16        And that, we would submit, is a significant distinction

17   from most of the cases they cite.  Certainly, all of the

18   Ninth Circuit cases that they cite.

19        So relying on cases that had monetary relief to the class

20   or that had waivers of (b)(3) claims, monetary claims on behalf

21   of the class, simply do not apply to this case.

22        To the extent you're evaluating the fairness of this

23   settlement, just to approve the settlement before you get to

24   the attorneys' fees, the injunctive relief here achieves the

25   principal aims of this lawsuit, in sharp contrast to the *Yahoo!*

1   lawsuit that Mr. Chamberlain referenced.

2       There, Yahoo! was doing what it was accused of doing,

3   which was for non-Yahoo! users -- for Yahoo! users, there was

4   consent; Judge Koh found consent.  But for non-Yahoo! users --

5   so if you had an AOL account and you sent an email to me -- I

6   have a Yahoo! account -- your message, the terms in your

7   message may have been used to serve targeted advertising on

8   you.

9       And there was no dispute in that case that Yahoo! was

10  actually engaged in that practice.  So, of course, you had

11  software changes as a result of the settlement.

12      Here, very early on, Your Honor may recall, the initial

13  complaint in this case accused Facebook of mining the content

14  of Facebook messages -- it's a closed system, so you didn't

15  have external messages -- to use those to serve targeted

16  advertising.  Very early in the case, we met with plaintiffs'

17  counsel.  We had what I would describe as a very constructive

18  meeting where we explained to them, we walked them through,

19  that is not what happens here.

20      It didn't resolve the case, but this core notion, this

21  core argument that you had in the *Yahoo!* case is fundamentally

22  different.  So that's why, as Your Honor noted, I think in

23  April, the practices that they challenged weren't even really

24  occurring in this case in the first instance.

25      The other remaining factor that I would say, contrasting

virtually every other case that we've talked about other than

*Yahoo!*, is we have two statutes here that do not prohibit

interception of content of messages if the provider secures

consent.  It's extremely unique.

It would distinguish any labeling case, like the *Pampers*

case that Counsel referenced to, these environmental damage

cases, every single case.  And that's in 18 U.S.C Section

2511(2)(d) and Cal Penal Code Section 631(a), that you can

secure consent.

And it's our position that the data policy changes that

went into effect in January 2015, data policy that was not

before Your Honor at the motion to dismiss stage, explicitly

secures consent for these practices, in which we were not

engaged, but it secures consent for them.  So, therefore, going

forward and also from that period forward, to the extent we

were doing what we were accused of doing, we now secure consent

for them.  So it's a very different case.

Counsel has attacked the help center language.

Your Honor, that was an explicit reference in the very first

complaint in this case, that there was no discussion of this in

the help center.

And, while plaintiffs' counsel argued that the data policy

in effect at the time of the motion to dismiss was

insufficient, they also challenged Facebook because they said,

even if you bury it in this legal document, if you bury it

there, you need to have something in your help center which is
a plain English disclosure.

So there's this refrain about 22 words being meaningless.
We fundamentally reject that.  This is a very complicated case,
as Your Honor knows.  The class certification had extensive
briefing, involving source code.  We had technical experts
dueling on both sides.  Very credentialed experts fundamentally
disagreeing over what was occurring.  They couldn't even agree
on what was occurring.

So to have that disclosure, that plain English disclosure
in the help center, where you're dealing only with claims for
injunctive relief and only dealing with statutes that
explicitly provide consent, we believe that does have value.
From the very beginning, plaintiffs' counsel has said this case
is about transparency.  And that's what you have.

So, again, circling back, we reject the notion that
under -- we haven't heard any Ninth Circuit law where you have
to value that and assign a dollar value to it in a (b)(2) only
settlement in order to approve the settlement is fair,
reasonable and adequate.  That would only be as necessary to
conduct the cross-check against the lodestar.

So, respectfully, Your Honor, there has been no argument
here or in the papers as to why you should reject the
underlying settlement.  There's no evidence of collusion.  This
was a hard fought litigation from Day 1.  I think, as Mr. Bates

1   put it in his papers, it was often acrimonious.

2        There were four mediation sessions with two different

3   mediators.  There was extensive discussion and negotiation, not

4   only under the core terms that were provided in this

5   settlement.  It was about the language in the release.  And,

6   after we finalized all of that and only after we finalized the

7   relief to the class, there was another round of mediation and

8   extensive negotiation over the attorneys' fees.

9        So perhaps I can get to that when we turn to the

10  attorneys' fees.  But, just by way of preview, counsel

11  submitted detailed time records to us, and there was

12  negotiation where it's a 50 percent cut-off of their lodestar.

13       And so, again, I don't want to get ahead of myself, but

14  the suggestion seems to be here that, unless the parties come

15  forward and litigate the issue of fees, it's somehow per se

16  collusive, and that is not the law in the Ninth Circuit.  And

17  there's been no evidence or argument as to why any part of this

18  settlement should be invalidated.

19            **THE COURT:**  Okay.  Thank you.

20       All right.  Let's turn to the fees request.  You object to

21  that in addition to the settlement.

22       Was there any additional argument that you wish to make on

23  the fee request?

24            **MR. CHAMBERLAIN:**  No, Your Honor.  The arguments

25  about the fact that there is no settlement benefit.  Thus, no

1  fees are justified.  And the arguments about how the value

2  of -- you need to estimate the value, the value isn't here

3  because it's only 700,000 impressions --

4          **THE COURT:**  All right.

5          **MR. CHAMBERLAIN:**  That's sufficient.

6          **THE COURT:**  Okay.

7          **MR. CHAMBERLAIN:**  Not a novel argument.  The rest is

8  in the papers.

9          **THE COURT:**  All right.  Thank you.

10     Do you wish to elaborate or respond?

11         **MR. BATES:**  On the fee, just very briefly.  We

12  provided the declarations and the support for both the fee

13  request and the cost request, which we believe is consistent

14  with the Court's standing order, at the level of detail the

15  Court prefers.

16     If the Court would like any more detail, we would gladly

17  provide that.  I think the Court's --

18         **THE COURT:**  Generally, I do -- when I'm performing

19  just a lodestar evaluation, I do expect more detail than what

20  was provided.  But, when I don't get it, I usually shave off

21  10 percent or 20 percent.

22     You all have already agreed to a more than 50 percent

23  reduction on your fee, so I don't find that to be critical.

24         **MR. BATES:**  Okay.  And I would just echo what

25  Mr. Chorba said.  This was very hard fought, contentious

litigation that at times stressed the cordial relationship

between counsel.  There is no hint of collusion.  And, in the

Ninth Circuit, the lodestar is presumptively reasonable.

We, through running up against a very hard negotiator,

agreed to a 50 percent cut on our lodestar, so that any

concerns that Ms. St. John may have I think are already baked

in the cake with the 50 percent deduction.

**THE COURT:**  Okay.  All right.

Mr. Chorba, anybody else?

**MR. CHORBA:**  No, nothing to add.  I think I covered

in terms of the analysis the Court needs to -- I guess the only

other thing I would add, and Mr. Chamberlain didn't address

this, is there's some argument that there's a clear sailing

agreement.  We obviously dispute that here.

The specific agreement that Facebook made was to pay an

amount as determined by the Court.  The parties are trying to

comply with *Bluetooth* and specifically design it in a way

where, again, the negotiation over the class benefit is

resolved, then there's fee.

But I would also highlight that this isn't a case where

counsel just said, "Here's our lodestar.  This is what we're

seeking."  And then we just rolled over and said, "Okay, we'll

agree not to take a position."

I want to focus the Court on the record here, which

distinguishes this case quite a bit from all the other cases

1   they cite, all of them, when there was an intense negotiation

2   over the fee.  They didn't just volunteer to us, I assure you.

3   Mr. Bates just said hard negotiations.  It was hard

4   negotiations on that side as well.  They didn't come to us and

5   say, "We'll take 50 percent off of our lodestar."  That was the

6   product of negotiation.

7      In addition -- and the record reflects this -- the time

8   records that were provided to the Court were provided to

9   Facebook before there was any agreement.  So we went through

10   with them very carefully, and there was further negotiation

11   over those where we asked them questions about that.  And I

12   don't want to get into mediation privilege or negotiation

13   except to note that that is all in the record before this Court

14   and it distinguishes this case quite a bit.

15      So, again, it seems that objector's argument is anytime

16   you have a request that follows a negotiation, unless we're

17   before you actually arguing and contesting the fee, which very

18   much defeats the entire purpose of a negotiated settlement if

19   the parties are going to reserve for themselves continued

20   litigation, there's no authority for that proposition.  And so

21   that all occurred.

22      But, again, the agreement here is that Your Honor will

23   determine the fee and Your Honor alone, not the parties.  And

24   that's an analysis that the Court has to perform under binding

25   precedent.

1          **THE COURT:**  Okay.

2          **MR. CHAMBERLAIN:**  Can I respond to just one point on

3     that?

4          My understanding of clear sailing agreement is an

5     agreement that defendant agrees not to contest a fee award at a

6     hearing.  And I'm pretty sure there was an agreement not to

7     argue in front of you for a reduced fee.

8          And the problem with a clear sailing agreement is it's

9     something that plaintiffs generally extract from defendants in

10    exchange for consideration elsewhere.  That discussion is in

11    our briefs.  But clear sailing is more something to consider in

12    the context of settlement fairness because what the cases

13    suggest, especially *Bluetooth*, that it's part of how a

14    settlement can be unfair.

15         It's not per se unreasonable, as defendant's counsel

16    notes, but it's something that goes to settlement fairness.

17         **THE COURT:**  Okay.  All right.  Thank you.

18         Is there anyone else in the courtroom who wishes to be

19    heard on this settlement?

20         All right.  Taking them separately, with regard to the

21    actual terms of the settlement agreement, given that I denied

22    class certification of a monetary class, the only relief being

23    sought were the kind of changes in the disclosures that were

24    ultimately agreed upon in the case.

25         I find the settlement is fair, adequate, and reasonable

1   for what was left in the case to litigate after the many rounds

2   of motions that I've entertained in this case.

3       With regard to the request for fees, as I indicated, I

4   normally when it's purely lodestar do require more than the

5   summary declarations, although they were fairly comprehensive

6   in breaking out the category of tasks that were being

7   performed.  The more than 50 percent reduction, I think, is

8   sufficient, in my view, to overcome any deficiencies with

9   regard to the adequacy of the showing.

10      And I have to say, having presided over this case for

11  three years, three-plus years, having listened to many of the

12  arguments, having an understanding as to how complicated the

13  technology involved was, I think that this is a good result for

14  the class.  I think that counsel earned the fees.  They would

15  not have -- the class wouldn't get the benefit that you

16  determined to be valueless.

17      I disagree.  I think that the settlement does have value

18  and it wouldn't have come about but for the efforts of

19  plaintiffs' counsel.  They were up against formidable opponents

20  who fought every step of the way.  And, ultimately, it's in the

21  class' best interest that the matter settled.

22      Had the matter proceeded to trial, I mean, they very well

23  could have got nothing, including the injunctive relief that

24  was ultimately agreed upon in the case.  So it's not a close

25  question, in my view.

1    I appreciate the arguments you advanced today, and I'll

2  issue a supplement to the proposed orders distinguishing the

3  cases because I -- I don't agree with your characterization of

4  the cases as they apply here.

5    There are two main distinguishing factors, in my view, one

6  having to do with the fact that this was an injunctive relief

7  class action and not a monetary damages class, and I don't

8  believe there has to be a dollar figure placed on the value of

9  a settlement.

10    So the two big, I think, determining differences with many

11  of the cases that you cited are the difference in the nature of

12  the relief that could be sought and available in this case and

13  the extent of the litigation.  I mean, this case settled a few

14  days before the discovery cut-off date.

15    There was an awful lot of activity.  In fact, this case

16  went much further than almost every other class action I've

17  settled in the past 17 years.  So in terms of the valuation of

18  the effort expended on the part of counsel, it's not a close

19  question to me.

20    So I'm approving.  I'll sign the proposed orders you've

21  submitted.  They don't go quite far enough, so I will file a

22  supplement, particularly with regard to the impact of the cases

23  relied upon by the objector so that the appellate court will

24  have that to review in the event this case goes any further.

25    Anything else?

```
1              MR. BATES:  No, Your Honor.

2              MR. CHORBA:  Just our thanks, Your Honor, for your

3    attention to the case.  Thank you.

4              THE COURT:  All right.  Thank you.

5              MR. CHAMBERLAIN:  Thank you, Your Honor.

6                   (Proceedings adjourned at 9:41 a.m.)

7                             ---o0o---

8

9

10   I certify that the foregoing is a correct transcript from the

11   record of proceedings in the above-entitled matter.

12

13   Dated:  August 23, 2017

14

15   _____

16        Sarah L. Goekler, CSR 13446, RMR, CRR, CCRR

17                   U.S. Court Reporter

18

19

20

21

22

23

24

25
```